# UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**FILED**
U.S. District Court
District of Kansas

OCT 27 2014

Clerk, U.S. District Court
By _____ Deputy Clerk

Ronald A. Baker, David E. Benton Sr., Richard L. Cochran, Robert Fox, Michael P. Gallagher, Harvey Hickman, Billy Ingram, Robert H. Kinzer, Alan Kirk, Michael D. Mellon, Justin Miller, Roy Nalley, Dale Patterson, Eric Patterson, Ramon Cruz Perez, James E. Roberts Jr., James R.Rowray, Billy J. Stanley, Danny Stanley, David Thayer, Michael Eugene Wald,Vance Walters, Travis Williams, and Larry Wright, individually and on behalf of all persons similarly situated

                       Plaintiffs,

          v.

Austin DesLauriers, in his official and individual capacity as retired Clinical Program Director of the Sexual Predator Treatment Program (SPTP), Sean Wagner, in his official and individual capacity as Administrative Program Director of the Sexual Predator Treatment Program (SPTP), Tom Kinlen, in his official and individual capacity as Superintendent of Larned State Hospital (LSH), Shawn Sullivan, in his official and individual capacity as State Budget Director, Kari Bruffet, in her official and individual capacity as Secretary of Kansas Department for Aging and Disability Services (KDADS), Derek Schmidt, in his official and individual capacity as Attorney General of the State of Kansas, and Sam Brownback, in his official and individual capacity as Governor of the State of Kansas,

                       Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Case No. 6:14-cv-01356-SAC-KMH

**COMPLAINT - - CLASS ACTION**

## INTRODUCTION

1.     This class action is brought on behalf of individuals civilly committed to the Kansas Sexual Predator Treatment Program (SPTP) against Defendants for violations of Plaintiffs' constitutional, statutory and common law rights. Plaintiffs seek declaratory and injunctive relief against the Kansas officials who are responsible for the treatment program. These Defendants have consistently and repeatedly failed to provide the minimally adequate treatment required by both federal and state law to justify the indefinite civil commitment of persons who have completed their prison sentences, and would therefore be free men, but for a judicial determination that they suffer from

"mental abnormality or personality disorder" that requires "care and treatment". Defendants have consistently and repeatedly failed to provide treatment decisions which meet "professionally accepted minimum standards". See *Society for Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239, 1248 (2d Cir. 1984). Defendants conduct is both shocking and intolerable, and is a continuing mistreatment of a constitutional stature, in violation of Plaintiffs' constitutional rights pursuant to K.S.A. 60-1501. Defendants prolonged indifference to Plaintiffs' and Class members' constitutional rights is shocking to the conscience. "A petitioner has a viable 60-1501 claim for shocking and intolerable conduct when the government's alleged conduct is so egregious, so outrageous, that it shocks the contemporary conscience." See *Brull v. Kans. Dep't of Soc. & Rehab. Servs.*, 240 P.3d 627; 2010 Kan. App. Unpub. LEXIS 780; *County of Sacramento v. Lewis*, 523 U.S. 833, 847-48, n.8 (1998).

Through local lawsuits and SPTP grievances Plaintiffs and Class members have exhausted all remedies to resolve this issue, without relief. However, See *Stanley v. Sullivan*, 49 Kan. App. 2d 732, 314 P.3d 883, No. 109,388, 2013 Kan. App. LEXIS 98 (December 6, 2013). Plaintiffs and Class members are not required to exhaust administrative remedies, because they are inadequate and serve no adequate purpose. On June 12th, 2014, Plaintiffs and Class members appealed their grievance all the way to the Administrative Program Director (APD). Unfortunately, Ben Ramsey had already vacated the position. As of June 12th, 2014, the program only had an acting APD, Cory Turner. As a result, on July 17th, 2014 Unit Leader Linda Kidd was designated to answer the grievance. Incidentally, per SPTP policy, the deadline to answer and return the grievance to the Plaintiffs and Class members was July 15th, 2014. On July 21st, 2014, Linda Kidd came to Dillon Annex to visit Class member Randall Ritchie, who had submitted the grievance. She acknowledged the answer was late and apologized for not giving the grievance an adequate answer. She admitted to Class member Ritchie that she was not qualified to have answered the grievance and that her answer to the grievance was not her words, but she was instructed what she must say on paper. She told Class member Ritchie that she did not feel good about the inadequate answer, that she understood why he filed the grievance and that she believed in his motivation for change. The actual answer to the grievance was not returned to Class member Ritchie until Wednesday, July 23rd, 2014. The following is the response that Linda Kidd was instructed to give (notice the answer is inadequate, arrogant, and sarcastic): "SPTP residents will be informed of any changes in the program before those changes take effect. However, residents are not entitled to be informed regarding any considered revisions to the manner in which SPTP provides treatment to sexually violent predators. As such, the Grievance Officer's response was appropriate. I apologize for the lateness." See *Exhibit W, Grievance of the Kansas Sexually Violent Predator Act as Applied*. Note,

2

this answer is in direct violation of K.S.A. § 59-29a22(b) "Each patient shall have the following rights: (3) A right to receive prompt and adequate treatment, rehabilitation and educational services appropriate for such patient's condition, within the limits of available state and federal funds. (4) Have the right to be informed of such patient's treatment and care and to participate in the planning of such treatment and care."

    2.    Plaintiffs bring this action, individually and on behalf of all persons similarly situated: (a) pursuant to 28 U.S.C. § 1983 and other statutes; (b) pursuant to 42 U.S.C. § 1983 for violations of the substantive due process guarantee of the Fourteenth Amendment to the United States Constitution; (c) pursuant to 28 U.S.C. § 1983 for violations of the First Amendment to the United States Constitution; (d) pursuant to 42 U.S.C. § 1983 for violations of the Fourth Amendment to the United States Constitution; (e) pursuant to 42 U.S.C. § 1983 for violations of the Fifth Amendment to the United States Constitution; (f) pursuant to 42 U.S.C. § 1983 for violations of the Sixth Amendment to the United States Constitution; (g) pursuant to 42 U.S.C. § 1983 for violations of the Eighth Amendment to the United States Constitution; (h) pursuant to 42 U.S.C. § 1983 for violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132; (i) pursuant to 42 U.S.C. § 1983 for violations of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; (j) for violations of the right to receive prompt and adequate treatment, rehabilitation and educational services appropriate for such patient's condition, pursuant to K.S.A. § 59-29a22(b)(3), and the Fourteenth Amendment Due Process Clause of the United States Constitution which requires officials to provide civilly committed persons, such as these Plaintiffs, with access to mental health treatment that gives them a realistic opportunity to be cured or to improve the mental condition for which they were confined. See *Turay v. Seling*, 108 F. Supp. 2d 1148 [The Turay Standards]; *Youngberg v. Romeo*, 457 U.S. 307, 319-22, 73 L. Ed.2d 28, 102 S. Ct. 2452 (1982); *Ohlinger v. Watson*, 652 F.2d at 778-79. The *Youngberg* constitutional standard "determines whether a particular decision has substantially met professionally accepted minimum standards." See *Society for Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239, 1248 (2d Cir. 1984); (k) for violating the Plaintiff's Fourteenth Amendment right to be placed in the least restrictive setting. See *Fourteenth Amendment to the United States Constitution, Turay v. Seling*, 108 F. Supp. 2d 1148 [The Turay Standards], and *Davis v. Watkins*, 384 F. Supp. 1196. These Plaintiffs, and others involuntarily confined through civil proceedings, cannot simply be warehoused and put out of sight, they must be afforded adequate treatment. Although confined, they are not prisoners. They are entitled by law to "more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." See *Youngberg*, 457 U.S. At 322; (l) for violating

3

.

the Plaintiff's right of treatment in the most humane psychological and physical environment. See *Davis v. Watkins*, 384 F. Supp. 1196; K.S.A. 59-29a22(b)(9); and (m) for violations of the rights of civilly committed persons under 29 U.S.C. § 794, K.S.A. § 59-29a07, K.S.A. § 59-29a22, K.S.A. § 59-2983, and K.S.A. § 39-1603.

## NATURE OF THE ACTION

3.      Plaintiffs bring this action on behalf of themselves and Class members alleging violations of their constitutional statutory and common law rights. Plaintiffs challenge the Kansas Sexual Predator Treatment Program as unconstitutional. Specifically, Plaintiffs allege that the Defendants, in their official capacities, and where applicable, in their individual capacities, have failed and refused to provide Plaintiffs and Class members of the SPTP with adequate treatment to address the mental abnormalities and/or personality disorders that caused them to be committed (or confined pending commitment) thus depriving them of a realistic opportunity to reintegrate into society. Among other things:

a.      Defendants have failed and refused to provide Plaintiffs and Class members of the SPTP with prompt and adequate treatment, rehabilitation and educational services in violation of the Fourteenth Amendment to the United States Constitution, K.S.A. § 59-29a22(b)(3), *Turay v. Seling*, 108 F. Supp. 2d 1148 [The Turay Standards], *Youngberg v. Romeo*, 457 U.S. 307, 319-22, 73 L. Ed. 2d 28, 102 S. Ct. 2452 (1982), *Ohlinger v. Watson*, 652 F. 2d 775, 778 (9th Cir. 1980).

b.      Defendants have failed and refused to provide Plaintiffs and Class members of the SPTP with minimally sufficient group therapy, and have further failed and refused to provide any meaningful individual therapy.

c.      Defendants have failed and refused to staff the SPTP with a sufficient number of trained/ qualified therapists and other mental health professionals to treat the Plaintiffs and Class members, whose numbers continue to grow. Defendants have failed and refused to train therapists to provide the specific/adequate group and individual therapy for which they are supposed to provide Plaintiffs and Class members.

d.      Defendants have failed and refused to provide for qualified educational counselors, with a major in the area in which they are teaching, specifically trained for each specific class/subject for which they are teaching. Defendants have failed and refused to provide for the continuing education and training of the existing SPTP clinical staff, such that what therapy the Plaintiffs and Class members receive is often administered by poorly trained and/or incompetent clinicians.

e.      Defendants have failed and refused to explain adequately to Plaintiffs and Class

4

members the standards and criteria used to evaluate their progress through the treatment program and their readiness for conditional discharge.

  f.  Defendants have failed and refused to provide Plaintiffs and Class members with timely and accurate feedback concerning their treatment progress, their goals for future treatment, and their prognosis for future advancement through the program.

  g.  Defendants have failed and refused to provide Plaintiffs and Class members with an adequate internal complaint system or other mechanism (short of formal legal proceedings) to *effectively* communicate complaints (that will not be ignored, inadequately handled, or used to intentionally retaliate or discriminate against the Plaintiff or Class member) concerning their mental health treatment.

  h.  Defendants have failed and refused to comply with their own internal management policies and procedures, many of which are outdated and some of which they simply ignore without bothering to revise, policies are changed to fulfill the individual desires of the administration, and rules change every day or per shift to fulfill the individual desires of the staff.

  i.  Defendants have failed and refused to assist the Plaintiffs and Class members with meaningful discharge planning, notwithstanding their acknowledged legal obligation to do so, thus reducing the chances for Plaintiffs and Class members to obtain conditional release even if they are able to progress successfully through the treatment program.

  j.  Defendants have failed and refused to provide minimally adequate job training, job opportunities, and educational opportunities within the SPTP, further reducing the chances that Plaintiffs and Class members will ever be able to reintegrate into society, regardless of their mental condition.

  k.  Kansas Sexual Predator Treatment Program is egregiously over-restrictive and impermissibly punitive. See *Fournier v. Corzine*, 2007 U.S. Dist. LEXIS 54110. Defendants have denied Plaintiffs and Class members the right to be free from punishment, neglect, or abuse, the right to be free from physical restraint and seclusion, and the right to be free from medication used as punishment, in violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution, *Davis v. Watkins*, 384 F. Supp. 1196, *Turay v. Seling*, 108 F. Supp. 2d 1148 [The Turay Standards], and K.S.A. § 59-29a22(b)(6).

  l.  Defendants have denied Plaintiffs and Class members the least restrictive alternative confinement in violation of the Fourteenth Amendment to the United States Constitution, and *Davis v. Watkins*, 384 F. Supp. 1196. Defendants have failed to explore options other than lifetime civil

commitment and thus, have created an "oppressive discrimination, counter-productive and un-therapeutic environment." See *Fournier v. Corzine*, 2007 U.S. Dist. LEXIS 54110.

m.       Defendants have denied Plaintiffs and Class members the right to be free from inhumane treatment in violation of the Fourteenth Amendment to the United States Constitution.

n.       Defendants have denied Plaintiffs and Class members the right to religion and religious freedom in violation of the First and Fourteenth amendments to the United States Constitution and K.S.A. § 59-29a22(b)(8).

o.       Defendants have unreasonably restricted the First Amendment rights of free speech and association of Plaintiffs and Class members in violation of the United States Constitution.

p.       Defendants have implemented unreasonable searches and seizures upon Plaintiffs and Class members in violation of the Fourth Amendment to the United States Constitution.

q.       Defendants have invaded the privacy of Plaintiffs and Class members in violation of the Fourth Amendment to the United States Constitution, K.S.A. § 59-29a22(b)(13) and K.S.A. § 59-29a22(b)(19).

r.       Defendants have failed and refused to provide Plaintiffs and Class members with a current examination of the person's mental condition made once every year in violation of K.S.A. § 59-29a08.

s.       Defendants have failed and refused to provide Plaintiffs and Class members with a· realistic opportunity to progress through the program or improve enough to return to society in violation of K.S.A. § 59-29a22(b)(3), and the Fourteenth Amendment Due Process Clause of the United States Constitution.

t.       Defendants have failed and refused to provide Plaintiffs and Class members with an unrestricted right to visitation in violation of *Davis v. Watkins*, 384 F. Supp. 1196, *Turay v. Seling*, 108 F. Supp. 2d 1148 [The Turay Standards], and K.S.A. § 59-29a22(b)(20).

u.       Defendants have failed and refused to provide adequate, competent staff, that is supervised by a mental health professional in violation of *Turay v. Seling*, 108 F. Supp. 2d 1148 [The Turay Standards].

v.       Defendants have failed and refused to provide the sufficient office space on each unit to house the necessary qualified mental health professionals in violation of *Davis v. Watkins*, 384 F. Supp. 1196.

w.       Defendants have failed and refused to provide a routine maintenance and repair program in violation of *Davis v. Watkins*, 384 F. Supp. 1196, and K.S.A. § 59-29a22(b)(9).

6

x.      Defendants have failed and refused to provide Plaintiffs and Class members with proper medical treatment in violation of *Davis v. Watkins*, 384 F. Supp. 1196, *Turay v. Seling*, 108 F. Supp. 2d 1148 [The Turay Standards], and K.S.A. § 59-29a22(b)(3).

y.      The Kansas Sexually Violent Predator Act (KSVPA) pursuant to K.S.A. § 59-29a01 through K.S.A. § 59-29a24 is over broad and vague. It does not define "personality disorder" and the definition for "mental abnormality" is too over broad and vague. Plaintiffs and Class members have been found to be Sexually Violent Predators based on hearsay from police reports, allegations of sex crimes for which they have been acquitted or never charged with, and evidence gathered against them while in Kansas Department of Corrections (KDOC) Sex Offender Treatment Program (SOTP). In violation of the right to be confronted with the witnesses against him Clause of the Sixth Amendment to the United States Constitution. See *Fournier v. Corzine*, 2007 U.S. Dist. LEXIS 54110.

z.      The Kansas Sexually Violent Predator Act (KSVPA) pursuant to K.S.A. § 59-29a01 through K.S.A. § 59-29a24 violates the Ex Post Facto, Double Jeopardy, and Privilege Against Self-Incrimination Due Process Clause of the Fifth Amendment to the United States Constitution, § 10 of the Kansas Constitution, and K.S.A. § 59-29a09 itself, "The involuntary detention or commitment of persons under this act shall conform to constitutional requirements for care and treatment." The Fifth Amendment Due Process Clause states the right that no person "shall be compelled in any criminal case to be a witness against himself." The Self-Incrimination Clause applies to the States through the Fourteenth Amendment to the United States Constitution.

4.      Plaintiffs seek injunctive relief for these constitutional, statutory, and common law violations on behalf of themselves and Class members. Plaintiffs also seek actual and/or nominal damages based on the Defendants' actions and omissions in their individual capacity to violate Plaintiffs' Constitutional, statutory, and common law rights.

## JURISDICTION AND VENUE

5.      This action is authorized under 28 U.S.C. § 1983 and 42 U.S.C. § 1983 for declaratory and injunctive relief against the Defendants in their official and individual capacities. The Court has subject matter jurisdiction over Plaintiffs' and Class members' federal claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § § 1343(a)(3) and (a)(4). The Court may exercise supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a). Venue in this Court is pro per pursuant to 28 U.S.C. § 1391(b) because the acts and omissions giving rise to these claims occurred in the State of Kansas and the Defendants all reside in the State of Kansas.

7

## DECLARATORY AND INJUNCTIVE RELIEF

6.      This Court has authority to grant declaratory relief pursuant to 28 U.S.C. § 2201 and injunctive and other necessary and proper relief pursuant to 28 U.S.C. § 2202.

## THE PARTIES

7.      Plaintiff Ronald A. Baker was involuntarily civilly committed to the Kansas Sexual Predator Treatment Program (SPTP) April 15th, 2003. Plaintiff Baker has now been civilly confined for eleven and a half (11 ½) years. He remains in the care and custody of the Kansas Department for Aging and Disability Services for an indeterminate period of time. He has been and continues to be injured by the shocking and intolerable acts and omissions of the Defendants.

8.      Plaintiff David E. Benton Senior was involuntarily civilly committed to the Kansas Sexual Predator Treatment Program (SPTP) June 10th, 2009. Plaintiff Benton has now been civilly confined for five (5) years. He remains in the care and custody of the Kansas Department for Aging and Disability Services for an indeterminate period of time. He has been and continues to be injured by the shocking and intolerable acts and omissions of the Defendants.

9.      Plaintiff Richard L. Cochran was involuntarily civilly committed to the Kansas Sexual Predator Treatment Program (SPTP) February 19th, 2003. Plaintiff Cochran has now been civilly confined for eleven and a half (11 ½) years. He remains in the care and custody of the Kansas Department for Aging and Disability Services for an indeterminate period of time. He has been and continues to be injured by the shocking and intolerable acts and omissions of the Defendants.

10.     Plaintiff Robert Fox was involuntarily civilly committed to the Kansas Sexual Predator Treatment Program (SPTP) July 19th, 2004. Plaintiff Fox has now been civilly confined for ten (10) years. He remains in the care and custody of the Kansas Department for Aging and Disability Services for an indeterminate period of time. He has been and continues to be injured by the shocking and intolerable acts and omissions of the Defendants.

11.     Plaintiff Michael P. Gallagher was involuntarily civilly committed to the Kansas Sexual Predator Treatment Program (SPTP) January 12th, 2011. Plaintiff Gallagher has now been civilly confined for three and a half (3 ½) years. He remains in the care and custody of the Kansas Department for Aging and Disability Services for an indeterminate period of time. He has been and continues to be injured by the shocking and intolerable acts and omissions of the Defendants.

12.     Plaintiff Harvey Hickman was involuntarily civilly committed to the Kansas Sexual Predator Treatment Program (SPTP) March 15th, 2003. Plaintiff Hickman has now been civilly confined for eleven and a half (11 ½) years. He remains in the care and custody of the Kansas

Department for Aging and Disability Services for an indeterminate period of time. He has been and continues to be injured by the shocking and intolerable acts and omissions of the Defendants.

13.    Plaintiff Billy Ingram was involuntarily civilly committed to the Kansas Sexual Predator Treatment Program (SPTP) October 2nd, 2007. Plaintiff Ingram has now been civilly confined for six (6) years. He remains in the care and custody of the Kansas Department for Aging and Disability Services for an indeterminate period of time. He has been and continues to be injured by the shocking and intolerable acts and omissions of the Defendants.

14.    Plaintiff Robert H. Kinzer was involuntarily civilly committed to the Kansas Sexual Predator Treatment Program (SPTP) May 30th, 2007. Plaintiff Kinzer has now been civilly confined for seven (7) years. He remains in the care and custody of the Kansas Department for Aging and Disability Services for an indeterminate period of time. He has been and continues to be injured by the shocking and intolerable acts and omissions of the Defendants.

15.    Plaintiff Alan Kirk was involuntarily civilly committed to the Kansas Sexual Predator Treatment Program (SPTP) January 23rd, 2002. Plaintiff Kirk has now been civilly confined for twelve and a half (12 ½) years. He remains in the care and custody of the Kansas Department for Aging and Disability Services for an indeterminate period of time. He has been and continues to be injured by the shocking and intolerable acts and omissions of the Defendants.

16.    Plaintiff Michael D. Mellon was involuntarily civilly committed to the Kansas Sexual Predator Treatment Program (SPTP) June 17th, 2003. Plaintiff Mellon has now been civilly confined for eleven (11) years. He remains in the care and custody of the Kansas Department for Aging and Disability Services for an indeterminate period of time. He has been and continues to be injured by the shocking and intolerable acts and omissions of the Defendants.

17.    Plaintiff Justin Miller was involuntarily civilly committed to the Kansas Sexual Predator Treatment Program (SPTP) October 9th, 2007. Plaintiff Miller has now been civilly confined for six years and eleven months (6) years (11) months. He remains in the care and custody of the Kansas Department for Aging and Disability Services for an indeterminate period of time. He has been and continues to be injured by the shocking and intolerable acts and omissions of the Defendants.

18.    Plaintiff Roy Nalley was involuntarily civilly committed to the Kansas Sexual Predator Treatment Program (SPTP) October 16th, 2002. Plaintiff Nalley has now been civilly confined for eleven years and eleven months (11) years (11) months. He remains in the care and custody of the Kansas Department for Aging and Disability Services for an indeterminate period of time. He has been and continues to be injured by the shocking and intolerable acts and omissions of the Defendants.

19.     Plaintiff Dale Patterson was involuntarily civilly committed to the Kansas Sexual Predator Treatment Program (SPTP) November 21st, 2011. Plaintiff Patterson has now been civilly confined for two years and ten months (2) years (10) months. He remains in the care and custody of the Kansas Department for Aging and Disability Services for an indeterminate period of time. He has been and continues to be injured by the shocking and intolerable acts and omissions of the Defendants.

20.     Plaintiff Eric Patterson was involuntarily civilly committed to the Kansas Sexual Predator Treatment Program (SPTP) December 20th, 2004. Plaintiff Patterson has now been civilly confined for ten (10) years. He remains in the care and custody of the Kansas Department for Aging and Disability Services for an indeterminate period of time. He has been and continues to be injured by the shocking and intolerable acts and omissions of the Defendants.

21.     Plaintiff Ramon Cruz Perez was involuntarily civilly committed to the Kansas Sexual Predator Treatment Program (SPTP) March 24th, 1999. Plaintiff Perez has now been civilly confined for fifteen and a half (15 ½) years. He remains in the care and custody of the Kansas Department for Aging and Disability Services for an indeterminate period of time. He has been and continues to be injured by the shocking and intolerable acts and omissions of the Defendants.

22.     Plaintiff James E. Roberts Junior was involuntarily civilly committed to the Kansas Sexual Predator Treatment Program (SPTP) November 2nd, 2005. Plaintiff Roberts has now been civilly confined for eight years and ten months (8) years (10) months. He remains in the care and custody of the Kansas Department for Aging and Disability Services for an indeterminate period of time. He has been and continues to be injured by the shocking and intolerable acts and omissions of the Defendants.

23.     Plaintiff James R. Rowray was involuntarily civilly committed to the Kansas Sexual Predator Treatment Program (SPTP) April 12th, 2012. Plaintiff Rowray has now been civilly confined for two and a half (2 ½) years. He remains in the care and custody of the Kansas Department for Aging and Disability Services for an indeterminate period of time. He has been and continues to be injured by the shocking and intolerable acts and omissions of the Defendants.

24.     Plaintiff Billy J. Stanley was involuntarily civilly committed to the Kansas Sexual Predator Treatment Program (SPTP) August 26th, 1999. Plaintiff Stanley has now been civilly confined for fifteen (15) years. He remains in the care and custody of the Kansas Department for Aging and Disability Services for an indeterminate period of time. He has been and continues to be injured by the shocking and intolerable acts and omissions of the Defendants.

25.     Plaintiff Danny Stanley was involuntarily civilly committed to the Kansas Sexual

10

Predator Treatment Program (SPTP) January 29ᵗʰ, 2008. Plaintiff Stanley has now been civilly confined for six and a half (6 ½) years. He remains in the care and custody of the Kansas Department for Aging and Disability Services for an indeterminate period of time. He has been and continues to be injured by the shocking and intolerable acts and omissions of the Defendants.

26.     Plaintiff David Thayer was involuntarily civilly committed to the Kansas Sexual Predator Treatment Program (SPTP) January 16ᵗʰ, 2001. Plaintiff Thayer has now been civilly confined for thirteen and a half (13 ½) years. He remains in the care and custody of the Kansas Department for Aging and Disability Services for an indeterminate period of time. He has been and continues to be injured by the shocking and intolerable acts and omissions of the Defendants.

27.     Plaintiff Michael Unruh was involuntarily civilly committed to the Kansas Sexual Predator Treatment Program (SPTP) November 23ʳᵈ, 2009. Plaintiff Unruh has now been civilly confined for four years and ten months (4) years (10) months. He remains in the care and custody of the Kansas Department for Aging and Disability Services for an indeterminate period of time. He has been and continues to be injured by the shocking and intolerable acts and omissions of the Defendants.

28.     Plaintiff William Eugene Wald was involuntarily civilly committed to the Kansas Sexual Predator Treatment Program (SPTP) August 7ᵗʰ, 2008. Plaintiff Wald has now been civilly confined for six (6) years. He remains in the care and custody of the Kansas Department for Aging and Disability Services for an indeterminate period of time. He has been and continues to be injured by the shocking and intolerable acts and omissions of the Defendants.

29.     Plaintiff Vance Walters was involuntarily civilly committed to the Kansas Sexual Predator Treatment Program (SPTP) June 22ⁿᵈ, 2002. Plaintiff Walters has now been civilly confined for twelve (12) years. He remains in the care and custody of the Kansas Department for Aging and Disability Services for an indeterminate period of time. He has been and continues to be injured by the shocking and intolerable acts and omissions of the Defendants.

30.     Plaintiff Travis Williams was involuntarily civilly committed to the Kansas Sexual Predator Treatment Program (SPTP) August 26ᵗʰ, 2003. Plaintiff Williams has now been civilly confined for eleven (11) years. He remains in the care and custody of the Kansas Department for Aging and Disability Services for an indeterminate period of time. He has been and continues to be injured by the shocking and intolerable acts and omissions of the Defendants.

31.     Plaintiff Larry E. Wright was involuntarily civilly committed to the Kansas Sexual Predator Treatment Program (SPTP) August 8ᵗʰ, 2013. Plaintiff Wright has now been civilly confined for one (1) year. He remains in the care and custody of the Kansas Department for Aging and

11

Disability Services for an indeterminate period of time. He has been and continues to be injured by the shocking and intolerable acts and omissions of the Defendants.

## DEFENDANTS

32.    Defendant Austin DesLauriers is the retired Clinical Program Director of the Sexual Predator Treatment Program (SPTP). Defendant DesLauriers in his individual and official capacity, is responsible for developing and administering the treatment program at Larned State Hospital (LSH), recruiting, training, and supervising the treatment staff, and providing adequate mental health treatment to each Plaintiff and Class member in an appropriately therapeutic environment. He is also responsible for developing and maintaining written policies and procedures for the clinical operation of the treatment program. Defendant DesLauriers, in his individual and official capacity, implemented, retained and carried out policies through the SPTP that violated the constitutional, statutory, and common law rights of Plaintiffs and Class members. Defendant DesLauriers is sued in his official and individual capacity.

33.    Defendant Sean Wagner is the Administrative Program Director of the SPTP. Defendant Wagner, in his individual and official capacity, is responsible for developing and administering the treatment program at LSH, recruiting, training, and supervising administrative treatment, medical, security, and all other staff, providing adequate mental health treatment to each Plaintiff and Class member in an appropriately therapeutic environment, and developing and maintaining written policies and procedures for the administrative operation of the treatment program. Defendant Wagner, in his individual and official capacity, implemented, retained and carried out policies through the SPTP that violated the constitutional, statutory, and common law rights of Plaintiffs and Class members. Defendant Wagner is sued in his individual and official capacity.

34.    Defendant Tom Kinlen is the Superintendent of LSH. Defendant Kinlen, in his individual and official capacity, is responsible for administering all treatment programs at the LSH, recruiting, training, and supervising all staff at LSH, and providing adequate mental health treatment to each Plaintiff and Class member in an appropriately therapeutic environment. He is also responsible for developing and maintaining written policies and procedures for the administrative operation of LSH, and therefore, the SPTP. Defendant Kinlen, in his individual and official capacity, implemented, retained and carried out policies through the SPTP that violated the constitutional, statutory, and common law rights of Plaintiffs and Class members. Defendant Kinlen is sued in his individual and official capacity.

35.    Defendant Shawn Sullivan is the State Budget Director for the State of Kansas.

12

Defendant Sullivan has been given the responsibility for, through Governor Sam Brownback, among other things, operating the SPTP, for formulating, promulgating and enforcing regulations governing the rights of and rules of conduct for Plaintiffs and Class members of the SPTP, overseeing the recruitment, training, and supervision of the treatment staff, and ensuring that each Plaintiff and Class member receives adequate mental health treatment in an appropriately therapeutic environment. Defendant Sullivan, in his individual and official capacity, implemented, retained and carried out policies through the SPTP that violated the constitutional, statutory, and common law rights of Plaintiffs and Class members. Defendant Sullivan is sued in his individual and official capacity.

36.     Defendant Kari Bruffett, is the Secretary of the Kansas Department for Aging and Disability Services (KDADS). KDADS together with the Attorney General is required by statute and by regulation to provide treatment for all persons committed by the Kansas Sexually Violent Predator Act (KSVPA), is responsible for operating the SPTP, for formulating, promulgating and enforcing regulations governing the rights of and rules of conduct for Plaintiffs and Class members of the SPTP. Pursuant to K.S.A. § 59-29a09, "The involuntary detention or commitment of persons under this Act shall conform to constitutional requirements for care and treatment." Pursuant to K.S.A. § 59-29a22(1) "'Patient" means any individual: (A) Who is receiving services for mental illness and who is admitted, detained, committed, transferred or placed in the custody of the Secretary," (b) "Each patient shall have the following rights": (b)(3) "A right to receive prompt and adequate treatment, rehabilitation and educational services appropriate for such patient's condition," (b)(4) "Have the right to be informed of such patient's treatment and care and to participate in the planning of such treatment and care," (b)(9) "A right to a humane psychological and physical environment within the hospital facilities shall be designed to afford patients with comfort and safety, to promote dignity and ensure privacy. Facilities shall also be designed to make a positive contribution to the effective attainment of the treatment goals of the hospital," (b)(13) "The right to be treated with respect and recognition of the patient's dignity and individuality by all employees of the treatment facility," (d) "The department (for Aging and Disability Services) shall establish procedures to assure protection of patient's rights guaranteed under this section."' The Secretary of KDADS is responsible for, among other things, overseeing the recruitment, training, and supervision of the treatment staff, and ensuring that each Plaintiff and Class member receives adequate mental health treatment in an appropriately therapeutic environment. Defendant Bruffett, in her individual and official capacity, implemented, retained and carried out policies through the SPTP that violated the constitutional, statutory, and common law rights of Plaintiffs and Class members. Defendant Bruffett is sued in her individual and official capacity.

37.     Defendant Derek Schmidt is the Attorney General of the State of Kansas and is responsible for commencing civil commitment proceedings under the Kansas Sexually Violent Predator Act (KSVPA), "may file a petition in the county where the person was convicted of or charged with a sexually violent offense alleging that the person is a sexually violent predator and stating sufficient facts to support such allegation," K.S.A. § 59-29a04(a), and for the continued enforcement of the Act. Defendant Schmidt, in his individual and official capacity, implemented, retained and carried out policies through the KSVPA and SPTP that violated the constitutional, statutory, and common law rights of Plaintiffs and Class members. Defendant Schmidt is sued in his individual and official capacity.

38.     Defendant Sam Brownback is the Governor of the State of Kansas and is responsible for the continued enforcement of the KSVPA. Defendant Brownback, in his individual and official capacity, implemented, retained and carried out policies through the KSVPA that violated the constitutional, statutory, and common law rights of Plaintiffs and Class members. Defendant Brownback is sued in his individual and official capacity.

39.     In all respects material to this action, all Defendants acted under the color of law and under the color of their authority as officers and employees of the State of Kansas, KDADS, LSH, and/or SPTP.

40.     In all respects material to this action, all Defendants acted within the scope of their employment with the State of Kansas, KDADS, LSH, and/or SPTP, but exceeded the legitimate scope of their individual and official capacity.

## CLASS ACTION ALLEGATIONS

41.     Plaintiffs bring this class action on behalf of themselves and the Class members pursuant to Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure seeking equitable and injunctive relief on behalf of the following Class ("Injunctive Class"): All residents who are civilly committed or confined pending commitment to the SPTP pursuant to the Kansas Sexually Violent Predator Act (KSVPA). K.S.A. § 59-29a01 through K.S.A. § 59-29a24.

42.     The Class satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because, as set forth herein, Defendants have acted and/or refused to act on grounds generally applicable to Plaintiffs and Class members, thereby warranting appropriate injunctive and/or declaratory relief with respect to the Class as a whole.

43.     Plaintiffs also bring this action on behalf of themselves and the Class members pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking actual or nominal damages

14

for the constitutional, statutory, and common law claims on behalf of the following Class ("Damages Class").

All Plaintiffs and Class members who are civilly committed to the SPTP pursuant to the KSVPA who have sustained actual or nominal damages through the actions and omissions of Defendants.

44.     The Class consists of two hundred and thirty two (232) individuals now housed at the LSH SPTP in Larned, Kansas, eight (8) individuals now housed at the MiCo House (Transition House) on the campus of Osawatomie State Hospital, and one (1) individual now housed at the (Transition House) on the campus of Parsons State Hospital.

45.     Material questions of law and fact are common to all Class members, including whether Defendants violated Plaintiff's rights under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, the Americans With Disabilities Act, the Rehabilitation Act, the Kansas Constitution, and 29 U.S.C. § 794, K.S.A. § 59-29a07, K.S.A. § 59-29a09, K.S.A. § 59-29a22, and K.S.A. § 39-1603. Such questions of law and fact common to the Class members include, but are not limited to:

a. Whether Defendants violated Plaintiff's and Class member's Due Process rights protected by the Fourteenth Amendment to the United States Constitution in the following ways:
   i. by violating Plaintiff's and Class member's rights to such that denies access to mental health treatment that gives them a realistic opportunity to be cured or to improve the mental condition for which they were confined, thus depriving them of a realistic opportunity to progress through the program or improve enough to reintegrate into society.
   ii. by failing to provide the least restrictive setting;
   iii. by creating an unnecessarily punitive environment;
   iv. by violating the Plaintiff's and Class member's right to treatment in the most humane psychological and physical environment;
   v. by failing and refusing to provide Plaintiffs and Class members with prompt and adequate treatment, rehabilitation and educational services appropriate for such Plaintiff's and Class member's condition;
   vi. by denying Plaintiffs and Class members the right to be free from punishment, neglect, or abuse, the right to be free from physical restraint and seclusion, and the right to be free from medication usage as punishment;
   vii. by denying Plaintiffs and Class members the right to be free from inhumane treatment; and
   viii. by denying Plaintiffs and Class members the right to religion and religious freedom;

15

b. Whether Kansas civil commitment laws are constitutional as applied to Plaintiffs and Class members;

c. Whether Defendants violated the court ordered treatment of Plaintiffs and Class members;

d. Whether Defendants' failure to satisfy their obligations to Plaintiffs and Class members court ordered treatment constitutes contempt of court;

e. Whether Defendants have failed and refused to provide Plaintiffs and Class members with minimally sufficient group therapy and further failed and refused to provide meaningful individual therapy;

f. Whether Defendants have failed and refused to staff SPTP with a sufficient number of qualified therapists and other mental health professionals to treat the Plaintiffs and Class members, whose numbers continue to grow;

g. Whether Defendants have failed and refused to provide for qualified educational counselors with a major in the area in which they are teaching, specifically trained for each specific class/subject they are teaching. And whether Defendants have failed and refused to provide for the continuing education and training of the existing SPTP clinical staff, such that what therapy the Plaintiffs and Class members receive is often administered by poorly trained and/or incompetent clinicians;

h. Whether Defendants have failed and refused to explain adequately to Plaintiffs and Class members the standards and criteria used to evaluate their progress through the treatment program and their readiness for conditional discharge;

i. Whether Defendants have failed and refused to provide Plaintiffs and Class members with timely and accurate feedback concerning their treatment progress, their goals for future treatment, and their prognosis for future advancement through the program;

j. Whether Defendants have failed and refused to provide Plaintiffs and Class members with an adequate internal complaint system or other mechanism (short of formal legal proceedings) to effectively communicate complaints (that will not be ignored, inadequately handled, or used to intentionally retaliate or discriminate against the Plaintiff or Class member) concerning their mental health treatment;

k. Whether Defendants have failed and refused to comply with their own internal management policies and procedures, many of which are outdated and some of which they simply ignore without bothering to revise, policies change every day or per shift to fulfill the individual desires of staff;

16

l.  Whether Defendants have failed and refused to assist the Plaintiffs and Class members with meaningful discharge planning, notwithstanding their acknowledged legal obligations to do so, thus reducing the chances for Plaintiffs and Class members to obtain conditional release even if they are able to progress successfully through the treatment program;

m. Whether Defendants have failed and refused to provide minimally adequate job training, job opportunities, and educational opportunities within the SPTP further reducing the chances that Plaintiffs and Class members will ever be able to reintegrate into society regardless of their mental health;

n.  Whether Defendants have unreasonably restricted the First Amendment rights of free speech and association of Plaintiffs and Class members in violation of the United States Constitution;

o.  Whether Defendants have implemented unreasonable searches and seizures upon Plaintiffs and Class members in violation of the Fourth Amendment to the United States Constitution;

p.  Whether Defendants have invaded the privacy of Plaintiffs and Class members in violation of the Fourth Amendment to the United States Constitution, K.S.A. § 59-29a22(b)(13) and K.S.A. § 59-29a22(b)(19);

q.  Whether Defendants have failed and refused to provide Plaintiffs and Class members with a current examination of the person's mental condition made once every year in violation of K.S.A. § 59-29a08;

r.  Whether Defendants failed and refused to provide Plaintiffs and Class members with an unrestricted right to visitation in violation of *Davis v. Watkins*, 384 F. Supp. 1196, *Turay v. Seling,* 108 F. Supp. 2D 1148 [The Turay Standards], and K.S.A. § 59-29a22(b)(20);

s.  Whether Defendants have failed and refused to provide adequate competent staff, that is supervised by a mental health professional in violation of *Turay v. Seling*, 108 F. Supp. 2D 1148 [The Turay Standards];

t.  Whether Defendants have failed and refused to provide sufficient office space on each unit to house the necessary qualified mental health professionals in violation of *Davis v. Watkins,* 384 F. Supp. 1196;

u.  Whether Defendants have failed and refused to provide a routine maintenance and repair program in violation of *Davis v. Watkins*, 384 F. Supp. 1196, and K.S.A. § 59-29a22(b)(3);

v.  Whether Defendants have failed and refused to provide Plaintiffs and Class members

17

proper medical treatment in violation of *Davis v. Watkins*, 384 F. Supp. 1196, and K.S.A. § 59-29a22(b)(3);

w. Whether the Kansas Sexual Predator Act pursuant to K.S.A. § 59-29a01 through K.S.A. § 59-29a24 is over broad and vague. It does not define "personality disorder" and the definition for "mental abnormality" is over broad and vague. Plaintiffs and Class members have been found to be Sexually Violent Predators based on hearsay from police reports, allegations of sex crimes for which they have been acquitted, and evidence gathered against them while in the Kansas Department of Corrections (KDOC) Sex Offender Treatment Program (SOTP). In violation of the right to be confronted with the witnesses against him clause of the Sixth Amendment to the United States Constitution;

x. Whether the Kansas Sexual Predator Act (KSVPA) pursuant to K.S.A. § 59-29a01 through K.S.A. § 59-29a24 violates the Ex Post Facto, Double Jeopardy, and Privilege Against Self-Incrimination Due Process Clause of the Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution. The Fifth Amendment Due Process Clause states the right that no person "shall be compelled in any criminal case to be a witness against himself." The Self-Incrimination Clause applies to the States through the Fourteenth Amendment to the United States Constitution.

46.     Plaintiffs' claims are typical of the claims of the entire class. Plaintiffs, like all Class members, claim that Defendants have violated their rights under the United States Constitution, the Americans with Disabilities Act, the Rehabilitation Act, and Kansas law. Plaintiffs and Class members are similarly affected by Defendants' wrongful conduct. All Class members are subject to the same inadequacies of the Sexual Predator Treatment Program.

47.     Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other Class members. Plaintiffs will fairly and adequately protect the interests of the Class members and have no interests antagonistic to those of the class. Plaintiffs move for representation of counsel who are competent and experienced in the prosecution of civil rights and class action litigation.

48.     The question of law and fact common to Class members predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

49.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous

individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially, outweigh any difficulties that may arise in management of this class action.

50.    The prosecution of separate actions by individual Class members as to the issues framed by this complaint would create the risk of inconsistent judgments that could establish incompatible standards of conduct for Defendants, and would frustrate the efforts of this Court in efficiently resolving these claims. In addition, the prosecution of separate actions by individual members of the class as to the issues framed by this Complaint would create a risk of adjudications, or substantially impair or impede their ability to protect their interests.

51.    Proper and sufficient notice of this action may be provided to Class members through actual notice to Plaintiffs at SPTP via direct mail.

52.    Plaintiffs and Class members have suffered harm and actual and/or nominal damages as a result of Defendants' wrongful conduct as alleged herein. Absent representative action, Plaintiffs and Class members will continue to suffer losses, thereby allowing Defendants' violation of law to proceed without remedy.

53.    Plaintiffs and Class members have exhausted their administrative remedies. Plaintiffs and Class members have filed various lawsuits in the Pawnee County District Court, which the Pawnee County District Court did not take seriously. Class member Randall Ritchie filed a grievance with the SPTP administration. See *Exhibit W*. The SPTP administration grievance officer answered the grievance, "Mr. Ritchie thank you for this detailed information and I would like to inform you that several of these avenues are being taken into consideration and looked @ for change. Thank you again for your time and concern. Casey Hoffman 6-12-14." This response was merely an attempt to placate Plaintiffs and Class members, as to date nothing has been done to remedy the grievable claims. Class member Randall Ritchie therefore Appealed the grievance to the Acting Administrative Program Director. See #1.

## FACTUAL ALLEGATIONS

### I. The Civil Commitment Process for Sex Offenders in Kansas

54.    In 1994, long after most Plaintiffs and Class members were criminally convicted and sentenced, the Kansas Legislature enacted the Kansas Sexually Violent Predator Act (KSVPA), K.S.A. § 59-29a01 through K.S.A. § 59-29a24. The Act authorizes the involuntary civil commitment of "sexually violent predators" for an indefinite period of time. A "sexually violent predator," under the

19

Act, is any person who has been convicted of (or in certain cases charged with but not convicted of) a
sexually violent offense and who "suffers from a mental abnormality or personality disorder which
makes the person likely to engage in repeat acts of sexual violence" if not confined to a secure facility
for control, care and treatment. K.S.A. § 59-29a01, K.S.A. § 59-29a02, and K.S.A. § 59-29a07.

55.     Once committed to the SPTP, a person who has been adjudicated a sexually violent
predator remains there until such time as the person's mental abnormality or personality disorder has so
changed that the person is safe to be at large. K.S.A. § 59-29a07(a). In other words, in order to regain
his liberty, the involuntarily committed *ex*-offender must establish that he has been successfully treated
for the mental abnormality or personality disorder that was the basis for his confinement to the SPTP.
But by the letter of the statute, once a person's mental abnormality or personality disorder has so
changed that the person is safe to be at large (he is no longer dangerous), he must be released.

56.     KDADS, through LSH, MiCo House, and Parson's State Hospital, is required to provide
"care and treatment" for the person committed pursuant to the Act. K.S.A. § 59-29a07(a). Such '
treatment must provide "prompt and adequate treatment, rehabilitation and educational services
appropriate for such Plaintiff's condition." K.S.A. § 59-29a22(b)(3). KDADS is also required to
promulgate regulations governing the treatment of Plaintiffs and Class members of the SPTP. Such
regulations must take into consideration the rights of all Kansas SPTP Plaintiffs and Class members
and must provide "adequate care and individualized treatment." *Turay v. Seling*, 108 F. Supp. 2d 1148
[The Turay Standards].

57.     The Kansas Sexually Violent Predator Act (KSVPA) of 1994 created a deeply flawed
program that resulted in numerous public criticism, criticism from mental health advocacy
organizations such as the Kansas Mental Health Coalition, National Alliance for Mental Illness, the
American Psychiatric Association, Mental Health America, Position Statement 55: Confining Sexual
Predators in the Mental Health System - See *Exhibit C*; criticism from the advocacy organization
International CURE (Citizens United for Rehabilitation of Errants) – See *Exhibit D*; criticism from
advocacy organizations such as National Association of Criminal Defense Lawyers and Barbara Moses,
Director of Civil Rights and Constitutional Litigation Clinic of Seton Hall University School of Law
Center for Social Justice – See *Exhibit E*; numerous critical new reports – See *Exhibit F*; criticism from
public officials leading to a critical 2005 Legislative Post Audit Committee Report – See *Exhibit G*; a
critical 2013 Larned State Hospital Fiscal Budget Report – See *Exhibit B*; a critical 2013 Legislative
Post Audit Committee Larned State Hospital Sexual Predator Treatment Program Performance Audit
Report – See *Exhibit H*; and a critical 2013 Governor Behavioral Health Services Planning Council

Special Task Force Report – See *Exhibit I*. In those reports these various organizations have found that Kansas' civil commitment scheme for sex offenders suffers from major problems, including the fact that it is incredibly costly, lacks reasonable less restrictive alternative confinements, and does not provide adequate treatment to those who are committed to the SPTP.

58.     The population of people civilly committed to the SPTP has grown dramatically since the program was started. On October 21, 1994, the first "resident", LeRoy Hendricks was admitted to Jung Building at Larned State Hospital, and then two additional residents were placed there. An interagency agreement was signed between Kansas Department of Social and Rehabilitation Services (SRS) and the Kansas Department of Corrections (KDOC), and with the arrival of the fourth resident on February 15, 1995, the program expanded to units at the Larned Correctional Mental Health Facility (LCMHF). LCMHF is a prison. SPTP residents were held for four (4) years in a prison, restriction unit, with no treatment provided. On October 15, 1999, the program expanded to units at the Larned State Security Hospital (LSSH) and a transition program at Osawatomie State Hospital (OSH). For a short time, the program was moved to the Isaac Ray facility; however, following an extensive renovation, the program returned to the main hospital grounds, utilizing three (3) buildings (Dillon, Meyer, and Jung) on the Larned State Hospital grounds. While Isaac Ray North Three is still utilized as a punishment unit. From 2002 to 2012, the program added an average of about eighteen (18) residents each year. Over that time period, the program has admitted between twelve (12) and twenty nine (29) residents every year – See *Exhibit H*, P. 5. As of Fiscal Year 2013, the program had two hundred forty two (242) residents, with two hundred thirty four (234) residents at Larned State Hospital and eight (8) residents at Osawatomie State Hospital (MiCo Transition House) – See *Exhibit B*, p.691. The budgeted bed capacity for SPTP is one hundred seventy seven (177) at LSH and eight (8) at OSH – See *Exhibit B*, p. 690. The census for the SPTP at LSH as of November 15, 2011 was two hundred twenty nine (229) residents. The habitable bed capacity for the SPTP is one hundred ninety five (195). The agency provides that to date, the population over-census has been managed by the conversion of staff offices to resident rooms and the occupation of modular housing. The modular housing is considered temporary and presents challenges to code compliance and patient management as well as security issues – See *Exhibit B*, p.697. As of June 2013 the modular housing was ordered closed, by order of the Kansas Legislature. SPTP administration was ordered to evacuate the modular housing, referred to as the Annex, by July 2013. SPTP administration has ignored that order. As of September 2014 the Annex still houses over thirty (30) Plaintiffs and Class members. As a result SPTP is fined $30,000.00 per month. The program admits about eighteen (18) new residents each year. Because so

21

few are released, program enrollment is likely to grow well beyond the physical capacity at LSH. Since the program began, only three (3) residents have completed the program and twenty seven (27) have died. Based on assumptions about death rates and program completion rates, we estimate the program could grow to about five hundred (500) residents within the next twenty (20) years – See *Exhibit H*, p. 5.

## A. CIVIL COMMITMENT TO THE SPTP

59.     All civilly committed sex offenders are indefinitely committed to the SPTP, which is a treatment program with secure facilities at Larned State Hospital (LSH) in Larned, Kansas, MiCo Transition House at Osawatomie State Hospital (OSH) in Osawatomie, Kansas, and a Transition House at Parsons State Hospital (PSH). The LSH facility houses Plaintiffs and Class members in the first five phases of the treatment program. The OSH and PSH facilities house Plaintiffs and Class members in the sixth and final stage of the program.

## B. SPTP TREATMENT PROGRAM

60.     SPTP is intended to be a treatment facility. All persons civilly committed as SVP enter the SPTP treatment program. Currently, the SPTP does not provide for any less restrictive alternatives to confinement at LSH, OSH, or PSH, such as halfway houses, community based treatment, or other less secure facilities.

61.     Other states, such as Texas, provide such alternatives. In Texas, civilly committed sex offenders are part of an outpatient treatment program in which they are subject to constant supervision, GPS monitoring, and intensive treatment.

62.     Similarly, in Wisconsin, when civilly committed sex offenders progress in treatment to a point where it is substantially probable they will not re-offend, they are placed on supervised release. See Wisconsin's Sexually Violent Person Law, Chapter 980: Supervised Release Program (Jan. 19, 2012), http://www.dhs.state.mn.us/main/groups/agencywide/documents/pub/dhs16_166453.pdf (last visited Feb. 13, 2012).

63.     In New York, civilly committed sex offenders can be immediately place in community based outpatient treatment called Strict and Intensive Supervision and Treatment in which the patient participates in individualized treatment, has monthly meetings with a case officer, and is electronically monitored. See New York Sex Offender Management and Treatment Act: An Overview of NYS Strict and Intensive Supervision and Treatment (SIST) (Jan. 19, 2012) http://www.dhs.state.mn.us/main/groups/agencywide/documents/pub/dhs16_166450.pdf.

64.     Upon entering SPTP, all Plaintiffs and Class members are presented with the dilemma to

22

participate in sex offender treatment or not. "Although admission to the program is involuntary, participation in the program is voluntary. In other words, residents can opt out of treatment. However, residents who decline treatment remain confined to the facility indefinitely. Those who do not participate in treatment will not be released." - See *Exhibit H, 2013 Legislative Post Audit Committee Larned State Hospital Sexual Predator Treatment Program Performance Audit Report*, P. 4. Each Plaintiff and Class member is then supposed to be evaluated and given an individual treatment plan. However, the evaluation consists of a few questions gathered in a fifteen minute interview and a psychology test. No individual treatment plan is given. All Plaintiffs and Class members are given an "orientation" packet of papers that generally describe the program, and are expected to orient themselves and figure out on their own what is expected of them.

65.    Plaintiff's and Class member's inability to make meaningful progress toward discharge is due in substantial part to the treatment shortfalls outlined in this document. Those inadequacies are exacerbated by Defendants' persistent failure to explain adequately to Plaintiffs and Class members the standards and criteria used to evaluate their progress and their readiness for conditional discharge. For example, although the Resident Handbook promises Plaintiffs and Class members that they will receive Comprehensive Integrated Treatment Plan (CITP) reviews every thirty (30) days, used to "communicate a plan of treatment for each individual resident," and "to measure progress toward personal improvement," these "reviews" only take place every ninety (90) days, and are perfunctory and fail to provide accurate feedback concerning their treatment progress, their goals for future treatment, and their prognosis for future advancement through the program. See *Exhibit S, The Sexual Predator Treatment Program of Kansas Resident Handbook*, p. 10.

66.    The SPTP treatment program is divided into seven (7) phases. In Phase 1, referred to as the entry or orientation phase, Plaintiffs and Class members must learn to comply with SPTP rules and learn basic treatment concepts. This phase is typically completed after two (three month) quarters. In Phase 2, referred to as the Core Phase (Basic Core), Plaintiffs and Class members must learn critical concepts to better control sexual impulses and avoid high-risk situations, and discuss and work through their sexual offenses and patterns of sexual abuse. The psycho-educational basic core classes are centered around a twelve (12) month curriculum which emphasizes treatment needs of sex offenders such as: thinking errors, relapse prevention, relationship skills, human sexuality, anger management, and empathy. Plaintiffs and Class members also have related tasks in group sessions which complement the classroom work. This phase can be completed in two (three month) quarters if the Plaintiff or Class member has taken and passed four (4) basic core classes per quarter (total of 16 basic

23

core classes in 12 months). However, according to Class member Randall Ritchie, a college graduate with a master's degree from the Wichita State University, basic core psycho-educational class tests are very difficult, even for him. He has to study very hard to pass the tests, which consist of an unusually high percentage of essay questions. Considering the fact that most Plaintiffs and Class members do not function at the college level, or even the high school level in many cases, often Plaintiffs and Class members do not pass the class the first time they take it. And, since each class is offered only one quarter per year, the Plaintiff or Class member has to wait a full year to take it again. Which means the Plaintiff or Class member cannot advance to Phase 3 for at least a full year longer than it should have taken him. And, while in Phase 2, the Plaintiff or Class member must complete and present a personal self-disclosure, a list of short-term goals, a list of long-term goals, victim disclosure sheets, and a personal autobiography in group therapy sessions before he is allowed to advance to Phase 3, many Plaintiffs and Class members are not able to advance in the expected six (6) months, because groups are over-full and too many Plaintiffs and Class members need to present, slowing each other from the possibility of advancement. To make matters worse, the already inadequate amount of group therapy hours offered are regularly canceled by therapists, further reducing the Plaintiff's and Class member's possibility of advancement. Any given Plaintiff or Class member loses an average of at least ten (10) hours of group therapy, due to cancellation, per quarter.

In Phase 3, referred to as the Application Phase (Advanced Core), the Plaintiff or Class member must apply the concepts learned in the Basic Core Phase (e.g. Demonstrating through his behavior, a degree of internalization of these core concepts). According to clinical staff, this is the most difficult stage of the program and is open-ended in terms of a time frame. Progress through this phase supposedly depends entirely on the Plaintiff and Class member demonstrating consistent application of the program principles to his daily life. The fact that clinical staff observation of whether a Plaintiff or Class member has actually demonstrated consistent application of the program principles is completely subjective, most Plaintiffs and Class members are stuck in Phase 3, stagnant. Clinical staff are often resistant to allowing the Plaintiff or Class member to advance to Phase 4, no matter how long the Plaintiff or Class member has been in Phase 3. They too often use the vague statement, "I don't feel you are ready for Phase 4 at this time." Furthermore, the Plaintiff or Class member must pass a "victim" polygraph, after re-presenting his victim disclosure sheets, then four (4) months later must pass a sexual behavior polygraph with no deception indicated, and a "maintenance" sexual behavior polygraph with no deception indicated every six (6) months thereafter to even be considered for advancement to Phase 4. It is suspicious that the Plaintiff or Class member can take the polygraph and

24

pass it the first time, then be directed by his therapist to take it again, then fail it. At which time the polygraph results are used against the Plaintiff or Class member to keep him from advancing.

In Phase 4, referred to as the Enhanced Phase, the Plaintiff or Class member is supposed to identify and resolve the deeper issues present for the Plaintiff or Class member, as well as complete and present a comprehensive relapse prevention plan. Before he is allowed to advance to Phase 5, the Plaintiff or Class member must appear before the Progress Review Board and receive permission to move to Phase 5.

In Phase 5, referred to as the Honor Phase, the Plaintiff or Class member must learn acclimatization to the real world through a series of supervised activities, such as shopping, outings, etc., and opportunities to make appropriate decisions about the use of one's own time. The Plaintiff or Class member must demonstrate knowledge of basic living skills (e.g., cooking, laundering, budgeting, etc.). The Plaintiff or Class member must successfully complete all stages of the Phase 5 outing process in the following order: minimum of three (3) on-campus outings, minimum of three (3) dining outings, minimum of five (5) shopping and recreation outings. Before he is allowed to advance to Phase 6 the Plaintiff or Class member must appear before the Progress Review Board and receive permission to move to Phase 6.

In Phase 6, referred to as the Advanced Application Phase, the Plaintiff or Class member must exhibit the skills necessary to handle typical open society responsibilities such as finding employment, managing income, paying bills and structuring one's time. The Plaintiff or Class member must demonstrate satisfactory living and self-management skills, including personal hygiene. The Plaintiff or Class member must maintain employment for at least six (6) consecutive months. And the Plaintiff or Class member must move from accompanied outing status to unaccompanied outings. The Plaintiff or Class member must receive approval by the court for movement to Phase 7, Transition.

In Phase 7, referred to as the Transition Phase, the Plaintiffs or Class members must demonstrate the ability to translate the knowledge and skill he has acquired into the carrying out of a responsible constructive life. The Plaintiff or Class member must maintain employment, positive facilitator/therapist evaluations, participation in support activities, an updated Relapse Prevention Plan, develop and maintain a group of persons willing to function as a support network, identify treatment providers willing to prepare annual reports for the court and successfully complete any/all required maintenance polygraphs. According to *Exhibit S, The Sexual Predator Treatment Program of Kansas Resident Handbook*, even if the Plaintiff or Class member can demonstrate the ability to carry out a responsible, constructive life, the Plaintiff or Class member must "receive approval by the court for

25

movement into conditional release."

67.    Few Plaintiffs or Class members even get to Phase 4 of the program (Enhanced Phase), and fewer still advance to Phase 5 (Honor Phase). After almost twenty (20) years in the SPTP, Plaintiff Blumenshine remains in Phase 3 of the program, due in part to his inability to pass core classes and polygraphs. Class member Anderson has been in Phase 3 for the past six (6) years, while Plaintiff Perez – who has been in the program over fifteen (15) years and has not committed a sexual offense nor sexually inappropriate behavior for well over those fifteen (15) years – has now spent at least thirteen (13) years in Phase 3.

68.    A barrier to a Plaintiff's or Class member's ability to progress through the program as appropriate, the 2009 Legislature passed House Substitute for SB91 that prohibits the Kansas Department for Aging and Disability Services from placing more than eight sexually violent predators in any one county on transitional release or conditional release; stated that these patients be housed only on state property; and required a report to the Governor every year on the status of transitional persons. According to the Department, if a court orders an individual to transitional or conditional release and that person cannot be placed because the counties that offer the needed resources have reached the eight person maximum, and no other county can be found to provide the needed services for that individual, the Department and the State of Kansas risk contempt of court charges and lawsuits. The current transitional program (MiCo House) is located on the grounds of Osawatomie State Hospital in Miami County. As of November 2011, there were eight (8) persons in the program. The SPTP was determined constitutional because it provides residents the opportunity to progress through the program as appropriate. The agency indicates that failure to provide this could jeopardize the SPTP's constitutionality and residents could challenge their civil commitment in court. See *Exhibit B, Larned State Hospital 2013 Fiscal Budget Report*, pp. 689 and 700. Plaintiffs and Class members have been injured and continued to be injured by Defendants shocking and intolerable denial of their right to progress through the program appropriately, based on the fact the transition program is at capacity. The bottleneck at the transition phase has caused such a ripple effect that virtually all Plaintiff's and Class member's ability to progress through treatment has been impeded, causing each and every Plaintiff and Class member continuing mistreatment of a constitutional stature.

69.    According to SPTP treatment protocol, for Plaintiffs and Class members, treatment is indeterminate, given the long-term nature of treatment programming. Although K.S.A. § 59-29a08(a) requires that each person committed under K.S.A. § 59-29a01 et seq., and amendments thereto, shall have a current examination of the person's mental condition made every year to determine if the

26

person's mental abnormality or personality disorder has so changed that the person is safe to be placed in transitional or conditional release, these examinations are perfunctory and fail to actually examine or evaluate the person's true mental condition at all. The evaluator simply interviews the Plaintiff or Class member for fifteen (15) minutes, having never had any contact with the Plaintiff or Class member before or after the interview at any time to get a true measure of his mental condition, and uses a pre-developed form, into which he/she cuts and pastes the Plaintiff's and Class member's names, which is summed up with the exact same conclusion word-for-word, regardless of the Plaintiff or Class member, his circumstances, his mental condition, his successes or failures, his improvements or deterioration, or how many yearly examinations the Plaintiff or Class member has received. Regardless of how well the Plaintiff's or Class member's participate in treatment, the progress they make in treatment, the fact that for the vast majority of Plaintiffs and Class members not one incident of a sexually inappropriate nature has happened in several years before and after they have entered the program, nor the entire twenty (20) years the program has been in existence, nor the fact they have displayed appropriate behavior daily and shown they have changed their thinking and behavior, their quarterly and annual reports always conclude, "In summary, Mr._____has made progress in treatment. In order to successfully complete the program residents are required to complete all phases of the program, including any and all requisites associated with each phase, to the satisfaction of the program. I therefore conclude that Mr._____remains a sexually violent predator because he continues to meet the definition of a person who has been convicted of a sexually violent offense, to wit, who suffers from a mental abnormality or personality disorder which makes it likely he will engage in repeat acts of sexual violence. I further conclude that Mr._____mental abnormality or personality disorder has not so changed that it would yet be safe for Mr._____to be placed in Transitional Release at this time. See *Exhibit J*, Document #1 pp. 4-8 of Ronald Alan Baker's *Yearly Report of Resident's Mental Condition*, May 1, 2011 and June 13, 2013 respectively; *Exhibit J*, Document #2 pp. 1-2 of Steven Earl Roberts *Yearly Report of Resident's Mental Condition*, March 6, 2011 and December 30, 2011 respectively; *Exhibit J*, Document #3 pp. 1-9 of Danny Wassell Stanley's *Yearly Report of Resident's Mental Condition*, February 16, 2009, February 4, 2010, and December 29, 2011 respectively; *Exhibit J*, Document #4 pp.1-6 of Tyrone Ray Tschantz *Yearly Report of Resident's Mental Condition*, August, 2013; and *Exhibit J*, Document #5 pp. 1-8 of Harvey Darrel Hickman's *Yearly Report of Resident's Mental Condition*, February 6, 2012 and March 11, 2013 respectively. Yet, this is no true yearly examination of the Plaintiff's or Class member's mental condition as required by K.S.A. § 59-29a08(a) "Each person committed under K.S.A. § 59-29a01 et seq., and amendments thereto shall have a current

27

examination of the person's mental condition made once every year." This supposed yearly examination is nothing more than a fifteen minute interview from which the interviewer draws his/her conclusion. The contention is that the fact that the Plaintiffs and Class members have proven through lack of any sexually inappropriate behavior for years, up to twenty (20) years in many cases, the fact that they have been in a so-called controlled environment proves nothing. The Defendants argue that the opportunities for sexual misconduct do not exist in a controlled environment. This is a fabrication. In prison there were numerous attractive female staff, some of which have been caught having sexual relationships with prisoners. Yet, the vast majority of Plaintiffs and Class members have had absolutely no disciplinary reports of a sexual nature while in prison. The conclusion that Defendants argue at that point is that a high percentage of civilly committed sex offenders are pedophiles, and they have had no contact with children, and therefore no opportunity to offend. However, this argument ignores the fact that there are children running around the visiting room at prison all the time. In many cases no adult is paying any attention to them. Choosing instead to pay attention to their adult visitor. If indeed the Plaintiff or Class member diagnosed as a pedophile had no self-control, those children would have been in danger. Yet, there are still no disciplinary reports from prison for any of the Plaintiffs or Class members having any inappropriate contact with a child while in the prison system. Furthermore, the vast majority of the Plaintiffs and Class members have absolutely no disciplinary reports of any sexually inappropriate behavior while in the SPTP program.

The courts often accept the commission of numerous acts of sexual violence as proof of impaired control, without further discussing whether the individual is *presently capable* of controlling the violent behavior. Since sex offender commitment laws are being used to indeterminately confine persons who have completed or are about to complete criminal sentences, there is often little or no evidence of *recent* sexual conduct to support a finding of impaired control. However, courts have accepted evidence of generic misbehavior under controlled circumstances as proof of impaired control. The relevance of this type of proof depends on a showing of a relationship between the individual's sexual misconduct and this generalized incapacity to control. It is logical to conclude that the absence of misbehavior in a controlled setting evidences the *ability* to control one's behavior. According to Dr. Luis B. Rosell in *U.S. v. Hall*, "Applying individual factors, Dr. Rosell opined that Hall was not a sexually dangerous person. Of particular significance, Dr. Rosell was persuaded by the fact that Hall had a limited history of child molestation offenses and a limited number of child victims, had undergone sex offender treatment, and had demonstrated, by being in the community for twenty-eight months without a hands-on offense, that he could refrain from engaging in child molestation despite

28

ample opportunity to do so." See *United States v. Hall*, 664 F.3d 456. Whether in a controlled environment or not, the absence of misbehavior over an extended period of time is evidence of the Plaintiff's and Class member's ability to control their behavior.

The Defendants contend that a significant number of the Plaintiffs and Class members suffer from Antisocial Personality Disorder which makes them likely to engage in repeat acts of sexual violence. However, *U.S. v. Wilkinson* does not agree. 'Although individuals with severe forms of Antisocial Personality Disorder might often make unlawful choices, they were able to control their conduct. The prisoner's Antisocial Personality Disorder was not severe, and the government did not prove that the disorder would cause the prisoner serious difficulty in refraining from committing sexual crimes if released. Unlike many prisoners with that diagnosis, the prisoner worked hard and generally behaved well while serving his long federal sentence. Moreover, the prisoner would be in his mid-fifties when he was released from federal and state custody. The evidence indicated that both Antisocial Personality Disorder and their risk of sexual recidivism diminished substantially by that age. To establish a proper basis for civil commitment of an allegedly sexually dangerous person, there must be proof of serious difficulty in controlling behavior. Civil commitment is constitutionally permissible only if the government proves by clear and convincing (beyond a reasonable doubt in Kansas) evidence that a person is dangerous because he has a serious mental condition (mental abnormality or personality disorder in Kansas) which causes him to have serious difficulty in controlling his conduct. Dr. Mills opined, however, that: [I]n general, persons with personality disorders are cognitively aware of the implications of their choices and are not involuntarily compelled to act in a certain manner... persons with antisocial personality traits tend to challenge rules, oppose authority figures, and break laws. However, neither of these phenomena are conditions which substantially impair cognitive understanding or volitional control of behavior. Personality disorders are primarily descriptive, a pattern of consistently exaggerated choices which persist despite negative social consequences. The DSM – IV – TR itself states that, "[t]he fact that an individual' presentation meets the criteria for a DSM – IV – TR diagnosis does not carry any necessary implication regarding an individual's degree of control over the behaviors that may be associated with the disorder. " DSM – IV – TR at xxiii. Therefore, the fact that Antisocial Personality Disorder is included in the DSM – IV – TR is not evidence that the disorder ever, always, or in Wilkinson's case involves any serious difficulty in controlling behavior.' *United States v. Wilkinson*, 646 F. Supp. 2d 194. Note that according to *U.S. v. Wilkinson*, the risk of sexual recidivism diminishes by the age of 50. Most Plaintiffs and Class members are approaching that age or are already older than 50. Sixty eight (68) Plaintiffs and Class

29

members are between the ages of forty (40) and forty nine (49), while a total of one hundred and twenty four (124) Plaintiffs and Class members are over the age of fifty (50).  See *Exhibit N, 2013 Legislative Post Audit Committee Larned State Hospital Sexual Predator Treatment Program Performance Audit Report*, p. 6, Figure OV – 1.  And the ones that are not, for the vast majority, are still not engaging in sexual misconduct.

A finding that the Plaintiffs or Class members still meet the criteria of a sexually violent predator *must* be based on *current* behavior and mental condition, not past behavior or condition.  See the *Sporn* case, 'The State first notes that the critical question to be answered in a SVPA action is whether the respondent has a mental abnormality or personality disorder which would make the respondent likely to engage in repeat acts of sexual violence.  It then contends that the determination presents a "fluid issue subject to change over time," because a person's condition can improve or deteriorate.  Accordingly, the State concludes that the recidivism risk determination is to be based on the respondent's *current* condition at the time of the SVPA proceedings.  Therefore, the cause of action against Sporn in 2007 to determine his then current condition was different than the cause of action to assess his condition in 2005. *In re Care & Treatment of Sporn*, 289 Kan. 681, 686, 215 P.3d 615 (2009). *Hendricks* found that the SVPA was not punitive, in part because one of the stated purposes of the commitment was to hold the person until his or her mental abnormality no longer causes him or her to be a threat to others.  See *Kansas v. Hendricks*, 521 U.S. 346, 138 L. Ed. 2d 501, 117 S. Ct. 2072 (1997).  The State argues that Hendricks recognized that a respondent's mental status and risk assessment is subject to improvement.  In *Turner v. Superior Court*, 105 Cal. App. 4th 1046, 130 Cal. Rptr. 2d 300 (2003), "The likelihood of a person committing criminal acts because of a mental disorder is not a fixed condition because an individual's mental health and potential dangerousness can, and frequently does, change.  Recognizing this, courts generally hold that an adjudication of status or mental health issues is not conclusive as to the same status on a later date."  A mental health professional may still fully evaluate the background/historical information when rendering his or her opinion.  However, the professional cannot rely solely on the historical information and must explain what has occurred in the interim to justify the conclusion that the individual is *currently* a sexually violent predator. *105 Cal. App. 4th at 1059-60* (emphasis added).

In many cases these commitments are based on historical information from the resident's adolescence, or even the resident's *recent past.*  This is problematic because such information is not a legitimate clinical basis for the diagnosis of sexual disorders (as the American Psychiatric Association will be very quick to tell you), and the use of such historical information fails to address the supposed

basis for a determination that the person is *presently* suffering from a psychological problem that causes them volitional impairment, leading them to be an imminent danger to themselves or others. The very nature of adolescence is to be impulsive and have poor decision making abilities. That does not speak to where that same person will be in their late twenties, or (as we have seen in some cases) in their 40s or 50s when this commitment decision is being made. A citizen is not supposed to be committed merely because they are "likely to re-offend" (a very vague concept ) - rather, they must suffer from some severe, marked mental illness/abnormality which renders them volitional impairment involving their abusive sexual behavior, rendering them an *imminent* danger to self or others.

In general the misconduct must be harmful, *recent*, and sex related. Commitment as a sex offender requires *proof* of a *recent* pattern of harmful sexual misconduct; harmless behavior is beyond the purview of sex offender commitment laws. Evaluators and examiners should be required to specify the particular recent acts of the Plaintiffs and Class members considered harmful, why these acts are harmful, and to whom. "The further the predictive behavior is from the *observed* behavior in terms of time or setting, the less accurate the prediction is likely to be." See *Randy K. Otto, "Prediction of Dangerous Behavior: A Review and Analysis of Second Generation Research," 5 Forensic Rep.*, 103, 128 (1992) (emphasis added). '[T]he "clear danger" to others must be "demonstrated" by past acts and a prediction of future harm... This suggests a temporal relationship between the past acts and the future dangerousness... Clearly, the more remote the past acts are in time, the less predictive value they have.' See *In re Brown*, 414 N.W. 2d 800, 803 (Minn. Ct. App. 1987) (emphasis added).

A book length treatment of the subject concludes that there is no biological or physiological evidence for the concept of lack of mental control: "Unless... specific physical connections that bypass mental control can be shown, there is no scientific warrant to assume, and no scientific way to determine, that a particular course of conduct, or more generally that all conduct associated with mental malfunction, is to be viewed as beyond the power of mind to control." See *Herbert Fingarette & Ann Fingarette Hasse, "Mental Disabilities and Criminal Responsibility"* (1979) (emphasis on original), pp. 64-65.

Writing specifically about sex offenders, W. L. Marshall, one of the editors of a treatise on sexual assault cited with approval by the Washington Supreme Court in, *In re Young*, 857 P.2d 989, 1001 (Wash. 1993), expresses skepticism that any sex offense is beyond the control of the sex offender: "It is our view that sexual offenders are not suffering from any disease and that their behavior is not out of their control, as such a medical model would imply. In fact, it is clear from an examination of the

behavior of these men that their offending is very well controlled." See *W. L. Marshall et al., "Present Status and Future Directions," in Handbook of Sexual Assault,* 389, 391 (W. L. Marshall et al., eds., 1990).

Many scholars assert that much sexual violence is *not* a product of *sexual* impulses. These observations undercut the assumption that sexual behavior can be assigned causes in the manner required by sex offender commitment laws. See e.g., *Margit C. Henderson & Seth C. Kalichman, "Sexually Deviant Behavior and Schizotypy: A Theoretical Perspective with Supportive Data," 61 Psychiatric Q,* 273, 274 (Winter 1990); *W. L. Marshall et al., "Issues in Sexual Assault,"* in *Handbook of Sexual Assault,* 3,5 (W. L. Marshall et al., 1990); *Raymond A. Knight & Robert A. Prentky, "Classifying Sexual Offenders: The Development and Corroboration of Taxonomic Models,"* in *Handbook of Sexual Assault,* 23,44; *Judith L. Herman, "Sex Offenders: A Feminist Perspective,"* in *Handbook of Sexual Assault,* 177, 181-182; *W. L. Marshall & H. E. Barbaree, "An Integrated Theory of the Etiology of Sexual Offending,"* in *Handbook of Sexual Assault,* 257; and *Park Elliot Dietz, "Sex Offenses: Behavioral Aspects,"* in *4 Encyclopedia of Crime and Justice,* 1485, 1485-1490 ( Sanford M. Kadish ed., 1983).

Many clinicians attach an Antisocial Personality Disorder label without careful criterion – by – criterion assessment of the Plaintiff or Class member. Expert diagnostic assessments should look not only for the presence of the criteria, but also for their stability. Evidence that the individual adapts his behavior to a variety of environments, perhaps by reducing his antisocial behavior in a prison or institutional setting, undercuts the "maladaptivity" and stability aspects of the diagnosis. Many clinicians base their diagnosis on old patterns of behaviors and then use the diagnostic label to describe current behaviors or to predict future ones. The diagnosis is improper because current behaviors do not meet the diagnostic criteria. The Plaintiff or Class member has not demonstrated the stability and maladaptivity necessary to diagnose Antisocial Personality Disorder. The Antisocial Personality Disorder diagnosis is not predictive of antisocial behaviors because its application, according to the clinician, now encompasses pro social behaviors. The legal theory is that such an indiscriminate diagnostic category is not a reliable basis for civil commitment. The fact that the resident has not recently been in physical fights contraindicates the following behavioral "feature" of the personality disorder diagnosis: "Individuals with Antisocial Personality Disorder tend to be irritable and aggressive and may repeatedly get into physical fights or commit acts of physical assault." If the Plaintiff or Class member has been in a closely supervised or highly structured environment, the absence of fights evidences adaptation to that environment. *American Psychiatric Association,*

32

*Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994), P. 646. To be considered a
"disorder," the behavior indicated by the diagnosis: must be "inflexible," "enduring," and "pervasive
across a broad range of personal and social situations;" must be "maladaptive;" and must "cause ·
significant functional impairment or subjective distress" that "leads to clinically significant distress or
impairment in social, occupational, or other important areas of function." *American Psychiatric
Association, Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994), p. 630. In
particular, look for the presence or absence of "clinically significant... impairment in social,
occupational, or other important areas of functioning" across a range of situations. Without this sort of
impairment, the Antisocial Personality Disorder diagnosis is inappropriate. Antisocial Personality
Disorder tends to "remit as the individual grows older, particularly by the fourth decade [age 30-39] of
life." *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* (4th
ed. 1994), p. 648. All but seven (7) of the Plaintiffs and Class members are over the age of thirty (30).
See *Exhibit H, 2013 Legislative Post Audit Committee Larned State Hospital Sexual Predator
Treatment Program Performance Audit Report*, p. 6, Figure OV-1.

     In the case of a diagnosis of *Paraphilia* (of which, pedophilia is included) – The DSM
criteria require intense urges specifically directed at deviant sexual objectives. Rape is not in itself
evidence of a DSM paraphilia, though some rape behaviors might constitute a paraphilic disorder. See
*G. G. Abel & J. L. Rouleau, "The Nature and Extent of Sexual Assault,"* in *Handbook of Sexual
Assault*, pp. 18-20. Sexual misconduct has many causes; certainly some misconduct is not based on
deviant sexual impulses – and is, therefore, not paraphilic. See *Park Elliot Dietz, "Sex Offenses:
Behavioral Aspects,"* in *4 Encyclopedia of Crime and Justice*, 1489 (Sanford M. Kadish ed., 1983).
The DSM definition does not have "exit criteria" for paraphilias. Pay attention to shifting time
referents, where diagnosis that purport to describe *current condition* are based on *remote conduct*.

     "Since personality disorders and paraphilias do not vitiate personal choice, counsel
should be skeptical of any determination that future sexual misconduct will be the result of a mental
disorder rather than a personal choice." *Thomas A. Widiger & Timothy J. Trull, "Personality Disorders
and Violence,"* in *Violence and Mental Disorder* (J. Monahan & H. Steadman, eds., 1994), p. 216.
"Even if a disorder predisposes one to act in a particular way, the choice to *follow* that predisposition is
a matter of individual choice; at most, the mental disorder merely influences the menu of possible
behaviors." See *Park Elliot Dietz, "Sex Offenses: Behavioral Aspects,"* in *4 Encyclopedia of Crime
and Justice*, p. 1490.

     Given these arguments, the Defendants cannot justify the conclusion the Plaintiffs and

33

Class members mental abnormality or personality disorder has not changed, minus any evidence of any *current* deviant behavior or mental condition. Without *current* deviant behavior, Plaintiffs and Class member mental abnormality or personality disorder must have changed. If then, Plaintiffs and Class members mental abnormality or personality disorder has changed, Plaintiffs and Class members must be released. According to *Exhibit H, 2013 Legislative Post Audit Committee Larned State Hospital Sexual Predator Treatment Program Performance Audit Report*, P. 3 "The goal of the treatment program is to *eliminate* the likelihood that sex offenders will re-offend after their release. Kansas has set a very high standard for release from the program. The statutorily mandated goal of the program is to have no new victims. To be released from the program, a resident has to complete seven treatment phases." This is too strict a standard, reaching shocking and intolerable standards that are so punitive in effect they negate the States intention to deem it civil, and create a continuing mistreatment of a constitutional stature, in violation of the Double Jeopardy and Ex Post Facto Clauses of the Fifth Amendment to the United States Constitution, § 10 of Kansas' Constitution, K.S.A. § 59-29a09 itself, and K.S.A. § 59-29a07(a), which requires that an SVP be committed only until such time as the person's mental abnormality or personality disorder has so changed that the person is safe to be at large. "If the court or jury determines that the person is a sexually violent predator, the person shall be committed to the custody of the secretary of social and rehabilitation services for control, care and treatment *until such time as the person's mental abnormality or personality disorder has so changed that the person is safe to be at large.*" K.S.A. § 59-29a07(a).

70.     Regardless of SVPA wording, the SPTP program was not originally designed for treatment. The first residents were held in a restriction building in the Department of Corrections Larned Correctional Mental Health Facility without even the pretense of treatment from February 15, 1995 until October 15, 1999. By October 15, 1999 Plaintiffs and Class members were moved to the Dillon building. An actual treatment program was eventually co-authored by Dr. Austin DesLauriers and Dr. Charles Befort. Dr. Charles Befort retired from the program in approximately 1998. Originally the program was designed to be completed within eighteen months. By 2003 the "Estimated Length of Stay" was increased to "Two and a half to Five years." The program length was extended again in 2004 when the "Estimated Length of Stay" was increased to "Three to Five years." In the *2005 Legislative Post Audit Committee Post Audit Report of the Larned State Hospital Sexual Predator Treatment Program*, p.2 the program was again lengthened in the quote, "the Program is designed to provide long-term treatment that should last about seven years for willing and active participants. See *Exhibit G*. Finally, in 2008 the Defendants extended the program length to "Indeterminate," while

34

eliminating any estimated length of stay. Instead, preferring an "Estimated Transfer Date" listed on Plaintiff's and Class member's "Integrated Treatment Plans" as "Indeterminate, given current Phase and long-term nature of treatment programming." See *Exhibit J*, Document #1 - "Integrated Treatment Plan" of Ronald Alan Baker, 9/11/2033, p. 1; 8/30/2004, p. 2; and 9/8/2008, p. 3 respectively. "Since 1998, the number of residents in Kansas' Sexual Predator Treatment Program has increased from 16 to 136. The Program is growing so fast because more sex offenders are being committed, and few are leaving. Since fiscal year 2000, about six percent of the sex offenders released from prison have entered the Program... If the Program continues to grow as it has, we estimated its population could increase by 100 residents over the next 10 years, and could nearly triple over the next several decades, before leveling off. Those figures could be much higher." See *Exhibit K, 2005 Legislative Post Audit Committee Larned State Hospital Sexual Predator Treatment Program Performance Audit Report*, p. 7. "The Sexual Predator Treatment Program's resident population has grown steadily since the program's inception. From 2002 to 2012, the program added an average of about 18 residents each year... Because so few residents are released, program enrollment is likely to grow well beyond the physical capacity at Larned State Hospital." See *Exhibit H, 2013 Legislative Post Audit Committee Larned State Hospital Sexual Predator Treatment Program Performance Audit Report*, Highlights page. As of September 2014, twenty six (26) Plaintiffs and Class members are in Phase One (1), sixty seven (67) Plaintiffs and Class members are in Phase Two (2), one hundred one Plaintiffs and Class members (101) are in Phase Three (3), Twenty (20) Plaintiffs and Class members are in Phase Four (4), nineteen (19) Plaintiffs and Class members are in Phase Five (5), four (4) Plaintiffs and Class members are in Phase Six (6), five (5) Plaintiffs and Class members are in Phase Seven (7), thirteen (13) Plaintiffs and Class members are re-incarcerated, nine (9) Plaintiffs and Class members are in Transition, four (4) Plaintiffs and Class members are on Conditional Release, eleven (11) residents were discharged by the Courts through appealing their cases, three (3) residents have been finally released (Donald R. Hale, Donald Hunt, and Jerry P. Inman), and twenty seven (27) residents have died. See *Exhibit V, Kansas Sexual Predator Treatment Program Statistics*. Additionally, 80% of SPTP Plaintiffs and Class members [one hundred sixty seven (167)] have been civilly committed to SPTP for between five (5) and ten (10) years or more, while 40% of SPTP Plaintiffs and Class members [seventy six (76)] have been civilly committed to SPTP for over ten (10) to fifteen (15) years or more. See *Exhibit H, 2013 Legislative Post Audit Committee Larned State Hospital Sexual Predator Treatment Program Performance Audit Report*, p. 6, Figure OV-1 Program Phase and Number of Years at Sexual Predator Treatment Program; and *Exhibit V, Kansas Sexual Predator Treatment Program Statistics*. It was not

35

until 2002 that Jerry P. Inman was the first man in the history of the SPTP to be deemed to have completed the treatment program, after commitment to the program for six years, from October 1, 1996 to 2002, and be ready for conditional release. He was required to attend regular therapy and intense supervision for five (5) years as a provision of his conditional release. Only six (6) residents have ever been conditionally released from SPTP, while only three (3) have ever been fully released, and twenty seven (27) have died (Michael L. Abrams-Brain Cancer January 13, 2013; Randall J. Blevins-Cancer May 20, 2009; Robert E. Boatright-Heart Failure 2012; Larry Carver-Heart Attack November 23, 2011; David Doolin-Heart Failure October 31, 2007; Francis Garret-Cancer December 23, 2005; Conn R. Goracke-Heart Attack 2003; Leroy J. Hendricks-Old Age 2009; Joe C. Hunter-Cancer 2013; Dennis L. Hupp-September 12, 2013; Max Johnson-December 12, 2009; Nelce Johnson-December 10, 2001; John King-Heart Attack October 03, 2000; Dee Jay McClure-Cancer/Airborne MRSA April 18, 2013; John Miller-Heart Failure July 17, 1998; Charles G. Mills-Cancer November 08, 2012; William D. Newman-Old Age July 21, 2007; Jerry M. Nichols-Cancer August 21, 2014; George H. Oldham-Cancer 2008; John Prins-Old Age 2012; James L. Russell-Cancer December 09, 2000; Ernest D. Sebring-Heart Failure 2008; Charley W. Snyder-Cancer May 05, 2005; Randy Taylor-Cancer 2010; David A. Tucker-Pulmonary Embolism/Suicide February 11, 2014; Darwin C. Williams-Heart Attack/wrong medication administered by medical staff August 24, 2013). See *Exhibit V, Kansas Sexual Predator Treatment Program Statistics*.

## C. CHANGES TO SPTP POLICY SINCE 1994

71.   In 1994 there was no program structure. Residents were handed a Kansas Department of Corrections Rule Book and expected to follow "prison" rules. From the beginning SPTP hired a number of employees directly from the Kansas Department of Corrections for the SPTP. Frequent leadership changes at SPTP have contributed to issues with the treatment program that have resulted in Plaintiffs and Class members remaining in early stages of treatment. The SPTP has had eight (8)· administrative program directors and three (3) clinical program directors over the last twenty (20) years, resulting in regular and substantial changes to the treatment program. This turnover has led to inconsistent treatment being provided to Plaintiffs and Class members, and Plaintiffs and Class members being forced to unnecessarily repeat treatment modules. For example, individualized treatment plans and reviews have become less specific and detailed and more generic and less individualized. Treatment plans and reviews do not give the Plaintiffs and Class members a clear idea of what they need to do to advance through treatment and clinicians do not explain how they come to conclusions about Plaintiffs and Class members.

72. In 1994, Dr. Charles Befort was Program Director of the SPTP. He retired in approximately 1998. From his own testimony in *Kansas v. Hendricks*, 521 U.S. 346 Dr. Charles Befort acknowledged he had no specialized training, admitting that he was not qualified to be SVP Program Director, that treatment that is prescribed by statute is still not available, and that "it" had little, if any, qualified treatment staff. In approximately 2000 SPTP administration began collecting room and board payments from Plaintiffs and Class members who have a Vocational Training Program (VTP) job. In approximately 2002 SPTP administration took away the privilege of Plaintiffs and Class members to own any personal recording device. In approximately 2004 SPTP administration took away Plaintiff's and Class member's right to own a personal computer. Administration blamed the removal of computers on a Class member accessing the internet. However, removal of modems ensure a Plaintiff or Class member could not possibly access the internet. And the memo ordering Plaintiffs and Class members to mail out their personal computers was posted *before* the Class member's violation. Plaintiffs and Class members have been and continue to be injured by the shocking and intolerable acts and omissions of the Defendants.

73. Dr. Austin DesLauriers, who was Clinical Program Director from 1995 to May 2014, co-authored the SPTP with Dr. Charles Befort. It is unclear whether Dr. DesLauriers had any expertise or past experience operating or managing a treatment program.

74. In approximately 2005, Mr. Leo Herman took over the duties of the administration of the SPTP. It is unclear whether Mr. Herman had any actual expertise or past experience operating or managing a treatment facility. Mr. Herman performed administrative duties only one year. He was interested in less restrictive alternatives for Plaintiffs and Class members, such as removing the inside restrictive fence, which limits Plaintiff's and Class member's movement from the facility to the gym and the yard. This fence is not necessary since there exists an exterior fence which already makes SPTP a secure facility. Mr. Herman's therapeutic ideas were unpopular with other members of the administration, and the SRS authorities whom he answered to. Mr. Herman resigned in approximately 2006.

75. In approximately 2006, Dr. Mayda Nel Strong took over duties of the administration of the SPTP. It is unclear whether Dr. Strong had any actual expertise or past experience operating or managing a treatment facility. In approximately 2007 SPTP administration took away Plaintiff's and Class member's privilege to attend activity call outs without program participation. This eliminated Plaintiff's and Class member's right to exercise, recreate, and remain active and healthy unless he enrolls in the program as a participant, every quarter. This is a violation of the Plaintiff's and Class

37

member's right to refuse treatment. Plaintiffs and Class members have been and continue to be injured by the shocking and intolerable acts and omissions of the Defendants.

76. In approximately 2008, Mr. Cory Turner became the first *official* Administrative Program Director of the SPTP. It is unclear whether Mr. Turner had any actual expertise or past experience operating or managing a treatment facility. Since Mr. Turner took over the role as the Administrative Program Director of the SPTP, he has implemented new policies that restrict many of the rights previously enjoyed by Plaintiffs and Class members. He has changed the SPTP standards to resemble a maximum security prison facility. Examples of those policy changes include punishment and abuse of residents through threats, restricted visitation, restricted property rights, censored mail, restricted phone calls, restricted physical movement, unreasonable searches, and discipline without due process of law. The resident's committee was no longer allowed to design rules for Plaintiffs and Class members to follow. Instead, a rule book was adopted which was patterned after the Kansas Department of Corrections Rule Book (K.D.O.C.). In fact, most policies and procedures implemented since 2008 have been adopted directly from the K.D.O.C. IMPP. Some of those policies include: use of force, use of tranquilizers as punishment, Office of Risk Management (intelligence information gathering and discipline), disciplinary reports, Daily Action Reports [staff use (DARs) to log biased negative observations and opinions against residents], resident grievances, resident request policy, visiting behavioral restrictions, mail policy, and property policy. Mr. Turner authorized the restriction of religious meals, and ceremonies; the elimination of freedom of movement between the Dillon, Meyer, and Jung buildings; the elimination of the privilege to have freedom of movement to use the back yard; the restriction of yard hours; the denial of recreation privileges due to the excuse of "lack of staff"; the elimination of resident's privilege to use the back yard grill; and the elimination of resident's privilege to cook their own food. Under Mr. Turner the Activity Therapists were given all the power, and Resident's Clinical Therapists are no longer given power to make treatment decisions for their clients.

Mr. Turner's policies and procedures created such an oppressive environment even the facility staff cannot tolerate SPTP for long. Staff began resigning and continue to resign in large numbers today. In 2008 Mr. Turner told the Plaintiffs and Class members that if it were up to him he would take everything away from them and lock them in their rooms and never let them out. Mr. Turner also stated that all Plaintiffs and Class members should be taken out back and shot.

Plaintiffs and Class members have been and continue to be injured by the shocking and intolerable acts and omissions of the Defendants.

77. In approximately 2009, Mr. Lee Flamik became the second official Administrative

Program Director of the SPTP. It is unclear whether Mr. Flamik had any actual expertise or past experience operating or managing a treatment facility.

78.     In approximately 2010, Mr. Christopher Burke became the third official Administrative Program Director of the SPTP. Mr. Burke remained Administrative Program Director for just eleven (11) months. It is unclear whether Mr. Burke had any actual expertise or past experience operating or managing a treatment facility. Since Mr. Burke took over the role as Administrative Program Director of the SPTP, he has implemented new policies that restrict the rights of Plaintiffs and Class members even further. Mr. Burke authorized locking all doors to Plaintiff's and Class member's units, access doors to the cafeteria, access doors to the stairwells, access doors to all classrooms, as well as all other doors in the SPTP facilities; the elimination of freedom of movement from the unit to medication line, etc.; the elimination of freedom of movement from the unit to any destination, such as group therapy, medication line, or the cafeteria without staff escort; the elimination of freedom of movement from any unit to and from any destination without unreasonable pat searches; the elimination of travel off facility grounds for any reason without restraints; the implementation of unreasonable room searches and deprivation of legally owned personal property without due process of law; the elimination of the privilege of Plaintiffs and Class members to wash their own personal clothes (Plaintiffs and Class members are forced to send their clothes to the KDOC laundry where KDOC prisoners, who hate sex offenders, work. Plaintiff's and Class member's clothes have their full name and information printed on labels for prisoners to read, a HIPPA violation. Plaintiff's and Class member's personal clothes often come back torn or destroyed intentionally by the prisoners, or they don't come back at all. Yet, Plaintiffs and Class members are not allowed to submit a property claim for reimbursement, because administration claims sending your clothes to the laundry (the only allowed means of washing clothes) is entirely at the Plaintiff's and Class member's own risk; the elimination of the privilege to use the refrigerator to keep food from spoiling; the restriction of the privilege to order fast food (Plaintiffs and Class members used to be allowed to order fast food weekly, provided he had the finances to do so). Mr. Burke restricted the privilege to once per month; the restriction and censorship of magazine and newspaper privileges; the change of phone service and restriction of phone calls to a prison-oriented phone service provider, limiting the ability to communicate with family that cannot afford the high collect call charges when the only two incoming lines are busy, and eliminating the ability to call 800 numbers, and communicate with Plaintiff's or Class member's lawyer toll free (most lawyers will not accept collect calls); and the installation of razor wire along the top of the entire fence-line surrounding all SPTP buildings (which makes the SPTP further resemble a maximum security prison, giving the

facility more of a prison "flavor" than a treatment "flavor." An indication of the true intention of warehousing and imprisoning the Plaintiffs and Class members indefinitely in a prison masquerading as a treatment facility).

79.     In approximately the later part of 2010, Mr. Clifford Voelker vacated his position as head of Risk Management to become the fourth official Administrative Program Director of the SPTP. It is unclear whether Mr. Voelker had any actual expertise or past experience operating or managing a treatment facility. Since Mr. Voelker took over the role as Administrative Program Director of the SPTP he has implemented new policies that further restrict the rights of Plaintiffs and Class members. Mr. Voelker authorized the implementation of an updated Rule Book in August 2012 which was taken nearly directly from the KDOC Rule Book, in effect adopting prison rules, which further oppress and restrict Plaintiff's and Class member's rights to the point the SPTP is a maximum security prison, not a therapeutic treatment facility; the restriction of visitation privileges, limiting visitation of family and friends to weekends and holidays, between the hours of 8:30 am to 11:30 am and 12:30 pm to 3:30 pm only; the restriction of visitation privileges to the Plaintiffs and Class members own children only, limited to the second Saturday of the month, for a half an hour only, and limited to a maximum of three (3) children per visit; the restriction of visitation privileges, limiting visitation of family and friends to weekends only when children are not visiting; the elimination of the privilege of family and friends to bring in packages and consumable items for Plaintiffs and Class members during visitation; the elimination of the privilege to own personal bedding; the restriction of the privilege to order personal items such as hobby craft, hygiene items, consumable foods, electronics, and clothing from any vendor the Plaintiff or Class member chooses; the restriction of the privilege to order hobby craft and are supplies; and the elimination of the privilege to have an ice machine, ice cart, or ice dispenser on the Plaintiff's and Class member's living units.

Plaintiffs and Class members have been and continue to be injured by the shocking and intolerable acts and omissions of the Defendants.

80.     In November 2013, Mr. Cory Turner served as acting Administrative Program Director, after Clifford Voelker vacated the position.

81.     In December 2013, Mr. Benjamin Ramsey vacated his position as head of Risk Management to become acting Administrative Program Director of the SPTP. It is unclear whether Mr. Ramsey had any actual expertise or past experience operating or managing a treatment facility. Since Mr. Ramsey took over the role as Administrative Program Director of the SPTP, he has not rescinded or implemented any policies that restore any rights to the Plaintiffs or Class members, nor offer any less

restrictive alternatives for Plaintiffs and Class members. Rather, Mr. Ramsey has authorized the significant increase in security staff and the reduction in Activity Therapy staff, even though MH/DD and Treatment staff are already grossly understaffed. Increasing security staff, of which SPTP already has an overabundance, and reducing clinical and treatment staff will only compound SPTP problems and result in a more prison-like, anti-therapeutic, warehousing of the Plaintiff's and Class member's environment, and failure to provide constitutionally required adequate treatment to the Plaintiffs and Class members.

Plaintiffs and Class members have been and continue to be injured by the shocking and intolerable acts and omissions of the Defendants.

82.     In May 2014, Mr. Cory Turner took over duties as acting Administrative Program Director (APD) of the Kansas Sexual Predator Program (SPTP) when the position was vacated by Ben Ramsey. Within a week after assuming acting APD duties Mr. Turner directed Security/Property Officers to target Plaintiffs and Class members who own *already approved* MP 3 Players and confiscate them *in violation of their Due Process Rights.* When the Plaintiffs and Class members who had their MP 3 Players confiscated complained that Security/Property Officers were violating their Due Process Rights without giving them written notice, without giving them receipts for confiscated property, and without giving them their right to a hearing to argue their right to the confiscated property, Security/Property Officers replied that Cory Turner gave them the right to take away anything they want, that Plaintiff's and Class member's Due Process Rights don't matter, and he (Mr. Turner) will stand behind them (security) no matter what they want to do.

83.     Approximately August 25, 2014, Mr. Sean Wagner become the fifth official Administrative Program Director of the SPTP. It is unclear whether Mr. Wagner had any actual expertise or past experience operating or managing a treatment facility.

84.     Nearly every policy and procedure implemented since 2008 at the SPTP goes beyond the scope of what is necessary for treating Plaintiffs and Class members in a therapeutic manner based on professional judgment in a safe environment and instead was enacted for staff convenience. None of these restrictions were necessary prior to 2008, and many implemented even before 2008 have never been necessary, to maintain control or security of the facility. The restriction and changes have created a hostile environment that encourages a sense of hopelessness, powerlessness, and fear among Plaintiffs and Class members.

## D. PROBLEMS WITH THE SPTP AS IMPLEMENTED

85.     The rapid growth, rising costs, under staffing, and lack of adequate treatment have come

to the attention of the House Social Services Budget Committee and the Legislature many times over the years. As a result, in 2005 the House Social Services Budget Committee requested a Legislative Performance Audit, See *Exhibit G*; in 2009 the Senate Ways and Means Committee requested an . Overview of the Sexual Predator Treatment Program, See *Exhibit K*; in 2011 the House Social Services Budget Committee performed their own Overview of the Sexual Predator Treatment Program, See *Exhibit L*; in 2012 the Joint Commission examined Larned State Hospital for Accreditation, See *Exhibit M*; in 2013 the Larned State Hospital Fiscal Budget Report addressed these issues, See *Exhibit B*; in May 2013 the National Alliance on Mental Illness-Kansas submitted reform recommendations to the Kansas Governor's Behavioral Health Services Planning Council's Special Task Force for SPTP Reform, See *Exhibit N*; in 2013 the Legislative Post Audit Committee performed a Legislative Performance Audit which it released in September 2013 entitled *Performance Audit Report – Larned State Hospital: Reviewing the Operations of the Sexual Predator Treatment Program*, See *Exhibit H*; in 2013 the Kansas Governor's Behavioral Health Services Planning Council's Special Task Force for SPTP Reform performed a study of the SPTP and submitted their SPTP Reform recommendations to Secretary Shawn Sullivan of the Kansas Department for Aging and Disability Services November 21, 2013, See *Exhibit I*; and also in 2013 Kansas officials hired The Buckley Group, L.L.C., a consulting firm based in Englewood, Colorado to review operations at the Kansas Neurological Institute in Topeka, Kansas, and at the State facilities in Osawatomie, Parsons, and Larned, Kansas, including the SPTP. In October 2013 The Buckley Group, L.L.C. Submitted to Secretary Shawn Sullivan, it's review entitled, *State of Kansas Department for Aging and Disability Services Larned State Hospital Operations Assessment Executive Summary*, See *Exhibit O*.

86.     The treatment requirement written into the Kansas Sexually Violent Predator Act (KSVPA) serves, among other things, to distinguish civil commitment under the KSVPA from "punishment," which is forbidden by the Double Jeopardy Clause, contained in the Fifth Amendment to the United States Constitution. Adequate treatment of Plaintiffs' and Class members' mental conditions is also required by the Due Process Clause, contained in the Fourteenth Amendment to the United States Constitution, which prohibits state entities and officials from depriving a person of his liberty due to a treatable mental health condition without also making reasonable efforts to treat that condition, so as to afford the affected person a meaningful opportunity to regain his liberty. In addition, the Eighth Amendment to the United States Constitution, which prohibits cruel and unusual punishments requires that persons who are involuntarily confined due to an asserted mental health disorder be provided with adequate treatment for that disorder. Contrary to *Fournier v. Corzine*, 2007 U.S. Dist.

LEXIS 54110, the Eighth Amendment *does* apply, because, though Plaintiffs and Class members are civilly committed, their commitment under the KSVPA, though facially civil in nature, is so punitive in purpose and effect it transforms what was intended as a civil remedy into a criminal penalty. See. *Hudson v. United States*, 522 U.S. 939, 118 S. Ct. 488, 139 L. Ed. 450 (1997). (1) The sanction involves an affirmative disability or restraint; (2) The conditions, when compared with criminal confinement, would be historically regarded as punishment; (3) It comes into play only on a finding of scienter; (4) It's operation will promote the traditional aims of punishment, retribution and deterrence; (5) The behavior to which it applies is already a crime; (6) An alternative purpose to which it may rationally be connected is assignable to it; and (7) It appears excessive in relation to the alternative purpose assigned. See *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69, 83 S. Ct. 554, 9 L. Ed. 2d 644 (1963). Conditions at SPTP and under the KSVPA do suggest a punitive purpose on the State's part, where treatment is a mere afterthought. Though created in 1994, KSVPA was created to "protect the public from any further victimization by sexual offenders assigned to the Program... The overall goal of the program is 'no more victims.'" See *Exhibit S, The Sexual Predator Treatment Program of Kansas, Resident Handbook, November 2013*, pp. 3-4. Treatment was not provided until 1999. And only then as a smoke screen. SPTP treatment is a "sham" based on the "Relapse Prevention Model," though, "Review of the relapse prevention models of treatment failed to consistently demonstrate efficacy. Resent research in the field of sex offender treatment rejects the relapse prevention model." See *Exhibit A, The Vermont Bar Journal & Law Digest, Summer 2013, 39 Ver. B. J. & L. Dig. 26, "DEPARTMENT: SEX OFFENDERS AND THE LAW." By Renee Sorrentino, M.D.*

When compared to prison, SPTP not only fails to provide "more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish," *Turay v. Seling*, 108 F. Supp. 2d 1148, the conditions of confinement are identical, similar to, or even more punitive than the restrictive conditions imposed on convicted prisoners. Thus Plaintiffs and Class members are being subjected to punishment in violation of their constitutional rights. To the extent these conditions serve alternative, non-punitive purposes, they are excessive in relation to that alternative purpose. Therefore, the policies, practices, and conditions of confinement under the KSVPA deprive Plaintiffs and Class members of their right to be free from punishment. KSVPA fails to consider the least restrictive alternative confinement. KSVPA involves KDOC security officers as part of the treatment environment at SPTP, issue a "rulebook" similar to "rulebooks" given to KDOC inmates, which prohibit KSVPA Plaintiffs and Class members from operating a legitimate business, owning a cell phone, owning a computer, purchase of art supplies from a vendor other than

43

Walmart.com, Walgreens.com or Walkenhorsts (though even the KDOC allows art supply purchases from vendors such as Dick Blick), the purchase of personal vitamins (though even the KDOC allows the purchase of personal vitamins), the purchase of dental floss (though even the KDOC allows the purchase of personal dental floss), storing a Plaintiff's or Class member's personal disposable razor in his own room (though even the KDOC allows inmates to store their own personal disposable razors in their own rooms), owning personal bedding, owning personal pillows, etc. The "Resident Rulebook" lists infractions that may cause a Plaintiff or Class member to lose access to his personal property, his employment, his privileges liberty, or even his treatment/therapy. Though the "rulebook" declares the loss of privileges do not constitute punishment, the rules are applied in a punitive manner. Failure to follow all SPTP rules can result in punishment through loss of privileges, loss of program phase, being moved back in the program, loss of level, restriction to the unit, restriction to the Plaintiff's or Class member's room, or even restriction to the Intensive Treatment Unit (ITU) at Isaac Ray building.

Visitation is permitted only on weekends and approved holidays. Telephone calls may be monitored. Defendants have intentionally conspired to impede Plaintiff's and Class member's progress in the program to maintain Plaintiff's and Class member's commitment. Defendants refuse to investigate evidence Plaintiffs or Class members may not truly meet the criteria for SVP or that their "mental abnormality or personality disorder" has so changed (evidenced by the fact of the lack of "current" inappropriate sexual behavior) that the person is safe to be at large. Residents who are not participating in treatment have not been separated from Plaintiffs and Class members who are participating in the Program, which promotes abuse and harassment of participating Plaintiffs and Class members from non-participating residents. Plaintiffs and Class members are not allowed to move from unit to class, from unit to yard, from unit to church, from unit to library, from unit to cafeteria, or anywhere without staff escort (though KDOC prisoners don't even require escort to move from unit to cafeteria, or anywhere else, in a maximum security facility). Showers are locked at all times. Plaintiffs and Class members have to sign up to take a shower and beg for staff to unlock the shower door before they can take a shower (though even KDOC showers are not locked for prisoners). The Kansas SPTP resembles a prison. SPTP staff treat Plaintiffs and Class members as prisoners. The facility is surrounded by security fences covered with razor wire. The SPTP is staffed with KDOC security officers. Plaintiffs and Class members are transported for medical treatment and court appearances in handcuffs and shackles. Plaintiffs and Class members are locked in their rooms for long periods of time and subject to restrictions. Plaintiffs and Class members are subject to random searches that often lead to the destruction or confiscation of personal property. These searches are conducted by KDOC

44

security officers, who routinely conduct targeted searches and arbitrary punishment of Plaintiffs and Class members. Plaintiffs and Class members have suffered physical harm in the form of beatings and medications used as punishment at the hands of staff, in an attempt to "control" an agitated Plaintiff or Class member who chooses not to take his medication.

87.     Plaintiffs and Class members "have a right to prompt and adequate treatment, rehabilitation and educational services appropriate for such patient's condition... Which provides civilly-committed persons with access to mental health treatment that gives them a realistic opportunity to be cured or to improve the mental condition for which they were confined..." Pursuant to the Kansas Constitution, the Fourteenth Amendment to the United States Constitution, the ADA, the Rehabilitation Act, and K.S.A. § 59-29a22(b)(3), and as set forth by the Act itself.

88.     Notwithstanding their legal obligations to Plaintiffs and Class members, Defendants have failed and refused to provide even minimally adequate treatment to the Plaintiffs and Class members of the SPTP for the mental abnormality or personality disorders with which they were diagnosed as a precondition to commitment. Evidenced by the fact that SPTP uses the Relapse Prevention Model, though "Review of the relapse prevention models of treatment failed to consistently demonstrate efficacy. Resent research in the field of sex offender treatment rejects the relapse prevention model." See *Exhibit A, The Vermont Bar Journal & Law Digest, Summer 2013, 39 Ver. B. J. & L. Dig. 26, "DEPARTMENT: SEX OFFENDERS AND THE LAW." By Renee Sorrentino, M.D.* And evidenced by the fact that after twenty years only three residents: Donald R. Hale, Donald Hunt, and Jerry P. Inman have been released and considered to have so changed their mental abnormality or personality disorder that they were considered safe to be at large.

89.     Although KSVPA mandates that treatment be prompt and adequate, rehabilitation and educational services appropriate for such "patient's" condition, the Fourteenth Amendment requires state officials to provide civilly-committed persons with access to mental health treatment that gives them a realistic opportunity to be cured or to improve the mental condition for which they were confined, and the Turay Standards require adequate care and individualized treatment, clinical direction and supervision be consistently provided by qualified professionals, and treatment plans be individualized and comprehensive (See *Turay v. Seling,* 108 F. Supp. 2d 1148), virtually no individual therapy is provided, nor is adequate group therapy provided. Plaintiffs and Class members receive only three (3) hours of group therapy per week and an average of , *at most*, one (1) individual therapy session per month. Moreover, many groups fail to meet when scheduled, groups are often canceled by the therapist, start late, and/or end early, thus further reducing the Plaintiff's and Class member's

therapy time. This is a result of the fact there are only an average of seven (7) therapists for over two hundred and thirty two (232) Plaintiff's and Class members, at any given time. Only one (1) of those therapists is a Licensed Clinical Therapist, he is Okey Nwadhukwu-udaku – Licensed Clinical Therapist. Dennis Smith has a Social Work Degree, while Joshua Durr has a Human Services Counselor Degree. The rest of the therapists are only temporary interns and doctoral students. Therapists are overworked and underpaid, with over sixty plus (60+) Plaintiffs and Class members on their caseloads. They do not have the time to provide the prompt, adequate, or individualized treatment Plaintiff's and Class member's are entitled to.

90.    To be effective, groups must be small in size, must focus on sex offender – specific issues, and must be led by qualified mental health professionals with training in sex offender – specific treatment. In fact, groups at SPTP are overcrowded, unfocused, and poorly managed in part because they are facilitated by under-qualified and/or poorly-trained psychologists or social workers, some of whom have little or no background in sex offender – specific treatment. While most only use SPTP as a training ground and move on after just one year in the employ of the program. Whereas a program of SPTP magnitude should employ only the most highly trained/qualified professionals, SPTP therapists are notoriously the greenest interns merely looking for springboard training for a year, no more, so they can move on to a "more desirable" career. This creates an anti-therapeutic atmosphere which destroys all trust the Plaintiffs and Class members need to develop a therapeutic relationship with his therapist.

91.    Some of the Plaintiffs and Class members are enrolled in Psycho-educational core classes designed to address specific topics or skills, such as "relapse prevention," "relationship skills," "anger management," "cognitive skills," "human sexuality," and "victim empathy." When offered, such classes typically meet once a week for twelve weeks, after which the Plaintiff or Class member is told whether he has "passed" or "failed" the class.

92.    Although Plaintiffs and Class members must successfully complete all psycho-educational core classes to progress toward discharge, Defendants frequently prevent them from doing so by failing Plaintiffs or Class members or by failing to offer classes in a timely or orderly manner. The lack of offering classes in a timely or orderly manner is due in part to Defendants' failure to recruit and train enough qualified mental health professionals to lead them. Some of the staff members "Activity Therapists" (ATs) who do lead the classes are unqualified to do so. Moreover, the ATs often instruct Plaintiffs and Class members to retake classes they have already passed (sometimes two or three more times) simply because they opine the Plaintiff or Class member is not "ready" to move forward.

Psycho-educational core classes are not offered to all Plaintiffs or Class members, which prevents Plaintiffs and Class members from a reasonable opportunity to progress in their treatment. Plaintiffs and Class members have to enroll in these classes at the beginning of every quarter. However, taking psycho-educational classes does not count toward the Plaintiff's or Class member's placement in the enrollment order. Only so many Plaintiff's or Class members are allowed to sign up for each class. Psycho-educational classes are often full before the Plaintiff or Class member, who needs to take the required class, has the opportunity to enroll in it. Since each class is offered only once per year, this prevents the Plaintiff of Class member the opportunity to participate in the class, complete the class, and progress through treatment by at least an extra year. Should the same Plaintiff or Class member be excluded for the same reason the following year, etc., he *never* can progress..

93.     Defendants have rarely, if ever, recommended a Plaintiff or Class member for discharge. Members of the SPTP clinical staff who advocate internally for such recommendations tend to lose their jobs. Only three (3) residents have been discharged over Defendants' objections. However, twenty seven (27) residents have died in SPTP since 1994. In the Program's twenty (20) year history, it has been more likely that a Plaintiff or Class member will leave in a hearse than walk out to rejoin society.

94.     A barrier to discharge is Defendants' failure to meaningfully assist Plaintiffs and Class members with discharge planning. Under the KSVPA, a Plaintiff or Class member may be conditionally released "During any period the person is in transitional release, the person committed under this act at least annually, and at any other time deemed appropriate by the treatment staff, shall be examined by the treatment staff to determine if the person's mental abnormality or personality disorder has so changed so as to warrant such person being considered for conditional release." See K.S.A. § 59-29a18(a). And "if the court determines that the person should be placed on conditional release, the court, based upon the recommendation of the treatment staff, shall establish a plan of treatment which the person shall be ordered to follow. This plan of treatment may include, but shall not be limited to: Provisions as to where the person shall reside and with whom, taking prescribed medications, attending individual and group counseling, maintaining employment, having no contact with children, not frequenting facilities, locations, events or otherwise in which children are likely to be present, and not engaging in activities in which contact with children is unlikely. Upon a showing by the person that the person accepts the plan of treatment and is prepared to follow it, the court shall release the person from the transitional release program." See K.S.A. § 59-29a19(a). Absent a detailed discharge plan, covering matters such as where the person will live, where he will obtain continuing therapy, and how

47

he will pursue employment or job training, a Plaintiff or Class member cannot hope to satisfy this standard. And absent meaningful assistance from SPTP Staff, a Plaintiff or Class member who has been in prison and/or the SPTP for decades – and who has no access to the internet or to most other forms of modern communication – cannot hope to prepare such a plan. Yet, the staff routinely refuse to provide such assistance.

95.     Defendants have failed and refused to provide the Plaintiffs and Class members with minimally adequate job training, job opportunities, and educational opportunities within the SPTP, further reducing the chances that they will ever be able to reintegrate into society regardless of their mental health. The minimum-wage jobs available within the SPTP (during limited hours) are largely limited to kitchen and janitorial work. These so-called minimum wage jobs are limited to the Vocational Training Program (VTP). However, no vocational training is provided at all. When a Plaintiff or Class member loses his VTP position, the job is either awarded to another Plaintiff or Class member who already has a VTP job and wants more hours, or it is posted for Plaintiffs and Class· members to apply. All Plaintiffs and Class members who apply are interviewed, yet, only the most "qualified" Plaintiffs or Class members are hired for the job. In other words, a Plaintiff or Class member is only hired for the VTP job if he already knows how to do the job. No training or instruction is provided. The Plaintiff or Class member is on his own. Plaintiffs and Class members who have no job skills are not provided the job skills training they need to be able to obtain employment upon release, nor to develop a reasonable expectation of re-entering society. Plaintiffs and Class members who cannot read or write are not offered any educational courses to teach them these life skills. Neither are any GED courses offered to Plaintiffs or Class members who wish to obtain their GED. Moreover, there is no adequate internal complaint system or other mechanism (short of formal legal proceedings) available within the SPTP for complaints concerning the treatment program (whereas the complaints would be taken seriously with any real attempt by staff to resolve the issue).

As a result of Defendants' failure to provide adequate mental health treatment, and Defendants' related misconduct as described above, Plaintiffs and Class members have been deprived of their liberty and denied rights to which they are entitled under the constitutional and statutory laws of the United States and Kansas.

Plaintiffs and Class members have no adequate remedy at law to redress these wrongs. They have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, practices, and conduct of Defendants unless granted the relief sought herein.

96.     According to the *April 2005 Legislative Post Audit Committee Performance Audit*

48

*Report Larned State Hospital: Reviewing the Growth In the Sexual Predator Program*, See *Exhibit G*, The report contains the findings, conclusions, and recommendations of the completed performance audit. The Auditors found that, 'Since 1998, the number of residents in the Sexual Predator Treatment Program increased from 16 to 136. The Program is growing so fast because more sex offenders are being committed, and few are leaving. Larned State Hospital staff have found that an increasingly higher percentage of the sex offenders referred to them for a final evaluation have "sexual predator" *tendencies*. Those percentages increased from 39% in fiscal year 2000 to a peak of 94% in 2004. Larned State Hospital officials attributed this increase to the following:

The definition of a sexually violent predator was changed in 1999, which made it *easier* to classify a sex offender as a sexual predator. Although most of the definition remained the same, one phrase was changed: "...likely to engage in the *predatory* acts of sexual violence." (Notice the men submitted for evaluation did not magically become more dangerous or more out-of-control, nor did the evaluation process suddenly become more sophisticated. Instead, Legislators simply changed the wording of the statute to make it *easier* for them to indefinitely civilly commit someone).

Few sex offenders have left the Program to date, and many may never leave. Since the Program's inception is May 1994, only 20 of 156 offenders committed to the Program have left. Two offenders currently are on conditional release and one has received a final discharge. Six died while in the Program. One resident was released in 1999 and 10 were released in 2002 because of court rulings involving time frames and commitment requirements. Subsequently, State law was amended to make the time frames *advisory* rather than mandatory. (This amended law which conveniently claims the time frames requiring reasonable due process and speedy trial are advisory rather than mandatory, are a continuing mistreatment of a constitutional stature that has allowed the courts to hold a man indefinitely in jail when he hasn't even been charged with a crime, but has already paid his debt to society). We identified several reasons why offenders aren't leaving the Program:

The Sexual Predator Treatment Program (SPTP) is designed to provide long-term treatment, and most residents haven't been in the program long enough to complete it. Program officials estimate that a resident who is willing to – and capable of – participating should complete the Program in about seven years.'

The Program has been in existence for twenty (20) years as of September 2014 and still only three men have been released. Most have been in the program long enough to have graduated if the seven year goal were true. It should be noted that Dr. Austin DesLauriers, retired SPTP Clinical Program Director himself said, a "legitimate program should be expected to have graduates." See

DesLauriers & Gardner, *The Sexual Predator Treatment Program of Kansas*, *The Sexual Predator: Law, Policy, Evaluation, and Treatment*, PP. 11-21 (Schlant & Cohen eds. 1999). Furthermore, in 2003 the so-called estimated length of stay in the Program, according to Plaintiff's and Class member's Integrated Treatment Plans was two and a half to five years, which was increased to three to five years in 2004, then seven years according to the 2005 Legislative Post Audit Report, and finally indeterminate in 2008 – See *Exhibit J*. The Program has clearly been steadily lengthened to intentionally make it increasingly more difficult for Plaintiffs and Class members to progress and earn their release. Program officials think many Plaintiffs and Class members will never meet the high standards for completing the Program. The goal of the Program is cited as no new victims. To be recommended for conditional release, a Plaintiff or Class member must have successfully completed all seven phases of the Program, and Program officials and the Court of jurisdiction must agree that probable cause exists to think the Plaintiff or Class member is safe to be at large.

This impossible high standard of a guaranteed 'no new victims' and completion of all seven phases of the Program before release is a violation of K.S.A. § 59-29a07 '... the person shall be committed to the custody of the Secretary of Social and Rehabilitation Services for control, care and treatment until such time as the person's mental abnormality or personality disorder has so changed that the person is safe to be at large,' K.S.A. § 59-29a18 'The attorney general shall have the burden of proof (annually) to show ***beyond a reasonable doubt*** that the person's mental abnormality or personality disorder remains such that the person is not safe to be at large...' and 'He is thus permitted ***immediate*** release upon a showing that he is no longer dangerous and the ***longest*** he can be detained pursuant to a single judicial proceeding is ***one year***.' *Allen v. Illinois*, 478, U.S. 364,368, 921, Ed. 2d 296, 106 S. Ct. 2988.

The Plaintiff or Class member ***must*** be released if his ***current*** mental condition is ***not*** proven ***beyond a reasonable doubt*** yearly to ***not*** have changed. The test of the law, requiring the Plaintiff's or Class member's release, is not whether he has completed all phases of the program, but simply whether his so-called mental abnormality or personality disorder has been proven beyond a reasonable doubt ***not*** to have changed. Considering the fact that no actuarial tests that measure the Plaintiff's or Class member's mental abnormality or personality disorder are administered upon entering the Program, nor are any actuarial tests that measure the Plaintiff's or Class member's current mental condition or whether or not it has, in fact, changed or not are administered during the Plaintiff's or Class member's yearly review, as admitted by Licensed Clinical Psycho-Therapist Keri Applequist in *Burch v. Sullivan,* 313 P.3d 837 and *Dillingham v. State of Kansas* (2013). According to Keri

Applequist, "We do not assess mental condition or volitional control." The State cannot prove beyond a reasonable doubt that *any* Plaintiff's nor Class member's mental abnormality or personality disorder has *not* so changed that he would be safe to be at large. The fact that the true recidivism rate for sex offenses is lower than all other crimes, except murder, proves the State could have never proven beyond a reasonable doubt that Plaintiffs and Class members are a high risk to re-offend and therefore too *dangerous* to be at large in the first place. The remedy for this shocking and intolerable continuing mistreatment of a constitutional stature, in which Plaintiffs and Class members have been injured and continue to be injured is immediate release with prejudice.

Overall, program officials estimate that one-third (1/3) of those currently in the Program won't master the necessary skills to be placed on conditional release, because some Plaintiffs and Class members lack the motivation and discipline to complete the Program, others lack the capacity and some have severe mental problems and aren't able to change their thinking patterns. (While this statement is true for a few of the Plaintiffs and Class members, an estimate of one-third (1/3) is far too high. Most Plaintiffs and Class members, even those of lower functioning, still possess the capacity, and motivation to progress through the Program and receive conditional release. The real problem is the fact that not enough actual therapy is offered and too many road blocks have been installed into the Program. After Plaintiffs and Class members have worked hard in the Program to succeed, only to see their efforts swatted down, and having to repeat classes, presenting their material, and steps they have completed many times, over and over, they realize they are spinning their wheels, they get fed-up with a Program that was set up for failure, they then become deflated, frustrated, and give up, after seeing no "light at the end of the tunnel").

**Kansas' goal of 'no new victims' appears to be more stringent than other states**. Although most states share the goal of minimizing repeat sexual offenses, Kansas' program appears to have zero tolerance for the likelihood of repeat offenses. For a sexual predator to be released from Kansas' program, staff have to be convinced there's very little likelihood the Plaintiff or Class member will commit another sexual offense when he is allowed to re-enter society. Other states, for example, Wisconsin and Illinois, have released significantly more offenders from their sexual predator treatment programs than Kansas has.

Unlike other states, Kansas requires Plaintiffs and Class members to complete treatment before being released. Only Kansas and Minnesota have released residents solely because they completed program requirements. The other states have released residents because of other reasons, all of which relate to a resident making some progress – but not completing the treatment program.

51

The court is supposed to determine yearly, by hearing, whether the Plaintiff's or Class member's commitment should be extended. The burden of proof falls on the State. If sufficient evidence isn't presented to keep the Plaintiff or Class member committed, the Plaintiff or Class member is supposed to be released from the Program. (Unfortunately, this does not happen. Though the State is obligated to prove the Plaintiff or Class member should remain committed, no evidence is ever presented, and no hearing is ever held, unless the Plaintiff or Class member files the motion himself. The SPTP therapist who produces the yearly report, simply conducts a fifteen minute interview of the Plaintiff or Class member, whom he/she has never met before, nor observed for any length of time, and without any true means of measuring the Plaintiff's or Class member's *current* mental condition, automatically concludes that, because of the Plaintiff's or Class member's *past, he still remains a sexually violent predator whose mental abnormality or personality disorder has not changed).*

"Unless Kansas is willing to accept a higher level of risk of re-offense, few options exist to curb the growth of the Program. SRS officials have identified two options for moving some Plaintiffs and Class members out of the program more quickly. The options include:

Transferring medically frail Plaintiffs or Class members to community group residences. According to a Program official, about ten (10) Plaintiffs and Class members have become frail or disabled because of physical disease or aging. Officials from the Attorney General's Office said they could support conditional release and transfer to a nursing home for a Plaintiff or Class member who has been deemed 'safe' by Program staff.

Establishment of a community containment model for Plaintiffs in the transition phases of the Program.

Options to significantly limit the growth of the Program include changing the entrance or exit criteria, and modifying the type of treatment that's provided.

Options for restricting the Program growth include the following:

Taking fewer offenders into the Program. Entry criteria could be limited, for example, by excluding certain crimes.

Letting more sexual predators out of the Program. Under this option, program participants' risk level for re-offending would not have to be reduced to 'practically nil' before being released. A sexual predator can be released after receiving some treatment and making sufficient progress to convince Program officials his risk of re-offending has dropped to medium or low since he came into the Program. Kansas also could allow some sexual predators to be released when factors such as age or health make it unlikely that they will re-offend. Another possibility is to have outside

evaluators conduct the annual reassessment of the sexual predator. Outside evaluators might be more objective and assign a lower level of risk than Program staff who work with and see Plaintiffs and Class members on a regular basis.

Providing more treatment for sex offenders in prison.

Provide sexual predator treatment through outpatient services."

In response to the Legislative Post Audit Committee's Performance Audit Report recommendations, Gary J. Daniels, acting Secretary of the Kansas Social and Rehabilitation Services responded, in a letter, to Barbara J. Hinton, Legislative Post Auditor, "We appreciate the work your office has done on the evaluation of the SPTP, and we look forward to exploring alternative public policy and program management options with the Legislature. We support your recommendation of additional study and dialog during the 2005 interim."

Unfortunately, all this was simply brushed under the carpet. Nothing was ever accomplished, nor was there even an attempt to accomplish any positive change or reform of the broken SPTP. Defendants have failed and refused to honor the 2005 Legislative Post Audit Committee Performance Audit Report recommendations: transferring medically frail Plaintiffs and Class members to community group residences; releasing Plaintiffs and Class members back into community in transition phase, instead of Osawatomie (or Parsons); letting more Plaintiffs and Class members out of the program when his risk of re-offending has dropped to medium or low instead of "practically nil"; release those whose age or health make it unlikely they will re-offend; using outside evaluators who are more objective and likely to assign a lower level of risk than program staff; and provide Sexual Predator Treatment through outpatient services. See *Exhibit G, 2005 Legislative Post Audit Committee, Performance Audit Report, Larned State Hospital: Reviewing the Growth in the Sexual Predator Program.*

97.     According to the *January 27, 2009 Senate Ways & Means Committee Overview of Sexual Predator Treatment Program and Expansion*, This report contains an Overview of the Sexual Predator Program from Ray Dalton, Deputy Secretary of Kansas Social and Rehabilitation Services, as presented to Chairman Emler and the members of the Senate Ways & Means Committee. In Mr. Dalton's report, he admits in his own words that, "States have an obligation to provide a minimally acceptable and appropriate level of professional treatment to those who are forcibly detained. It is a requirement of due process to provide available health treatment to a convicted individual with a mental condition." See *Exhibit K, 2009 Senate Ways & Means Committee, Overview of Sexual Predator Treatment Program and Expansion.*

Regardless of the fact SPTP Administration take pride in claiming how the Kansas program is widely admired around the country, their words and figures are merely smoke and mirrors designed to cover up the fact Kansas SPTP does *not* provide the minimally acceptable and appropriate level of professional treatment required by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The Supreme Court has recited ten specific standards, known as the **Turay Standards**, by which an institutional based sexually violent predator program must be judged in order to meet Due Process Constitutional muster. See *Turay v. Seling*, 1999 Wash. LEXIS 74 (2000). The standards consist of:

1) Adequate competent staff that is supervised by a mental health professional.

According to the *2013 Legislative Post Audit Committee Legislative Performance Audit Report, Larned State Hospital: Reviewing the Operations of the Sexual Predator Treatment Program*, the SPTP is chronically understaffed, and direct care staff themselves report that they feel under trained. See *Exhibit H.* According to an November 30, 2013 article in the Topeka Capital · Journal entitled *Nurses: Death of State Hospital Patient Reveals Blame-Shifting*, "...survey teams from a national accreditation organization reported the facility was plagued by staffing shortages and turnover rates described as 'alarming.' LSH had lost two-thirds of its medical staff in a five – year period due to budget cuts and turnover attributed to poor morale and working conditions. Employees were forced to work overtime to the point they were physically and mentally exhausted... Wray, who had her 30-day suspension reduced to a two-day absence, said patients at the state hospital were vulnerable due to the hospital administration's indifference or inability to address under-staffing and overcrowding. She said nurses at the hospital complained about issues of patient safety for years but nothing has ever been done about it." See *Exhibit F, Critical News Reports*. Furthermore, SPTP is so lacking in professionally qualified therapists, Defendants are guilty of criminal negligence for intentionally not providing constitutionally required adequate treatment. For the current over 234 residents of the SPTP as estimated by the *Larned State Hospital 2013 Fiscal Budget Report*, there are only seven (7) therapists. See *Exhibit B.* Only one (1) of those therapists is a Licensed Clinical · Therapist, he is Okey Nwadhukwu-udaku – Licensed Clinical Therapist. Dennis Smith has a Social Work Degree, while Joshua Durr has a Human Services Counselor Degree. The rest of the therapists are only temporary interns and doctoral students. Keri Applequist, Licensed Clinical Psycho-Therapist was a qualified therapist, however, she now only performs yearly reports. Yet, without a Ph.D., she may not be qualified to perform these yearly reports. And in February 2014, Tapatha Strickler was fired, leaving the Dillon building without any qualified, licensed clinical therapist. Regardless, all

54

SPTP "therapists" provide unqualified, inadequate treatment for the two hundred thirty four plus (234+) Plaintiffs and Class members of the SPTP. That's at least thirty three (33) Plaintiffs or Class members per therapist caseload. Therapists often have over sixty plus (60+) Plaintiffs and Class members on their caseload. Therapists are required to handle clients in numbers that exceed their licensing and in ways that violate the regulations of the Kansas Behavioral Sciences Regulatory Board. To make matters worse, The Buckley Group's report to KDADS recommended the number of therapists be significantly reduced. The result would further reduce the slightest possibility for a Plaintiff or Class member to receive adequate treatment. See *Exhibit O, 2013 The Buckley Group, L.L.C., State of Kansas Department for Aging and Disability Services, Larned State Hospital Operations Assessment Executive Summary.*

2) Appropriate training of staff in order to ensure a consistency of treatment between all staff.

In the 2013 Legislative Performance Audit Report of the SPTP, direct care staff · themselves reported that they felt under-trained. See *Exhibit H, 2013 Legislative Post Audit Committee, Performance Audit Report, Larned State Hospital: Reviewing the Operations of the Sexucl Predator Treatment Program.*

3) Individualized treatment plans for patients. This includes providing the Plaintiff or Class member with a "road map" in a manner understandable to the Plaintiff or Class member as to what it takes to complete the treatment and show the progress of the Plaintiff or Class member.

No such "road map" is *ever* provided the Plaintiffs or Class members. Upon entering the program, Plaintiffs and Class members are given a small packet of papers, from which they are expected to figure out for themselves what is expected of them. The closest thing to a treatment plan for the Plaintiff or Class member is, every ninety (90) days the Plaintiff or Class member meets with his treatment team, who discuss his progress, by asking the Plaintiff or Class member how he thinks he is doing, and then report this progress on an "*Integrated Treatment Plan,*" which is no individualized treatment plan at all. It is, instead, a simple report of the Plaintiff's or Class member's progress to date.

4) Appropriate behavioral management policies and procedures.

5) Inclusions of the Plaintiff's and Class member's family in the rehabilitation effort, including visitation, telephone, and mail.

Plaintiff's and Class member's family are not adequately included in the Plaintiff's or Class member's treatment. There are not enough incoming phone lines. Many Plaintiffs and Class members cannot receive calls from their loved ones, because the only incoming phone lines are always

occupied. While visitation is extremely limited, to weekends and holidays only. Family members are sometimes allowed to listen in, by phone, during a Plaintiff's or Class member's Integrated Treatment Plan meeting. However, this seldom happens, and in no other way(s) is/are a Plaintiff's or Class member's family included in the Plaintiff's or Class member's therapy.

6) A treatment oriented "flavor" to the facility that is *lacking* a Department of Corrections "flavor." The SPTP facility lacks a treatment oriented "flavor." a) With an average of three (3) to, at most, seven (7) hours of therapy and/or psycho-education per week, there isn't enough treatment provided to qualify as a treatment facility, nor to provide a therapeutic environment. b) The Direct Care (MH/DD) Staff are overworked, underpaid, poorly trained, stressed out, and unprofessional toward Plaintiffs and Class members, causing a stressful environment for Plaintiffs and Class members. c) Direct Care (MH/DD) Staff act like Department of Corrections Officers; treat Plaintiffs and Class members disrespectfully; demean and threaten Plaintiffs and Class members; apply Department or Corrections type rules, taken directly from the Department of Corrections Rule Book; inconsistently apply rules abusively and threaten Plaintiffs and Class members with punishment; frequently ignore Plaintiff's and Class member's needs and requests; frequently refuse to do their jobs (ex.: MH/DD Toni Dill refused to take Class member Randall Ritchie to the visitation room for a visit with his wife, though CTS Tony Martinez had called her and given her orders to do so. Class member Randall Ritchie filed a grievance on the incident, but the only answer he received was, "Thank you for the information"); and neglect Plaintiffs and Class members who have legitimate medical needs, even when the Plaintiff or Class member has a medical emergency, often allowing the Plaintiff or Class member to suffer and/or die (ex.: Resident Robert Boatright, whom MH/DD Staff knew had heart problems, passed out in the Dillon building West One Unit north day room – MH/DD Staff ignored him and refused to call a medical emergency. It was only after his fellow residents, now Plaintiffs and Class members, complained enough MH/DD Staff could no longer ignore them, that MH/DD Staff "helped" Robert Boatright to his room. They told him to rest. Robert Boatright died that evening from heart attack and burst veins). d) Department of Corrections type rules implemented deprive Plaintiffs and Class members of dignity, and humiliate, demean, and torture Plaintiffs and Class members (ex.: Plaintiffs and Class members are not allowed to have their overhead fluorescent lights off at night. A very bright night light, which has been installed in the Plaintiff's and Class member's overhead light, cannot be shut off. It shines in the Plaintiff's and Class member's face all night. Many Plaintiffs and Class members cannot sleep with the light shinning in their faces, which deprives them of sleep and tortures them. Plaintiffs and Class members are punished if they try to cover the night light in any way,

56

so they can sleep. As well, Plaintiffs and Class members are not allowed to cover their room door window long enough to change or toilet, depriving them of the dignity of privacy for changing and toileting. Plaintiffs and Class members are punished if they try to cover their window in any way to change or toilet in privacy). e) Plaintiffs and Class members are often locked in their rooms, given a sedative, or locked down on a punishment/seclusion unit (referred to as the Intensive Treatment Unit "ITU", located in the Isaac Ray building), as punishment. f) Plaintiffs and Class members are locked on their units and are not allowed movement to anywhere without MH/DD Staff escort. This type of treatment is more strict than in a maximum security facility prison. g) Plaintiffs and Class members are not allowed to trade food (a Department of Corrections rule called "dealing and trading"). Plaintiffs and Class members who wish to trade food are punished. h) SPTP employs an overabundance of security staff, many of whom were Department of Corrections officers, and apply the rules as strictly as if SPTP were a maximum security prison facility. i) Security officers use excessive force while attempting to control agitated Plaintiffs and Class members. And j) Plaintiffs and Class members are housed in secure buildings, behind tall fences with locked gates, and razor wire. All or which looks and feels just like a maximum security facility prison, but gives SPTP nothing but a Department of Corrections "flavor." Plaintiffs and Class members have been and continue to be injured by this shocking and intolerable, continuing mistreatment of a constitutional stature.

7) Separation of participating Plaintiffs and Class members from non-participating residents, in order to avoid harassment of the participating Plaintiffs and Class members. (Note: SPTP does *not* separate non-participating residents from participating Plaintiffs and Class members. All residents are housed together, whether they are participating in the program or not. Non-participating residents continuously harass, threaten, and belittle participating Plaintiffs and Class members. They continuously discourage participating Plaintiffs and Class members from participating. Oftentimes non-participating residents physically assault participating Plaintiffs and Class members in an effort to promote negativity and force all Plaintiffs and Class members to develop a negative attitude toward treatment. This has oftentimes worked. It has created a stressful, anti-therapeutic environment where Plaintiffs and Class members who have tried to participate have become afraid and depressed, and have lost hope. Plaintiffs and Class members have been injured by and continue to be injured by Defendants shocking and intolerable continuing mistreatment of a constitutional stature.

8) Educational, vocational, religious, and recreational opportunities.

SPTP does not offer educational opportunities equally to all Plaintiffs and Class members. Plaintiffs and Class members must enroll in psycho-educational classes each quarter. There

57

are a limited number of Plaintiffs and Class members allowed to enroll in each class. If the class is full before the Plaintiff's or Class member's turn to enroll, he is not allowed to take the class. Since each class is only offered once per year, the Plaintiff or Class member is not allowed to take the class. Since each class is only offered once per year, the Plaintiff or Class member is held back at least a year in his treatment, through no fault of his own. If the Plaintiff or Class member cannot read or write, or his education level is not at the college level, the Plaintiff or Class member cannot succeed (psycho-educational class tests are college level difficulty). Defendants contend they are not obligated to teach reading and writing, or GED classes.

Though SPTP has a so-called vocational-technical training program (VTP), the program is a sham. Though VTP and job opportunities should be offered to all Plaintiffs and Class members, no such opportunity exists. There are *no* paying jobs other than so-called VTP jobs. There are only a handful of VTP jobs. Those are kitchen and environmental jobs, which involve either food preparation, food serving, or cleaning/janitorial work. Though a vocational training program is supposed to provide job training for Plaintiffs and Class members who have no job skills, so they will be prepared to find work when released from SPTP, no such training exists. When a VTP job is vacated by a Plaintiff or Class member, Defendants take applications from interested Plaintiffs and Class members, and interview them to find the most qualified Plaintiff or Class member, who already has the job skills to fill the position. The last question asked of the Plaintiff or Class member during the interview is, "what makes you the most qualified resident for the job?" In fact, if a Plaintiff or Class member does not already possess job skills, he will never get a so-called VTP job. No job training is offered when the Plaintiff or Class member is hired. He is given the job, in most cases without supervision, and expected to know what he is supposed to do.

Religious rights are often denied to Plaintiffs and Class members. See *Exhibit P, Plaintiff's and Class member's Resident Grievance Forms* and *Exhibit Q, Plaintiff's and Class member's Resident Class Action Questionnaires.*

In October 2013 The Buckley Group, L.L.C. Recommended SPTP reduce the number of Activity Therapists (AT) positions. See *Exhibit O, 2013 The Buckley Group, L.L.C., State of Kansas Department for Aging and Disability Services, Larned State Hospital, Operations Assessment Executive Summary.* As a result, KDADS secretary Shawn Sullivan directed SPTP to reduce ATs to save the State three (3) million dollars. Unfortunately, ATs are necessary not only because they are the only employees who teach psycho-educational classes, but because they are the only employees who conduct activities for the Plaintiffs and Class members to participate in. Plaintiffs and Class members

are not allowed any activities without first enrolling in them. Nor are they allowed to attend an activity without an AT present. All activities are pre-scheduled. However, these same activities are regularly canceled, throughout the quarter, when an AT cannot come into work for whatever reason. This includes the recreational opportunities not only ordered by the U.S. Supreme Court in the Turay Standards, but which are necessary for the Plaintiff's or Class member's emotional psychological, and physical health, in order to live a balanced lifestyle. These recreational necessities include scheduled activities such as: gym and swim, walking and yard, softball, weight lifting, social recreation, interactive games, leisure art, and library. However, fifty six (56) hours of gym and swim activities were canceled; one hundred (100) hours of walking and yard activities were canceled; twelve (12) hours of softball activities were canceled; six (6) hours of weight lifting activities were canceled; ten (10) hours of social recreation activities were canceled; ten (10) hours of interactive games activities were canceled; sixteen (16) hours of leisure art activities were canceled; and eight (8) hours of library activities were canceled between October 2013 and September 2014. As the number of ATs are reduced, more of these recreational opportunities will eventually be eliminated. The danger being that these required recreational opportunities will eventually be eliminated completely. Plaintiffs and Class members have been injured and continue to be injured by Defendants' shocking and intolerable continuing mistreatment of a constitutional stature.

9) Availability of a grievance procedure. A grievance procedure was created for the SPTP as a mere show that SPTP was attempting to comply with this standard. The current grievance procedure is a sham. The SPTP Grievance Officer works for the SPTP, works out of the same office occupied by the Administrative Program Director (APD), and answers to SPTP Administration. The Plaintiff's and Class member's grievances are almost never given serious consideration. See *Exhibit P, Plaintiff's and Class member's Resident Grievance Forms*. Plaintiffs and Class members have been injured and continue to be injured by Defendants' shocking and intolerable continuing mistreatment of a constitutional stature.

10) External oversight, either in the form of licensing, certification, or a consultation agreement. Larned State Hospital uses The Joint Commission for it's accreditation. Unfortunately, The Joint Commission does not examine or monitor Larned State Hospital closely enough. Accreditation is only conducted once every three (3) years. The Joint Commission only inspects material LSH/SPTP officials provide them. LSH/SPTP officials typically lie to The Joint Commission, provide false figures, or cover up the truth. According to the November 30, 2013 article in the Topeka Capital Journal entitled *Nurses: Death of State Hospital Patient Reveals Blame-Shifting*, "The unexpected

59

death of a 76-year-old man with dementia, schizophrenia and cancer after a seven-month stay at Larned State Hospital continues to reverberate among administrators assigning responsibility and nurses targeted by their wrath... The external reviewer also pointed to dozens of other infractions at LSH, including poor documentation and inadequate oversight of medication. Sanctions were delivered immediately after The Joint Commission, which accredits and certifies more than 20,000 health care organizations in the United States, made a second site visit to LSH and agreed to certify the hospital. 'The hospital knew the Joint Commission would be very interested in the case,' said Stephanie Harper, an LPN suspended for 30 days. 'They knew this was a systemic hospital problem and didn't want the Joint Commission to know about it. So, the hospital waited until after their accreditation was attained.'" During the 2012 Joint Commission of the LSH accreditation, The Joint Commission identified standard deficiency in several areas, partial compliance in several areas, and insufficient compliance in numerous areas, yet the Joint Commission granted LSH accreditation anyway. See *Exhibit M, 2012 The Joint Commission, Larned State Hospital, Hospital Accreditation Report*. The Joint Commission therefore, fails as an effective external oversight of the LSH and SPTP. A more effective external oversight, one which engages regularly with SPTP in order to keep SPTP officials honest, is required.

　　　　　According to Ray Dalton's *2009 Senate Ways & Means Committee report*, 'The overarching principle of the program is "no more victims," which we believe is consistent with the legislative intent to protect the citizens of Kansas... The program has been steadily growing from its inception in 1994. We currently have 175 residents in the program at Larned and 8 residents in the transition program at Osawatomie State Hospital... Every person ultimately committed to the SVP program has been screened several times and determined to present an extremely high level of risk of repeating their prior sex offending behaviors...The best estimates of growth at this time are the historical averages which are approximately 16 persons per year to the SPTP at LSH and approximately two persons per year moving from the inpatient program at Larned to the Transitional Housing Services at OSH... The numbers of persons released from similar programs around the country appears to be higher than Kansas... In its 14-year history, Kansas has had 2 persons who have been granted final release by the courts... One aspect of the Kansas program which is widely admired around the country is the systematic structure of our transition programming... This is a strong advantage of the Kansas approach but also adds to time required for a resident to complete the program. Given the focus of "no more victims" for the Kansas program, this additional time has the value of giving program staff the opportunity to observe the real-world behavior of the resident before any recommendation for

conditional release is made... In addition to the need to fund staffing and Other Operating Expenses (OOE) for the growth of these programs, as you have already heard from my testimony we are running out of physical space to treat the SPTP and THS residents. If the current growth rates is maintained we will be out of space for the SPTP at LSH sometime during FY 2012... A proviso to last year's Appropriations Bill directed SRS to conduct a study to consider the feasibility of transferring the Sexual Predator Treatment Program (SPTP) from Larned State Hospital and relocating it to a new location within the state.' See *Exhibit K, 2009 Senate Ways & Means Committee, Overview of Sexual Predator Treatment Program and Expansion.*

According to the April 2005 Legislative Post Audit Committee Performance Audit Report, the goal of "no more victims," is "more stringent than other states." See *Exhibit G, 2005 Legislative Post Audit Committee, Performance Audit Report, Larned State Hospital: Reviewing the Growth in the Sexual Predator Program.* The Department of Corrections own records of recidivism rates show that recidivism rates for all sex offenders is no higher than 3.5%. In fact, all organizations that record recidivism rates nationwide consistently report that all sex offenders have the lowest recidivism rate of all offenders, except murderers. This statistic alone shows that the evaluators who claim SVPs have a high risk for re-offense are guilty of false testimony. If sex offenders recidivism rates are lower than all other offenders, except murderers, then clearly SVPs have a lower risk of re-offense than nearly all offenders. SVPs who are held under the pretense of dangerousness, are therefore held illegally, for they are not so dangerous as the State claims. Furthermore, this impossibly high standard of "no more victims" is a violation of K.S.A. § 59-29a07 "...the person shall be committed to the custody of the secretary of social and rehabilitation services for control, care and treatment until such time as the person is safe to be at large," K.S.A. § 59-29a18 "The attorney general shall have the burden of proof (annually) to show *beyond a reasonable doubt* that the person's mental abnormality or personality disorder remains such that the person is not safe to be at large..." and "He is thus permitted *immediate* release upon showing that he is no longer dangerous and the *longest* he can be detained pursuant to a single judicial proceeding is *one year.*" See *Allen v. Illinois*, 478 U.S. 364, 368, 921 Ed. 2d 296, 106 S. Ct. 2988. The Plaintiff or Class member *must* be released if his *current* mental condition is not proven beyond a reasonable doubt yearly to *not* have changed. SPTPs overarching principle of "no more victims" being the measure by which Defendants would release Plaintiffs and Class members from SPTP is in violation of K.S.A. statutes, case law precedent, and United States Constitutional rights.

Defendants admit the Transitional Program only allows eight (8) Plaintiffs or Class

members at a time. However, their contention that an average of two Plaintiffs or Class members per year move into the Transitional Program is incorrect. The average is not that high. The program stagnates and bottlenecks at the transitional phase, because most Plaintiffs and Class members in the transitional phase go nowhere. The ones that do leave generally do not get conditional release, but are rolled back into the SPTP, to a lower phase, for various reasons. Many Plaintiffs and Class members have been waiting years to enter the transitional phase, even after the courts have awarded him transitional release, simply because transition is full. Defendants simply use the excuse, "There aren't enough beds for you in transition." Defendants are denying the Plaintiffs and Class members their constitutional right to "progress through the program as appropriate." See *Exhibit B, 2013 Larned State Hospital Fiscal Budget Report*. The remedy for the continuing injury to the Plaintiffs and Class members by the Defendants violation of the Plaintiff's and Class member's constitutional rights is immediate release with prejudice. Absent a constitutional program Plaintiffs and Class members should have the right to have the oppressive "Sexually Violent Predator" label removed and the lifetime registration punishment removed. These labels and conditions cause Plaintiffs and Class members continuing injury in the form of public bias, harassment, and threats of bodily harm to their persons and/or the persons of their loved ones, family members, and/or relatives. Numerous cases of sex offenders being persecuted, prejudiced against, physically beaten, and/or murdered because of irrational public fear and prejudice are well documented.

Defendants admit the SPTP growth rate is increasing. The report estimated SPTP would run out of physical space to treat SPTP residents during FY 2012. According to the *2013 Larned State Hospital Fiscal Budget Report*, this estimate was correct. "The current census for the SPTP at the Larned State Hospital was 229 as of November 15, 2011. The habitable bed capacity for the SPTP is 195." See *Exhibit B, 2013 Larned State Hospital Fiscal Budget Report*, p. 697. SPTP is overcrowded, which causes a stressful, anti-therapeutic environment. SPTP is understaffed, without enough qualified therapists or treatment staff to provide constitutionally required adequate treatment to so many Plaintiffs and Class members. See *Exhibit B, 2013 Larned State Hospital Fiscal Budget Report*.

Defendants admit only 2 residents had ever been released from SPTP (3 as of September 2014), and "similar programs around the country appear to (have a higher release rate) than Kansas..." Kansas' true intent is not to provide constitutionally adequate treatment that, "...gives them a realistic opportunity to be cured or to improve the mental condition for which they were confined." See *Youngberg v. Romeo*, 457 U.S. 307, 319-22, 73L. Ed. 2d 28, 102 S. Ct. 2452 (1982); *Ohlinger v. Watson*, 652 F. 2d 775, 778 (9th Cir. 1980). 'This rule applies to sex offenders, and "lack of funds, staff

or facilities cannot justify the State's failure to provide [those confined] with that treatment necessary for rehabilitation.'" See *Ohlinger v. Watson*, 652 F. 2d at 778-79. But, by designing a program that releases only three (3) residents in a twenty (20) year period, which "adds to time required for a resident to complete the program," and bottlenecks at the transitional phase, the true purpose appears to be to warehouse and not release any Plaintiff or Class member, holding him indefinitely, for the rest of his natural life [a possible life sentence, given twenty seven (27) residents have died, statistically the odds are higher a Plaintiff or Class member will die than ever be released]. SPTP therefore, in a very real sense, is a prison masquerading as a treatment facility, and is punitive, thus a violation of Plaintiff's and Class member's constitutional rights against Double Jeopardy. For the Plaintiffs and Class members have already served a punitive sentence for their offenses.

Defendants admit they were directed to study the feasibility of transferring SPTP from Larned State Hospital and relocating it to a new location within the state. In fact, this recommendation has been made several times throughout the years (most recently in the *2013 Legislative Performance Audit Report*), yet this recommendation has never been given serious consideration by the Defendants. Relocating the program to a more populaced area would cure several of the programs problems, such as: lack of qualified employees, problems employing enough staff due to a limited pool of possible recruits who have any interest in working for LSH or SPTP, and SPTP overcrowding due to limited physical space to house SPTP Plaintiffs and Class members. Plaintiffs and Class members have suffered and continue to suffer harm as a result of Defendants wrongful, shocking and intolerable conduct, and continuing mistreatment of a constitutional stature. See *Exhibit H, 2013 Legislative Post Audit Committee, Performance Audit Report, Larned State Hospital: Reviewing the Operations of the Sexual Predator Treatment Program*.

98.    According to *Exhibit L, January 26, 2011 House Social Services Budget Committee Overview of Sexual Predator Treatment Program*, This report contains an Overview of the Sexual Predator Treatment Program from Ray Dalton, Deputy Secretary of Kansas Social and Rehabilitation Services, as presented to Chairperson Crum and members of the House Social Services Budget Committee. In Mr. Dalton's report, he restates the SPTP constitutional obligation to "provide a minimally acceptable and appropriate level of professional treatment to those who are forcibly detained," as required by the due process clause of the Fourteenth Amendment to the United States Constitution, and the United States Supreme Court Turay Standards (*Turay v. Seling*, 1999 Wash. LEXIS 74 (2000)).

Mr. Dalton reports, "The current census for the Sexual Predator Treatment Program

(SPTP) at Larned State Hospital (LSH) is 200 as of January 1, 2011. The designed bed capacity for the SPTP at LSH is 214. If the current projections on the growth of the SPTP hold true then the total bed capacity available at Larned will be reached in FY 2012:.. The current transitional program is the transition house located on the grounds of Osawatomie State Hospital. State law limits the number of residents in a transitional program to eight per county... The SPTP is, for the great majority of residents, a post-incarceration program. In other words, residents who have served the time in prison proscribed by the courts for their offenses are then mandated to the SPTP because they are seen as still constituting a risk for harm to the citizens of Kansas... residents have due process procedures available to them within the program which allow for appeal to the Superintendent of the hospital and the Secretary of SRS. All complaints are taken seriously..."

Mr. Dalton quite correctly estimated SPTP bed capacity would be reached in FY 2012. Not only was the bed capacity reached, it was surpassed. According to *Exhibit B, 2013 Larned State Hospital Fiscal Budget Report*, "According to the Department (SRS), all three facilities (State Mental Hospitals, which includes Larned State Hospital and the Sexual Predator Treatment Program) were full beyond licensed capacities and the agency did not have additional resources to serve persons seeking voluntary admissions." The Fiscal Budget Report reports the SPTP budgeted bed capacity for persons on the campus of Larned State Hospital was only 177 for Fiscal Year 2013, and 8 for persons residing at the MiCO House (transition house) on the campus of Osawatomie State Hospital, while the average number of patients in the SPTP on the campus of Larned State Hospital for the Fiscal Year 2013 was 234, while the average number of patients residing at the MiCO House (transition house) on the campus of Osawatomie State Hospital was 8. SPTP is therefore not only full beyond licensed capacities, but grossly overcrowded. Which causes a stressful, anti-therapeutic, unconstitutionally punitive environment.

Mr. Dalton reports the transitional program, by state law, limits the program to eight (8) per county. The fact that the transitional program only existed on the grounds of the Osawatomie State Hospital, limited the transitional program to eight (8) Plaintiffs and Class members total then. And therefore, since the transitional program was always full with eight (8) Plaintiffs and Class members, no other Plaintiff or Class member, no matter how long he has been eligible, has been allowed to enter the transitional program. The SPTP therefore is unconstitutional since it blocks the Plaintiff's and Class member's from their Fourteenth Amendment United States Constitutional right to "progress through the program as appropriate."

In Mr. Dalton's own words, "SPTP is a post-incarceration program for residents who

64

have *already* served their time in prison." The fact that the majority of Plaintiffs and Class members have already served their time for the offenses for which they were sentenced to prison, and the SPTP has become so punitive it has more of a Department of Corrections "flavor" than a treatment "flavor" and fails to provide the constitutionally required Fourteenth Amendment Due Process Clause minimally acceptable and appropriate level of professional treatment, SPTP is therefore unconstitutional and in violation of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, § 10 of Kansas' Constitution, and K.S.A. § 59-29a09 itself, "The involuntary detention or commitment of persons under this act shall conform to constitutional requirements for care and treatment."

Though Mr. Dalton reports that SPTP residents have due process procedures available within the program, and all complaints are taken seriously, as discussed previously, Defendants have failed and refused to provide Plaintiffs and Class members with an *adequate* internal complaint system or other mechanism (short of legal proceedings) to effectively communicate complaints (that will not be ignored, inadequately handled, or used to intentionally retaliate or discriminate against the Plaintiff or Class member) concerning his mental health treatment. See *Exhibit L, 2011 House Social Services Budget Committee, Overview of Sexual Predator Treatment Program.*

Defendants conduct has caused and continues to cause Plaintiffs and Class members harm and is both shocking and intolerable, and a continuing mistreatment of a constitutional stature, in violation of Plaintiff's and Class member's constitutional rights.

99. According to the *2012 Joint Commission, Larned State Hospital, Hospital Accreditation Report*, this report contains the accreditation findings made by the Joint Commission Accreditation Committee. According to the report, The Joint Commission granted the hospital accreditation, even though LSH, including SPTP, failed compliance in numerous critical areas. Under Executive Summary, Hospital Accreditation, the report states, "As a result of the accreditation activity conducted on the above dates(s), you have met the criteria for Accreditation with Follow-up Survey." Yet, the same report clearly shows these critical areas of insufficient compliance:

1) Emergency Management: Credentialed Practitioners. Insufficient Compliance; 2) Environment of Care: Physical Environment, fire safety equipment and fire safety building features. Insufficient Compliance. This Standard is NOT MET; 3) Environment of Care: Physical Environment, emergency power systems. Insufficient Compliance. This Standard is NOT MET; 4) Human Resources: Organizational Structure, staff qualifications. Insufficient Compliance. This Standard is NOT MET; 5) Leadership: Staffing. Insufficient Compliance; 6) Leadership: Quality Improvement Expertise/ Activities. Insufficient Compliance. This Standard is NOT MET; 7) Leadership: Staffing.

Insufficient Compliance. This Standard is NOT MET; 8) Leadership: Information Management. Insufficient Compliance; 9) Medical Staff: Information Management, the organized medical staff oversees the quality of patient care, treatment, and services provided by practitioners privileged through the medical staff process. Insufficient Compliance. 10) Medical Staff: Credentialed Practitioners, the organized medical staff has a leadership role in organization performance improvement activities to improve quality of care, treatment, and services and patient safety. Insufficient Compliance. This Standard is NOT MET; 11) Medical Staff: Information Management. Insufficient Compliance; 12) Medical Staff: Credentialed Practitioners, the hospital collects information regarding each practitioner's current license status, training, experience, competence, and ability to perform the requested privilege. Insufficient Compliance. The Standard is NOT MET; 13) Medical Staff: Credentialed Practitioners, the decision to grant or deny a privilege(s), and/or to renew an existing privilege(s), is an objective, evidence-based process. Insufficient Compliance. This Standard is NOT MET; 14) Medical Staff: Credentialed Practitioners, the organized medical staff defines the circumstances requiring monitoring and evaluation of a practitioner's professional performance. Insufficient Compliance. 15) Medication Management, the hospital addresses the safe use of look-alike/sound-alike medications. Insufficient Compliance. 16) Medication Management, the hospital selects and procures medications. Insufficient Compliance. This Standard is NOT MET; 17) Medication Management, a pharmacist reviews the appropriateness of all medication orders for medications to be dispensed in the hospital. Insufficient Compliance. This Standard is NOT MET; 18) Medication Management, when an individualized medication(s) is prepared by someone other than the person administering the medication, the label includes the following: The patient's name. Insufficient Compliance; 19) Medication Management. The hospital safely obtains medications when the pharmacy is closed. Insufficient Compliance. 20) Provision of Care, Treatment, and Services: Assessment and Care/Services. Insufficient Compliance. 21) Provision of Care, Treatment, and Services: Assessment and Care Services, resuscitation services are available throughout the hospital. Insufficient Compliance. 22) Record of Care, Treatment, and Services: Information Management, the hospital maintains complete and accurate medical records for each individual patient. Insufficient Compliance. This Standard is NOT MET; 23) Record of Care, Treatment, and Services: Medication Management, the medical record contains information that reflects the patient's care, treatment, and services. Insufficient Compliance. This Standard is NOT MET. See *Exhibit M, 2012 The Joint Commission, Larned State Hospital, Hospital Accreditation Report.*

        These ongoing insufficiencies are clear proof of Defendants' blatant disregard of their

Fourteenth Amendment Due Process Clause of the United States Constitutional obligation to provide civilly – committed persons, such as Plaintiffs and Class members, with access to mental health treatment that gives them a realistic opportunity to be cured or to improve the mental condition for which they were confined. See *Youngberg v. Romeo*, 457 U.S. 307, 319-22, 73L. Ed. 2d 28, 102 S. Ct. 2452 (1982); *Ohlinger v. Watson*, 652 F. 2d 775, 778 (9ᵗʰ Cir. 1980). Specifically, items #5) Failure to recruit and retain adequate qualified leadership, or other staff to provide access to the level of mental health care required to give Plaintiffs and Class members the realistic opportunity to improve their mental condition; #6) Failure to prioritize changes in the physical environment, staff training, and enhanced patient assessment to obviate the risk of suicide to the fullest extent possible; #7) The numbers of qualified therapists, support personnel, and consultants to provide comprehensive therapeutic activities consistent with each patients' active program is perpetually inadequate due to chronic staff shortages and alarmingly high rates of staff turnover and vacancies, directly contributing to treatment/care concerns of Plaintiffs and Class members, an ongoing problem for the entire history of the SPTP since its inception in 1994; #10) Inadequate oversight of the medical and psychiatric assessment and treatment, resulting in deficiencies in assessment, treatment, and development and implementation of appropriate guidelines and standards of care; #12) Failure to employ qualified staff, inability to recruit enough qualified staff, and inability to retain enough qualified staff, whose licenses, training, experience, and competence, provide the ability to perform the minimally required treatment to Plaintiffs and Class members; #13) Failure to employ qualified staff to provide psychiatric care as part of Plaintiff's and Class member's mental health treatment, as evidenced by the fact a primary care physician without any postgraduate or continuing education in the assessment and treatment of psychiatric patients was given the same full privileges as those who had completed full postgraduate training in the field in which they were given privileges, and no documentation existed in the credentials file containing any evidence of any education or training in the performance of a complete psychiatric examination – also an ongoing, chronic insufficiency in SPTP since it's inception in 1994; #14) Insufficient monitoring by an external source to evaluate staff performance and ensure adequate competence for the required services to Plaintiffs and Class members relevant to the privileges granted.

These ongoing insufficiencies are also clear proof of Defendants blatant disregard of their obligation to adhere to the ***Turay Standards***, as set forth by the United States Supreme Court. See *Turay v. Seling*, 1999 Wash. LEXIS 74 (2000). Specifically, items #4) The hospital must assure that personnel are licensed or meet other applicable standards that are required by State or local laws, was not met, as evidenced by both the Infection Control Nurse and the "Agency" nurse practicing on

67

expired licenses; #5) The medical staff having lost almost two thirds of it's members due to turnover and elimination of positions; #7) The number of qualified therapists, support personnel, and consultants are not adequate to provide comprehensive therapeutic activities consistent with each patient's active treatment program, as evidenced by the chronic staff shortages and alarmingly high rates of staff turnover and vacancies at the SPTP; #10) Staff turnover at the highest level, including the resignation of the Medical director, contributing to insufficient oversight of the medical and psychiatric assessment and treatment of Plaintiffs and Class members; #12) The resignation of the Medical director and inability to recruit a person with the required qualifications creates difficulty in retaining adequate, competent staff such as clinical director, service chief, or equivalent who meet the training and experience requirements for examination by the American Board of Psychiatry and Neurology or the American Osteopathic Board of Neurology and Psychiatry; #13) The medical staff does not adequately examine the credentials of candidates for medical staff membership as required before the decision to grant or deny a privilege(s), and/or to renew an existing privilege(s), as evidenced by the primary care physician without any postgraduate or continuing education in the assessment and treatment of psychiatric patients who was given the same full privileges as those who had completed full postgraduate training in the field in which they were given privileges; are Defendants violation of Plaintiff's and Class member's *Turay Standard* rights to *Adequate*, competent staff that is supervised by a mental health professional; while items #6) The hospital failed to prioritize changes in the physical environment, staff training, and enhanced patient assessment to obviate the risk of suicide to the fullest extent possible; and #12) No clinical director, service chief, or equivalent met the training and experience requirements for examination by the American Board of Psychiatry and Neurology or the American Osteopathic Board of Neurology and Psychiatry; are Defendants violation of Plaintiff's and Class member's *Turay Standard* rights to *Appropriate* training of staff in order to ensure a consistency of treatment between all staff.

As well, these ongoing insufficiencies are clear proof of Defendants blatant disregard of Plaintiff's and Class member's K.S.A. § 59-29a22 rights under K.S.A. § 59-29a22(b)(9) "A right to a humane psychological and physical environment within the hospital facilities. All facilities shall be designed to afford patients with comfort and safety, to promote dignity and ensure privacy. Facilities shall also be designed to make a positive contribution to the effective attainment of the treatment goals of the hospital." Specifically, items #2) Though facilities, supplies, and equipment must be maintained to ensure an acceptable level of safety and quality, the total inventory of fire safety equipment indicated by the contracted fire alarm contractor was inconsistent from year to year, even though staff indicated

there were no changes in the fire alarm systems; #3) Though facilities, supplies, and equipment must be maintained to ensure an acceptable level of safety and quality, the 36-month emergency generator test for the ATC building generator did not achieve the required dynamic or static load that is at least 30% of the nameplate rating of the generator; #6) The hospital failed to prioritize changes in the physical environment, staff training, and enhanced patient assessment to obviate the risk of suicide to the fullest extent possible. Key physical environmental issues remain even though previously identified as significant risks. The hospital has not implemented any enhanced assessment for patients potentially at risk of suicide or closer observations of those patients to prevent suicide, and #21) Though resuscitation services must be available throughout the hospital, the exam room #S125 (Jung Bldg) did not have oxygen inside the room as directed by signage on the door. Minor surgical procedures are performed in this area. Should oxygen have been required, staff would have to go elsewhere to get some, potentially compromising the patient. See *Exhibit M, 2012 The Joint Commission, Larned State Hospital, Hospital Accreditation Report.*

Defendants have made no effort to rectify said insufficiencies or comply with said constitutional obligations, Turay Standards, or K.S.A. § 59-29a22 statutes in the 20 year history since the SPTP was created in 1994.

Defendants conduct has caused and continues to cause Plaintiffs and Class members harm and is both shocking and intolerable, and a continuing mistreatment of a constitutional stature, in violation of Plaintiff's and Class member's Constitutional rights.

100.    According to the *2013 Larned State Hospital Fiscal Budget Report*, 'Since 1994, the Sexual Predator Treatment Program (SPTP) has provided treatment for convicted sex offenders who have completed their prison sentences and have been civilly committed under the Kansas Sexual Predator Law because of ongoing danger to the community. The Sexual Predator Transition House Program is located on the grounds of Osawatomie State Hospital, but is funded in the Larned State Hospital budget.

Since 1994, 265 persons have been committed to the Sexual Predator Treatment Program. Of the residents presently assigned to the Program, more than one third have been received within the past five years. According to the agency, the steady increase in referrals to the program and the length of time it takes to complete the program combine to create a continuing budget and public policy challenge.

The April 2005, Legislative Post Audit concluded that the state will either have to change policies to commit fewer sex offenders to the Sexual Predator Treatment Program, allow clients to be

released sooner, or commit to supporting a new class of institutionalized individuals. The report recommended that the Legislature examine these issues and that the Department of Social and Rehabilitation Services should develop multi-year forecasts based on several scenarios to address resident capacity, housing costs and staffing costs.

The 2009 Legislature passed House Substitute for SB91 that prohibits the Department of Social and Rehabilitation Services from placing more than eight sexually violent predators in any one county on transitional release or conditional release; stated that these patients be housed only on state property; and required a report to the Governor every year on the status of transitional persons. The Department of Social and Rehabilitation Services testified that House Substitute for SB91 created both programmatic and fiscal challenges for the Sexual Predator Treatment Program. Current zoning and residency restrictions make it more difficult to place offenders back into the community after treatment. According to the Department, if a court orders an individual to transitional or conditional release and that person cannot be placed because the counties that offer the needed resources have reached the eight person maximum, and no other county can be found to provide the needed services for that individual, The Department of Social and Rehabilitation Services and the State of Kansas risk contempt of court charges and lawsuits.

The opening of the additional adult beds was determined necessary by the Department of Social and Rehabilitation Services as the agency temporarily suspended voluntary admissions to the three Kansas mental health hospitals during May 2010 and July 2010. According to the Department, all three facilities were full beyond licensed capacities and the agency did not have additional resources to serve persons seeking voluntary admissions. SRS expects census issues to continue in FY 2012 and FY 2013.

The following summarizes the status of the 246 persons committed to the Sexual Predator Treatment Program (SPTP) as of November, 2011:

   2 persons have completed the final conditional release stage;

   4 persons are on conditional release;

   13 persons were released by the courts due to timely filing issues (these issues were later "corrected" by legislative action);

   16 persons have died;

   17 new commitments have been made to date in calendar year 2011; and

   229 persons are currently in the SPTP as of November 15, 2011;

   217 persons are on the campus of Larned State Hospital;

4 persons in DOC (due to parole violations); and

8 persons residing at the MiCO House (transition house) on the campus of Osawatomie
State Hospital.

SPTPs physical capacity is 214 beds with 214 residents currently assigned. The program
is budgeted to serve 177 persons.

### Budgeted Bed Capacity

The chart below shows the budgeted bed capacity. FY 13 Est.

| | FY 13 Est. |
|---|---|
| SPTP | 177 |
| MiCO Transition House | 8 |

### Average Daily Census

Average Daily Census represents the average number of patients in a hospital over a fiscal year.

| | FY 13 Est. |
|---|---|
| SPTP | 234 |
| MiCO Transition House | 8 |

### Admissions

The chart below shows admissions. FY 13 Est.

| | FY 13 Est. |
|---|---|
| SPTP | 18 |

**FY 2013 – Budget Year**. The agency request includes one enhancement for FY 2013
totaling $951,203, all from the State General Fund and 11.0 FTE positions to staff an eight bed Sexual
Predator Treatment Program (SPTP) transition house to be located at Parsons State Hospital.

**The Governor** recommends the transfer of the administration and state-of-the-art
security identified at the Larned State Hospital and the other four state hospitals from the Department
of Social and Rehabilitation Services to the Department on Aging.

**The agency** indicates the secure housing and state-of-the-art security identified at the
Larned State Hospital Security Program, Isaac Ray Building North 3, will provide a short-term solution
to the current over-census problem of the sexual predator population and allow for 30 high risk
residents to be moved into a Restriction Unit setting, freeing beds in the main SPTP building.

According to the agency, new admissions to the SPTP are growing at an average of 18
residents per year. The current census for the SPTP at Larned State Hospital was 229 as of November
15, 2011. The habitable bed capacity for the SPTP is 195. The agency provides that to date, the
population over-census has been managed by the conversion of staff offices to resident rooms and the
occupation of modular housing. The modular housing is considered temporary and presents challenges

relating to code compliance and patient management as well as security issues.

**New Sexual Predator Treatment Program Transition Housing Unit at Parsons State Hospital and Training Center. The agency** requests $951,203, all from the State General Fund, for FY 2013 to expand it's SPTP Transition program with the addition of an eight bed unit to be located in the Maple Cottage building at the Parsons State Hospital. The agency indicates the primary reason for this proposal is to accommodate an additional eight patients to the SPTP Transition program and to meet its statutory requirement of no more than a maximum of eight transition patients to reside in one county (KSA 59-29a01).

The current transitional program (MiCO House) is located on the grounds of Osawatomie State Hopsital in Miami County. State law limits the number of residents in transitional program to eight per county. As of November 2011, there were 8 persons in the program. The SPTP was determined constitutional because it provides residents the opportunity to progress through the program as appropriate. The agency indicates that failure to provided this opportunity to progress because the transition program is at capacity could jeopardize the SPTP's constitutionality and residents could challenge their civil commitment in court.

Larned State Hospital is primarily funded from three sources. The first is the State General Fund, which consists of money collected through various statewide taxes. The second is the Hospital Fee Fund, which includes collection from Medicare, private payments, Social Security, and insurance. The third source is federal, Title XIX funding, which is earned as disproportionate share hospital funding at the state mental health hospitals. The Disproportionate Share program allows extra Medicaid payments to hospitals serving a disproportionate number of Medicaid-eligible and low income patients.

Title XIX (Medicaid) Funding Issues. Federal Title XIX funding comprises approximately one third (1/3) of all funding for state hospitals. Larned State Hospital is a mental health hospital.

The state MH hospitals establish per diem rates in much the same way as the state developmental disabilities hospitals but are classified as institutions for mental disease. The result is that, due to federal rules, most patients are not eligible for standard Medicaid match but the hospitals are eligible for Medicaid payments through the Disproportionate Share Hospital program. This program assists all acute care hospitals that serve a disproportionately high number of indigent persons.

KSA 76-1302a provides that the superintendent of the Larned State Hospital remit all moneys received from charges under KSA 59-2006 and deposit them into the Larned State Hospital

Fee Fund. KSA 59-2006 relates to the duty of parents and spouses to pay for the maintenance, care and treatment of a patient in a state institution.'" See *Exhibit B, 2013 Larned State Hospital Fiscal Budget Report*.

The fact that SPTP provides "treatment" for convicted sex offenders (after) completing their prison sentences violates the *Ex Post Facto Clause* of the United States Constitution for all Plaintiffs and Class members who were sentenced before the SVP Act of 1994. "Kansas, concedes that Hendricks' condition is treatable; yet the Act did not provide Hendricks (or others like him) with any treatment until after his release date from prison and only inadequate treatment thereafter. These, and certain other, special features of the Act convince me that it was not simply an effort to commit Hendricks civilly, but rather an effort to inflict further punishment upon him. The *Ex Post Facto Clause* therefore prohibits the Act's application to Hendricks, who committed his crimes prior to its enactment." See *Kansas v. Hendricks*, 521 U.S. 346. **DISSENT BY:** BREYER. Many of the Plaintiffs and Class members were offered no treatment while in prison, due to various reasons, and those who were offered treatment, were offered only inadequate treatment, and have only been offered inadequate treatment while in the SPTP program.

According to the *April 2005 Legislative Post Audit Committee Performance Audit Report*, "One of the concerns raised in requesting this audit involved the treatment sex offenders receive while in the Department of Corrections' custody, and the impact that treatment has on the amount of time they spend in the Sexual Predator Treatment Program. Of the 156 predators who have been sent to the Sexual Predator Treatment Program, 53% successfully completed the Department of Corrections' sex offender treatment program, Sexual Predator Treatment Program officials told us that completion of the Department of Corrections' sex offender treatment program in prison generally has no impact on – and shouldn't be used as an indicator of – how well a resident will progress in the Sexual Predator Treatment Program." See *Exhibit G, 2005 Legislative Post Audit Committee, Performance Audit Report, Larned State Hospital: Reviewing the Growth in the Sexual Predator Program*. Therefore, the *Ex Post Facto Clause* also prohibits the Act's application to Plaintiffs and Class members, who committed their crimes prior to its enactment.

The fact that SPTP provides "treatment" for convicted sex offenders (after) completing their prison sentences violates the *Double Jeopardy Clause* of the United States Constitution for all Plaintiffs and Class members. "'The Act, like criminal punishment, imposes its confinement (or sanction) only upon an individual who previously committed a criminal offense." Kan. Stat. Ann. §§ 59-29a02(a), 59-29a03(a) (1994). *Cf. Department of Revenue of Mont. v. Kurth Ranch*, 511 U.S. 767,

73

781, 114 S. Ct. 1937, 128 L. Ed. 2d 767 (1994) (fact that a tax on marijuana was "conditioned on the commission of a crime" is "significant of [its] penal and prohibitory intent") (citation omitted); *Lipke v. Lederer*, 259 U.S. 557, 561-562, 66 L. E. 1061, 42 S. Ct. 549 (1922). And the Act imposes that confinement through the use of persons (county prosecutors), procedural guarantees (trial by jury assistance of counsel, psychiatric evaluations), and standards ("beyond a reasonable doubt") traditionally associated with the criminal law. Kan. Stat. Ann. §§ 59-29a06, 59-29a07 (1994). When a State believes that treatment does exist, and then couples that admission with a legislatively required delay of such treatment until a person is at the end of his jail term (so that further incapacitation is therefore necessary), such a legislative scheme begins to look punitive. In *Allen v. Illinois*, 478 U.S. 364, 370-371, 373-375, 92 L. Ed. 2d 296, 106 S. Ct. 2988 (1986), the Court considered whether, for Fifth Amendment purposes, proceedings under an Illinois statute were civil or "criminal." The *Allen* Court found the proceedings "'essentially civil'" because the statute's aim was to provide "'treatment, not punishment.'" *Id.*, at 367 (quoting *People v. Allen*, 107 Ill. 2d91, 99-101, 481 N.E. 3d690, 694-695, 89 Ill. Dec. 847 (1985). It observed that the State had "a statutory obligation to provide 'care and treatment... designed to effect recovery'" in a "facility set aside to provide psychiatric care." 478 U.S. At 369 (quoting Ill. Rev. Stat., ch. 38, p. 105-8 (1985). And it referred to the State's purpose as one of "*treating* rather than punishing sexually dangerous persons." 478 U.S. At 373; See also *ibid.* ("Had petitioner shown, for example, that the confinement... imposes... a regimen which is essentially identical to that imposed upon felons with no need for psychiatric care, this might well be a different case")... One would expect a non-punitively motivated legislature that confines *because of* a dangerous mental abnormality to seek to help the individual himself overcome that abnormality. Conversely, a statutory scheme that provides confinement that does not reasonably fit a practically available, medically oriented treatment objective, more likely reflects a primarily punitive legislative purpose... the State Supreme Court here, unlike the state court in *Allen*, has held that treatment is not a significant objective of the Act. The Kansas Court wrote that the Act's purpose is "segregation of sexually violent offenders," with "treatment" as a matter was "incidental at best." 259 Kan. At 258, 912 P. 2d at 136. By way of contrast, in *Allen* the Illinois court had written that "'treatment, not punishment'" was "the aim of the Statute." *Allen*, supra, at 367 (quoting *People v. Allen*, 107 Ill. 2d at 99-101, 481 N.E. 2d at 694-695)... the Kansas statute insofar as it applies to previously convicted offenders, such as Hendricks, commits, confines, and treats those offenders *after* they have served virtually their entire criminal sentence. That time – related circumstances seems deliberate. The Act explicitly defers diagnosis, evaluation, and commitment proceedings until a few weeks prior to the "anticipated release"

74

of a previously convicted offender from prison. Kan. Stat. Ann. § 59-29a03(a)(1) (1994). But why, one might ask, does the Act not commit and require treatment of sex offenders sooner, say soon after they begin to serve their sentences? An Act that simply seeks confinement, of course, would not need to begin civil commitment proceedings sooner. Such an Act would have to begin proceedings only when an offender's prison term ends, threatening his release from the confinement that imprisonment assures. But it is difficult to see why rational legislators who seek treatment would write the Act in this way - - providing treatment, years after the criminal act that indicated its necessity. See, *e.g.*, *Wettstein, A Psychiatric Perspective on Washington's Sexually Violent Predator Statute*, 15 U. Puget Sound L. Rev. 597, 617 (1992) (stating that treatment delay leads to "loss of memory" and makes it "more difficulty for the offender' to "accept responsibility," and time in prison leads to attitude hardening that "engenders a distorted view of the precipitating offense"). And it is particularly difficult to see why legislators who specifically wrote into the statute a finding that "prognosis for rehabilitating... in a prison setting is poor" would leave an offender in that setting for months or years before beginning treatment. This is to say, the timing provisions of the statute confirm the Kansas Supreme Court's view that treatment was not a particularly important legislative objective. Much of the treatment that Kansas offered here (called "ward milieu" and "group therapy") can be given at the same time as, and in the same place where, Hendricks serves his punishment. See, *e.g.*, Testimony of Leroy Hendricks, *id.*, 142-143, 150, 154, 179-181 (stating that Washington and Kansas had both provided group therapy to Hendricks, and that he had both taken and refused such treatment at various points); Testimony of Terry Davis, SRS Director of Quality Assurance, *id.*, at 78-81 (pointing out that treatment under the Act takes place in surroundings very similar to those in which prisoners receive treatment); Testimony of John House, SRS Attorney, *id.*, at 375-376. See Testimony of Dr. Befort at State Habeas Proceeding, App. 399, 406-408 (describing treatment as ward milieu and group therapy); *id.*, at 416-417 (stating that Kansas offers similar treatment, on a voluntary basis, to prisoners). Hence, assuming arguendo that it would be otherwise permissible, Kansas need not postpone treatment in order to make certain that sex offenders serve their full terms of imprisonment, *i.e.*, to make certain that they receive the entire punishment that Kansas' criminal law provides. To the contrary, the statement in the Act itself, that the Act aims to respond to special "long term" "treatment needs," suggests that treatment should begin during imprisonment. It also suggests that, were those long-term treatment needs (rather than further punishment) Kansas' primary aim, the State would require that treatment begin soon after conviction, not 10 or more years later. See also *Vt. Stat. Ann., Tit. 18 § 2815 (1959)* (providing for treatment of sexual psychopaths first, and punishment afterwards). The majority suggests that this is the very case I

75

say it is not, namely a case of a mentally ill person who is *un-treatable. Ante*, at 18. And it quotes a long excerpt from the Kansas Supreme Court's opinion in support. That court, however, did not find that Hendricks was *un-treatable*, it found that he was untreated - - quite a different matter. Had the Kansas Supreme Court thought that Hendricks, or others like him, are un-treatable, it could not have written the words that follow that excerpt, adopting by reference the words of another court opinion:

> "The statute forecloses the possibility that offenders will be evaluated and treated until after they have been punished... Setting aside the question of whether a prison term exacerbates or minimizes the mental condition of a sex offender, it plainly delays the treatment that must constitutionally accompany commitment pursuant to the Statute. The failure of the Statute to provide for examination or treatment prior to the completion punishment phase strongly suggests that treatment is of secondary, rather than primary concern." 259 Kan. At 258, 912 P. 2d at 136 (quoting *Young v. Weston*, 898 F. Supp. 744, 753 (WD Wash. 1995)).

This quotation, and the rest of the opinion, make clear that the court is finding it objectionable that the Statute, among other things, has not provided adequate treatment to one who, all parties here concede, *can* be treated. I believe the Act before us involves an affirmative restraint historically regarded as punishment; imposed upon behavior already a crime after a finding of scienter; which restraint, namely confinement, serves a traditional aim of punishment, does not primarily serve an alternative purpose (such as treatment) and is excessive in relation to any alternative purpose assigned. 372 U.S. At 168-169. The statutory provisions before us do amount to punishment primarily because, as I have said, the legislature did not tailor the Statute to fit the non-punitive civil aim of treatment, which it concedes exists in Hendricks' case. The Clause in these circumstances does not stand as an obstacle to achieving important protections for the publics' safety; rather it provides an assurance that where so significant a restriction of an individual's basic freedoms is at issue, a State cannot cut corners. Rather, the legislature must hew to the Constitution's liberty – protecting line. See The Federalist, No. 78, p. 466 (C. Rossiter ed. 1961) (A. Hamilton).' See *Kansas v. Hendricks*, 521 U.S. 346. **DISSENT BY:** BREYER.

The fact that of the 298 persons who have been committed to SPTP, more than one third have been received within the past five years, shows the true purpose to warehouse and punish, not to provide treatment. This same "treatment" could be provided in the KDOC, or in outpatient treatment. Statistically, there are not 30 percent more sexual offenders committing the type of multiple/sexually violent crimes required to "label" them a sexually violent predator, than there were five years prior.

Defendants claim they are simply getting better at predicting, and recommending for trial, who is a sexually violent predator. This is not the case. In 2000 one hundred forty six (146) sex offenders were recommended to the Attorney General for civil commitment. Though those men had the exact same types of multiple/sexually violent crimes as do those who were recommended in 2012, only fifteen (15) were civilly committed. One hundred thirty one (131) sex offenders the multidisciplinary board considered a sexually violent predator, were released. In 2012, eighteen (18) sex offenders were civilly committed. Each year, the number or commitments rises, not because the multidisciplinary board are getting better at predicting who is a sexually violent predator, Defendants are getting better at fooling the public. Though the percentage of sexually violent crimes is not thirty percent (30%) higher than it was five (5) years ago, the number of sex offenders committed is. Defendants' true purpose therefore, is to restrain and punish, not to provide treatment (in a less restrictive environment/alternative).

The Fiscal Budget Report acknowledges the 2005 Legislative Post Audit recommended committing fewer sex offenders, or allowing residents to be released sooner, as well as examining these issues to develop multi-year forecasts to address resident capacity, housing costs and staffing costs. Defendants refusal to follow any of these recommendations in the following eight (8) years since 2005 shows disregard for Plaintiff's and Class member's Constitutional rights, intentional contempt for U.S. Supreme Court rulings, intentional contempt for Kansas' Legislative directives, and deliberate neglect of Defendants legal and Constitutional obligations.

Defendants admit the 2009 Legislature passed House Substitute for SB91 prohibiting more than eight (8) sexually violent predators in any one (1) county on transitional or conditional release, and stating that these "patients" be housed only on state property. By passing House Substitute SB91, Defendants have violated Plaintiff's and Class member's Fourteenth Amendment Due Process Clause of the United States Constitution requiring state officials to provide civilly – committed persons with access to mental health treatment that gives them a realistic opportunity to be cured or to improve the mental condition for which they were confined. See *Turay v. Seling*, 108 F. Supp. 2d 1148; *Youngberg v. Romeo*, 457 U.S. 307, 319-22, 73 L. Ed. 2d 28, 102 S. Ct. 2452 (1982); *Ohlinger v. Watson*, 652 F. 2d 775, 778 (9th Cir. 1980). This rule applies to sex offenders and "lack of funds, staff or facilities cannot justify the State's failure to provide [those confined] with that treatment necessary for rehabilitation." *Ohlinger v. Watson*, 652 F. 2d at 778-79. And Defendants have violated Plaintiff's and Class member's K.S.A. § 59-29a22(b)(3) right to receive prompt and adequate treatment, rehabilitation and educational services appropriate for such patient's condition; K.S.A. § 59-29a07(a)... If the court or jury determines that the person is a sexually violent predator, the person shall be

77

committed to the custody of the Secretary of social and rehabilitation services for control, care and treatment until such time as the person's mental abnormality or personality disorder has so changed that the person is safe to be at large; K.S.A. § 59-29a08(e) If the court determines that the person should be placed in transitional release, the secretary shall transfer the person to the transitional release program; and K.S.A. § 59-29a18(b) If, after the hearing, the court is convinced beyond a reasonable doubt that the person is not appropriate for conditional release, the court shall order that the person remain either in secure commitment or in transitional release. Otherwise, the court shall order that the person be placed on conditional release. House Substitute for SB91 prohibits Plaintiffs and Class members from their right to progress and earn release, because only eight (8) sexually violent predators are allowed in any one (1) county on transitional or conditional release, while currently only Osawatomie and Parsons allows any Plaintiffs or Class members on transitional release. Each facility only has eight (8)   .   transitional spots, which are always occupied. Eligible Plaintiffs and Class members are denied transitional release simply because they cannot be placed, because transition is always full, and those Plaintiffs and Class members already in transition are not progressing forward, therefore, no other Plaintiffs or Class members are allowed to move forward either. Defendants are therefore in contempt of court, SPTP is unconstitutional, and the only fair remedy for the harm Defendant's continuing mistreatment of a Constitutional stature of Plaintiff's and Class member's Constitutional rights is immediate release with prejudice. See *Exhibit B, 2013 Larned State Hospital Fiscal Budget Report*.

Defendants continue to report to auditors that SPTP admits an average of eighteen (18) residents each year, and that though the program will reach its physical capacity in a very near fiscal year, it has not yet reached it's physical capacity. See *Exhibit G, 2005 Legislative Post Audit Committee, Performance Audit Report, Larned State Hospital: Reviewing the Growth in the Sexual Predator Program*, pp. 1, 8, 13, and 25 (Appendix A); *Exhibit K, January 27, 2009 Senate Ways and Means Committee Overview of Sexual Predator Treatment Program and Expansion*, pp. 3,4, and 7; *Exhibit L, January 26, 2011 House Social Services Budget Committee Overview of Sexual Predator Treatment Program*, pp. 3-4; *Exhibit H, 2013 Legislative Post Audit Committee, Performance Audit Report, Larned State Hospital: Reviewing the Operations of the Sexual Predator Treatment Program*, pp. 1, 5, 7, and 25 (Appendix A); and *Exhibit O, 2013 The Buckley Group, L.L.C., State of Kansas Department for Aging and Disability Services, Larned State Hospital, Operations Assessment Executive Summary*, p. 1. These reports are either intentionally misleading or falsified. The truth can be found in *Exhibit B*, "According to the Department, all three facilities were full beyond licensed capacities... 246 persons were committed to the SPTP as of November, 2011: 2 persons have

78

completed final release; 4 persons are on conditional release; 13 persons were released by the courts due to timely filing issues; 16 persons have died (not true – 27 have died); 17 new commitments in 2011; 229 persons are currently in SPTP as of November 15, 2011;217 persons on the campus of Larned State Hospital; 4 persons in DOC (due to parole violations); and 8 persons residing at the MiCO House (Transition House). **Budgeted Bed Capacity** Chart FY 13 Est. SPTP budgeted bed capacity is 177, and MiCO Transition House budgeted bed capacity is 8 (a total of 185). **Average Daily Census** Chart FY 13 Est. SPTP average daily census is 234, and MiCO Transition House average daily census is 8 (a total of 242)." SPTP is therefore, according to Defendant's own 2013 Fiscal Budget Report, fifty seven (57) Plaintiffs and Class members over it's own budgeted bed capacity. SPTP overcrowding places Defendants in violation of Plaintiff's and Class member's Constitutional and Statutory rights: The Fourteenth Amendment Due Process Clause of the United States Constitution requiring state officials to provide civilly – committed persons with access to mental health treatment that gives them a realistic opportunity to be cured or to improve the mental condition for which they were confined. See *Exhibit B, 2013 Larned State Hospital Fiscal Budget Report*, pp. 690-691. Also see *Youngberg v. Romeo*, 457 U.S. 307, 319-22, 73 L. Ed. 2d 28, 102 S. Ct. 2452 (1982); *Turay v. Seling*, 1999 Wash. LEXIS 74 (2000) 'A treatment oriented "flavor" to the facility that is lacking a Department of Corrections "flavor,'" K.S.A. § 59-29a22(b)(3) "A right to receive prompt and adequate treatment, rehabilitation and educational services," and K.S.A. § 59-29a22(b)(9) "A right to humane psychological and physical environment within the hospital facilities. All facilities shall be designed to afford patients with comfort and safety, to promote dignity and to ensure privacy." SPTP overcrowding creates an inhumane environment, creating a punitive – DOC "flavor," rather than a treatment "flavor." Furthermore, SPTP overcrowding impedes Plaintiff's and Class member's opportunity to receive . prompt and adequate treatment or a realistic opportunity to present required materials (i.e. auto-biography, victim sheets, sexual history, relapse prevention plan, etc.); and SPTP does not employ enough treatment therapists to provide the adequate treatment, causing overcrowded groups and therapists case loads, which further impedes Plaintiff's and Class member's realistic opportunity to progress. SPTP is, therefore, unconstitutional.

It should be noted that, according to the LSH 2013 Fiscal Budget Report, the Governor transferred the administration of the Larned State Hospital and the other four State hospitals from the Department of Social and Rehabilitation Services to the Kansas Department for Aging and Disability Services (this includes the administration of the SPTP). See *Exhibit B, 2013 Larned State Hospital Fiscal Budget Report*, p. 693. However, transfer of the administration of the SPTP was never

statutorily completed. See K.S.A. § 59-29a07(a) "The court or jury shall determine whether beyond a reasonable doubt, the person is a sexually violent predator. If such determination that the person is a sexually violent predator is made by a jury, such determination shall be by unanimous verdict of such jury. Such determination may be appealed. If the court or jury determines that the person is a sexually violent predator, the person shall be committed to the custody of the *secretary of social and rehabilitation services* for control, care and treatment until such time as the person's mental abnormality or personality disorder has so changed that the person is safe to be at large. Such control, care and treatment shall be provided at a facility operated by the *department of social and rehabilitation services*." All administrative decisions made by the Secretary of the Kansas Department for Aging and Disability Services regarding the SPTP are therefore not statutorily legal.

According to the LSH 2013 Fiscal Budget Report, Isaac Ray North 3 was opened as a Restriction Unit for high risk residents. See *Exhibit B, 2013 Larned State Hospital Fiscal Budget Report*, pp. 696-697. But as Plaintiffs and Class members have learned, this Restriction Unit is also referred to as the "*Intensive Treatment Unit* (ITU)." According to the SPTP ITU Resident Handbook, the "ITU is designed as a break from the phases of the program for persons at SPTP who have tended to get in their own way, or in the way of others, when it comes to moving forward in the program." See *Exhibit R, Sexual Predator Treatment Program of Kansas, Intensive Treatment Unit, Resident Handbook*. This is clear punitive treatment, not therapeutic treatment. Proof the SPTP has more of a Department of Corrections "flavor" than a treatment oriented "flavor." As well, in their own words Defendants are intentionally and willfully impeding Plaintiff's and Class member's ability to progress in treatment by way of "a break from the phases... when it comes to moving forward in the program." Though Defendants no longer *officially* call the unit at Isaac Ray *ITU*, they still use it as a punishment unit "break from the phases." According to *Davis v. Watkins*, 384 F. Supp. 1196(C)(7), minimum constitutional standards for adequate treatment requires, "The institution shall prohibit corporal punishment, mistreatment, neglect or abuse in any form of any patient."

According to the LSH 2013 Fiscal Budget Report, Defendants attempt to manage the SPTP habitable bed capacity over – census by the conversion of staff offices and the occupation of modular housing. See *Exhibit B, 2013 Larned State Hospital Fiscal Budget Report.* Unfortunately, these staff offices were located on the Plaintiff's and Class member's living units and were occupied by unit leaders, nurses, and treatment therapists. According to *Davis v. Watkins*, 384 F. Supp. 1196(G)(14), minimum constitutional standards for adequate treatment requires, "There shall be provided on each unit of the hospital sufficient office space to house the necessary qualified mental

health professionals, the Unit Director, psychiatrists, psychologists, social workers, registered nurse and mental health associate. Such persons shall be readily accessible to the patient population and, in turn, the patient shall be accessible to them." Conversion of these offices to residents rooms has removed the qualified mental health professionals from the residents living units and denied Plaintiffs and Class members access to them, in violation of the minimum constitutional standards required to in the *LSH 2013 Fiscal Budget Report* is a building on the Dillon Building grounds referred to as the "Annex." The Annex houses approximately thirty (30) residents. Unfortunately, the Annex is improperly heated, improperly ventilated, is deteriorating, is full of water leaks and black mold and has been condemned. Defendants were ordered to remove all Plaintiffs and Class members from the Annex in 2011. However, Defendants have refused to comply. As a result, as of July 2013, Defendants have been fined thirty thousand ($30,000) per month until such time as they remove all Plaintiffs and Class members from the Annex and demolish the structure. As of today, Defendants have not complied.

According to the *LSH 2013 Fiscal Budget Report* the *agency* requests to expand its SPTP Transition program with the addition of an eight (8) bed unit to be located at the Parsons State Hospital. Since current law limits the number of Plaintiffs and Class members in transitional program to eight (8) per county, the fact that there are already eight (8) Plaintiffs and Class members in the transitional program at Osawatomie State Hospital, and SPTP is not sending eligible Plaintiffs and Class members to Parsons as soon as they are eligible, the transition program is still full and Plaintiffs and Class members who are eligible for transition are not being allowed to progress through treatment as appropriate, in violation of Defendant's Constitutional obligation to the Fourteenth Amendment Due Process Clause of the United States Constitution requiring state officials to provide civilly–committed persons with access to mental health treatment that gives them a realistic opportunity to be cured or to improve the mental condition for which they were confined. Furthermore, Defendants admit SPTP is in violation of the constitution, "The agency indicates that failure to provide this opportunity to progress because the transition program is at capacity could jeopardize the SPTP's constitutionality and residents could challenge their civil commitment in court." SPTP, in Defendants' own words, is not constitutional, Plaintiffs and Class members are therefore held in violation of their constitutional rights and are entitled to relief, the remedy of which is immediate release with prejudice. See *Exhibit B, 2013 Larned State Hospital Fiscal Budget Report*, p. 700.

According to the *LSH 2013 Fiscal Budget Report*, SPTP, being funded through Larned State Hospital, is funded through the State General Fund (taxes), the Hospital Fee Fund (Medicare, private payments, Social Security, and insurance), and Federal Title XIX Funding through Medicaid

payments through the Disproportionate Share Hospital program (acute care hospitals) that serve a disproportionately high number of indigent persons receive funds from Medicaid. As well, LSH charges Plaintiffs and Class members and their parents and spouses to pay for the maintenance, care and treatment of these Plaintiffs and Class members who are in state custody. Defendants are denying Plaintiffs and Class members their rights to collect disability through Social Security, or to collect Medicare and/or Medicaid, while Defendants are collecting funds from Social Security, Medicare and Medicaid in Plaintiff's and Class member's names. Whether Defendants have therefore committed Fraud and/or Larceny. Furthermore, Defendants enjoined from issuing demands for reimbursement of the costs of Plaintiff's and Class member's treatment and stay at LSH SPTP. Defendants are not authorized by law to demand reimbursement from Plaintiffs and Class members for their hospitalization because they are legally disabled by virtue of their diagnosis, and their civil confinement. Defendants have demanded reimbursement from Plaintiffs and Class members of the costs of their institutionalization under K.S.A. § 59-2006. By making demand for reimbursement, Defendants have placed Plaintiffs and Class members under an obligation to pay a portion, if not all, of the costs of their maintenance, care, and treatment at Larned. See K.S.A. § 59-2006(c).

The Kansas Legislature enacted the Sexually Violent Predator Act in 1994 to grapple with the problem of managing repeat sexual offenders. Although Kansas already had a statute addressing the involuntary commitment of those defined as "mentally ill," the legislature determined that existing civil commitment procedures were inadequate to confront risks presented by "sexually violent predators." In the Act's preamble, the legislature explained:

> "[A] small but extremely dangerous group of sexually violent predators exist who do not have a mental disease or defect that renders them appropriate for involuntary treatment pursuant to the [general involuntary civil commitment statute]... In contrast to persons appropriate for civil commitment under the [general involuntary civil commitment statute], sexually violent predators generally have anti-social personality features which are unamenable to existing mental illness treatment modalities and those features render them likely to engage in sexually violent behavior. The legislature further finds that sexually violent predators likelihood of engaging in repeat acts of predatory sexual violence is high. The existing involuntary commitment procedure... is inadequate to address the risk these sexually violent predators pose to society. The legislature further finds that the prognosis for rehabilitating sexually violent predators in a prison setting is poor, the treatment needs of this population are very long term and the treatment

82

modalities for this population are very different than the treatment modalities for people

appropriate for commitment under the [general involuntary civil commitment statute]."

Kan. Stat. Ann. § 59-29a01 (1994).

The Defendants civilly commit Plaintiffs and Class members for long term treatment through diagnosis of a mental abnormality or personality disorder, which legally disables them. Defendants have the affirmative duty to serve written demand for reimbursement upon Plaintiffs and Class members as a patient of Larned – SPTP. K.S.A. § 59-2006(b); K.S.A. § 59-2006(c). Compliance with the initial demand requirements of K.S.A. § 59-2006(a) and (b) is not a discretionary function of Defendants but a ministerial one. Defendants have attempted to recover, and have recovered, the amount demanded of Plaintiffs and Class members for reimbursement through room and board charges withheld from their monthly pay checks.

Defendants conduct has caused and continues to cause Plaintiffs and Class members harm and is both shocking and intolerable, and a continuing mistreatment of a constitutional stature, in violation of Plaintiff's and Class member's Constitutional rights.

101.    According to the *September 2013 Legislative Post Audit Committee Performance Audit Report*, The report contains the findings, conclusions, and recommendations of the completed performance audit. The audit was requested by the House Appropriations committee and Senate Ways and Means committee, because Legislators have expressed concern about the growing size of the offender population, employee workload, and working conditions at the Larned facility. They would like to know how Kansas' program compares to other state programs in terms of cost and treatment, what actions could be taken to limit program growth, and whether the Larned facility is being adequately managed. By the APPENDIX A Scope Statement on pp. 25-26 the Legislative Post Audit Committee was directed to address the following questions:

1. **How does Kansas' Sexual Predator Treatment Program compare to similar programs in other states and best practices?**

2. **What actions could be taken to reduce the number of offenders committed to Kansas' other states and best practices?**

3. **What actions could be taken to reduce the number of offenders committed to Kansas' *Sexual Predator Treatment Program?***

4. **Is the Sexual Predator Treatment Program appropriately managed to ensure the safety and well being of program staff, and offenders?**

Yet, on p. 1 of the report the Legislative Post Audit Committee admit, "In May 2013, the

Legislative Post Audit Committee decided to delay audit work on questions one and two and await the written report of a Department for Aging and Disability Services' Task Force. The mission of this task force is to answer questions very similar to questions one and two of the scope statement. As a result, this audit report includes only question three from the approved Scope Statement." The Auditors only examined question three and never re-engaged to examine questions one and two of the Scope Statement, even after the Task Force submitted their written report to Shawn Sullivan, Secretary of KDADS. The Legislative Post Audit Committee therefore refused and failed to perform the audit they were directed to perform. This dereliction of duties has allowed SPTP to continue as an unconstitutional program, and as a result, conditions have worsened, causing further harm to Plaintiffs and Class members.

As for the one and only question the Auditors actually examined, question three, the Auditors found that, "**Civil commitment is an involuntary confinement in a *secure facility*.** Kansas' Sexual Predator Treatment program facilities are not considered prisons but are secured through locked doors, perimeter fencing, and security staff. The rights of committed individuals are restricted including confinement to their assigned residential units, controlled movement to and from treatment, and no access to the Internet. Civil commitment is intended to keep these individuals confined for treatment.

**District courts determine whether convicted sex offenders should be civilly committed to the Sexual Predator Treatment Program *after the completion of their prison sentence*.** After they are committed, sex offenders remain in the program until their abnormality or disorder has changed and they are deemed "safe" to be allowed to return to society.

**The goal of the treatment program is to *eliminate* the likelihood that sex offenders will re-offend after their release.** Kansas has set a very high standard for release from the program. The statutorily mandated goal of the program is to have no new victims. To be released from the. program, a Plaintiff or Class member has to complete *seven treatment phases*.

**The Sexual Predator Treatment Program's Resident Population Has Grown Steadily Since Its Inception. From 2002 to 2012 , the program added an average of about 18 residents each year.** As of April 2013, the program had 226 residents, with 129 residents at Larned State Hospital and seven residents at Osawatomie State Hospital. **Based on the average growth rate, the program will reach its current maximum physical capacity during 2018. The program admits about 18 new residents each year and has a current capacity at Larned State Hospital of 293 residents. Because so few residents are released, program enrollment is likely to grow well**

84

**beyond the physical capacity at Larned State Hospital.** Since the program began, only three residents have completed the program and 22 have died.

**Is the Sexual Predator Treatment Program Appropriately Managed to Ensure the Safety and Well Being of Program Staff and Offenders? Answer in Brief:** Overall the Sexual Predator Treatment Program appears to have done a good job of addressing staff and resident safety and security, though we did identify a few safety and security issues that could affect staff and resident safety. Specifically, the program did not have adequate policies or controls to ensure keys and doors were secure and to prevent and detect residents receiving prohibited items. Also, despite participating in conflict avoidance training, some staff did not feel adequately prepared for resident altercations. In addition, a significant number of staff positions responsible for ensuring safety, security, and treatment of residents were vacant and program staff worked a significant amount of overtime. Finally, even with significant amounts of overtime, the program consistently failed to meet its internal minimum staffing levels needed to provide safety, security, and treatment.

## FINDINGS RELATED TO SPECIFIC SECURITY ISSUES

**We Identified a Few Safety and Security Issues That Could Affect Staff and Resident Safety. Survey respondents expressed concerns about workplace safety, policies not being followed, and safety not being management priority.** In all, we surveyed 170 program staff members with a response rate of 27%. **Only half of survey respondents felt safe while working. Only half of survey respondents felt residents were living in a safe and secure environment. Many survey respondents reported both management and staff do not follow safety and security policies. About 40% of survey respondents reported safety and security was not a high priority for management. We examined safety and security policies and practices in five areas and identified three areas that needed improvement. Controls over facility doors and keys need to be strengthened. Controls preventing residents from obtaining prohibited items need to be improved. Staff training regarding physical and verbal altercations needs to be improved.** Several survey respondents reported they feel the training was not adequate for addressing physical altercations. The other two safety and security areas that we examined appeared to be managed appropriately. These two areas are summarized below. **Staff appear to appropriately monitor resident location and movement. Staff appear to investigate incidents and complaints appropriately.** The program has developed a formalized process to review and investigate staff incident reports and resident grievances.

**The Sexual Predator Treatment Program Did Not Have Adequate Policies or**

Controls to Ensure Keys and Doors Were Secure.

**Security Controls to Prevent and Detect Prohibited Items Were Inadequate.**
**Security officers did not conduct adequate security checks on staff.** Program officials we spoke
with stated that, in their opinion, residents receive most prohibited items from staff. Controls to
prevent staff from bringing prohibited items into the facility were inadequate in two ways. **Employees
did not pass through metal detectors upon entering the facility. Employee belongings were not
searched.**

**Despite Participating in Conflict Avoidance Training, Some Staff Did Not Feel
Adequately Prepared for Resident Altercations. Despite recurring safety training, several survey
respondents reported they did not feel adequately trained for their job.** Survey respondents
reported concerns about the adequacy of the training and questioned whether it was effective.

### FINDINGS RELATED TO STAFFING

**A Significant Number of Direct Care Staff Positions Were Vacant.** Direct care staff –
These employees tend to residents' treatment and medical needs, and help with daily activities.
Examples include mental health and developmental disability (MH/DD) technicians and nurses, as well
as activity therapists and psychologists. **As of April 2013, about 30% of the program's direct care
positions were vacant.** A report prepared by program staff showed that 55 of 178 certain direct care
positions (including MH/DD technicians and nurses) were unfilled. These types of positions are
responsible for escorting residents throughout the program's facility, supervising daily living activities,
and helping to ensure the safety and security of all residents and staff members in around-the-clock
shifts. **Several factors likely caused the high vacancy rates including a limited pool of applicants,
and undesirable working conditions.** Larned State Hospital officials acknowledged the high vacancy
rate for certain direct care positions is an ongoing problem for the program. Reasons for the high
vacancy rate include: **Potential employees do not want to work with sexual predators. The
program's rural location contributes to a limited applicant pool.** The population of Larned is about
4,000 and the population of Pawnee County is about 7,000. In addition, it is possible that potential
applicants living in other cities may not apply because of the lengthy daily commute that would be
required. **Employees expressed concerns about working too much overtime and receiving low
wages. As the program's resident population grows, the under-staffing problem is likely to get
worse.** The program's resident population will likely continue to grow by about 18 residents a year.
This increase will dictate the need to hire more staff to ensure safety and security. However, due to the
rural location and undesirable resident population to work with, program management is already having

difficulty filling positions. The need for more staff in the future will likely exacerbate staffing shortages.

**Program Staff Worked a Significant Amount of Overtime to Provide Safety, Security, and Treatment.** The program's high vacancy rates have caused certain staff members to work additional hours to provide sufficient staffing levels. **In calendar year 2012, program staff worked more than 38,000 overtime hours. During a recent 20 – week period, more than 60% of all program staff worked some overtime and at least 7% worked an average of 10 to 30 hours of overtime a week. The majority of program staff who responded to our survey reported working long shifts and more than half of respondents felt they worked too much overtime.** About 70% of the survey respondents indicated that they frequently worked nine to 12 hour shifts in the last six months, instead of a normal eight hour shift. Further, more than 50% of respondents indicated the amount of overtime they work is excessive.

**Even With Significant Overtime, the Program Often Failed to Meet its Internal Minimum Staffing Goals. Program management has established minimum staffing levels that are intended to ensure the safety of staff and residents. Staffing data and employee survey results strongly suggest the program often did not meet its own minimum staffing goals.** We reviewed staffing data for 13 days between January 2013 an May 2013. Direct care positions were understaffed on as many as eight of the 13 days. About half of the survey respondents reported that core staffing levels are only sometimes or rarely met. About 35% of staff reported that there are rarely or never enough staff on duty during a shift to ensure safety of residents and staff. Agency officials disagree with this finding. We focused our analysis on summary level data and think the data are sufficiently reliable to show a trend. **Program management said they have to cancel resident activities and services when shifts were understaffed.** Because the program may not have enough staff to both supervise residential unit activities and escort residents to other activities, managers told us they have had to cancel resident activities. Either situation can cause tension among staff and residents and can increase the stress that staff experience.

### Conclusion

Some of these issues can be addressed through improved policies and procedures, but those related to staffing issues will require alternative solutions. The continued growth of the resident population will require additional staff to ensure safety and security. The program already has a large number of unfilled vacancies and current staff work large amounts of overtime to compensate. The limited staffing pool surrounding Larned State Hospital and the undesirable working conditions make it

unlikely the program will be able to address its current and future staffing needs.

**Recommendations for Executive Action**

1. To address security issues regarding control of <u>staff assigned keys and facility keys,</u> Program officials should: a. evaluate and determine which program staff should be allowed to take keys off site and those that should not be allowed to do so. b. revise policies to prohibit staff from taking keys off site without a valid business reason. c. develop a centralized inventory of all facility keys not assigned to a specific individual.

2. To improve the safety and security procedures related to preventing and detecting <u>prohibited items</u> from entering the program, Program officials should: a. install metal detectors at each of the secure building entrances. b. utilize the newly purchased x-ray machine to scan all mailed packages. c. purchase and install the necessary equipment to detect the use of prohibited the electronic devices.

3. To improve Staff conflict avoidance training and to help ensure all staff feel adequately prepared to address verbal and physical altercations, program officials should work with staff to identify deficiencies in the training and ways to enhance training.

4. To address vacancy issues, Program officials should: a. implement strategies designed to increase the number of applicants and hires. b. evaluate the adequacy of the wages paid to program staff. c. examine the feasibility of relocating some or all of the Program to an area of the state with a larger labor market that will increase the number of potential job applicants.

**APPENDIX B  Agency Response**

In its response, the agency concurred with most of the report's findings and recommendations. However, the agency strongly disagreed with the report's finding that the Program did not meet its own minimum staffing goals. It was not supported by any of the records provided to us. After carefully reviewing the response, supporting documents and our audit working papers, we think our finding is appropriate. Additionally, the agency disagreed with recommendation to examine the feasibility of relocating some or all of the program to another area of the state to increase the number or potential job applicants. Agency officials told us they will not examine the feasibility of relocating at this time and have no plans to do so in the future." See E*xhibit H, 2013 Legislative Post Audit Committee, Performance Audit Report, Larned State Hospital: Reviewing the Operations of the Sexual Predator Treatment Program.*

Despite the findings and recommendations of the Legislative Post Audit Committee, Defendants have made no effort to rectify said insufficiencies, nor comply with said recommendations.

Defendants conduct has caused and continues to cause Plaintiffs and Class members harm and is both shocking and intolerable, and a continuing mistreatment of a constitutional stature, in violation of Plaintiff's and Class member's Constitutional rights.

102.    According to the *November 21, 2013 Kansas Governor's Behavioral Health Services Planning Council's Special Task Force, Report of the Sexual Predator Treatment Program Task Force*, recommendations to the Secretary of the Kansas Department for Aging and Disability Services, The report contains: 1) Recommendations for best practices model for serving sexual predators; 2) Recommended standards treatment model and staff orientation for use in current and future transition programs; 3) Recommendations for preventing or reducing sexual offending behaviors in juveniles.

### As for goals number 1 and 2, the Task Force recommendations are:

"1. Evaluate the program components, criteria and outcomes for progression through the Arizona, Washington, California, Missouri, and Texas programs.  These programs reported the highest treatment participation and completion rates.

2. Adopt a containment approach philosophy which incorporates strengths – based components such as the Good Lives Model.

3. Ensure that all SPTP programs are evidenced based:

a. Assessments should identify and target the strongest predictors of re-offending

b. Examine the quantity of treatment hours to determine if it is adequate to support progress.

c. Evaluate why residents are not engaged in treatment and establish a motivational program with positive incentives for meeting treatment outcomes.

d. To best meet individual needs and provide a safe and successful program, the population should be divided into low/medium/high behavioral management populations (i.e. Washington State Model).

e. Review current treatment philosophy to ensure it respects residents as individuals with the potential for recovery and reintegration and incorporate this treatment philosophy into new staff orientation.

f. Maximize opportunities for inclusion/education of family members in the relapse prevention model as clinically indicated (Dowden et al. 2003).

g. Monitor and regularly evaluate fidelity standards by internal and external evaluators.

h. Review current treatment paradigm consisting of seven phases for analysis of clear and consistent criteria based on: 1) Assessment and acquisition; 2) Generalization; 3) Transition; and 4)

Conditional Release to facilitate the principles of effective treatment, clarify treatment phases, and avoid recycling residents through previous classes which might reduce their motivation to make progress in the program. Based on the above analysis, findings may justify reducing the seven phases to fewer phases of treatment.

       i. Assure that persons with disabilities may actively participate and benefit from the program.

       j. Establish an advisory council with representation of family members as part of the SPTP overall quality improvement process.

       k. Implement programs using an objective step-down approach to transition so that the level of supervision is based on risks and their appropriate mitigation.

### Future Recommendations that are outside the scope of the Charter

KDADS should consider taking a leadership role in establishing a Sex Offender Policy Board. The Sex Offender Policy Board should address the items below:

1. Support consistent practices for assessment, treatment, and behavioral objectives.

2. Guide the development of principle-based pilot procedures and programs.

3. Provide oversight and guidance to the implementation of procedures and programs."

See *Exhibit I, 2013 Kansas Governor's Behavioral Services Planning Council, Report of the Sexual Predator Treatment Program Task Force*.

       In addition, on May 23, 2013, Task Force member Rick Cagan of the National Alliance on Mental Illness (NAMI) – Kansas, submitted his own list of recommendations for consideration by the SPTP Task Force. NAMI – Kansas recommendations are:

1. Provide new leadership for the SPTP that will listen and work with residents and family members, that will uphold the law, and implement a system for reporting abuse.

2. Relocate the program to a more urbanized area where better access to professional staff can be achieved.

3. Evaluate the security needs of the program according to threats posed by different groups of residents.

4. Evaluate why residents are not engaged in the treatment program and establish a motivational program with positive incentives to increase the number of individuals who will positively engage.

5. Identify a top tier of residents who can be safely moved through the transition program and released using a GPS monitoring system.

6. Establish oversight for the Administrative Program Director to ensure that program rules and regulations are implemented fairly and consistently and that they are not in a constant state of flux.

7. Ensure that the availability of individual therapy must not be compromised due to the ongoing turnover in clinical staff.

8. Establish a treatment philosophy which respects residents as individuals with the potential for recovery and reintegration and incorporate this treatment philosophy in a new staff oriented program.

9. Consider therapeutic approaches such as those which have been developed by Dr. Fred Berlin of the National Institute for the Study and Prevention of Sexual Trauma.

10. Evaluate all aspects of the treatment program to ensure that inclusion and involvement of family integrated at all levels.

11. Ensure that all transition programs are in major labor market areas to maximize employment opportunities and increase efficiencies.

12. All residents should have the opportunity for an independent psychological evaluation, especially any resident who was evaluated at any time by Rex Rosenberg.

13. Study the feasibility of implementing multiple phases of the SPTP at KDOC and provide an option for any ensuing civil commitment to begin at the level of the program where the offender is at the point of release.

14. Develop uniform minimum qualifications for all treatment staff, including but not limited to activity leaders, instructors, unit leaders, and the Administrative Program Director.

15. Consider specific credentialing and training requirements for all program staff designed to ensure high quality programming at the SPTP.

16. Identify fidelity standards for the implementation of the treatment program and provide for an external review which measures the level of fidelity in carrying out the program.

17. Ensure that staff capacity to administer polygraphs is not a constraint in the advancement of residents from one phase to another.

18. Establish a meaningful and responsive grievance process that eliminates the backlog of unanswered grievances and include the ability to take matters to a level beyond the Administrative Program Director.

19. Make arrangements for the Task Force for an on site visit to the SPTP and provide an opportunity to visit with and hear from residents and staff.

20. Conduct a review of statutory rights provided to SPTP residents and how LSH is complying with those provisions.

21. Address deficiencies in the program's ability to provide timely and adequate medical treatment.

22. Provide funding for adequate staffing to ensure proper execution of a quality treatment program.

23. Establish local agreements with mental health providers for additional treatment options that can be integrated with the overall treatment plan.

24. Make provisions for residents, other than those in the transition program, to have meaningful work assignments on campus.

25. Evaluate complaints about routine HIPAA violations at the SPTP.

26. Provide a transparent organizational chart for the SPTP and identify all staff who are part of treatment teams.

27. Reconsider the $4,000 cap on criminal defense costs for sex predator cases.

28. Establish more individualized treatment and which moves away from the Central Individual Treatment Program.

29. Conduct assessments on volitional impairment.

30. Use of seclusion and restraints at the SPTP must be reported as part of LSH's overall data on use of seclusion and restraints as opposed to classifying the use of seclusion and restraints at the SPTP under another administrative category.

31. Re-evaluate the statutory language which references violent sexual predators and consider changes to the criteria for admission for individuals who have no history of violence or predators status as part of the record.

32. Expand the scope of best practices models from other states, including the 30 states that have not adopted the civil commitment model.

33. Consider the recommendations from the Joint Legislative Audit and Review Commission of the Virginia General Assembly referenced in Edward Dahl's written testimony to the Task Force (4/10/13).

34. Establish recidivism targets for SPTP residents who are released in relation to other subgroups of offenders.

35. Continue the review of best practice treatment models that address mainstream, current research form prominent authors such as R. Karl Hanson.
See http://www.researchgate.net/profile/RKarl_Hanson/publications/." See also *Exhibit N*

*2013 National Alliance on Mental Illness – Kansas, Recommendations for Consideration by the SPTP Task Force.*

Despite the recommendations of the Task Force and NAMI – Kansas, Defendants have made no effort to rectify said insufficiencies, nor comply with said recommendations. Defendants conduct has caused and continues to cause Plaintiffs and Class members harm and is both shocking and intolerable, and a continuing mistreatment of a constitutional stature, in violation of Plaintiff's and Class member's Constitutional rights.

103.    According to the Buckley Group, L.L.C., Larned State Hospital Operations Assessment, The report contains the Buckley Group recommendations for improving Larned State Hospital operations. These recommendations are:

**"ISSUES AND FINDINGS**

**Direct Care Staffing**

Direct patient care is provided by registered nurses (RNs), licensed practical nurses (LPNs) and mental health and development disability technicians (MHDDTs).

We did find two significant issues with direct care staffing. One is that the direct care staff have higher than expected rates of overtime and compensatory time earned (CTE). Related to and perhaps causing the high rate of overtime and CTEs that LSH staff have a high rate of unscheduled/unplanned absences (call-ins). Both issues apparently stem from a high vacancy rate in these positions, especially the MHDDTs.

We believe it may be possible to reduce the frequency of unplanned absences through tighter standards of employee accountability and expanding the pool of direct care staff. Increasing the pool of MHDDTs and other direct staff should also reduce the high rate of overtime.

**Psychiatric Coverage**

Psychiatric coverage at LSH is insufficient. Based on our benchmarks and assessments, LSH would need 13.9 FTE Psychiatrists. If all of its current efforts are successful, LSH will still have a need for approximately 3.5 FTE Psychiatrists.

**Chart Audit**

We found that a number of elements were often missing from several sections of the chart, including psychiatric evaluations, histories and physicals, psychosocial histories, nursing assessments and treatment plans. Additional prompts in the medical record system should correct these deficiencies.

In addition, there is a lack of documented involvement by Psychiatrists in treatment

planning and the frequency of visits with patients is not in compliance with current guidelines. The lack of involvement may reflect the need for additional Psychiatrists and/or psychiatric Advanced Practice Registered Nurses (APRNs).

## CONCLUSIONS

Our analysis suggests there is an opportunity to reduce personnel at LSH by 50.0 FTEs, including Administrative, Social Services, Therapy and Activity Therapy staff. These reductions would achieve an estimated corresponding reduction of nearly $2,7000,000 in salary and benefit costs, based on representative compensation data provided by LSH. This estimate does not factor in reduction in overtime pay that may result by increasing the pool of direct care staff. It also does not include the incremental costs that would be incurred with, the addition of Psychiatrists; however, it is possible that some of the costs of adding Psychiatrists may be offset to a degree by a shorter length of stay for both acute care and residential patients." See *Exhibit O, 2013 The Buckley Group, L.L.C., State of Kansas Department for Aging and Disability Services, Larned State Hospital, Operations Assessment Executive Summary.*

In addition, on December 17, 2013, Tim Carpenter reported in the Topeka Capital – Journal, in an article entitled *State Moving to Trim Staff At KNI, Larned Hospital* that, "Kansas officials plan to implement staffing reductions at state facilities in Topeka and Larned to free an estimated $3 million during the next two years for employee pay raises, hiring of extra psychiatrists and to cover reductions in federal aid. The Kansas Department for Aging and Disability Services responded to a Colorado consultant's evaluation of the state hospital system by developing plans to trim 35 jobs at Kansas Neurological Institute in Topeka and nearly two dozen positions at Larned State Hospital. 'We are undertaking these changes in order to be good stewards of taxpayers' resources and to improve the delivery of behavioral health resources to the people of Kansas, most specifically our patients,' said KDADS Secretary Shawn Sullivan. Under a proposal to be forwarded to the 2014 Legislature, savings would be targeted at hiring at least three additional psychiatrists for Larned – a key recommendation of consultants – at the same time over-staffing in social services and therapy programs was addressed. Consultants proposed the state expand the pool of direct – care nursing staff to alleviate a chronic overtime problem at Larned." See *Exhibit O, 2013 The Buckley Group, L.L.C., State of Kansas Department for Aging and Disability Services, Larned State Hospital, Operations Assessment Executive Summary.*

And, on December 16, 2013, Mike Shields reported in the KHI News Service, in an article entitled *More than $8 million could be saved at four state hospitals, consultant concludes* that,

94

"A consulting company has completed its review of the state hospitals for the mentally ill and developmentally disabled and Kansas officials are now moving forward with some of the resulting recommendations, including reducing the number of employees at Larned State Hospital and Kansas Neurological Institute in Topeka.

Shawn Sullivan, Secretary of the Kansas Department for Aging and Disability Services, the agency that oversees the hospitals, said no layoffs would be required to complete the agency's follow-up plan but that the equivalent of about 35 full-time jobs at KNI and 22 at Larned would be eliminated over the next two years as workers retire, resign or otherwise leave. Sullivan said he intended to use the more than $3 million in expected savings over the next two years to cover recent pay raises given to some hospital workers, to offset anticipated cuts in federal aid for the facilities, hire more psychiatrists at Larned, and to help move developmentally disabled persons off the waiting list for home-based Medicaid services.

But Rebecca Proctor, interim executive director of the Kansas Organization of State Employees, a labor group with members at the hospital, said 'forced overtime' remains a serious problem at Larned with many direct care workers clocking 15 to 30 hours of it per week.

'I can tell you that KOSE would oppose any of those reductions because we believe Larned is understaffed at the moment,' Proctor said. 'When you're working people that much overtime that tells me there is no room for cuts.'

The state's Sexual Predator Treatment Program is housed at Larned and a September legislative audit that looked at security and staffing on the unit concluded that 55 of its 178 direct-care positions were vacant.

The audit also noted that staff on that unit alone had clocked more than 38,000 hours overtime in 2012, compared to 6,7000 hours in 2010.

The consultant also reported that the employees absenteeism rate at Larned was relatively high, 'around 5 percent' compared to the expected 1 percent.

'We believe it may be possible to reduce the frequency of unplanned absences through tighter standards of employee accountability and by expanding the pool of direct care staff. Increasing the pool of MHDDTs (mental health developmental disability technicians) and other direct care staff should also reduce the high rate of overtime,' the consultants wrote.

KDADS officials said their plan is to reduce positions in areas that the consultant concluded were overstaffed but increase direct-care staffing.

Sullivan said the agency would be moving people from overstaffed functions, such as

95

therapy, to fill vacancies in direct care over the next six months." See *Exhibit O, 2013 The Buckley Group, L.L.C., State of Kansas Department for Aging and Disability Services, Larned State Hospital, Operations Assessment Executive Summary.*

The Buckley Group is correct in that SPTP is grievously understaffed in Psychiatrists, however, they failed to acknowledge the fact that SPTP is grievously understaffed in Psychologists as well. And the recommendation to reduce Therapy and Activity Therapy staff is anti-therapeutic and detrimental to Plaintiff's and Class member's right to adequate treatment. Regardless of Defendant's claims that they are implementing recommended changes, Defendants have implemented none of the recommendations of the Buckley Group. SPTP continues to be grievously understaffed, underpaid, and overworked. Defendant's conduct has caused and continues to cause Plaintiffs and Class members harm and is both shocking and intolerable, and a continuing mistreatment of a constitutional stature, in violation of Plaintiff's and Class member's Constitutional rights.

104.    SPTP provides inadequate treatment hours compared to acceptable best practices for sex offender treatment.

105.    Most of SPTP Plaintiff's and Class member's time is unstructured. As of March 2014, Plaintiffs and Class members who were participating in treatment at LSH received on average three hours of group therapy a week. While those participating in basic core psycho-educational classes received a maximum additional four hours of education per week, and those participating in advanced core psycho-educational classes received a maximum additional two hours of education per week.

106.    Plaintiffs and Class members are provided as little as three hours per week of group therapy and as little as one hour per month of individual therapy. Requests for additional frequent and intensive treatment are routinely denied. In contrast, the Department of Corrections, in facilities that are not primarily for treatment, provides at least 10 hours of group therapy and psycho-educational classes for its sex offender treatment.

107.    Defendants have not provided Plaintiffs or Class members treatment by a psychiatrist or licensed clinical psychologist trained qualified certified, or licensed to provide meaningful treatment to sex offenders. SPTP at LSH only employed two licensed clinical psychologists, who between themselves could not provide treatment to even one third of all Plaintiffs and Class members. And in February 2014 SPTP administration fired the only licensed clinical psychologist assigned to the Dillon building. As a result, Defendants provide no treatment by a licensed clinical psychologist to any Plaintiffs or Class members housed in the Dillon building. Defendants and employees treating Plaintiffs and Class members at SPTP are not qualified, certified or licensed to treat sex offenders.

96

Some clinicians were formerly security staff, with backgrounds in criminal justice. Some are nothing more than social workers, or human services counselors. Some are post-docs, while others are only trainees. SPTP does not require new clinicians to have master's degrees or be licensed or license – eligible.

Defendants have denied and refused to provide Plaintiffs and Class members with qualified educational counselors with a major in the area which they are teaching, specifically trained for the class and/or subject he/she is teaching. Defendants have denied and refused to provide continuing education and training of the clinical staff. Psycho-educational classes are administered by poorly trained/incompetent clinicians. See *Turay v. Seling*, 1999 Wash. LEXIS 74 (2000), *Turay v. Seling*, 108 F. Supp. 2d 1148, and *Davis v. Watkins*, 384 F. Supp. 1196.

108.    SPTP has had difficulty filling clinical positions with qualified staff, and has had difficulty filling the clinical supervisory positions with competent staff, and that as a result, has had problems ensuring that the treatment program is implemented competently/adequately.

109.    General therapist under-staffing has been a persistent problem. Therapists caseloads are too high, which has affected the ability of the program to deliver treatment to clients. Therapists should have no more than eight (8) Plaintiffs and Class members on their caseload, but some therapists have more than 60 Plaintiffs and Class members on their caseloads. This under-staffing has resulted in poor treatment.

Defendants have therefore violated court ordered treatments of Plaintiffs and Class members and this failure constitutes contempt of court, is shocking and intolerable, and is a continuing mistreatment of a constitutional stature. See *Turay v. Seling*, 108 F. Supp. 2d 1148, 'The Fourteenth Amendment Due Process Clause of the United States Constitution requires state officials to provide civilly – committed persons, such as these Plaintiffs and Class members, with access to mental health treatment that gives them a realistic opportunity to be cured or to improve the mental condition for which they were confined. See *Youngberg v. Romeo*, 457 U.S. 307, 319-22, 73 L. Ed. 2d 28, 102 S. Ct. 2452 (1982); *Ohlinger v. Watson*, 652 F. 2d 775, 778 (9th Cir. 1980). This rule applies to sex offenders, and "lack of funds, staff or facilities cannot justify the state's failure to provide [those confined] with that treatment necessary for rehabilitation." *Ohlinger v. Watson*, 652 F. 2d 778-79. The *Youngberg* constitutional standard "determines whether a particular decision has substantially met professionally accepted minimum standards." *Society for Good Will to Retarded Children, Inc. v. Cuomo*, 737 F. 2d 1239, 1248 (2nd Cir. 1984).

Accordingly, these Plaintiffs and Class members, and others involuntarily confined

97

through civil proceedings cannot simply be warehoused and put out of sight; they must be afforded adequate treatment. Although confined, they are not prisoners. They are entitled by law to "more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg*, 457 U.S. At 322.'

110.    By any measure, the SPTP is not providing Plaintiffs or Class members with a therapeutic environment. Historically and currently, the program [at SPTP] has struggled to create an environment that fosters client rehabilitation. Historically and currently: (1) Some SPTP staff have held disrespectful negative, punitive, and non-therapeutic attitudes towards clients; and (2) the culture at the facilities are counter-therapeutic.

111.    Though accredited by the Joint Commission on Accreditation of Health Care Organizations (JCAHO), SPTP at LSH regularly fails sufficient compliance. Suspiciously, JCAHO grants Defendants accreditation even though they are guilty of insufficient compliance. See *Exhibit M, 2012 The Joint Commission, Larned State Hospital, Hospital Accreditation Report*.

112.    Plaintiffs and Class members are not billed for individualized care. Instead, they are billed a per diem rate regardless of the individual treatment or individual costs. There are many levels of care and many varying levels of cost, depending upon the programming the patient receives or otherwise requires. Yet, all of the Plaintiffs and Class members are charged at one daily rate regardless of individual needs. According to the *2013 Larned State Hospital Fiscal Budget Report*, SPTP, being funded through Larned State Hospital, is funded through the State General Fund (taxes), the Hospital Fee Fund (Medicare, private payments, Social Security, and insurance), and Federal Title XIX Funding through Medicaid payments through the Disproportionate Share Hospital program (acute care hospitals) that serve a disproportionately high number of indigent persons receiving funds from . Medicaid. At the same time Defendants deny Plaintiffs and Class members their rights to collect disability through Social Security, or to collect Medicare and/or Medicaid, while Defendants are collecting funds from Social Security, Medicare and Medicaid in Plaintiffs' and Class members' names. Defendants should not charge Plaintiffs and Class members, or their family members for their treatment, because Defendants cannot be authorized by law to demand reimbursement from Plaintiffs and Class members since they are legally disabled by virtue of their diagnosis, and civil confinement, and because Plaintiffs and Class members are forcibly detained, not voluntarily seeking treatment in a secure facility. The State should be solely liable for the cost of Plaintiff's and Class member's confinement. Furthermore, Plaintiffs and Class members should have the right to collect their own Social Security, disability, and Medicaid and/or Medicare.

## E. DISCIPLINE AND PUNISHMENT

113.    In addition to the lack of treatment, Defendants have subjected Plaintiffs and Class members to disciplinary and punitive policies, practices, and procedures during their civil commitment to SPTP, particularly since Mr. Cory Turner became Administrative Program Director of the SPTP in approximately 2008 and implemented new policies, procedures and practices. With each new Administrative Program Director since Mr. Turner: Mr. Lee Flamik, Mr. Christopher Burke, Mr. Clifford Voelker, Mr. Benjamin Ramsey, and Mr. Turner again in 2013 (as acting APD), new policies, procedures and practices, as implemented, have become increasingly punitive and restrictive. This is a violation of Plaintiff's and Class member's Fourteenth Amendment Due Process Clause of the United States Constitution which entitles Plaintiffs and Class members by law to "more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish," 'A treatment oriented "flavor" to the facility that is lacking a Department of Corrections "flavor"' "'alternative and less harsh methods" to achieve a non-punitive objective,' "Legislation that seeks to help the individual offender as well as to protect the public would avoid significantly greater restriction of an individual's liberty than public safety requires," "Placement of Patients in the Least Restrictive Setting," and "A right to a humane psychological and physical environment within the hospital facilities." See *Turay v. Seling*, 108 F. Supp. 2d 1148; *Youngberg v. Romeo*, 457 U.S. 307, 319-22, 73 L. Ed. 2d 28, 102 S. Ct. 2452 (1982); *Turay v. Seling*, 1999 wash. LEXIS 74 (2000); *Kansas v. Hendricks*, 521 U.S. 346; *Bell v. Wolfish*, 441 U.S. 520, 539, n. 20, 60 L. Ed. 2d 447, 99 S. Ct. 1861 (1979); *Keilitz, Conn & Gianpetro*, Least Restrictive Treatment of Involuntary Patients: Translating Concepts into Practice, 29 St. Louis U.L.J. 691, 693 (1985) (describing "least restrictive alternative" provisions in the ordinary civil commitment laws of almost all States); *Davis v. Watkins*, 384 F. Supp. 1196; and K.S.A. § 59-29a22(b)(9).

114.    The main disciplinary tools used at the SPTP are Daily Action Reports (DARs), which staff members use to record negative statements and observations against Plaintiffs and Class members; and Disciplinary Reports (DRs), used to punish Plaintiffs and Class members. The current Resident Rulebook was issued in 2008 and updated in 2012. It contains descriptions of behavioral violations, consequences, and a disciplinary procedure for DARs and Drs. The Resident Rulebook was adopted nearly word-for-word from the Kansas Department of Corrections Inmate Rule Book for prisoners.

115.    Defendants categorize behavioral violations as either Class I offenses, Class II offenses, or Class III offenses.

116.    Class III offenses are defined as those violations of a less serious nature that are

designated in the rule book as Class III offenses, whether or not the offense is a violation of law. · Additionally, each violation of any published policy or procedure that is not otherwise designated in the rule book as a Class I or Class II offense is designated a Class III offense. As a result of a Class III offense, Plaintiffs and Class members may be subject to any one or all, or any combination of the following consequence(s): a) Oral or written reprimand; b) Restrictions status, not to exceed (30) days; c) Forfeiture of property, not to exceed (30) days, if property item was used in commission of the violation. Note: If, within a (90) day period, a fourth (or subsequent) Class III violation is committed; the violation is considered a Class II.

117.    Class II offenses are defined as: 1) Those violations of moderate seriousness that are designated in the rulebook as Class II offenses, whether or not the offense is a violation of law; 2) Those violations of law designated by the laws of the state of Kansas as misdemeanors; or 3) Those violations of law designated by the laws of the United States as misdemeanors. As a result of a Class II offense, Plaintiffs and Class members may be subject to any one or all, or any combination of the following consequence(s): a) Restriction status, not to exceed (60) days; b) Restriction from purchasing, not to exceed (60) days; c) Reduction in privilege level; d) Forfeiture of property, not to exceed (60) days, if property item was used in commission of the violation. Note: If, within a (90) day period, a fourth (or subsequent) Class II violation is committed; the violation is considered a Class I.

118.    Class I offenses are defined as: 1) Those violations of a very serious nature that are designated in the rulebook as Class I offenses, whether or not the offenses are also a violation of law; 2) Those violations of law designated by the laws of the state of Kansas as felonies; or 3) Those violations of law designated by the laws of the United States as felonies. As a result of a Class I offense, Plaintiffs and Class members may be subject to any one or all, or any combination of the following consequence(s): a) Restriction status, not to exceed (90) days; b) Restriction from purchasing, not to exceed (90) days; c) Reduction in privilege level; d) Forfeiture of property, not to exceed (90) days, if property item was used in commission of the violation.

119.    Defendants fail to mention in the rulebook that SPTP staff often lock Plaintiffs and Class members in their rooms, lock Plaintiffs and Class members in the "seclusion room," forcibly sedate Plaintiffs and Class members, and/or lock Plaintiffs and Class members up in the Intensive Treatment Unit located in the Isaac Ray building as further punishment for rule violations.

120.    Other behavior SPTP classifies as rule violations include a Plaintiff or Class member signing up for an activity and not attending that activity, a Plaintiff or Class member attending an activity he had not signed up for, dress code violations, loitering the halls, or blocking the night light in

100

the Plaintiff's or Class member's room so that it's actually dark enough for the patient to get peaceful, undisturbed rest.

121.    SPTP staff do not consistently apply the rules to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to determine what level of punishment or restriction they should expect for any given rule violation or behavior.

122.    If SPTP staff believes a Plaintiff or Class member has violated a rule, they issue a redirect, a Daily Action Report, or a Disciplinary Report. A redirect is a request from SPTP staff that the Plaintiff or Class member alter their behavior. If the offending behavior persists, the staff may issue a Disciplinary Report. After receiving a Disciplinary Report, the Plaintiff or Class member may appeal the Disciplinary Report itself or the restrictions imposed, to the disciplinary officer, or the Administrative Program Director if the Plaintiff or Class member is unsatisfied with the disciplinary officers decision. The disciplinary officer and the Administrative Program Director are not impartial or objective and the disciplinary process is a sham.

123.    Plaintiffs and Class members are not given a hearing and are not allowed to present evidence, cross examine witnesses, or face their accusers when served with a Disciplinary Report. Plaintiffs or Class members are not given copies of the incident reports or other evidence that is being used against them to impose disciplinary restrictions.

124.    Plaintiffs and Class members may only appeal the disciplinary officer's decision to the SPTP Administrative Program Director. However, most policies and procedures complained of by Plaintiffs and Class members are implemented by the APD, suggesting a less than impartial appellate process.

125.    The treatment team and vocational services utilize Individual Treatment Plans and Treatment Memos to issue further discipline and restrictions on Plaintiffs and Class members. Vocational services will often remove a Plaintiff or Class member from the Vocational Work for Pay Program or reduce the amount of hours he is entitled to participate as a result of receiving a Disciplinary Report.

126.    Receiving a Disciplinary Report directly affects a Plaintiff's or Class member's progression in treatment. Disciplinary restrictions cause at least a six month delay in progression in treatment.

127.    The Intensive Treatment Unit (ITU) is also used as a disciplinary measure at SPTP. ITU is essentially solitary confinement. Plaintiffs and Class members are locked in their room, injected with tranquilizer, locked in a seclusion room, and eventually transferred to the ITU in the Isaac Ray

101

building for punishment. Plaintiffs and Class members are held in ITU when SPTP staff determines they need to be placed on "Protective Isolation Status." See *Exhibit R, Sexual Predator Treatment Program of Kansas, Intensive Treatment Unit, Resident Handbook.*

128.    Plaintiffs and Class members can be placed in ITU until SPTP staff determines they have regained behavioral control. While in ITU, Plaintiffs and Class members can be locked in their cell whenever it pleases SPTP staff, for as long as it pleases SPTP staff. See *Exhibit R, Sexual Predator Treatment Program of Kansas, Intensive Treatment Unit, Resident Handbook.*

129.    Plaintiffs and Class members are kept in ITU much longer than is necessary, and it is used as a punitive measure rather than a behavioral control measure. See *Exhibit R, Sexual Predator Treatment Program of Kansas, Intensive Treatment Unit, Resident Handbook.*

130.    Other punitive policies and practices in place at SPTP by Defendants include: a) punishing Plaintiffs and Class members by denying access to group therapy when restricted to the unit; b) unreasonably restricting Plaintiffs' and Class members' access to, and conduct during, visitation; c) restricting Plaintiffs' and Class members' access to both regular and law library; d) restricting Plaintiffs' and Class members' access to recreational activities and exercise; e) restricting what can be purchased by Plaintiffs and Class members from vendors; f) denying Plaintiffs and Class members adequate educational programming; g) denying Plaintiffs and Class members any meaningful employment opportunities; h) permitting SPTP staff to punish Plaintiffs and Class members by denying them employment; i) denying Plaintiffs and Class members access to hobbies; j) restricting the time Plaintiffs and Class members are allowed access to the gym and the yard; k) allowing staff to punish Plaintiffs and Class members by locking them in their cell; l) creating a patient disciplinary process for Plaintiffs and Class members that does not follow Constitutional standards of due process; m) creating policies that, as implemented, super cede statutory rights provided to Plaintiffs and Class members under the Patient Bill of Rights; n) denying Plaintiffs and Class members the right to share food and other items with others; and o) creating an inadequate grievance procedure. Plaintiffs and Class members file a grievance with the grievance disciplinary officer, who does nothing to resolve the issue the Plaintiff or Class member is attempting to grieve. Plaintiffs and Class members may appeal the grievance disciplinary officer's decision to the Administrative Program Director if unsatisfied with the grievance disciplinary officer's decision. The grievance disciplinary officer and the Administrative Program Director are not impartial or objective and the grievance procedure is a sham. Most policies and procedures grieved of by Plaintiffs and Class members are implemented by the APD, suggesting a less than impartial grievance procedure.

## F. NON-THERAPEUTIC ENVIRONMENT

131.    The policies, procedures, and practices of Defendants have led to a non-therapeutic environment in the SPTP.

### 1. Physical Layout of the Secure Facility

132.    The SPTP facility at Larned State Hospital is laid out like a state prison. In fact, there is a Kansas Department of Corrections maximum custody facility prison and a minimum custody facility prison on the same grounds. SPTP security staff wear KDOC-style uniforms. SPTP facilities have locked doors, locked gates, and razor wire on the perimeter fence. Plaintiffs and Class members are not allowed movement within the secure buildings without escort. SPTP at LSH is more restrictive than Kansas' maximum custody facility prison facilities. The SPTP is not designed with therapeutic goals in mind.

133.    Despite the well documented concerns regarding the difficulty of fostering a therapeutic environment in the current facilities at Larned State Hospital, SPTP is currently considering Governor Brownback's suggested expansion that will create a second Intensive Treatment Unit in the Isaac Ray building. See *Exhibit B, 2013 Larned State Hospital Fiscal Budget Report*, pp. 710-711.

134.    Mail and Kitchen facilities at SPTP Dillon building have not been expanded since the program was opened in the Dillon building. Therefore, a facility that was designed for forty (40) patients is now required to serve over one hundred and sixty (160) Plaintiffs and Class members. Those limited facilities have resulted in inadequate meal and mail service for Plaintiffs and Class members.

### 2. Cell Conditions

135.    In the past, patients could purchase video game systems, televisions, word processors, computers, furniture, personal bedding, religious items and food from any vendor. Currently, Plaintiffs and Class members are limited on the items they may purchase, to pre-approved only food and hygiene products, and other limited purchases, from a handful of pre-approved vendors only. Plaintiffs and Class members are no longer allowed to purchase computers, furniture, personal bedding, religious items, personal recording devices, or art/hobby craft items. Indigent Plaintiffs and Class members must make canteen purchases of food and hygiene products through Keefe only, which is the exclusive vendor for LSH, and consequently, SPTP indigent Plaintiffs and Class members. This results in excessive prices for purchases.

136.    In 1998-1999, and following years the SPTP Dillon building at LSH was remodeled, followed by the Jung building in 2012-2013, and the Meyer building in 2013-2014. As a result of these

remodels, SPTP facilities' cells are equipped with small, cold metal desks, hard metal stools, cold metal toilet/sink combinations which supply only ice cold water – even in winter, inferior ventilation systems that supply only cold air in winter and warm air in summer, poor air quality from a dirty ventilation system which is never cleaned or filtered properly, spring less beds, inferior mattresses, flat pillows, smaller/inoperable windows, night lights that stay on all night and interfere with any possibility of a restful sleep, and a more prison-like setting as opposed to a home-like environment.

137.    Cell doors are metal and only have a small viewing window.  There is no privacy when toileting.  Plaintiffs and Class members are not allowed to cover the cell door window even long enough to toilet or change clothes in private.  The only storage Plaintiffs and Class members are allowed are one shelving unit no larger than 72"h x 36"w x 18"d, and one storage cabinet no larger than 25 5/8"l x 18 1/2"w x 69 3/8"h.

138.    SPTP staff are allowed to lock Plaintiffs and Class members in their cell from 10:00pm until 5:00am any day, should they choose such action.

### 3. Searches

139.    Defendants perform unwarranted and unreasonable searches of Plaintiff's and Class member's persons, property, and living quarters at SPTP.

140.    Currently, Plaintiffs and Class members are subject to unwarranted pat searches of the body without reasonable suspicion being established.  Plaintiffs and Class members may be pat searched or wand searched at any time for no reason including whenever leaving the gym/recreation area, the visiting area or vocational work areas.

141.    Plaintiffs and Class members are subject to strip searches upon entry to the SPTP, regardless of the incident that led to being placed in the SPTP.

142.    Plaintiffs and Class members are subject to regular random cell searches.  These cell searches are used as a punitive exertion of authority on Plaintiffs and Class members.  No meaningful process exists to oppose the searches or appeal the resulting arbitrary confiscation of Plaintiff's and Class member's property.

143.    The following policies, procedures, and practices related to searches performed by Defendants are also unreasonable: a) conducting random, unreasonable, and unwarranted searches of Plaintiff's and Class member's quarters, property and persons; b) monitoring Plaintiff's and Class member's telephone calls.  Class member Randall Ritchie has been directly harmed by this invasion as security staff, and switchboard staff have broken into his conversation with his wife on multiple occasions; c) monitoring Plaintiffs and Class members when they are speaking with clergy or other

religious volunteers; d) monitoring Plaintiffs and Class members when they are speaking with attorneys; e) forcing Plaintiffs and Class members to buy from approved vendors only, even though staff check all incoming mail; and f) allowing staff to shakedown Plaintiff's and Class member's cells at any time.

### 4. Physical Restraints

144.    In the past, Plaintiffs and Class members were allowed to leave the facility with a staff escort and without physical restraints. Plaintiffs and Class members could move freely about the compound and socialize with other Plaintiffs and Class members. Plaintiffs and Class members were not locked in their rooms. Plaintiffs and Class members could shop at local stores, cook food on stoves and barbecues, and carry cash.

145.    Since Mr. Cory Turner took over SPTP in approximately 2008, and every APD following, the restrictions on movement at the SPTP are worse than a maximum custody correctional facility.

146.    When Plaintiffs and Class members leave the secure facility they are placed in wrist restraints, leg restraints, and a waist restraint. They are then placed in a secure transport vehicle, in the back seat, with doors that only open from the outside. They are subject to these same restraints when they suffer a medical emergency and need to leave the secure facility via ambulance. Class member Randal Terrel has been directly harmed by Defendants actions, policies, and procedures when he suffered a bleeding colon and lost a life threatening amount of blood. Though Class member Terrel almost died, Defendants would not allow Class member Terrel to be transported by ambulance until staff had fully placed him in restraints.

147.    Plaintiffs and Class members cannot ever move freely around the facility. The only time they can move around an area as they wish is when they are locked on their designated living unit. All other move is only allowed with staff escort.

148.    The physical restraint policy is impermissibly applied across the board to Plaintiffs and Class members. No consideration is given to the individualized security risk that a Plaintiff or Class member poses.

### 5. Inadequate Medical Treatments

149.    Defendants do not provide adequate medical treatment to Plaintiffs and Class members.

150.    Defendants unnecessarily delay providing Plaintiffs and Class members medication after they have been prescribed to the Plaintiff or Class member.

151.    Defendants limit the medical assistance they are willing to provide, especially when it

requires professional medical assistance outside of SPTP Health Services. Medical treatment for legitimate medical needs such as heart problems, strokes, broken bones, x-rays, cancer, pulmonary problems, hernias and the like have often been refused to Plaintiffs and Class members. Defendants refuse to provide Plaintiffs and Class members an on-site medical doctor, providing them instead with only an Advanced Practice Registered Nurse (APRN) to provide their medical care. The APRN typically refuses to recommend necessary medical treatment for legitimate medical needs which require professional medical assistance outside of SPTP Health Services. When the APRN does recommend medical treatment by professional medical assistance outside of SPTP Health Services, Defendants' medical board typically cancel the medical procedures without cause. Defendants regularly collect Medicaire and Medicaid in the name of Plaintiffs and Class members, yet they charge Plaintiffs and Class members for those same services. The medical neglect by SPTP Health Services has resulted in Plaintiffs and Class member suffering lasting harm.

### 6. Personal Property

152.    Plaintiffs and Class members may no longer possess cell phones, personal recording devices, personal computers, laptop computers, and computer software. Plaintiffs and Class members may not access the internet. This isolates Plaintiffs and Class members from educational opportunities, career opportunities in the outside world, communication with family and friends, and engaging with the outside world.

153.    Plaintiffs and Class members are forced, at their own expense, to mail property that SPTP deems contraband outside the facility or the property is destroyed.

154.    If Plaintiff's and Class member's property is considered contraband, such as books and movies that are not on the approved media list, that property is confiscated. Plaintiffs and Class members have no outlet to appeal the denial of their property, save filing a grievance. However, when the grievance is reviewed by the grievance/disciplinary officer, and eventually the Administrative Program Director, the grievance is always denied, and the property confiscation is always upheld, because neither the grievance/disciplinary officer, nor the Administrative Program Director are fair, nor impartial. The process to grieve the confiscation and destruction of property is overly burdensome and futile.

155.    Plaintiff's and Class member's personal computers were removed from the SPTP in 2004 when Dr. Austin DesLauriers was acting as Administrative Program Director and Clinical Program Director. A patient network was established with ten computers for the over one hundred and sixty (160) Plaintiffs and Class members in the Dillon building to perform word-processing and other simple

tasks.

156. Plaintiffs and Class members have been denied and restricted from using or accessing the internet even though only two individuals have misused the internet. No other individual reasonable suspicion of any other Plaintiff or Class member has ever been established to warrant the restriction. The SPTP also already possesses the commercial software necessary to monitor an Internet Server, and limit internet usage, which is currently on-line for employees of the SPTP. Furthermore, restrictions should be solely placed on any individual guilty of misusing the internet. Restrictions should not be administered as a blanket punishment upon all Plaintiffs and Class members based on the actions of one or two other Plaintiffs or Class members.

157. Completely preventing Plaintiffs and Class members from accessing the internet further isolates them from the world because they are not able to pursue on-line educational or employment opportunities or even communicate with friends and family via e-mail.

### 7. Visitation

158. Plaintiffs and Class members used to be afforded liberal visitation policies, with visiting hours daily. Visitors were allowed to prepare food or cook food during the visitation for consumption with Plaintiffs and Class members. Contact between visitors and Plaintiffs and Class members was broadly permissible – hand holding, hugging, and holding children were all acceptable. Visitors could drop off gifts and groceries on their visits with Plaintiffs and Class members.

159. Currently visitation is limited to weekends and holidays only, from 8:30am to 11:30am (with a break from 11:30am to 12:30pm), and from 12:30pm to 3:30pm. Visitors must now be pre-approved for visitation, submit to a criminal background check and submit to a metal detector, wand search, and/or pat search. Contact between visitors and Plaintiffs and Class members is limited to one hug at the beginning and end of each visit. Plaintiffs and Class members are pat searched before and after visitation. SPTP limits the size of a Plaintiff's or Class member's visiting list as well as the number of visitors at one time.

160. Currently, children are only allowed to visit on the first Saturday of each month. Children are not allowed to visit any other day during the month. No other Plaintiff or Class member is allowed a visit on child visitation day (whether any children show up to visit or not), besides the Plaintiff or Class member who the child is visiting.

161. The current visitation practices greatly discourage visitation and serve to further isolate Plaintiffs and Class members and hinder their therapeutic progress.

107

### 8. Employment Options

162.    Plaintiff's and Class member's vocational work assignments, at the Dillon building and Annex, are limited to a handful of Class members, awarded to only the most qualified, who already have the work skills to perform the job, and are provided *no* vocational training whatsoever. Vocational work assignments are limited to menial labor. Plaintiffs and Class members must perform janitorial maintenance work on their own living unit, in the dining hall, or in the kitchen – serving food. Plaintiffs and Class members do not have access to facility jobs which would allow the Plaintiff or Class member to be more employable upon re-entering society, such as: plumbing, electrical, HVAC or any other vocational programs which would afford them meaningful job skills.

163.    Employment and education opportunities at SPTP are lacking. There are limited work opportunities for clients of the SPTP. The amount of time that a Class member may work is limited. Class member's upper limit of time working is up to nine (9) hours in a two week pay period. Few Class members are scheduled the maximum amount of work hours.

164.    Vocational programming jobs at the SPTP pay minimum wage, however, Class members are only given two thirds of their amount of wages by the SPTP per month. One third of the Class member's monthly wages are taken from Class members as room and board.

165.    The need for employment opportunities is especially pressing given the fact that Plaintiffs and Class members are billed per diem for their treatment. Those bills accrue until the Plaintiff or Class member is released from SPTP.

### 9. Inadequate Diet

166.    The diet for Plaintiffs and Class members must provide, at a minimum, the Recommended Daily Dietary Allowances established by the National Academy of Sciences. In developing such menus, the SPTP must utilize the moderate cost food plan of the United States Department of Agriculture. For an adult male, the SPTP must provide, at a minimum, a regular diet of at least 2800 calories per day.

167.    SPTP cannot spend less per Plaintiff or Class member for raw food, including donated food, than the most recent per person costs of the Moderate Cost Food Plan for the Midwestern Region of the United States, as compiled by the United States Department of Agriculture, for appropriate grouping of Plaintiffs and Class members, discounted for any savings which might result from institutional procurement of such food.

168.    The SPTP food contractor A'viands continually shortens meals or simply does not deliver what is on the menu. The menu itself does not equal a 2800 calorie per day diet, nor does

A'viands deliver a 2800 calorie diet on any given day. Meals are poorly prepared and in some cases handled without due care, which has led to some illness. Food proportions are rationed out at a lesser degree than what the menu states due to the practice of equating food volume with weight. The food Defendants provide to Plaintiffs and Class members is of extremely poor quality and includes by-product meat, old meats that have sat at room temperature too long, various other foods exposed to room temperature too long, and over-cooked vegetables.

### 10. Communication and Media Restrictions

169.    SPTP charges Plaintiffs and Class members exorbitant rates for using the telephones. Currently, Plaintiffs and Class members are charged approximately one dollar and thirty three cents per minute to use the pay phones. The SPTP phone system is the only phone system Plaintiffs and Class members are allowed to use.

170.    Plaintiffs and Class members are not allowed to use 800 numbers to conduct business.

171.    The extremely high rates Plaintiffs and Class members are charged serve no therapeutic or security purpose.

172.    Defendant's phone service contractor is IC Solutions. Through IC Solutions Defendants record and monitor Plaintiff's and Class member's personal telephone calls. As evidenced by IC Solutions own recording that, "All calls are recorded and are subject to monitoring."

173.    Class member Randall Ritchie negotiated a plan with Nex-Tech wireless that satisfied SPTPs every concern to provide Plaintiffs and Class members with cell phones. SPTP does not want Plaintiffs or Class members to have access to the internet, to be able to send or receive photos, or to be able to call potential victims. Nex-tech wireless is willing to program the cell phones without internet access, without the ability to send or receive photos, and pre-programmed to call only the pre-approved numbers SPTP pre-approves for each Plaintiff and Class member, as submitted on their pre-approved calling list. Class member Randall Ritchie submitted this plan as a proposal to the SPTP treatment team, which was rejected without reason.

174.    Defendants limit which magazines and newspapers the Plaintiffs and Class members can read. They also censor and remove certain articles and sections of the newspapers that are given to the Plaintiffs and Class members to read.

175.    Defendants monitor Plaintiffs and Class members when they speak to clergy and religious volunteers, even though they have been screened by SPTP staff upon entry to the facility. They also monitor Plaintiffs and Class members during religious services.

176.    Defendants do not provide Plaintiffs and Class members Kosher or Halal meals.

Plaintiffs and Class members are not allowed to wear yarmulkes or kufis in the dining hall or anywhere else other than on their own living unit or to their specific religious call-out. Plaintiffs and Class members are denied certain religious medallions, pendants, arrowheads, and many other religious items specific to their religious beliefs.

177.   Defendants limit the types and number of religious items Plaintiffs and Class members may have in their personal property. Plaintiffs and Class members are allowed only one bible at a time.

178.   Defendants only allow Plaintiffs and Class members to have religious feasts once per year, despite the fact that Plaintiffs and Class members have offered to pay for those feasts.

179.   Defendants do not allow Plaintiff's and Class member's separate religious groups to have their own religious leader, specifically trained in their religious beliefs. Defendants force all Plaintiffs and Class members to answer to one so-called "All Faith" Chaplain, regardless of their particular religious beliefs.

## II. Release from Civil Commitment from SPTP

180.   The only way the Plaintiffs and Class members can be released from their civil commitment from SPTP is through the statutory process for a reduction in custody.

181.   Requests for a reduction in custody must be filed with and considered by a panel of the Progress Review Board. The Progress Review Board reviews the Plaintiff's and Class member's requests, records including the commitment order and any relevant treatment information such as quarterly and annual reviews. The Progress Review Board determines whether the Plaintiff's or Class member's mental abnormality or personality disorder has so changed that he is safe to be placed in the advanced application phase – Phase V.

182.   The only way the Plaintiffs and Class members can be placed in transition is to petition the district court which civilly-committed the Plaintiffs and Class members in the first place. To be placed in transition the judge must agree to a hearing. At that hearing the judge must rule that the Plaintiff's or Class member's mental abnormality or personality disorder has so changed that he is safe to be placed in transition. This is an extreme conflict of interest, because the same judge that civilly-committed the Plaintiff or Class member in the first place is not fair and impartial. His interest lies in keeping the Plaintiff or Class member confined. The judge rarely, if ever, rules the Plaintiff or Class member is safe to be placed in transition.

183.   The only way the Plaintiffs and Class members can be released on conditional release is to petition the district court which civilly-committed the Plaintiffs and Class members in the first place. To be placed on conditional release the judge must agree to a hearing. At that hearing the judge must

rule that the Plaintiff's or Class member's mental abnormality or personality disorder has so changed that he is safe to be placed on conditional release. This is an extreme conflict of interest, because the same judge that civilly-committed the Plaintiff or Class member in the first place is not fair and impartial. His interest lies in keeping the Plaintiff or Class member confined. The judge rarely, if ever, rules the Plaintiff or Class member is safe to be placed on conditional release.

184. The only way the Plaintiffs and Class members can receive final release is to petition the district court which civilly-committed the Plaintiffs and Class members in the first place. To receive final release the judge must agree to a hearing. At that hearing the judge must rule that the Plaintiff's or Class member's mental abnormality or personality disorder has so changed that he is safe to receive final release. This is an extreme conflict of interest, because the same judge that civilly-committed the Plaintiff or Class member in the first place is not fair and impartial. His interest lies in keeping the Plaintiff or Class member confined. The judge rarely, if ever, rules the Plaintiff or Class member is safe to receive final release.

185. Pursuant to K.S.A. § 59-29a08(c), K.S.A. § 59-29a11(b), and K.S.A. § 59-29a19(a), factors that are considered by the district court when deciding if transitional release or conditional release is appropriate are: (1) If the court at the hearing determines that probable cause exists to believe that the person's mental abnormality or personality disorder has so changed that the person is safe to be placed in transitional (or conditional) release, (2) whether a transitional or conditional release facility or building is located within 2,000 feet of a licensed child care facility, registered family day care home, an established place of worship, any residence in which a child under 18 years of age resides, or the real property of any school upon which is located a structure used by a unified school district or an accredited non-public school for student instruction or attendance or extra curricular activities of pupils enrolled in kindergarten or any grades one through twelve, (3) provision as to where the person shall reside and with whom, (4) taking prescribed medications, (5) attending individual and group counseling, (6) maintaining employment, (7) having no contact with children, (8) not frequenting facilities, locations, events or otherwise in which children are likely to be present, and (9) not engaging in activities in which contact with children is likely.

186. Pursuant to K.S.A. § 59-29a19(b) and K.S.A. § 59-29a19(c), after a minimum of five years have passed in which the person has been free of violations of conditions of such person's treatment plan (while on conditional release), the treatment staff, or other professionals directed by the court may examine such person to determine if the person's mental abnormality or personality disorder has so changed as to warrant such person being considered for final discharge. The person preparing

111

the report shall forward the report to the court. The court shall review the same. If the court determines that probable cause exists to believe that the person's mental abnormality or personality disorder has so changed that the person is safe to be entitled to final discharge, the court shall set a formal hearing on the issue. If, after a hearing, the court is convinced beyond a reasonable doubt that the person is not appropriate for final discharge, the court shall continue custody of the person with the secretary for placement in a secure facility, transitional release program or conditional release program. Otherwise, the court shall order the person finally discharged.

187.    As of September 2014, only seven (7) SPTP patients have ever been placed on any kind of Conditional release. In contrast, as of 2006, the following other states with civil commitment programs had placed the following number of people on supervised or conditional release: Arizona – 69, Illinois – 18, Wisconsin – 17, Washington – 12, and Florida – 12.

188.    As of September 2014, only three (3) SPTP patients have ever obtained final discharge. In contrast, as of 2006, the following other states with civil commitment programs had fully discharged the following number of people: Arizona – 81, California – 59, South Carolina – 32, Wisconsin – 26, New Jersey -13, Iowa – 9, Florida – 7, Washington – 4, and Massachusetts – 4. See Monica Davey and Abbey Goodnough, Doubts Rise as States Hold Sex Offenders After Prison, N.Y. Times (March 4, 2007), available at http://www.nytimes.com/2007/03/04/us/04cicil.html? pagewanted=1&_r=1&adxnnl x=1329498616-AcmZ+J1J58oxOsZDKbLw6Q.

189.    As of September 2014 twenty seven (27) SPTP patients have died while in the program; eleven (11) have been discharged only through the court due to a 60-day technicality or winning an appeal, and nine (9) have been placed in transition.

190.    It is likely Plaintiffs and Class members are not being released because of public stigma against sex offenders and public pressure to keep civilly committed sex offenders in a secure facility. Additionally, by K.S.A. statute no sex offender can be released without court order. Thus, the decision not to release Plaintiffs and Class members from the SPTP is based on political considerations, not professional judgment.

## CLAIMS

### Count I

### Violation of the Fourteenth Amendment to the United States Constitution

191.    Plaintiffs incorporate all previous allegations as if fully set forth herein.

192.    Kansas' Sexually Violent Predator Statutes impose substantial penalties on Plaintiffs and Class members, serve traditional means and goals of punishment, and justify punishment on the basis

112

of perceived risk alone.

193. Defendants have deprived Plaintiffs and Class members of their liberty on the basis of treatable mental health conditions but have failed and refused to make reasonable efforts to treat those conditions. Defendants have thereby denied the Plaintiffs and Class members any meaningful opportunity to regain their liberty, in violation of the Due Process Clause of the Fourteenth Amendment.

194. SPTP as applied to Plaintiffs and Class members is inadequate to cure their conditions or lead to their eventual release.

195. Defendants' conduct demonstrates a deliberate indifference to the well-being of the Plaintiffs and Class members.

196. Defendants phased out the Clinical Program Director (CPD) position when Austin. DesLauriers retired in May 2014. Defendants put all the power in the hands of the Administrative Program Director (APD). Yet, the CPD is the most impòrtant position toward providing treatment for Plaintiffs and Class members. If Defendants truly intended to provide treatment for Plaintiffs and Class members, why did they phase out the CPD position?

197. Defendants' acts and omissions are both shocking and intolerable and a continuing mistreatment of a constitutional stature. See *Leamer v. Fauver*, 288 F. 3d 532, 546 (3d Cr. 2002). The SPTP personnel were compelled to carry out a prescribed course of sex offender treatment, Defendants indifference to their statutory obligation is deemed shocking. See *Smith, The Constitutionality of Civil Commitment and the Requirement of Adequate Treatment*, 49 B.C.L. Rev. 1383, 1384 (Nov. 20080 (Suggesting that "[W]ithout adequate treatment providing a path to an individual's potential release, civil commitment becomes state – imposed criminal punishment"); *Sharp v. Weston*, 233 F. 3d 1166, 1172 (9th Cir. 2000) (holding that due process requires that civilly committed persons be provided "a realistic opportunity to be cured or improve the mental condition for which they were confined"); *Ohlinger v. Watson,* 652 F.2d 775, 777-78 (9th Cir. 1980) (stating civilly committed persons are entitled to mental health treatment that gives them a realistic opportunity to be cured and released; standard is one only required to provide a "'reasonable level of treatment based upon a reasonable cost and time basis'"); *Cross v. Harris,* 418 F.2d 1095, 1107, 135 U.S. App. D.C. 259 (D.C. Cir. 1969) (due process commands that conditions and duration of confinement bear some reasonable relation to its civil purpose--treatment--without which incapacitation serves as mere preventive detention, "a warehousing operation for social misfits"); and *Reno v. Flores* (1993), 507 U.S. 292, 301-302, 'While the state may claim a compelling interest in deterring convicted sex offenders from re-offending, there are certain

113

fundamental rights that are being infringed upon, and thus "more than a compelling interest is needed to survive constitutional scrutiny. The statute must be narrowly tailored to meet the compelling interest.'"

198.    Defendants have adopted policies and procedures which mirror Kansas Department of Corrections policies and procedures. Furthermore, Defendants have adopted their Resident Rulebook directly from the Kansas Department of Corrections regulations and rules. See *Sandin v. Conners*, 515 U.S. 472, 115 S. Ct. 2293, "States may under certain circumstances, by adopting prison regulations, create liberty interests which are protected by due process."

199.    The Fourteenth Amendment provides that "[n]o state shall... deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. Amend. XIV, § 1. "[T]he Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Zinerman v. Burch*, 494 U.S. 113, 125, 110 S. Ct. 975, 108 L. Ed. 2d 100 (1990); see also *Cnty. Of Sacramento v. Lewis*, 523 U.S. 833, 845, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998) (noting that the Supreme Court has "emphasized time and again that the touchstone of due process is protection of the individual against arbitrary action of government."). Indefinite commitment to the SPTP unquestionably constitutes a "significant deprivation of liberty" that infringes upon one's fundamental right to be free from confinement. See *Jones v. United States*, 463 U.S. 354, 361, 103 S. Ct. 3043, 77 L. Ed. 2d 694 (1983) ("[C]ommitment for any purpose constitutes a significant deprivation of liberty that requires due process protection."); See also *Cooper v. Oklahoma*, 517 U.S. 348, 368-69, 116 S. Ct. 1373, 134 L. Ed. 2d 498 (1996) ("The requirement that the grounds for civil commitment be shown by clear and convincing evidence protects the individual's fundamental interest in liberty.") Where the government acts in a systematic way (for example through combined legislative and executive action) to indefinitely confine a class of citizens in detention facilities – such as those of the SPTP – the government action must be narrowly tailored to serve a compelling state interest in order to pass constitutional muster. See *Gallagher v. City of Clayton*, 699 F. 3d 1013, 1017 (8th Cir. 2012) (noting that, where legislation infringes upon a fundamental right, such legislation "must survive strict scrutiny – the law must be 'narrowly tailored to serve a compelling state interest'") (quoting *Reno v. Flores*, 507 U.S. 292, 302, 113 S. Ct. 1439, 123 L. Ed. 2d 1 (1993)).

Plaintiffs and Class members intend to prove the KSVPA as implemented is so punitive that it is unconstitutional. Where notwithstanding a "civil label," a statutory scheme "is so punitive either in purpose or effect as to negate the State's intention to deem it 'civil,'" a court will reject a

114

legislature's "manifest intent" to create a civil proceeding and "will consider the statute to have established criminal proceedings for constitutional purposes." *Kansas v, Hendricks*, 521 U.S. At 361; see also *Seling v. Young*, 531 U.S. 250, 261,121 S. Ct. 727, 148 L. Ed. 2D 734 (2001) ("A court will reject the legislature's manifest intent only where a party challenging the Act provides the clearest proof that the statutory scheme is so punitive in either purpose or effect as to negate the State's intention."). Therefore, a law whose objective is retribution or deterrence implicates criminal punishment. See *Hendricks*, 521 U.S. At 361-62. See *E.B. v. Verniero*, 127 F.3d 298, "even when punishment is neither the actual or objective purpose of the law, civil sanctions may constitute punishment if the effect or "sting" are harsh enough to be considered a punishment, and must be evaluated in the light of importance of any legitimate governmental interest served." See *U.S. v. Gartner*, 93 F.3d 633, cert. Denied 579 U.S. 1047, "even a civil penalty is considered a punishment if the sanction cannot be·fairly said to serve a remedial purpose, but instead as a deterrent or retribution."

Furthermore, "[d]ue process requires that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed." *Foucha v. Louisiana*, 504 U.S. 71, 79, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992); *Jackson v. Indiana*, 406 U.S. 715, 738, 92 S. Ct. 1845, 32 L. Ed. 2d 435 (1972). Plaintiffs and Class members have been subjected to conditions of confinement that are punitive in nature and antithetical to the purpose of their commitment.

With respect to the duration of a civil commitment, "the Constitution permits the Government... to confine [an individual] to a mental institution until such time as he has regained his sanity or is no longer a danger to himself or society." *Jones v. United States*, 463 U.S. At 370. Thus, a civilly committed individual is entitled to release when he is no longer mentally ill or dangerous. See *Foucha*, 504 U.S. At 77-78. As a matter of due process, it is "unconstitutional for a State to continue to confine a harmless, mentally ill person." *Foucha*, 504 U.S. At 77 (citing *O'Connor v. Donaldson*, 422 U.S. 563, 95 S. Ct. 2486, 45 L. Ed. 396 (1975)). "Even if the initial commitment was permissible," a civil commitment may not "constitutionally continue after that basis no longer exist[s]." *Foucha*, 504 U.S. At 77 (citing *O'Connor*, 422 U.S. At 565). By that reasoning, an individual who no longer meets the criteria for commitment should be entitled to release.

Kansas sex offender commitment scheme commits Plaintiffs and Class members to the SPTP to what essentially amounts to life long confinement, equivalent to a lifetime of criminal incarceration in a facility resembling a maximum custody facility prison. The SPTP is serving the constitutionally impermissible purposes of retribution and deterrence. The fact that only three (3) residents have ever been fully released in the SPTPs twenty (20) year history, supports Plaintiff's and

115

Class member's Complaint.

"A civil as well as a criminal sanction constitutes punishment when the sanction as applied in the individual case serves the goals of punishment." See *In re Pers. Restraint of Andre Brigham Young*, 122 Wn. 2d 1.

200.    Defendants have failed to provide Plaintiffs and Class members with a current examination of their current mental condition made every year in violation of K.S.A. § 59-29a08(a). K.S.A. § 59-29a08(c), K.S.A. § 59-29a08(d), K.S.A. § 59-29a18(a), K.S.A. § 59-29a18(b), and K.S.A. § 59-29a19(b) requires that the Plaintiff or Class member be released when his *current* mental condition has so changed that he is safe to be released. Defendants refuse to measure the Plaintiff's or Class member's current mental condition or admit it has so changed that the Plaintiff or Class member is safe to be released until he has completed all seven phases. See *Exhibit J, Yearly Reports of Plaintiffs and Class members Ronald Alan Baker, Steven Earl Roberts, Danny Wassell Stanley, Tyrone R. Tschantz, and Harvey Darrel Hickman*. On every yearly report of every Plaintiff and Class member under *Plan for Upcoming Year*, Defendants state, "In order to successfully complete the program, residents must complete all phases of the program, including any and all requisites associated with each phase to the satisfaction of the program." However, completing phases is *no* requirement of law. Only the examination of the Plaintiff's and Class member's current mental condition is lawful.

See *Burch v. Sullivan*, 313 P.3d 837, Licensed Clinical Psycho-Therapist Keri Applequist, who performs a fifteen minute interview with Plaintiffs and Class members once per year and labels it a Y*early Review*, intended to fulfill the required yearly examination of the Plaintiff's or Class member's current mental condition, admitting, "We do not assess volitional control... We do not measure current mental condition... mental abnormality... personality disorder..." Then, on what basis do Defendants conclude Plaintiffs and Class members, beyond a reasonable doubt, still meet the criteria for civil commitment? See *Exhibit J, Yearly Reports of Plaintiffs and Class members Ronald Alan Baker, Steven Earl Roberts, Danny Wassell Stanley, Tyrone R. Tschantz, and Harvey Darrel Hickman*. On every Conclusion on every Plaintiff's and Class member's Yearly Report, Defendants state, 'Therefore, ... Mr.... remains a "sexually violent predator" because he continues to meet the definition of "a person who *has been* convicted of a sexually violent offense," to wit:..., and who suffers from a mental abnormality or personality disorder which makes it likely that he will engage in repeat acts of sexual violence. I further conclude that Mr.... mental abnormality or personality disorder has not so changed that it would be safe for Mr.... to be placed in Transitional Release at this time.' Defendants use *no* actuarial instruments to measure Plaintiff's or Class member's *current* mental condition from

116

which they form their conclusion. Defendants base their conclusion on Plaintiff's and Class member's *past* conviction of a sexually violent offense, not their *current* mental condition. Furthermore, Keri Applequist is the only Licensed Clinical Psycho-Therapist who performs these yearly reviews. She does not have a Ph.D. and is therefore in question of whether she is unqualified to perform these yearly reviews. Finally, these yearly reviews do not satisfy the legal requirement for yearly examination of Plaintiff's and Class member's current mental conditions. As such, the SPTP as implemented fails to satisfy the legitimate governmental objective of providing SPTP Plaintiffs and Class members with minimally adequate mental health treatment that provides them a realistic opportunity to be cured or to improve their mental condition for which they were confined.

See *In re Care and Treatment of Sporn*, 289 Kan. 681, '*Hendricks* found that the SVPA was not punitive, in part because one of the stated purposes of the commitment was to hold the person until his or her mental abnormality no longer causes him or her to be a threat to others. 521 U.S. At 363. The State argues that *Hendricks* recognized that a respondent's mental status and risk assessment is subject to improvement.' 'The State first notes that the critical question to be answered in a SVPA action is whether the respondent has a mental abnormality or personality disorder which would make the respondent likely to engage in repeat acts of sexual violence. It contends that the determination presents a "*fluid issue subject to change over time*," because a person's condition *can improve* or deteriorate. Accordingly, the State concludes that the recidivism risk determination is to be based on the respondent's *current condition* at the time of the SVPA proceedings... In support of its creative argument, the State points to *Kansas v. Hendricks*, 521 U.S. 346, 138 L. Ed. 2d 501, 117 S. Ct. 2072 (1997)... The State argues that *Hendricks* recognized that a respondent's mental status and risk assessment *is subject to improvement*... In *Turner v. Superior Court*, 105 Cal. App. 4Th 1046, 130 Cal. Rptr. 2d 300 (2003)... "The likelihood of a person committing criminal acts because of a mental disorder is not a fixed condition because *an individual's mental health and potential dangerousness can, and frequently does, change*. Recognizing this, courts generally hold that an adjudication of status or mental health issues is not conclusive as to the same status on a later date." 105 Cal. App. 4th at 1058-59... A mental health professional may still fully evaluate the background/historical information and must explain what has occurred in the interim to justify the conclusion that the individual is currently a sexually violent predator. 105 Cal. App. 4th at 1059-60.

See *United States v. Wilkinson*, 646 F. Supp. 2d 194: The government did not establish that Wilkinson had a serious mental impairment which causes him serious difficulty in controlling his behavior, even though Wilkinson was diagnosed with Antisocial Personality Disorder. Like in

Wilkinson, Defendants claim Plaintiffs and Class members have Antisocial Personality Disorder, and they further claim this Antisocial Personality Disorder causes them serious difficulty in controlling their behavior. However, like in Wilkinson, the Defendants are wrong, they cannot rely on an Antisocial Personality Disorder diagnosis and cannot establish Plaintiffs and Class members *currently* have a mental abnormality or personality disorder which causes them serious difficulty controlling their behavior. In *United States v. Wilkinson*, "The government has not proven that Antisocial Personality Disorder alone ever causes a person to have serious difficulty controlling his conduct. In essence, the evidence indicates that individuals with severe forms of that disorder may often make unlawful choices, *but they are able to control their conduct*. In addition, Wilkinson's Antisocial Personality Disorder is not now severe and the government has not proven that it causes him serious difficulty in controlling his behavior generally or will cause him serious difficulty in refraining from committing sexual crimes if released. Unlike many prisoners with that diagnosis, Wilkinson worked hard and generally behaved well while serving his long federal sentence. Moreover, Wilkinson will be in his mid-fifties when he is released from federal and state custody. The evidence indicates that both Antisocial Personality Disorder and the risk of sexual recidivism diminish substantially by that age." Plaintiffs and Class members have made unlawful choices, but they are able to control their conduct. A fact Defendants refuse to acknowledge. Plaintiff's and Class member's Antisocial Personality Disorder is not now severe, if it ever was, and Defendants cannot prove it causes them serious difficulty in controlling their behavior or will cause them serious difficulty in refraining from committing sexual crimes if released. Plaintiffs and Class members have worked hard and generally behaved well while serving their long State sentences, with few exceptions. The majority of Plaintiffs and Class members are fifty years old or older. Since the evidence indicates that both Antisocial Personality Disorder and the risk of sexual recidivism diminish substantially by that age, logic follows that both Antisocial Personality Disorder and the risk of sexual recidivism h*as diminished* for the majority of all Plaintiffs and Class members, who therefore have *no* difficulty controlling their behavior, are *no longer* a danger to engage in repeat acts of sexual violence, and are therefore, *not dangerous*, and should be released immediately with prejudice.

In *United States v. Wilkinson*, 'Therefore, "[a] finding of dangerousness, standing alone, is ordinarily not a sufficient ground upon which to justify indefinite involuntary committment." Hendricks, 521 U.S. at 358. In a case involving a prisoner who once committed a crime and had an Antisocial Personality Disorder that sometimes led to aggressive conduct and could not be effectively treated, the Supreme Court held that civil commitment was not constitutionally permissible because

118

this rationale for indefinite detention "would also be only a step away from substituting confinements for dangerousness for our present system which, with only narrow exceptions aside from permissible confinements for mental illness, incarcerates only those who are proved beyond a reasonable doubt to have violated the criminal law." Foucha v. Louisiana, 504 U.S. 71, 82, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992). Finally, the government must demonstrate that "as a result of" the "serious mental illness, abnormality, or disorder," a person "would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6). As the language of the statute makes clear, the mental illness, abnormality, or disorder, must be the cause of the difficulty. In addition, "there must be proof of serious difficulty in controlling behavior." Kansas v. Crane, 534 U.S. at 413. The court concludes that the government has not proven by clear and convincing evidence that Wilkinson's civil commitment is justified. Wilkinson does have convictions for sexually violent conduct which make him eligible for possible civil commitment. However, the government has not proven: that Wilkinson's Antisocial Personality Disorder is now a serious mental disorder; that Antisocial Personality Disorder generally causes a person to have serious difficulty in controlling his behavior; that Wilkinson's Antisocial Personality Disorder causes him serious difficulty in controlling his behavior; or that as a result of his Antisocial Personality Disorder Wilkinson will have serious difficulty refraining from molesting children or committing sexually violent crimes.' Like in Wilkinson, Plaintiff's and Class member's civil commitment is not justified. Defendants cannot prove Plaintiff's and Class member's Antisocial Personality Disorder is now a serious mental disorder; Antisocial Personality Disorder generally causes Plaintiffs and Class members to have serious difficulty in controlling their behavior; or that as a result of their Antisocial Personality Disorder Plaintiffs and Class members will have serious difficulty refraining from molesting children or committing sexually violent crimes.

In *United States v. Wilkinson*, 'Antisocial Personality Disorder has a chronic course but may become less evident or remit as the individual grows older, particularly by the fourth decade of life. Although this remission tends to be particularly evident with respect to engaging in criminal behavior, there is likely to be a decrease in the full spectrum of antisocial behaviors and substance use.

Wilkinson's disciplinary record while serving his sentence was also excellent. During the initial sixteen years of his confinement he did not have a single disciplinary incident or case of misconduct.

Dr. Mills did not characterize Wilkinson's Antisocial Personality Disorder as "serious." In opining that it was "serious," Dr. Schwartz ignored all of Wilkinson's positive conduct while in

119

federal prison, which substantially diminishes the credibility of her opinion on this issue. In any event, the government has not proven by clear and convincing evidence that Wilkinson's Antisocial Personality Disorder is a "serious" mental disorder within the meaning of § 4247(a)(6). See United States v. Abregana, 574 F. Supp. 2d 1145, 1159 (D. Haw. 2008)(in view of conflicting expert opinion court did not find that Abregana's hebephilia, which involved the sexual arousal to adolescents, is sufficiently severe to constitute a "serious" mental disorder).

The government has also not proven by clear and convincing evidence that Antisocial Personality Disorder generally causes a person to have "serious difficulty in controlling [his] behavior." Crane, 534 U.S. at 413. Nor has it proven that Wilkinson's particular Antisocial Personality Disorder causes him to have severe difficulty in controlling his behavior.

Dr. Mills opined, however, that:

[I]n general, persons with personality disorders are cognitively aware of the implications of their choices and are not involuntarily compelled to act in a certain manner . . . persons with antisocial personality traits tend to challenge rules, oppose authority figures, and break laws. However, neither of these phenomena are conditions which substantively impair cognitive understanding or volitional control of behavior. Personality disorders are primarily descriptive, a pattern of consistently exaggerated choices which persist despite negative social consequences.

The DSM--IV--TR itself states that, "[t]he fact that an individual's presentation meets the criteria for a DSM--IV--TR diagnosis does not carry any necessary implication regarding an individual's degree of control over the behaviors that may be associated with the disorder." DSM--IV--TR at xxxiii. Therefore, the fact that Antisocial Personality Disorder is included in the DSM--IV--TR is not evidence that the disorder ever, always, or in Wilkinson's case involves any serious difficulty in controlling behavior.

Although the court has not relied on it, there is additional expert literature that was not introduced into evidence which reinforces the conclusion that Antisocial Personality Disorder generally does not involve the serious difficulty in controlling behavior necessary to justify a civil commitment. For example, University of Pennsylvania professor Stephen Morse has written:

"Personality disorder" is a recognized category of psychiatric diagnoses, but people with personality disorders rarely suffer on that basis alone from the types of psychotic cognition or extremely severe mood problems that are the standard touchstones for a finding of non--responsibility. Most are perfectly in touch with reality, their instrumental rationality is intact, and they have adequate knowledge of the applicable moral and legal rules that apply to their conduct. Although their

120

abnormalities might make it harder for them to behave well, they seldom manifest the grave problems that might satisfy an insanity defense or even warrant a common--sense excuse on the ground that the person cannot "help" himself or herself.

The government has not only failed to prove that Wilkinson's Antisocial Personality Disorder causes him to have serious difficulty in controlling his behavior generally, it has also failed to present clear and convincing evidence that as a result of his Antisocial Personality Disorder Wilkinson will have serious difficulty in refraining from child molestation or sexually violent conduct if he is released. Dr. Schwartz and Dr. Mills disagreed on this issue. Once again, Dr. Schwartz's testimony is not convincing.

Dr. Schwartz and Dr. Mills each administered to Wilkinson the Static--99, which is an actuarial risk assessment instrument. Wilkinson's scores on the Static--99 as calculated by both examiners indicate that he is at a high risk to commit another sexual offense. However, as Dr. Mills testified, the test focuses on historic or static risk factors which do not change and, therefore, do not take into account Wilkinson's positive performance in prison since 1991.

Dr. Mills explained that most individuals with Antisocial Personality Disorder tend to burnout and stop misbehaving in their fourth decade of life. Wilkinson's good conduct in prison is consistent with this pattern.

In addition, all of the evidence indicates that the risk of sexual recidivism declines with age. Even for child molesters released after age sixty, the recidivism rate is very low (3.8%). See R. Karl Hanson, Recidivism and Age: Follow--Up Data From 4,673 Sexual Offenders, 17 J. Interpersonal Violence 1046, 1059 (2002). As Dr. Schwartz acknowledged, for individuals convicted of multiple sex offenses the risk of recidivism dramatically declines at age sixty and the consensus in the learned literature is that people over age sixty do not commit sexual offenses.

In the absence of clear and convincing proof that a serious mental impairment causes an individual to have serious difficulty in controlling his behavior, the constitution requires reliance on the criminal law, rather than a civil commitment, to deal with that risk. See Crane, 534 U.S. At 412; Hendricks, 521 U.S. at 358; Foucha, 504 U.S. at 82-3; Varner, 460 F.3d at 864. As the government has not presented such clear and convincing proof, Wilkinson may not be civilly committed. Having served his federal sentence, he would ordinarily now be ordered released from federal custody.'

As supported by *United States v. Wilkinson*, Plaintiff's and Class member's Antisocial Personality Disorder, for the majority, has remitted and decreased with respect to engaging in criminal behavior. Defendants have failed and refused to acknowledge the majority of Plaintiffs and Class

members have an excellent disciplinary record during their many years in confinement, with little or no disciplinary incidents or cases of misconduct. Those who do not have excellent disciplinary records are very few. Defendants have failed and refused to acknowledge Plaintiff's and Class member's positive conduct while in State prison, which substantially diminishes the credibility of their opinion. Defendants cannot prove that Antisocial Personality Disorder generally causes a person to have "serious difficulty in controlling [his] behavior." Nor can Defendants prove Plaintiff's and Class member's particular Antisocial Personality Disorder causes them severe difficulty in controlling their behavior. Plaintiffs and Class members are cognitively aware of the implications of their choices and are not involuntarily compelled to act in a certain manner. According to the DSM - - IV - - TR itself, the fact that Plaintiffs and Class members presentation meets the criteria for a DSM - - IV - - TR diagnosis does not carry any necessary implication regarding their degree of control over their behaviors. The fact that Antisocial Personality Disorder is included in the DSM - - IV - - TR is not evidence that the disorder ever, always, or in Plaintiff's or Class member's case involves any serious difficulty in controlling behaviors necessary to justify a civil commitment. Plaintiffs and Class members are perfectly in touch with reality, their instrumental rationality is intact, and they have adequate knowledge of the applicable moral and legal rules that apply to their conduct. Defendants have not only failed to prove that Plaintiff's and Class member's Antisocial Personality Disorder causes them to have a serious difficulty in controlling their behavior generally, they have also failed to present evidence beyond a reasonable doubt that as a result of their Antisocial Personality Disorder Plaintiffs or Class members will have serious difficulty in refraining from child molestation or sexually violent conduct if they are released. Defendants use actuarial risk assessment instruments to claim Plaintiffs and Class members have a high risk to commit another sexual offense, however, Defendants actuarial tests focus on historic or static risk factors which do not change and, therefore, do not take into account Plaintiff's and Class member's positive performance while in prison and other confinement. Plaintiff's and Class member's Antisocial Personality Disorder, for the majority, has burned out and Plaintiffs and Class members have stopped misbehaving. Plaintiff's and Class member's good conduct in prison is evidence of this fact. All of the evidence indicates that Plaintiff's and Class member's risk of sexual recidivism has declined with age. In the absence of proof beyond a reasonable doubt that a serious mental impairment causes Plaintiffs and Class members to have serious difficulty in controlling their behavior, the constitution requires reliance on the criminal law, rather than a civil commitment, to deal with that risk. As Defendants cannot prove beyond a reasonable doubt, Plaintiffs and Class members may not be civilly committed. Having served their sentence, Plaintiffs and Class members must be

released from custody, immediately, with prejudice.

201.    In *Kansas v. Hendricks*, 521 U.S. 346, Justice Breyer concluded the Kansas Sexually Violent Predator Act is punitive. Justice Breyer pointed out some obvious ways in which civil commitment pursuant to the ACT resembles traditional criminal punishment: People are confined against their will; one of the Act's goals is to prevent harm to others; and it uses people, procedures, and standards traditionally associated with criminal law. Although such similarities by themselves do not make the statute criminal, neither, according to Justice Breyer, is the "civil" label dispositive. Justice Breyer then looked at the Act's provision for treatment as an important guide in discerning whether the Act' objective is punitive or non-punitive. Justice Breyer asserted, "[A] statutory scheme that provides confinement does not reasonably fit a practically available, medically oriented treatment objective, more likely reflects a primarily punitive/legislative purpose." As such, the Kansas legislator's primary goal in creating the Act, he concluded, was punitive, and not civil. There were a number of reasons for Justice Breyer's conclusion. First, the Kansas Supreme Court already had found that the legislative history and early implementation of the Act indicated that treatment is not a significant purpose of the Act. Second, Justice Breyer noted the delay in applying the Act to a previously convicted offender until the end of his prison sentence. Such a delay makes treatment more difficult, and punishment more severe. Third, the statute does not allow for less restrictive methods. Justice Breyer stated, "This Court has said that a failure to consider, or to use, 'alternative and less harsh methods' to achieve a non-punitive objective can help to show that legislature's 'purpose... was to punish.'" Fourth, Justice Breyer compared the Kansas Statute to the laws of sixteen other states dealing with civil commitment of mentally abnormal, sexually dangerous persons. Besides Kansas, only Iowa both delays civil commitment (and consequent treatment) and fails to explicitly consider less restrictive alternatives. See *Journal of Criminal Law & Criminology*, Spring, 1998, 88J. Crim. L. & Criminology 985, *SUPREME COURT REVIEW: "MENTAL ILLNESS": A SEXUALLY VIOLENT PREDATOR IS PUNISHED TWICE FOR ONE CRIME*, By Eli M. Rollman.

202.    The Kansas Sexually Violent Predator Act does not require a finding of mental illness to confine someone in a civil proceeding. That failure means that the Act violates constitutional due process requirements. The Hendricks Court should have upheld the decision of the Kansas Supreme Court on this issue, and found the Act unconstitutional. Furthermore, despite the civil label attached to the Kansas statute, Hendricks' confinement is "punishment" for a criminal act, and therefore violates the Double Jeopardy and Ex Post Facto Clauses of the United States Constitution. See *Journal of Criminal Law & Criminology*, Spring, 1998, 88J. Crim. L. & Criminology 985, *SUPREME COURT*

*REVIEW: "MENTAL ILLNESS": A SEXUALLY VIOLENT PREDATOR IS PUNISHED TWICE FOR ONE CRIME*, By Eli M. Rollman.

203.    The Supreme Court erred in *Kansas v. Hendricks* by allowing the civil commitment of Leroy Hendricks under the Kansas Sexually Violent Predator Act. The Court should have held that the Act does not satisfy the Addington test for civil commitment. The Addington Court established that a finding of "mental illness" is a requisite for civil commitment. The Kansas Sexually Violent Predator Act falls short of requiring such a finding, and therefore should have been struck down as a violation of due process. Furthermore, the clear intent of Kansas in implementing the Act is to punish the perpetrator of sex crimes above and beyond whatever sanctions are applied in the state criminal justice system. A second punishment for a single crime runs afoul of the Constitution's prohibition on Double Jeopardy. See *Addington v. Texas*, 441 U.S. 418 (1979), and *Journal of Criminal Law & Criminology*, Spring, 1998, 88J. Crim. L. & Criminology 985, *SUPREME COURT REVIEW: "MENTAL ILLNESS": A SEXUALLY VIOLENT PREDATOR IS PUNISHED TWICE FOR ONE CRIME*, By Eli M. Rollman.

204.    The Supreme Court has repeatedly held that, where treatment is possible, it is constitutionally required. Otherwise civil commitment becomes punitive and thus criminal in nature, and the potentially indefinite confinement violates the detainees' due process rights. See *Boston College Law Review*, November 2008, 49 B.B.L. Rev 1383, *ARTICLE: THE CONSTITUTIONALITY OF CIVIL COMMITMENT AND THE REQUIREMENT OF ADEQUATE TREATMENT*, by Douglas G. Smith. Defendants are not providing constitutionally adequate treatment that meets professionally acceptable minimum standards. Therefore, Plaintiffs' and Class members' civil commitment is punitive, criminal in nature, and their due process rights are violated by Defendants.

205.    The recalcitrance of government officials to provide constitutionally adequate treatment suggests that, from the beginning, Defendants did not intend to use civil commitment to rehabilitate the Plaintiffs or Class members. Instead, Defendant's actions demonstrate a desire to use civil commitment as a means to warehouse potentially dangerous Plaintiffs and Class members after their criminal sentences have expired. Thus, although the Supreme Court has upheld civil commitment statutes because they typically mandate treatment and thus do not have a solely punitive purpose, in practice, the promise of treatment has not been fulfilled. States, such as Kansas, enact statutes that declare treatment as a goal, but in practice, that goal is a sham. Although the statutes pay lip service to the goal of treatment, they seem designed solely to further incapacitate and punish Plaintiffs and Class members. Thus, Kansas' SPTP has, in effect, produced what the Supreme Court has prohibited: the "warehousing" of Plaintiffs and Class members whose criminal sentences have expired under the guise

of civil commitment. Under these circumstances, there exists a powerful argument that the costs of civil commitment outweigh the costs associated with increased criminal penalties for sexually violent crimes. Because the State's motivation appears to be incapacitation and further punishment, simply increasing criminal penalties would be preferable to enacting civil commitment schemes. Civil commitment programs inevitably become the subject of extensive litigation, as states such as Kansas, are reluctant to provide adequate treatment programs that provide a pathway to eventual release. Abandoning civil commitment in favor of increased criminal penalties - - accompanied by constitutional guarantees found in the criminal system - - would arguably mitigate these costs, and, at the same time, avoid many of the constitutional pitfalls associated with civil commitment.

206.    The Kansas Sexual Predator statute distorts the meaning and practice of civil commitment. The basic rationale of involuntary confinement is that the person is found to be dangerous to self or others at the time of the commitment, that he or she receives treatment and that the confinement is time – limited and paired with a course of treatment. None of these essential elements is present in the case of a sex offender committed after serving a prison sentence in Kansas. Thus, sexual predator commitments are an abuse of civil commitment. See *Exhibit C, Mental Health America, Position Statement 55: Confining Sexual Predators in the Mental Health System*. In Kansas' Sexual Predator Treatment Program Defendants give lip service to treatment, but the so-called treatment is inadequate and does not allow Plaintiffs and Class members to progress as appropriate and be cured or improve their mental condition so they may be released. Plaintiffs' and Class members' confinement is indefinite, not time-limited as is required.

207.    In *Johnson v. State*, 289 Kan. 642, In the response to the State's motion to dismiss, Johnson and Collins argued that since the SPTP was initiated in October 1994, only two residents have been released from treatment, while as of June 2007, more than 150 have been admitted to the program. The Petitioner's claimed that "[t]wo patients in thirteen years is not a strong indicator of an effective program." For general support, Johnson and Collins cited an article co-authored by Dr. Austin DesLauriers, the program clinical director for the SPTP at Larned, which indicated that a "legitimate program should be expected to have graduates." See *DesLauriers & Gardner, The Sexual Predator Treatment Program of Kansas, The Sexual Predator: Law, Policy, Evaluation, and Treatment*, p. 11-21 (Schlank & Cohen eds. 1999). Currently, as of September 2014, only three (3) residents have been released on final discharge from the SPTP treatment program, while current total resident population is two hundred forty one (241), and the total present and former resident population is two hundred ninety nine (299) (four residents are on conditional release, twenty seven residents have died, eleven residents

125

were discharged through the court of appeals, and thirteen residents are back in jail or prison). Dr. Charles Befort, who co-created the inadequate treatment program along with Dr. Austin DesLauriers, in 1996, while testifying the *Kansas v. Hendricks*, 521 U.S. 346 case, "acknowledging that he has no specialized training." Further, Dr. Befort, though he was the SPTP program director at the time, he admitted that, "he is not qualified to be SVP program director." Finally, Dr. Befort testified that, 'SVPs were receiving "essentially no treatment" and that the program does not "have adequate staffing."' Defendants have denied Plaintiffs and Class members any meaningful opportunity to regain their liberty, in violation of the Due Process Clause of the Fourteenth Amendment. Defendants, in the words of Dr. Charles Befort, the co-creator of the SPTP treatment program was "not qualified," the "treatment was inadequate" (and still is), and the program did "not have adequate staffing" (and still does not). And, in co-creator, Austin DesLaurier's own words, a "legitimate program should be expected to have graduates." Since only three (3) residents have been released in the twenty (20) years SPTP has been in existence, the program, therefore, is not legitimate.

208.    Defendants require Plaintiffs and Class members pass a series of polygraph examinations before they are allowed to advance through the phases of the Kansas Sexual Predator Treatment Program (SPTP), in violation of Plaintiffs' and Class members' constitutional rights. Defendants' use of the polygraph constitutes a death sentence because any Plaintiff or Class member who cannot pass the polygraph for any reason bars them from progression through the phases of the treatment program, thereby requiring them to remain civilly confined until their death. Defendants' use of the polygraph to keep Plaintiffs and Class members civilly confined until their death is both shocking and intolerable and a continuing mistreatment of a constitutional stature. Defendants' use of the polygraph therefore violates Plaintiff's and Class member's constitutional protection under the substantive Due Process Clause of the Fourteenth Amendment to the United States Constitution. The Fourteenth Amendment states that "[n]o State shall... deprive any person of life, liberty, or property without due process of law." Defendants have failed and refused to make reasonable efforts to provide adequate sex offender treatment to Plaintiffs and Class members. Defendants have thereby denied the Plaintiffs and Class members meaningful opportunity to regain their liberty, in violation of the Due Process Clause of the Fourteenth Amendment. Defendants' conduct demonstrates a deliberate    ·    indifference to their statutory obligation to carry out their prescribed course of sex offender treatment. Defendants' indifference to their statutory obligation to provide Plaintiffs and Class members adequate treatment, and indifference to providing Plaintiffs and Class members any meaningful opportunity to regain their liberty is shocking and intolerable and a continuing mistreatment of a constitutional stature.

The United States Supreme Court has stated that, in a program designed to treat and incapacitate, due process requires that the conditions and duration of treatment must bear some reasonable relation to the purpose for which the person is confined. See *Seling v. Young*, 531 U.S. 250, 265, 121 S. Ct. 727, 148 L. Ed. 2d 734 (2001). SPTP does not offer a realistic opportunity to cure or improve the mental condition for which the Plaintiff's and Class member's were involuntarily committed. It is unknown whether the past or present polygrapher(s) are or have been qualified to administer the polygraph examination and whether they lack or lacked proper training and experience to perform the test. Plaintiffs and Class members frequently fail their polygraph test due to high anxiety, stress, nervousness, heart conditions, and blood pressure problems, rather than being deceitful in the answers to the questions on the test. It is not established whether the polygraph or the testing procedure is reliable. Due process requires that the polygraph examiner is someone who is properly trained and the testing procedure is reliable. Otherwise, the SPTP does not offer Plaintiffs and Class members a realistic opportunity to cure or improve his mental condition and there is no reasonable relation between the conditions and duration of the SPTP and the purpose of Plaintiff's and Class member's confinement. See *Seling*, 531 U.S. At 265. Plaintiffs and Class members have been and continue to be injured by the acts and omissions of Defendants. Unless relief is granted, Plaintiffs and Class members will continue to be injured by and suffer damages as a direct and proximate result of Defendants' acts and omissions specifically set forth above. The remedy for Defendant's acts and omissions is a finding of SPTP as unconstitutional and therefore the immediate release, with prejudice, for all Plaintiffs and Class members.

209. 'The sexual predator Statute violates substantive due process. Under the Fifth and Fourteenth Amendments, no person shall be deprived of life, liberty, or property without due process of law. U.S. Const. amend. 5; U.S. Const. amend. 14, § 1. "The Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" *Zinermon v. Burch*, 494 U.S. 113, 125, 108 L. Ed. 2d 100, 110 S. Ct. 975 (1990) (quoting *Daniels v. Williams*, 474 U.S. 327, 331, 88 L. Ed. 2d 662, 106 S. Ct. 662, 106 S. Ct. 677 (1986)). The test to be applied in determining the constitutionality of a statute under substantive due process depends upon whether a fundamental right is at stake. Although the majority acknowledges the Statute must pass strict scrutiny, it fails to adequately analyze whether the Statute is narrowly tailored to achieve the State's interest. The most recent statement of the Supreme Court's requirements for narrowly tailoring an involuntary commitment statute is *Foucha v. Louisiana*, 504 U.S. 71, 118 L. Ed. 2d 437, 112 S. Ct. 1780 (1992). The majority has failed to see or has chosen to

ignore that *Foucha* provides a framework for substantive due process analysis in these types of cases. *Foucha* recognizes only three situations in which the State has such a compelling interest in public safety that a complete deprivation of an individual's liberty interest is justified: criminal conviction, civil commitment, and limited detention of persons shown to be dangerous to the community. *Foucha*, 112 S. Ct. at 1785-86. The majority chides the dissent for relying on a handful of law review articles in support for the claim that a "mental abnormality" or "personality disorder" does not constitute "mental illness" as required by *Foucha*. Majority, at 33 n.10. It is curious that the majority also relies on a law review article in support of its proposition that the Statute's terms do constitute "a number of recognized mental pathologies", *i.e.*, mental illness. See majority, at 27. It is also curious that, after concluding the statute requires a showing of mental illness, the majority states in its equal protection analysis, "there are good reasons to treat *mentally ill people* differently than *violent sex offenders*". (Italics mine.) Majority, at 44. The majority cannot have it both ways. Despite some psychiatric incantations, therefore, the sexual predator Statute deals with potentially dangerous people, but not mentally ill people. Because under *Foucha* a prediction of dangerousness alone is an unconstitutional basis for indefinite confinement in a mental institution, the Statute violates due process. Even if a personality disorder or mental abnormality is a mental illness, this court has previously required proof of a recent overt act as evidence of dangerousness before a person can be detained to assess whether he or she is mentally ill. See *In re Harris*, 98 Wash. 2d 276, 654 P.2d 109 (1982). The plain language of the sex predator Statute contains no such requirement. The majority attempts to salvage the Statute's constitutionality by reading in a requirement of a recent overt act, but *only* for individuals who have been released into the community. For individuals currently incarcerated, no evidence of a recent overt act is required.' See *In re Pers. Restraint of Andre Brigham Young*, 122 Wn. 2d 1.

Defendants do not narrowly tailor civil commitment statutes. Defendants do not prove Plaintiffs and Class members are both mentally ill and dangerous in a way to constitutionally tailor KSVPA civil commitment statutes. Defendants violate the strict time limits for pretrial detention with their own KSVPA statutes (K.S.A. § 59-29a01). KSVPA Sexual Predator Statute is not narrowly tailored to achieve its compelling interest. In order to be narrowly drawn, the Statute must satisfy certain requirements set out by the United States Supreme Court, for either civil commitment or preventive detention statutes. The Kansas Sexual Predator Statute fails on both counts. KSVPA fails to satisfy the substantive due process requirement that an individual be both mentally ill and dangerous before he or she may be involuntarily committed. The Statute does not apply specifically to individuals who have a mental disease or defect that renders them appropriate for the existing involuntary

128

treatment act. Supreme Court Justices erred when they found the mental abnormality or personality disorder satisfied this standard. Without proof of a mental illness, KSVPA violates substantive due process because it requires only dangerousness and not mental illness as a prerequisite to commitment. Plaintiffs and Class members cannot be found dangerous based on "antisocial personality disorder, a condition that is not a mental disease and... is un-treatable." The KSVPA statute attempts to define a "sexually violent predator" as any person who... suffers from "a mental abnormality or personality disorder...," but these two terms do not involve any medically recognized mental illness. "Mental abnormality" has no clinically significant meaning and no recognized diagnostic use; the term "abnormality" has long been in disuse because it can have a variety of different meanings. A "mental abnormality" which makes a person "likely to engage in predatory acts of sexual violence" is thus defined by the KSVPA as a mental condition that may predispose a person to commit a sex crime. This definition is merely circular, and as one commentator has observed, allows a "mental abnormality" to be established in a circular manner: the "abnormality" will be derived from the person's predisposition to future dangerous sexual behavior. There is no "personality disorder" specific to sex offenders. Defendants attempt to determine a causal relationship for Plaintiffs and Class members, exists between a "personality disorder" and the Plaintiff's and Class member's potential dangerousness is nothing more than "a matter of speculation or meaningless circularity."

'Like the statute in *Foucha*, the sexual predator Statute is fundamentally flawed. Its scope is broad, covering everything from murder-rape to attempted sexually motivated burglary. Its duration is indefinite. Unlike *Salerno, Schall*, and *Jackson*, the Statute in this case produces lifetime preventive detention. The Legislature found that "sexually violent predators" are "unamenable to existing mental illness treatment modalities" and that the prognosis for curing them is "poor". RCW 71.09.010. The Statute thus creates a class of persons who, by definition, are not likely to be "cured", and thus not likely to ever be released. As a result, the Statute does precisely what *Foucha* expressly says the government may not do: confine someone indefinitely as dangerous who is not mentally ill but simply has a personality disorder or antisocial personality. As the Supreme Court noted: The State asserts that because Foucha once committed a criminal act and now has an antisocial personality that sometimes leads to aggressive conduct, a disorder for which there is no effective treatment, he may be held indefinitely. This rationale would permit the State to hold indefinitely any other insanity acquittee not mentally ill who could be shown to have a personality disorder that may lead to criminal conduct. *The same would be true of any convicted criminal, even though he has completed his prison term.* (Italics mine.) *Foucha*, 112 S. Ct. at 1787. The Legislature has other options for dealing with sex

129

offenders. Enhanced sentences for repeat offenders and supervised release are but two of the most obvious. The sexual predator Statute has each of the constitutional weaknesses of the statute in *Foucha*, weaknesses that caused the Supreme Court to consider the *Foucha* statute *only a step away from substituting confinements for dangerousness for our present system which, with only narrow exceptions . . . incarcerates only those who are proved beyond a reasonable doubt to have violated a criminal law.* (Italics mine.) *Foucha*, 112 S. Ct. at 1787. I would hold the sexual predator Statute is an unconstitutional violation of substantive due process." See *In re Pers. Restraint of Andre Brigham Young*, 122 Wn. 2d 1.

210.    "Civil commitment has met with controversy for a variety of reasons. It is considered by many to be incarceration for an action an individual has yet to commit. Treatment for sex offenders during incarceration is not widely available. Many offenders will not have access to treatment while they are serving their sentence. As a result treatment is possible only when and if an individual is civilly committed." See *The Vermont Bar Journal & Law Digest, Summer, 2013, 39 Ver. B.J. & L. Dig. 26, DEPARTMENT: SEX OFFENDERS AND THE LAW*; by Renee Sorrentino, M.D.

211.    KSVPA is clearly criminal, not civil as Defendants profess. Whenever Plaintiff's and Class member's "civil commitment" hearings end in a hung jury, Defendants retry Plaintiffs and Class members multiple times until they finally get a jury to find the Plaintiffs and Class members a sexually violent predator. Such tactics are traditionally criminal procedure, not a traditionally civil procedure.

## Count I Actual Harm

212.    Defendants have deprived Class member Timothy L. Anderson liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Class member Timothy L. Anderson has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants extended the amount of phases they require Class member Anderson to complete to seven phases, though K.S.A. Statutes' only requirement for completing treatment and release is that Class member Anderson's mental condition has so changed that he is no longer dangerous. K.S.A. Statutes do not require completion of phases. Defendants have never provided Class member Anderson an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and *specific* anticipated time frame for promotion to the next phase and eventual release. Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants have shuffled Class member Anderson from one therapist to another. He has had at least ten therapists in nine and a half years. Nine out of ten of his therapists have not been

qualified. They have only been temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Class member Anderson. Defendants overcrowd therapy groups with ten to twelve residents so that Class member Anderson does not get a fair chance to present his necessary work, receive adequate feedback, and improve enough so that he can advance as appropriate. Defendants cancel groups three to six times per quarter so that Class member Anderson does not get a fair chance to improve and advance as appropriate. Defendants have impeded Class member Anderson's progress so that he cannot advance as appropriate. After nine and a half years, Class member Anderson is still stuck in phase three. Defendants have twice forced Class member Anderson to re-present his autobiography, victim sheets, and relapse prevention plan when starting a new group and when getting shuffled to a new therapist, though Class member Anderson had previously completed this requirement. Though Class member Anderson has no serious difficulty in controlling his behavior, Defendants refuse to acknowledge his mental condition has improved, nor have Defendants recommended release. Though Class member Anderson has never engaged in any sexually inappropriate behavior while in SPTP, Defendant's yearly reports of Class member Anderson's supposed mental condition still reads Class member Anderson meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

213.    Defendants have deprived Plaintiff Ronald A. Baker liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Plaintiff Ronald A. Baker has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants extended the amount of phases they require Plaintiff Baker to complete from three phases to seven phases, though K.S.A. Statutes' only requirement for completing treatment and release is that Plaintiff Baker's mental condition has so changed that he is no longer dangerous. K.S.A. Statutes do not require completion of phases. Defendants have never provided Plaintiff Baker an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and *specific* anticipated time frame for promotion to the next phase and eventual release. Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants have shuffled Plaintiff Baker from one therapist to another. He has had at least seven therapists in eleven

131

years. At least three of his therapists have not been qualified. They have only been temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Plaintiff Baker. Defendants overcrowd therapy groups with twelve residents so that Plaintiff Baker does not get a fair chance to present his necessary work, receive adequate feedback, and improve enough so that he can advance as appropriate. Defendants cancel groups nine times per quarter so that Class member Barker does not get a fair chance to improve and advance as appropriate. Defendants impede Plaintiff Baker's progress so that he cannot advance as appropriate by only allowing him to present his required material (autobiography, victim sheets, relapse prevention plan, etc.) twice per quarter. After eleven years, Plaintiff Baker is still stuck in phase three. Defendants have dropped Plaintiff Baker from phase five to phase four after he had rightfully earned phase five, but could not pass two polygraphs. Defendants have dropped Plaintiff Baker from phase four to phase three because he could not pass two polygraphs. Defendants forced Plaintiff to repeat phase three, though he has completed it previously. Defendants have refused to progress Plaintiff Baker to phase four on four separate occasions for failing a polygraph or failing an advanced core class. Seven times Defendants have forced Plaintiff Baker to re-present his autobiography, victim sheets, and relapse prevention plan when starting a new group and when getting shuffled to a new therapist, though Plaintiff Baker had previously completed this requirement. Two or three times Defendants have forced Plaintiff Baker to re-present his autobiography, victim sheets, and relapse prevention plan because Defendants changed the criteria. Six times Defendants have impeded Plaintiff Baker from progressing because of failing a polygraph. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

214. Defendants have deprived Class member Steve Barker liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Class member Steve Barker has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants extended the amount of phases they require Class member Barker to complete to seven phases, though K.S.A. Statutes' only requirement for completing treatment and release is that Class member Barker's mental condition has so changed that he is no longer dangerous. K.S.A. Statutes do not require completion of phases. Defendants have never provided Class member Barker an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and *specific* anticipated time frame for promotion to the next phase and eventual release.

Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants have shuffled Class member Barker from one therapist to another. He has had at least three therapists in six years. It is unknown whether any of his therapists have been qualified. They have only been temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Class member Barker. Defendants overcrowd therapy groups with ten to twelve residents so that Class member Barker does not get a fair chance to present his necessary work, receive adequate feedback, and improve enough so that he can advance as appropriate. Defendants cancel groups six times per quarter so that Class member Barker does not get a fair chance to improve and advance as appropriate. Defendants have impeded Class member Barker's progress so that he cannot advance as appropriate by only allowing him to present his required material (autobiography, victim sheets, relapse prevention plan, etc.) twice per quarter. This quarter Class member Barker was only allowed to present once. After six years, Class member Barker is still stuck in phase three. Defendants have twice forced Class member Barker to re-present his autobiography, victim sheets, and relapse prevention plan when starting a new group and when getting shuffled to a new therapist, though Class member Barker had previously completed this requirement. Defendants have impeded Class member Barker's progress so that he cannot advance as appropriate by holding him back from advancing to the next phase of the program because his therapist and an activity therapist said he was moving too *quickly* through the program. Defendants have impeded Class member Barker's progress so that he cannot advance as appropriate by holding him back from advancing to the next phase of the program for failing a polygraph. Though Class member Barker has no serious difficulty in controlling his behavior, Defendants refuse to acknowledge his mental condition has improved, nor have Defendants recommended release. Though Class member Barker has never engaged in any sexually inappropriate behavior while in SPTP, Defendant's yearly reports of Class member Barker's supposed mental condition still reads Class member Barker meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

215.    Defendants have deprived Class member Terrence A. Barnett liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Class member Terrence A. Barnett has been subject to

and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants extended the amount of phases they require Class member Barnett to complete, though K.S.A. Statutes' only requirement for completing treatment and release is that Class member Barnett's mental condition has so changed that he is no longer dangerous. K.S.A. Statutes do not require completion of phases. Defendants have never provided Class member Barnett an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and *specific* anticipated time frame for promotion to the next phase and eventual release. Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants have shuffled Class member Barnett from one therapist to another. It is unknown whether any of his therapists have been qualified. They have only been temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Class member Barnett. Defendants overcrowd therapy groups so that Class member Barnett does not get a fair chance to present his necessary work, receive adequate feedback, and improve enough so that he can advance as appropriate. Though Class member Barnett has no serious difficulty in controlling his behavior, Defendants refuse to acknowledge his mental condition has improved, nor have Defendants recommended release. Though Class member Barnett has never engaged in any sexually inappropriate behavior while in SPTP, Defendant's yearly reports of Class member Barnett's supposed mental condition still reads Class member Barnett meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

216.    Defendants have deprived Class member Roger Berryman liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Class member Roger Berryman has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants extended the amount of phases they require Class member Berryman to complete from three to seven phases, though K.S.A. Statutes' only requirement for completing treatment and release is that Class member Berryman's mental condition has so changed that he is no longer dangerous. K.S.A. Statutes do not require completion of phases. Defendants have not provided Class member Berryman with any qualified therapists. They have only been a temporary trainee, an intern, or post-doc. Defendants only employ these therapists for one year, long enough for

134

these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Class member Berryman. Defendants cancel groups ten times per quarter so that Class member Berryman does not get a fair chance to improve and advance as appropriate. Defendants have impeded Class member Berryman's progress so that he cannot advance as appropriate. After twelve and a half years, Class member Berryman is still stuck in phase three. Defendants have impeded Class member Berryman's progress so that he cannot advance as appropriate by holding him back from advancing to the next phase of the program because his therapist and an activity therapist said he was too slow and belonged in the "parallel" program. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

217.    Defendants have deprived Class member Paul Blumenshine liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Class member Paul Blumenshine has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants refused to provide any treatment program in 1994 when Class member Blumenshine was first civilly committed. There was no program and no phases until Class member Blumenshine and three other SPTP residents sued the program to get treatment. Defendants have created a treatment program as a sham only. Defendants extended the amount of phases they require Class member Blumenshine to complete from none, to three, to five, and now seven phases, though K.S.A. Statutes' only requirement for completing treatment and release is that Class member Blumenshine's mental condition has so changed that he is no longer dangerous. K.S.A. Statutes do not require completion of phases. Defendants have never provided Class member Blumenshine an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and *specific* anticipated time frame for promotion to the next phase and eventual release. Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants have shuffled Class member Blumenshine from one therapist to another. He has had at least six therapists in twenty years. (Note: The number of therapists he has had is probably higher than he remembers). None of his therapists have been qualified. They have only been temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Class member Blumenshine. Defendants overcrowd therapy groups with twelve residents so that Class member Blumenshine does not get a fair chance to

135

present his necessary work, receive adequate feedback, and improve enough so that he can advance as appropriate. Defendants have impeded Class member Blumenshine's progress so that he cannot advance as appropriate by not allowing him to present his material (autobiography, victim sheets, relapse prevention plan, etc.) even one time this quarter, nor even one time last quarter. Defendants cancel groups at least three times per quarter so that Class member Blumenshine does not get a fair chance to improve and advance as appropriate. Defendants have impeded Class member Blumenshine's progress so that he cannot advance as appropriate. There was no treatment at all for the first five years, then in 1999, Defendants started Class member Blumenshine in what they currently call phase three. After fourteen years, Class member Blumenshine is still stuck in phase three. Defendants have forced Class member Blumenshine to re-present his autobiography, victim sheets, and relapse prevention plan at least nine times when starting a new group and when getting shuffled to a new therapist, though Class member Blumenshine had previously completed this requirement. Defendants have impeded Class member Blumenshine's progress so that he cannot advance as appropriate by dropping him from phase four back to phase three on three separate occasions after he had fully earned phase four. Defendants have impeded Class member Blumenshine's progress so that he cannot advance as appropriate on at least eleven separate occasions by refusing to allow him to advance to the next phase because his therapist said, "I don't think you're ready for phase four." Defendants have forced Class member Blumenshine to repeat phase three for at least fourteen years, though he has completed it previously. Though Class member Blumenshine has no serious difficulty in controlling his behavior, Defendants refuse to acknowledge his mental condition has improved, nor have Defendants recommended release. Though Class member Blumenshine has never engaged in any sexually inappropriate behavior while in SPTP, Defendant's yearly reports of Class member Blumenshine's supposed mental condition still reads Class member Blumenshine meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. Defendants violate Class member Blumenshine's right to petition the Court yearly for independent evaluation and release. Though he has asked for a yearly evaluation of his current mental condition, an independent evaluation, and a hearing for Transitional or Conditional release, Defendants refuse to grant such a petition, calling it frivolous. Defendants have not granted Class member Blumenshine's petition for independent evaluation and transition/conditional release in nineteen years. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

218.    Defendants have deprived Class member Rodney Callow liberty on basis of a treatable

136

condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Class member Rodney Callow has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants extended the amount of phases they require Class member Callow to complete, though K.S.A. Statutes' only requirement for completing treatment and release is that Class member Callow's mental condition has so changed that he is no longer dangerous. K.S.A. Statutes do not require completion of phases. Defendants have never provided Class member Callow an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and *specific* anticipated time frame for promotion to the next phase and eventual release. Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants have shuffled Class member Callow from one therapist to another. He has had at least five therapists in four years. None of his therapists have been qualified. They have only been temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Class member Callow. Defendants cancel groups three to five times per quarter so that Class member Callow does not get a fair chance to improve and advance as appropriate. Defendants have forced Class member Callow to re-present his autobiography, victim sheets, and relapse prevention plan when starting a new group and when getting shuffled to a new therapist, though Class member Callow had previously completed this requirement, simply because his previous therapist had not documented the fact that Class member Callow had previously completed this requirement. Though Class member Callow has never engaged in any sexually inappropriate behavior while in SPTP, Defendant's yearly reports of Class member Callow's supposed mental condition still reads Class member Callow meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

219.   Defendants have deprived Plaintiff Richard L. Cochran liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Plaintiff Richard L. Cochran has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants extended the amount of phases they require Plaintiff Cochran to complete, though K.S.A. Statutes' only requirement for completing treatment and release is that Plaintiff

Cochran's mental condition has so changed that he is no longer dangerous. K.S.A. Statutes do not require completion of phases. Defendants have never provided Plaintiff Cochran an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and *specific* anticipated time frame for promotion to the next phase and eventual release. Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants have shuffled Plaintiff Cochran from one therapist to another. He states he has had too many therapists to remember, in the eleven year period he has been in SPTP. None of his therapists have been qualified. They have only been temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Plaintiff Cochran. Defendants have impeded Plaintiff Cochran's progress so that he cannot advance as appropriate. Plaintiff Cochran has been in SPTP eleven years and is still stuck in phase three. Defendants have impeded Plaintiff Cochran's progress so that he cannot advance as appropriate by holding him back from advancing to the next phase of the program because his therapist will not recommend him for advancement based on the fact he refuses to continue to repeat again and again the material he has already completed which forces him to continuously relive the past. Plaintiff Cochran states this is contrary to his progress towards a new life free from sex offending (healthy life). Plaintiff Cochran believes Defendant's practices are de-habilitating him and are handicapping him from being mentally healthy in a transitional lifestyle of non-offending behavior. Plaintiff Cochran believes Defendants have created a program which is overly punitive, which is overly antisocial in its treatment of Plaintiffs and Class members. Defendants have on numerous occasions forced Plaintiff Cochran to re-present his autobiography, victim sheets, and relapse prevention plan when starting a new group and when getting shuffled to a new therapist, though Plaintiff Cochran had previously completed this requirement. Though Plaintiff Cochran has no serious difficulty in controlling his behavior, Defendants refuse to acknowledge his mental condition has improved, nor have Defendants recommended release. Though Plaintiff Cochran has never engaged in any sexually inappropriate behavior while in SPTP, Defendant's yearly reports of Plaintiff Cochran's supposed mental condition still reads Plaintiff Cochran meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. Plaintiff Cochran has been denied an actual evaluation of his *current* mental condition made yearly by Defendants. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

220.    Defendants retried Class member Rafe Davis so that his second jury would find him a

Sexually Violent Predator, though his first trial ended in a hung jury. Such tactics are traditionally criminal procedure, not a traditionally civil procedure.

221. Defendants have deprived Class member Toby Dillingham liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Class member Dillingham has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants have never provided Class member Dillingham an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and *specific* anticipated time frame for promotion to the next phase and eventual release. Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants have shuffled Class member Dillingham from one therapist to another. He has had at least six therapists in three and a half years. None of his therapists have been qualified. They have only been temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Class member Dillingham. Defendants cancel groups five times per quarter so that Class member Dillingham does not get a fair chance to improve and advance as appropriate. Defendants have impeded Class member Dillingham's progress so that he cannot advance as appropriate by only allowing him to present his required material (autobiography, victim sheets, relapse prevention plan, etc.) once per quarter. Defendants have impeded Class member Dillingham's progress so that he cannot advance as appropriate. After three and a half years, Class member Dillingham is still stuck in phase three. Defendants have impeded Class member Dillingham's progress to phase four by assigning him lower Treatment Needs Assessment Scores than he deserves. Plaintiffs and Class members in phase three are required to obtain Treatment Needs Assessment Scores of at least a seven of above to be eligible to advance to phase four. As well, Class member Dillingham's therapist intentionally delays the submission of Class member Dillingham's name for eligibility to take the polygraph. The polygraph is used by Defendants to hold Plaintiffs and Class members back from advancing as appropriate. Defendants have forced Class member Dillingham to re-present his autobiography, victim sheets, and relapse prevention plan on several occasions when starting a new group and when getting shuffled to a new therapist, though Class member Dillingham had previously completed this requirement. Defendants have refused to progress Class member Dillingham to phase four for failing a polygraph on four separate occasions. Though Class member Dillingham has no serious difficulty in controlling his behavior, Defendants refuse to acknowledge his

mental condition has improved, nor have Defendants recommended release. Though Class member Dillingham has never engaged in any sexually inappropriate behavior while in SPTP, Defendant's yearly reports of Class member Dillingham's supposed mental condition still reads Class member Dillingham meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

222.    Defendants have deprived Class member Paul Stephen Douglas liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Class member Douglas has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants extended the amount of phases they require Class member Douglas to complete, though K.S.A. Statutes' only requirement for completing treatment and release is that Class member Douglas' mental condition has so changed that he is no longer dangerous. K.S.A. Statutes do not require completion of phases. Defendants have never provided Class member Douglas an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and *specific* anticipated time frame for promotion to the next phase and eventual release. Defendants originally claimed Class member Douglas could progress through the phases in three to five years. Currently, Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants have shuffled Class member Douglas from one therapist to another. He has had at least fifteen therapists in ten and a half years. At least twelve of his therapists have not been qualified. They have only been temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Class member Douglas. Defendants overcrowd therapy groups with ten residents so that Class member Douglas does not get a fair chance to present his necessary work, receive adequate feedback, and improve enough so that he can advance as appropriate. Defendants cancel groups five or six times per quarter so that Class member Douglas does not get a fair chance to improve and advance as appropriate. Defendants have impeded Class member Douglas' progress so that he cannot advance as appropriate. After ten and a half years, Class member Douglas is still stuck in phase three. Defendants have dropped Class member Douglas from phase three to phase two after he had rightfully earned phase three. Defendants forced Class member Douglas to repeat phase two a second time, though he had previously completed phase two requirements. Defendants have forced Class member Douglas to

140

re-present his autobiography, victim sheets, and relapse prevention plan eleven separate times because he was told his therapist did not approve of the way he was presenting the information. Though Class member Douglas has no serious difficulty in controlling his behavior, Defendants refuse to acknowledge his mental condition has improved, nor have Defendants recommended release. Though Class member Douglas has never engaged in any sexually inappropriate behavior while in SPTP, Defendant's yearly reports of Class member Douglas' supposed mental condition still reads Class member Douglas meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

223.   Defendants have deprived Class member Edward Franklin liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Class member Franklin has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants extended the amount of phases they require Class member Franklin to complete, though K.S.A. Statutes' only requirement for completing treatment and release is that Class member Franklin's mental condition has so changed that he is no longer dangerous. K.S.A. Statutes do not require completion of phases. Defendants have never provided Class member Franklin an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and *specific* anticipated time frame for promotion to the next phase and eventual release. Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants have shuffled Class member Franklin from one therapist to another. He has had eight to ten therapists in nine years. It is unknown whether any of his therapists have been qualified. At least three have only been temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Class member Franklin. Defendants overcrowd therapy groups with nine to ten residents so that Class member Franklin does not get a fair chance to present his necessary work, receive adequate feedback, and improve enough so that he can advance as appropriate. Defendants cancel groups four times per quarter so that Class member Franklin does not get a fair chance to improve and advance as appropriate. Defendants have impeded Class member Franklin's progress so that he cannot advance as appropriate by only allowing him to present his required material (autobiography, victim sheets, relapse prevention plan, etc.) twice per quarter. After nine years, Class member Franklin is still stuck in phase

141

three.  Defendants forced Class member Franklin to retake all psycho-educational core classes, after going to court, even though he had previously completed all psycho-educational classes, which was used to impede his progress so that he could not advance to the next phase of the program.  Defendants have impeded Class member Franklin's progress to the next phase by assigning him lower Criminogenics scores than he deserves.  Plaintiffs and Class members are required to obtain Criminogenics scores of at least seven or above to be eligible to advance to phase four.  Defendants have forced Class member Franklin to re-present his autobiography, victim sheets, and relapse prevention plan when starting a new group and when getting shuffled to a new therapist, though Class member Franklin had previously completed this requirement.  Though Class member Franklin has no serious difficulty in controlling his behavior, Defendants refuse to acknowledge his mental condition has improved, nor have Defendants recommended release.  Though Class member Franklin has never engaged in any sexually inappropriate behavior while in SPTP, Defendant's yearly reports of Class member Franklin's supposed mental condition still reads Class member Franklin meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time.  See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

224.  Defendants have deprived Plaintiff Michael P. Gallagher liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights.  Plaintiff Gallagher has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants have never provided Plaintiff Gallagher an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and *specific* anticipated time frame for promotion to the next phase and eventual release.  Defendants' claim promotion and release are indeterminate, are not sufficient.  Defendants have shuffled Plaintiff Gallagher from one therapist to another.  He has had at least four therapists in three and a half years.  Only one of his therapists has been qualified.  They have only been temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on.  Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Plaintiff Gallagher.  Defendants overcrowd therapy groups with ten to twelve residents so that Plaintiff Gallagher does not get a fair chance to present his necessary work, receive adequate feedback, and improve enough so that he can advance as appropriate. Defendants cancel groups four to eight times per quarter so that Plaintiff Gallagher does not get a fair

chance to improve and advance as appropriate. Defendants have impeded Plaintiff Gallagher's progress so that he cannot advance as appropriate. After three and a half years, Plaintiff Gallagher is still stuck in phase three. Defendants have forced Plaintiff Gallagher to re-present his autobiography, victim sheets, and relapse prevention plan at least three times when starting a new group and when getting shuffled to a new therapist, though Plaintiff Gallagher had previously completed this requirement. Though Plaintiff Gallagher has no serious difficulty in controlling his behavior, Defendants refuse to acknowledge his mental condition has improved, nor have Defendants recommended release. Though Plaintiff Gallagher has never engaged in any sexually inappropriate behavior while in SPTP, Defendant's yearly reports of Plaintiff Gallagher's supposed mental condition still reads Plaintiff Gallagher meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

225.   Defendants have deprived Plaintiff Harvey Hickman liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Plaintiff Hickman has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants extended the amount of phases they require Plaintiff Hickman to complete from four phases to seven phases, though K.S.A. Statutes' only requirement for completing treatment and release is that Plaintiff Hickman's mental condition has so changed that he is no longer dangerous. K.S.A. Statutes do not require completion of phases. Defendants have never provided Plaintiff Hickman an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and *specific* anticipated time frame for promotion to the next phase and eventual release. Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants have shuffled Plaintiff Hickman from one therapist to another. He has had at least twelve therapists in eleven years. Most of his therapists have been qualified. They have only been temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Plaintiff Hickman. Defendants overcrowd therapy groups with ten to twelve residents so that Plaintiff Hickman does not get a fair chance to present his necessary work, receive adequate feedback, and improve enough so that he can advance as appropriate. Defendants cancel groups three to five times per quarter so that . Plaintiff Hickman does not get a fair chance to improve and advance as appropriate. Defendants have

143

impeded Plaintiff Hickman's progress so that he cannot advance as appropriate. After eleven years, Plaintiff Hickman is still stuck in phase three. Defendants have forced Plaintiff Hickman to re-present his autobiography, victim sheets, and relapse prevention plan over ten times when starting a new group and when getting shuffled to a new therapist, though Plaintiff Hickman had previously completed this requirement. Defendants have impeded Plaintiff Hickman's progress so that he cannot advance as appropriate by holding him back from advancing to the next phase of the program twice for failing a polygraph. Though Plaintiff Hickman has no serious difficulty in controlling his behavior, Defendants refuse to acknowledge his mental condition has improved, nor have Defendants recommended release. Though Plaintiff Hickman has never engaged in any sexually inappropriate behavior while in SPTP, Defendant's yearly reports of Plaintiff Hickman's supposed mental condition still reads Plaintiff Hickman meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

226. Defendants have deprived Class member Steven Islam liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Class member Islam has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants extended the amount of phases they require Class member Islam to complete from five phases to seven phases, though K.S.A. Statutes' only requirement for completing treatment and release is that Class member Islam's mental condition has so changed that he is no longer dangerous. K.S.A. Statutes do not require completion of phases. Defendants have never provided Class member Islam an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and *specific* anticipated time frame for promotion to the next phase and eventual release. Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants have shuffled Class member Islam from one therapist to another. He has had at least seven therapists in eleven years. It is unknown whether any of his therapists have been qualified. They have only been temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Class member Islam. Defendants overcrowd therapy groups with ten to thirteen residents so that Class member Islam does not get a fair chance to present his necessary work, receive adequate feedback, and improve enough so that he can advance as appropriate. Defendants cancel groups several times per

144

quarter so that Class member Islam does not get a fair chance to improve and advance as appropriate. Defendants have impeded Class member Islam's progress so that he cannot advance as appropriate by only allowing him to present his required material (autobiography, victim sheets, relapse prevention plan, etc.) twice per quarter. Defendants have impeded Class member Islam's progress so that he cannot advance as appropriate. After eleven years he is only in phase four. Defendants have impeded Class member Islam's progress so that he cannot advances as appropriate by forcing him to repeat phase three because his therapist, Joshua Durr, had lost his phase three paperwork. Defendants have forced Class member Islam to re-present his autobiography, victim sheets, and relapse prevention plan over ten times when starting a new group and when getting shuffled to a new therapist, though Class member Islam had previously completed this requirement. Though Class member Islam has no serious difficulty in controlling his behavior, Defendants refuse to acknowledge his mental condition has improved, nor have Defendants recommended release. Though Class member Islam has never engaged in any sexually inappropriate behavior while in SPTP, Defendant's yearly reports of Class member Islam's supposed mental condition still reads Class member Islam meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

227.    Defendants have deprived Plaintiff Alan Kirk liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Plaintiff Kirk has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants extended the amount of phases they require Plaintiff Kirk to complete from five phases to seven phases, though K.S.A. Statutes' only requirement for completing treatment and release is that Plaintiff Kirk's mental condition has so changed that he is no longer dangerous. K.S.A. Statutes do not require completion of phases. Defendants have never provided Plaintiff Kirk an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and *specific* anticipated time frame for promotion to the next phase and eventual release. Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants have shuffled Plaintiff Kirk from one therapist to another. He has had at least thirteen therapists in twelve and a half years. At least eight of his therapists have not been qualified. They have only been temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of

individual therapy per quarter (90 days) to Plaintiff Kirk. Defendants overcrowd therapy groups with ten to twelve residents so that Plaintiff Kirk does not get a fair chance to present his necessary work, receive adequate feedback, and improve enough so that he can advance as appropriate. Defendants cancel groups six times per quarter so that Plaintiff Kirk does not get a fair chance to improve and advance as appropriate. Defendants have impeded Plaintiff Kirk's progress so that he cannot advance as appropriate. After twelve and a half years, Plaintiff Kirk is still stuck in phase three. Defendants have impeded Plaintiff Kirk's progress so that he cannot advance as appropriate. It took him one year to get to phase three and another eleven years to get to phase four. Currently, however, Plaintiff Kirk has been reduced to phase three and is still stuck there. Defendants have impeded Plaintiff Kirk's progress so that he cannot advance as appropriate by forcing him to repeat phase three eight times. Defendants have impeded Plaintiff Kirk's progress so that he cannot advance as appropriate by refusing to advance Plaintiff Kirk to phase four three times when he was eligible because they, "wanted to make sure he was *ready* for phase four." Defendants have forced Plaintiff Kirk to re-present his autobiography, victim sheets, and relapse prevention plan twelve times when starting a new group and when getting shuffled to a new therapist, though Plaintiff Kirk had previously completed this requirement. Defendants have forced Plaintiff Kirk to re-present his autobiography, victim sheets, and relapse prevention plan three separate times after first punishing him by sending him to the Intensive Treatment Unit. Though Plaintiff Kirk has no serious difficulty in controlling his behavior, Defendants refuse to acknowledge his mental condition has improved, nor have Defendants recommended release. Defendant's yearly reports of Plaintiff Kirk's supposed mental condition still reads Plaintiff Kirk meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

228.    Defendants have deprived Class member Eddie Martin liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Class member Martin has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants have never provided Class member Martin an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and *specific* anticipated time frame for promotion to the next phase and eventual release. Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants have shuffled Class member Martin from one therapist to another. He has had at least six therapists in four years. Four out of six of

146

his therapists have not been qualified. They have only been temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Class member Martin. Defendants overcrowd therapy groups with twelve residents so that Class member Martin does not get a fair chance to present his necessary work, receive adequate feedback, and improve enough so that he can advance as appropriate. Defendants cancel groups five times per quarter so that Class member Martin does not get a fair chance to improve and advance as appropriate. Defendants have impeded Class member Martin's progress so that he cannot advance as appropriate by only allowing him to present his required material (autobiography, victim sheets, relapse prevention plan, etc.) twice per quarter. After four years, Class member Martin is still stuck in phase three. Though Class member Martin has no serious difficulty in controlling his behavior, Defendants refuse to acknowledge his mental condition has improved, nor have Defendants recommended release. Though Class member Martin has never engaged in any sexually inappropriate behavior while in SPTP, Defendant's yearly reports of Class member Martin's supposed mental condition still reads Class member Martin meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

229.    Defendants have deprived Plaintiff Michael D. Mellon liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Plaintiff Mellon has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants extended the amount of phases they require Plaintiff Mellon to complete from five phases to seven phases, though K.S.A. Statutes' only requirement for completing treatment and release is that Plaintiff Mellon's mental condition has so changed that he is no longer dangerous. K.S.A. Statutes do not require completion of phases. Defendants have shuffled Plaintiff Mellon from one therapist to another. He has had at least nine therapists in eleven years. It is unknown whether any of his therapists have been qualified. They have only been temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Plaintiff Mellon. Defendants have impeded Plaintiff Mellon's progress so that he cannot advance as appropriate. After eleven years, Plaintiff Mellon is still stuck in phase three.

147

Defendants have impeded Plaintiff Melon's progress so that he cannot advance as appropriate by dropping him from phase four to phase three because, after two years of being physically and emotionally assaulted by another resident, and though he complained regularly, his therapist refused to do anything about it, Plaintiff Mellon struck the offending resident. Defendant have impeded Plaintiff Melon's progress so that he cannot advance as appropriate by refusing to advance him to phase four when he was eligible because he refused to continue re-presenting the same material (autobiography, victim sheets, relapse prevention plan, etc.) though he had previously completed this requirement multiple times. Defendants have forced Plaintiff Mellon to re-present his autobiography, victim sheets, and relapse prevention plan four times when starting a new group and when getting shuffled to a new therapist, though Plaintiff Mellon had previously completed this requirement. Defendants have forced Plaintiff Mellon to re-present his autobiography, victim sheets, and relapse prevention plan once because he was dropped from phase four to phase three. Defendants have impeded Plaintiff Mellon's progress so that he cannot advance as appropriate by holding him back, four times, from advancing to the next phase of the program for failing a polygraph. Though Plaintiff Mellon has no serious difficulty in controlling his behavior, Defendants refuse to acknowledge his mental condition has improved, nor have Defendants recommended release. Though Plaintiff Mellon has never engaged in any sexually inappropriate behavior while in SPTP, Defendant's yearly reports of Plaintiff Mellon's supposed mental condition still reads Plaintiff Mellon meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

230.    Defendants have deprived Plaintiff Justin Miller liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Plaintiff Justin Miller has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants extended the amount of phases they require Plaintiff Miller to complete to seven phases, though K.S.A. Statutes' only requirement for completing treatment and release is that Plaintiff Justin Miller's mental condition has so changed that he is no longer dangerous. K.S.A. Statutes do not require completion of phases. Defendants have never provided Plaintiff Miller an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and *specific* anticipated time frame for promotion to the next phase and eventual release. Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants have shuffled Plaintiff Miller from one

148

therapist to another. He has had at least seven therapists in seven years. It is unknown whether any of his therapists have been qualified. They have only been temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Plaintiff Miller. Defendants have impeded Plaintiff Miller's progress so that he cannot advance as appropriate. After seven years, Plaintiff Miller is still stuck in phase two. Though Plaintiff Miller has no serious difficulty in controlling his behavior, Defendants refuse to acknowledge his mental condition has improved, nor have Defendants recommended release. Though Plaintiff Miller has never engaged in any sexually inappropriate behavior while in SPTP, Defendant's yearly reports of Plaintiff Miller's supposed mental condition still reads Plaintiff Miller meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

231. Defendants have deprived Class member Richard A. Miller liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Class member Miller has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants extended the amount of phases they require Class member Miller to complete to seven phases, though K.S.A. Statutes' only requirement for completing treatment and release is that Class member Miller's mental condition has so changed that he is no longer dangerous. K.S.A. Statutes do not require completion of phases. Defendants have never provided Class member Miller an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and *specific* anticipated time frame for promotion to the next phase and eventual release. Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants have shuffled Class member Miller from one therapist to another. He has had eight therapists in eight years. At least three of his therapists have not been qualified. They have only been temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Class member Miller. Defendants have impeded Class member Miller's progress so that he cannot advance as appropriate. After eight years, Class member Miller is still stuck in phase four. Defendants have impeded Class member Miller's progress so that he cannot advance as appropriate by forcing him to repeat phase three

three times because his Criminogenics scores were too low. Defendants have forced Class member Miller to re-present his autobiography, victim sheets, and relapse prevention plan three times when starting a new group and when getting shuffled to a new therapist, though Class member Miller had previously completed this requirement. Defendants have impeded Class member Miller's progress so that he cannot advance as appropriate four times by "slow playing" him by not scheduling his polygraph in a timely manner, would not give him any information as the whether he passed the . polygraph after he had taken it, and on the third occasion his intern therapist "misplaced" his polygraph results. Though Class member Miller has no serious difficulty in controlling his behavior, Defendants refuse to acknowledge his mental condition has improved, nor have Defendants recommended release. Though Class member Miller has never engaged in any sexually inappropriate behavior while in SPTP, Defendant's yearly reports of Class member Miller's supposed mental condition still reads Class member Miller meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

232.   Defendants have deprived Class member Mark Palmer liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Class member Mark Palmer has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants extended the amount of phases they require Class member Palmer to complete to seven phases, though K.S.A. Statutes' only requirement for completing treatment and release is that Class member Palmer's mental condition has so changed that he is no longer dangerous. K.S.A. Statutes do not require completion of phases. Defendants have never provided Class member Palmer an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and *specific* anticipated time frame for promotion to the next phase and eventual release. Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants have shuffled Class member Palmer from one therapist to another. He has had at least five therapists in five years. At least two of his therapists have not been qualified. They have only been temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Class member Palmer. Defendants overcrowd therapy groups with seven or more residents so that Class member Palmer does

not get a fair chance to present his necessary work, receive adequate feedback, and improve enough so that he can advance as appropriate. Defendants cancel groups numerous times per quarter so that Class member Palmer does not get a fair chance to improve and advance as appropriate. Defendants have impeded Class member Palmer's progress so that he cannot advance as appropriate because they have not allowed him to present his required material (autobiography, victim sheets, relapse prevention plan, etc.) at any time this quarter. Defendants have impeded Class member Palmer's progress so that he cannot advance as appropriate. After five years, Class member Palmer is still stuck in phase three. Defendants have impeded Class member Palmer's progress so that he cannot advances as appropriate by refusing to advance Class member Palmer to phase four twice when he was eligible because his therapist gave him low Treatment Needs Assessment Scores because he was depressed and they ordered him to re-present his sexual history. Defendants have forced Class member Palmer to re-present his autobiography, victim sheets, and relapse prevention plan when starting a new group and when getting shuffled to a new therapist, though Class member Palmer had previously completed this requirement. Though Class member Palmer has never engaged in any sexually inappropriate behavior while in SPTP, Defendant's yearly reports of Class member Palmer's supposed mental condition still reads Class member Palmer meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

233.    Defendants have deprived Plaintiff Eric Patterson liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Plaintiff Patterson has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants extended the amount of phases they require Plaintiff Patterson to complete to seven phases, though K.S.A. Statutes' only requirement for completing treatment and release is that Plaintiff Patterson's mental condition has so changed that he is no longer dangerous. K.S.A. Statutes do not require completion of phases. Defendants have never provided Plaintiff Patterson an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and *specific* anticipated time frame for promotion to the next phase and eventual release. Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants have shuffled Plaintiff Patterson from one therapist to another. He has had at least eight therapists in ten years. None of his therapists have been qualified. They have only been temporary trainees, interns, or post-docs.

151

Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Plaintiff Patterson. Defendants overcrowd therapy groups with at least eight residents so that Plaintiff Patterson does not get a fair chance to present his necessary work, receive adequate feedback, and improve enough so that he can advance as appropriate. Defendants have impeded Plaintiff Patterson's progress so that he cannot advance as appropriate by only allowing him to present his required material (autobiography, victim sheets, relapse prevention plan, etc.) once or twice per quarter. Defendants have impeded Plaintiff Patterson's progress so that he cannot advance as appropriate. After ten years, Plaintiff Patterson is still stuck in phase three. Defendants have frequently forced Plaintiff Patterson to re-present his autobiography, victim sheets, and relapse prevention plan when starting a new group and when getting shuffled to a new therapist, though Plaintiff Patterson had previously completed this requirement. Defendants have impeded Plaintiff Patterson's progress so that he cannot advance as appropriate by forcing him to repeat phase three twice, though he had completed it previously. Though Plaintiff Patterson has no serious difficulty in controlling his behavior, Defendants refuse to acknowledge his mental condition has improved, nor have Defendants recommended release. Though Plaintiff Patterson has never engaged in any sexually inappropriate behavior while in SPTP, Defendant's yearly reports of Plaintiff Patterson's supposed mental condition still reads Plaintiff Patterson meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

234.    Defendants have deprived Plaintiff Ramon Cruz Perez liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Plaintiff Perez has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants extended the amount of phases they require Plaintiff Perez to complete from four to seven phases, though K.S.A. Statutes' only requirement for completing treatment and release is that Plaintiff Perez's mental condition has so changed that he is no longer dangerous. K.S.A. Statutes do not require completion of phases. Defendants have shuffled Plaintiff Perez from one therapist to another. At least five of his therapists have not been qualified. They have only been temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one

hour of individual therapy per quarter (90 days) to Plaintiff Perez. Defendants overcrowd therapy groups with five to twelve residents so that Plaintiff Perez does not get a fair chance to present his necessary work, receive adequate feedback, and improve enough so that he can advance as appropriate. Defendants cancel groups many times per quarter so that Plaintiff Perez does not get a fair chance to improve and advance as appropriate. Defendants have impeded Plaintiff Perez's progress so that he cannot advance as appropriate. After fifteen years, Plaintiff Perez is still stuck in phase three. Defendants have frequently forced Plaintiff Perez to re-present his autobiography, victim sheets, and relapse prevention plan when starting a new group and when getting shuffled to a new therapist, though Plaintiff Perez had previously completed this requirement. Defendants have impeded Plaintiff Perez's progress so that he cannot advance as appropriate by dropping him from phase four to phase three, because, "He was not talking enough in groups." Defendants have impeded Plaintiff Perez's progress so that he cannot advance as appropriate by forcing him to repeat phase three five times for not passing his psycho-educational classes. Defendants have impeded Plaintiff Perez's progress so that he cannot advance as appropriate by refusing to advance him to phase four when he was eligible because he brought an orange back from the cafeteria. Though Plaintiff Perez has no serious difficulty in controlling his behavior, Defendants refuse to acknowledge his mental condition has improved, nor have Defendants recommended release. Though Plaintiff Perez has never engaged in any sexually inappropriate behavior while in SPTP, Defendant's yearly reports of Plaintiff Perez's supposed mental condition still reads Plaintiff Perez meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires.*

235. Defendants have deprived Class member William Bruce Pitts liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Class member Pitts has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants extended the amount of phases they require Class member Pitts to complete from six phases to seven phases, though K.S.A. Statutes' only requirement for completing treatment and release is that Class member Pitts' mental condition has so changed that he is no longer dangerous. K.S.A. Statutes do not require completion of phases. Defendants have never provided Class member Pitts an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and *specific* anticipated time frame for promotion to the next phase and eventual release.

153

Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants have shuffled Class member Pitts from one therapist to another. At least three out of four of his therapists have been qualified. They have only been temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Class member Pitts. Defendants overcrowd therapy groups with twelve residents so that Class member Pitts does not get a fair chance to present his necessary work, receive adequate feedback, and improve enough so that he can advance as appropriate. Defendants cancel groups nine times per quarter so that Class member Pitts does not get a fair chance to improve and advance as appropriate. Defendants have impeded Class member Pitts' progress so that he cannot advance as appropriate. After eight and a half years, Class member Pitts is still stuck in phase three. Though Class member Pitts has no serious difficulty in controlling his behavior, Defendants refuse to acknowledge his mental condition has improved, nor have Defendants recommended release. Though Class member Pitts has never engaged in any sexually inappropriate behavior while in SPTP, Defendant's yearly reports of Class member Pitts' supposed mental condition still reads Class member Pitts meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

236.    Defendants have deprived Class member Randall Ritchie liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Class member Ritchie has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants extended the amount of phases they require Class member Ritchie to complete to seven phases, though K.S.A. Statutes' only requirement for completing treatment and release is that Class member Ritchie's mental condition has so changed that he is no longer dangerous. K.S.A. Statutes do not require completion of phases. Defendants have never provided Class member Ritchie an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and *specific* anticipated time frame for promotion to the next phase and eventual release. Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants have shuffled Class member Ritchie from one therapist to another. He has had at least five therapists in twenty one months. Only one of his therapists has been qualified. They have only been temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long enough for

these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Class member Ritchie. Defendants overcrowd therapy groups with ten to twelve residents so that Class member Ritchie does not get a fair chance to present his necessary work, receive adequate feedback, and improve enough so that he can advance as appropriate. Defendants cancel groups six times per quarter so that Class member Ritchie does not get a fair chance to improve and advance as appropriate. Defendants have impeded Class member Ritchie's progress so that he cannot advance as appropriate by only allowing him to present his required material (autobiography, victim sheets, relapse prevention plan, etc.) two to three times per quarter. Defendants have impeded Class member Ritchie's progress so that he cannot advance as appropriate. After twenty one months, Class member Ritchie is still stuck in phase three. Defendants have twice forced Class member Ritchie to re-present his autobiography, victim sheets, and relapse prevention plan when starting a new group and when getting shuffled to a new therapist, though Class member Ritchie had previously completed this requirement. Defendants have forced Class member Ritchie to re-present his material (autobiography, victim sheets, relapse prevention plan, etc.)in phase three, when starting a new group and when getting shuffled to a new therapist, though he had previously completed this requirement. Though Class member Ritchie has no serious difficulty in controlling his behavior, Defendants refuse to acknowledge his mental condition has improved, nor have Defendants recommended release. Though Class member Ritchie has never engaged in any sexually inappropriate behavior while in SPTP, Defendant's yearly reports of Class member Ritchie's supposed mental condition still reads Class member Ritchie meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

237. Defendants have deprived Plaintiff James E. Roberts, Jr. liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Plaintiff Roberts has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants extended the amount of phases they require Plaintiff Roberts to complete from five phases to seven phases, though K.S.A. Statutes' only requirement for completing treatment and release is that Plaintiff Roberts' mental condition has so changed that he is no longer dangerous. K.S.A. Statutes do not require completion of phases. Defendants have never provided Plaintiff Roberts an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and

155

*specific* anticipated time frame for promotion to the next phase and eventual release. Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants have shuffled Plaintiff Roberts from one therapist to another. He has had at least twelve therapists in nine years. At least five of his therapists have not been qualified. They have only been temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Plaintiff Roberts. Defendants overcrowd therapy groups with twelve residents so that Plaintiff Roberts does not get a fair chance to present his necessary work, receive adequate feedback, and improve enough so that he can advance as appropriate. Defendants cancel groups many times per quarter so that Plaintiff Roberts does not get a fair chance to improve and advance as appropriate. Defendants have impeded Plaintiff Roberts' progress so that he cannot advance as appropriate by only allowing him to present his required material (autobiography, victim sheets, relapse prevention plan, etc.) two to three times per quarter. Defendants have impeded Plaintiff Roberts' progress so that he cannot advance as appropriate. After nine years, Plaintiff Roberts is still stuck in phase three. Defendants have forced Plaintiff Roberts to re-present his autobiography, victim sheets, and relapse prevention plan eight times when starting a new group and when getting shuffled to a new therapist, though Plaintiff Roberts had previously completed this requirement. Defendants have impeded Plaintiff Roberts' progress so that he cannot advance as appropriate. They refuse to advance him to phase four because he will not participate in certain activities, such as yard, when it is cold and snowy. Defendants have impeded Plaintiff Roberts' progress so that he cannot advance as appropriate by holding him back from advancing to the next phase of the program because his therapist and an activity therapist said he was moving too *quickly* through the program. Defendants have impeded Plaintiff Roberts' progress so that he cannot advance as appropriate by holding him back from advancing to the next phase of the program for failing a polygraph. Though Plaintiff Roberts has no serious difficulty in controlling his behavior, Defendants refuse to acknowledge his mental condition has improved, nor have Defendants recommended release. Though Plaintiff Roberts has never engaged in any sexually inappropriate behavior while in SPTP, Defendant's yearly reports of Plaintiff Roberts' supposed mental condition still reads Plaintiff Roberts meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

238.    Defendants have deprived Plaintiff James R. Rowray liberty on basis of a treatable

156

condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Plaintiff Rowray has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants extended the amount of phases they require Plaintiff Rowray to complete to seven phases, though K.S.A. Statutes' only requirement for completing treatment and release is that Plaintiff Rowray's mental condition has so changed that he is no longer dangerous. K.S.A. Statutes do not require completion of phases. Defendants have never provided Plaintiff Rowray an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and *specific* anticipated time frame for promotion to the next phase and eventual release. Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants have shuffled Plaintiff Rowray from one therapist to another. He has had at least three therapists in two and a half years. It is unknown whether any of his therapists have been qualified. They have only been temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Plaintiff Rowray. Defendants cancel nearly half of all groups he attends per quarter so that Plaintiff Rowray does not get a fair chance to improve and advance as appropriate. Defendants have impeded Plaintiff Rowray's progress so that he cannot advance as appropriate. After two and a half years, Plaintiff Rowray is still stuck in phase two. Defendants have impeded Plaintiff Rowray's progress so that he cannot advance as appropriate. They refuse to advance him to phase three because he believes he cannot talk about his personal sexual issues with a female therapist. Plaintiff Rowray has requested to have a male therapist, but Defendants have refused to give him one. Though Plaintiff Rowray has no serious difficulty in controlling his behavior, Defendants refuse to acknowledge his mental condition has improved, nor have Defendants recommended release. Though Plaintiff Rowray has never engaged in any sexually inappropriate behavior while in SPTP, Defendant's yearly reports of Plaintiff Rowray's supposed mental condition still reads Plaintiff Rowray meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

239.    Defendants have deprived Class member Lonnie Ryan liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Class member Ryan has been subject to and injured by

Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants extended the amount of phases they require Class member Ryan to complete from five phases to seven phases, though K.S.A. Statutes' only requirement for completing treatment and release is that Class member Ryan's mental condition has so changed that he is no longer dangerous. K.S.A. Statutes do not require completion of phases. Defendants have never provided Class member Ryan an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and *specific* anticipated time frame for promotion to the next phase and eventual release. Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants have shuffled Class member Ryan from one therapist to another. He has had eight therapists in twelve years. It is unknown whether any of his therapists have been qualified. They have only been temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Class member Ryan. Defendants overcrowd therapy groups with ten to twelve residents so that Class member Ryan does not get a fair chance to present his necessary work, receive adequate feedback, and improve enough so that he can advance as appropriate. Defendants cancel groups at least four times per quarter so that Class member Ryan does not get a fair chance to improve and advance as appropriate. Defendants have impeded Class member Ryan's progress so that he cannot advance as appropriate. After twelve years, Class member Ryan is still stuck in phase three. Defendants have frequently forced Class member Ryan to re-present his autobiography, victim sheets, and relapse prevention plan when starting a new group and when getting shuffled to a new therapist, though Class member Ryan had previously completed this requirement. Defendants have impeded Class member Ryan's progress so that he cannot advance as appropriate by dropping him from phase five to phase four for failing a polygraph, and again dropping him from phase four to phase three for failing a polygraph. Defendants have impeded Class member Ryan's progress so that he cannot advance as appropriate by refusing to advance him to the next phase because "there was no room on the phase" for him. Defendants have impeded Class member Ryan's progress so that he cannot advance as appropriate by holding him back from advancing to the next phase of the program for failing a polygraph. Though Class member Ryan has no serious difficulty in controlling his behavior, Defendants refuse to acknowledge his mental condition has improved, nor have Defendants recommended release. Though Class member Ryan has never engaged in any sexually inappropriate behavior while in SPTP, Defendant's yearly reports of Class member Ryan's supposed mental condition still reads Class member Ryan meets the definition of a person who

158

suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

240.     Defendants have deprived Class member Jimmie A. Sebek liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Class member Sebek has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants extended the amount of phases they require Class member Sebek to complete to seven phases, though K.S.A. Statutes' only requirement for completing treatment and release is that Class member Sebek's mental condition has so changed that he is no longer dangerous. K.S.A. Statutes do not require completion of phases. Defendants have never provided Class member Sebek an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and *specific* anticipated time frame for promotion to the next phase and eventual release. Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants have shuffled Class member Sebek from one therapist to another. He has had at least three therapists in two years. None of his therapists have been qualified. They have only been temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Class member Sebek. Defendants overcrowd therapy groups with eight residents so that Class member Sebek does not get a fair chance to present his necessary work, receive adequate feedback, and improve enough so that he can advance as appropriate. Defendants cancel groups several times per quarter so that Class member Sebek does not get a fair chance to improve and advance as appropriate. Defendants have impeded Class member Sebek's progress so that he cannot advance as appropriate. After two years, Class member Sebek is still stuck in phase two. Defendant's yearly reports of Class member Sebek's supposed mental condition still reads Class member Sebek meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

241.     Defendants have deprived Class member David H. Sipe liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Class member Sipe has been subject to and injured by

Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions.

Defendants extended the amount of phases they require Class member Sipe to complete from five

phases to seven phases, though K.S.A. Statutes' only requirement for completing treatment and release

is that Class member Sipe's mental condition has so changed that he is no longer dangerous. K.S.A.

Statutes do not require completion of phases. Defendants have never provided Class member Sipe an

*Individualized* Treatment Plan with concrete information concerning his criteria to progress through the

treatment and *specific* anticipated time frame for promotion to the next phase and eventual release.

Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants have

shuffled Class member Sipe from one therapist to another. He has had at least fourteen therapists

in fourteen years. At least nine of his therapists have not been qualified. They have only been

temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long

enough for these therapists to receive their training and move on. Defendants only provide three hours

of group therapy per week, and one hour of individual therapy per quarter (90 days) to Class member

Sipe. Defendants overcrowd therapy groups with nine to twelve residents so that Class member Sipe

does not get a fair chance to present his necessary work, receive adequate feedback, and improve

enough so that he can advance as appropriate. Defendants cancel groups at least thirty percent of the

time per quarter so that Class member Sipe does not get a fair chance to improve and advance as

appropriate. Defendants have impeded Class member Sipe's progress so that he cannot advance as

appropriate by only allowing him to present his required material (autobiography, victim sheets, relapse

prevention plan, etc.) once per quarter. Defendants have impeded Class member Sipe's progress so that

he cannot advance as appropriate. After fourteen years, Class member Sipe is still stuck in phase three.

Defendants have forced Class member Sipe to re-present his autobiography, victim sheets, and relapse

prevention plan over fourteen times when starting a new group and when getting shuffled to a new

therapist, though Class member Sipe had previously completed this requirement. Defendants have

impeded Class member Sipe's progress so that he cannot advance as appropriate by dropping him from

phase four to phase three after accusing him of making "hooch" out of "vinegar." (It is impossible to

make hooch our of vinegar. After the fact, Defendants discovered the vinegar was nothing more than

vinegar). Defendants have impeded Class member Sipe's progress so that he cannot advance as

appropriate by refusing to advance him to phase five because of "improper punctuation" in his relapse

prevention plan. Though Class member Sipe has no serious difficulty in controlling his behavior,

Defendants refuse to acknowledge his mental condition has improved, nor have Defendants

recommended release. Though Class member Sipe has never engaged in any sexually inappropriate

behavior while in SPTP, Defendant's yearly reports of Class member Sipe's supposed mental condition still reads Class member Sipe meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

242. Defendants have deprived Class member Charles Smeltzer liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Class member Smeltzer has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants extended the amount of phases they require Class member Smeltzer to complete from five phases to seven phases, though K.S.A. Statutes' only requirement for completing treatment and release is that Class member Smeltzer's mental condition has so changed that he is no longer dangerous. K.S.A. Statutes do not require completion of phases. Defendants have never provided Class member Smeltzer an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and *specific* anticipated time frame for promotion to the next phase and eventual release. Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants have shuffled Class member Smeltzer from one therapist to another. He has had over twelve therapists in twelve years. At least four of his therapists have not been qualified. They have only been temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Class member Smeltzer. Defendants overcrowd therapy groups with at least seven residents so that Class member Smeltzer does not get a fair chance to present his necessary work, receive adequate feedback, and improve enough so that he can advance as appropriate. Defendants cancel groups seven times per quarter so that Class member Smeltzer does not get a fair chance to improve and advance as appropriate. Defendants have impeded Class member Smeltzer's progress so that he cannot advance as appropriate. After twelve years, Class member Smeltzer is still stuck in phase three. Defendants have impeded Class member Smeltzer's progress so that he cannot advance as appropriate by dropping him from phase four to phase three, and again dropping him from phase three to phase two. Defendants have impeded Class member Smeltzer's progress so that he cannot advance as appropriate by forcing him to repeat phases two and three, forcing him to retake psycho-educational classes he had previously completed, and forcing him to re-present his auto-biography, victim sheets,

161

and relapse prevention plan over twelve times when starting a new group and when getting shuffled to a new therapist, though Class member Smeltzer had previously completed this requirement. Defendants have impeded Class member Smeltzer's progress so that he cannot advance as appropriate by refusing to advance him to phase five four times by assigning him lower Treatment Needs Assessment Scores than he deserves. Defendants have impeded Class member Smeltzer's progress so that he cannot advance as appropriate by holding him back from advancing to the next phase of the program because his therapist and an activity therapist said he was moving too *quickly* through the program. Though Class member Smeltzer has no serious difficulty in controlling his behavior, Defendants refuse to acknowledge his mental condition has improved, nor have Defendants recommended release. Defendant's yearly reports of Class member Smeltzer's supposed mental condition still reads Class member Smeltzer meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

243.    Defendants have deprived Plaintiff Billy J. Stanley liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Plaintiff Stanley has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants extended the amount of phases they require Plaintiff Stanley to complete from five phases to seven phases, though K.S.A. Statutes' only requirement for completing treatment and release is that Plaintiff Stanley's mental condition has so changed that he is no longer dangerous. K.S.A. Statutes do not require completion of phases. Defendants have never provided Plaintiff Stanley an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and *specific* anticipated time frame for promotion to the next phase and eventual release. Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants have shuffled Plaintiff Stanley from one therapist to another. He has had over twenty therapists in fifteen years. Most of his therapists have not been qualified. They have only been temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Plaintiff Stanley. Defendants overcrowd therapy groups with fifteen residents so that Plaintiff Stanley does not get a fair chance to present his necessary work, receive adequate feedback, and improve enough so that he can advance as appropriate. Defendants cancel

groups several times per quarter so that Plaintiff Stanley does not get a fair chance to improve and advance as appropriate. Defendants have impeded Plaintiff Stanley's progress so that he cannot advance. After fifteen years, Plaintiff Stanley is still stuck in phase three. Defendants have forced Plaintiff Stanley to re-present his autobiography, victim sheets, and relapse prevention plan several times when starting a new group and when getting shuffled to a new therapist, though Plaintiff Stanley had previously completed this requirement. Though Plaintiff Stanley has no serious difficulty in controlling his behavior, Defendants refuse to acknowledge his mental condition has improved, nor have Defendants recommended release. Though Plaintiff Stanley has never engaged in any sexually inappropriate behavior while in SPTP, Defendant's yearly reports of Plaintiff Stanley's supposed mental condition still reads Plaintiff Stanley meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires.*

244.    Defendants have deprived Plaintiff Danny Stanley liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Plaintiff Stanley has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants extended the amount of phases they require Plaintiff Stanley to complete to seven phases, though K.S.A. Statutes' only requirement for completing treatment and release is that Plaintiff Stanley's mental condition has so changed that he is no longer dangerous. K.S.A. Statutes do not require completion of phases. Defendants have never provided Plaintiff Stanley an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and *specific* anticipated time frame for promotion to the next phase and eventual release. Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants have shuffled Plaintiff Stanley from one therapist to another. He has had over six therapists in six years. At least two of his therapists have not been qualified. They have only been temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Plaintiff Stanley. Defendants cancel groups ten to fifteen times per quarter so that Plaintiff Stanley does not get a fair chance to improve and advance as appropriate. Defendants have impeded Plaintiff Stanley's progress so that he cannot advance as appropriate. After six years, Class member Barker is still stuck in phase three. Defendants have impeded Plaintiff

163

Stanley's progress so that he cannot advance as appropriate by holding him back from advancing to the next phase of the program for failing a polygraph. Plaintiff Stanley cannot pass a polygraph because he has a congenital heart defect. Though Plaintiff Stanley has no serious difficulty in controlling his behavior, Defendants refuse to acknowledge his mental condition has improved, nor have Defendants recommended release. Though Plaintiff Stanley has never engaged in any sexually inappropriate behavior while in SPTP, Defendant's yearly reports of Plaintiff Stanley's supposed mental condition still reads Plaintiff Stanley meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

245. Defendants have deprived Class member Nicholas Stape liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Class member Stape has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants extended the amount of phases they require Class member Stape to complete from five phases to seven phases, though K.S.A. Statutes' only requirement for completing treatment and release is that Class member Stape's mental condition has so changed that he is no longer dangerous. K.S.A. Statutes do not require completion of phases. Defendants have never provided Class member Stape an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and *specific* anticipated time frame for promotion to the next phase and eventual release. Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants have shuffled Class member Stape from one therapist to another. He has had over fifteen therapists in nine and three quarters years. At least seven of his therapists have not been qualified. They have only been temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Class member Stape. Defendants overcrowd therapy groups with at least ten residents so that Class member Stape does not get a fair chance to present his necessary work, receive adequate feedback, and improve enough so that he can advance as appropriate. Defendants cancel groups at least six times per quarter so that Class member Stape does not get a fair chance to improve and advance as appropriate. Defendants have impeded Class member Stape's progress so that he cannot advance as appropriate. After nine and three quarters years, Class member Stape is still stuck in phase three. Defendants have

forced Class member Stape to re-present his autobiography, victim sheets, and relapse prevention plan over twelve times when starting a new group and when getting shuffled to a new therapist, though Class member Stape had previously completed this requirement. Defendants have impeded Class member Stape's progress so that he cannot advance as appropriate by dropping him from phase three to phase two because he was in the county jail, when his case was in appeal, and therefore could not keep his criminogenic scores or his attendance up. Though Class member Stape has no serious difficulty in controlling his behavior, Defendants refuse to acknowledge his mental condition has improved, nor have Defendants recommended release. Though Class member Stape has never engaged in any sexually inappropriate behavior while in SPTP, Defendant's yearly reports of Class member Stape's supposed mental condition still reads Class member Stape meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

246.    Defendants have deprived Class member Randal Clay Terrel, Jr. liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Class member Terrel has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants extended the amount of phases they require Class member Terrel to complete to seven phases, though K.S.A. Statutes' only requirement for completing treatment and release is that Class member Terrel's mental condition has so changed that he is no longer dangerous. K.S.A. Statutes do not require completion of phases. Defendants have never provided Class member Terrel an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and *specific* anticipated time frame for promotion to the next phase and eventual release. Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants have shuffled Class member Terrel from one therapist to another. He has had at least four therapists in two years. Only one of his therapists has been qualified. They have only been temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Class member Terrel. Defendants overcrowd therapy groups with ten to twelve residents so that Class member Terrel does not get a fair chance to present his necessary work, receive adequate feedback, and improve enough so that he can advance as appropriate. Defendants cancel groups six times per quarter so that Class member Terrel

does not get a fair chance to improve and advance as appropriate. Defendants have impeded Class member Terrel's progress so that he cannot advance as appropriate by only allowing him to present his required material (autobiography, victim sheets, relapse prevention plan, etc.) three times per quarter. Defendants have twice forced Class member Terrel to re-present his autobiography, victim sheets, and relapse prevention plan when starting a new group and when getting shuffled to a new therapist, though Class member Terrel had previously completed this requirement. Though Class member Terrel has no serious difficulty in controlling his behavior, Defendants refuse to acknowledge his mental condition has improved, nor have Defendants recommended release. Though Class member Terrel has never engaged in any sexually inappropriate behavior while in SPTP, Defendant's yearly reports of Class member Terrel r's supposed mental condition still reads Class member Terrel meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires.*

247.    Defendants have deprived Plaintiff David Thayer liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Plaintiff Thayer has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants extended the amount of phases they require Plaintiff Thayer to complete from five phases to seven phases, though K.S.A. Statutes' only requirement for completing treatment and release is that Plaintiff Thayer's mental condition has so changed that he is no longer dangerous. K.S.A. Statutes do not require completion of phases. Defendants have never provided Plaintiff Thayer an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and *specific* anticipated time frame for promotion to the next phase and eventual release. Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants have shuffled Plaintiff Thayer from one therapist to another. He has had over six therapists in nine and a half years. At least two of his therapists have not been qualified. They have only been temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Plaintiff Thayer. Defendants overcrowd therapy groups with fifteen residents so that Plaintiff Thayer does not get a fair chance to present his necessary work, receive adequate feedback, and improve enough so that he can advance as appropriate. Defendants cancel groups numerous times per quarter so that Plaintiff Thayer does not get a fair chance to improve

166

and advance as appropriate. Defendants have impeded Plaintiff Thayer's progress so that he cannot advance as appropriate. After nine and a half years, Plaintiff Thayer is still stuck in phase three. Defendants have forced Plaintiff Thayer to re-present his autobiography, victim sheets, and relapse prevention plan over six times when starting a new group and when getting shuffled to a new therapist, though Plaintiff Thayer had previously completed this requirement. Defendants have impeded Plaintiff Thayer's progress so that he cannot advance as appropriate by dropping him from phase three to phase one after he was molested by a staff member. Defendants have impeded Plaintiff Thayer's progress so that he cannot advance as appropriate by forcing him to repeat the sixteen basic core classes three times. Defendants have impeded Plaintiff Thayer's progress so that he cannot advance as appropriate by refusing to advance him to the next phase after assigning him to the parallel program. Defendants have impeded Plaintiff Thayer's progress so that he cannot advance as appropriate by refusing to advance him to the next phase because his therapist said he was moving too quickly through the program. Though Plaintiff Thayer has no serious difficulty in controlling his behavior, Defendants refuse to acknowledge his mental condition has improved, nor have Defendants recommended release. Though Plaintiff Thayer has never engaged in any sexually inappropriate behavior while in SPTP, Defendant's yearly reports of Plaintiff Thayer's supposed mental condition still reads Plaintiff Thayer meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

248.    Defendants have deprived Class member Tyrone Tschantz liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Class member Tschantz has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants extended the amount of phases they require Class member Tschantz to complete to seven phases, though K.S.A. Statutes' only requirement for completing treatment and release is that Class member Tschantz's mental condition has so changed that he is no longer dangerous. K.S.A. Statutes do not require completion of phases. Defendants have never provided Class member Tschantz an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and *specific* anticipated time frame for promotion to the next phase and eventual release. Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants have shuffled Class member Tschantz from one therapist to another. He has had at least five therapists in two years. Only one of his therapists has been qualified. They have only been temporary trainees,

167

interns, or post-docs. Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Class member Tschantz. Defendants overcrowd therapy groups with ten to twelve residents so that Class member Tschantz does not get a fair chance to present his necessary work, receive adequate feedback, and improve enough so that he can advance as appropriate. Defendants cancel groups six times per quarter so that Class member Tschantz does not get a fair chance to improve and advance as appropriate. Defendants have impeded Class member Tschantz's progress so that he cannot advance as appropriate by only allowing him to present his required material (autobiography, victim sheets, relapse prevention plan, etc.) two to three times per quarter. Defendants have impeded Class member Tschantz's progress so that he cannot advance as appropriate. After two years, Class member Tschantz is still stuck in phase three. Defendants have twice forced Class member Tschantz to re-present his autobiography, victim sheets, and relapse prevention plan when starting a new group and when getting shuffled to a new therapist, though Class member Tschantz had previously completed this requirement. Though Class member Tschantz has no serious difficulty in controlling his behavior, Defendants refuse to acknowledge his mental condition has improved, nor have Defendants recommended release. Though Class member Tschantz has never engaged in any sexually inappropriate behavior while in SPTP, Defendant's yearly reports of Class member Tschantz's supposed mental condition still reads Class member Tschantz meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

249. Defendants have deprived Plaintiff Vance Walters liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Plaintiff Walters has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants extended the amount of phases they require Plaintiff Walters to complete from three phases to seven phases, though K.S.A. Statutes' only requirement for completing treatment and release is that Plaintiff Walters' mental condition has so changed that he is no longer dangerous. K.S.A. Statutes do not require completion of phases. Defendants have never provided Plaintiff Walters an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and *specific* anticipated time frame for promotion to the next phase and eventual release. Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants have shuffled Plaintiff Walters

168

from one therapist to another. He has had at least nine therapists in twelve years. Most of his therapists have not been qualified. They have only been temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Plaintiff Walters. Defendants overcrowd therapy groups with at least seven residents so that Plaintiff Walters does not get a fair chance to present his necessary work, receive adequate feedback, and improve enough so that he can advance as appropriate. Defendants cancel groups at an unreasonably high level each quarter so that Plaintiff Walters does not get a fair chance to improve and advance as appropriate. Defendants have impeded Plaintiff Walters' progress so that he cannot advance as appropriate. After twelve years, Plaintiff Walters is still stuck in phase three. Defendants have forced Plaintiff Walters to re-present his autobiography, victim sheets, and relapse prevention plan when starting a new group and when getting shuffled to a new therapist, though Plaintiff Walters had previously completed this requirement. Defendants have impeded Plaintiff Walters' progress so that he cannot advance as appropriate by dropping him to phase zero. Though Plaintiff Walters has no serious difficulty in controlling his behavior, Defendants refuse to acknowledge his mental condition has improved, nor have Defendants recommended release. Though Plaintiff Walters has never engaged in any sexually inappropriate behavior while in SPTP, Defendant's yearly reports of Plaintiff Walters' supposed mental condition still reads Plaintiff Walters meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. Defendants refuse to provide Plaintiff Walters adequate amount of treatment/therapy hours. Defendants only provide Plaintiff Walters three hours of treatment/therapy per week. The other so-called twenty hours per week are merely activities, which Defendants force Plaintiff Walters and his fellow Plaintiffs and Class members to attend. Defendants refuse to provide Plaintiff Walters unstructured yard/activity time. Furthermore, Defendants have removed and refuse to provide vocational trade programs for Plaintiff Walters and his fellow Plaintiffs and Class members. As well, Defendants have placed severe restrictions on what Plaintiff Walters can purchase. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

250.    Defendants have deprived Class member Owen Waters liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Class member Waters has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and

169

omissions. Defendants extended the amount of phases they require Class member Waters to complete from three phases to seven phases, though K.S.A. Statutes' only requirement for completing treatment and release is that Class member Waters ' mental condition has so changed that he is no longer dangerous. K.S.A. Statutes do not require completion of phases. Defendants have never provided Class member Waters an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and *specific* anticipated time frame for promotion to the next phase and eventual release. Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Class member Waters. Defendants overcrowd therapy groups with at least eight residents so that Class member Waters does not get a fair chance to present his necessary work, receive adequate feedback, and improve enough so that he can advance as appropriate. Defendants have impeded Class member Waters' progress so that he cannot advance as appropriate by only allowing him to present his required material (autobiography, victim sheets, relapse prevention plan, etc.) once per quarter. Defendants have impeded Class member Waters' progress so that he cannot advance as appropriate. After ten years, Class member Waters is still stuck in phase three. Defendants have forced Class member Waters to re-present his autobiography, victim sheets, and relapse prevention plan when starting a new group and when getting shuffled to a new therapist, though Class member Waters had previously completed this requirement. Defendants have impeded Class member Waters' progress so that he cannot advance as appropriate by holding him back from advancing to the next phase of the program because his therapist and an activity therapist said he was moving too *quickly* through the program. Though Class member Waters has no serious difficulty in controlling his behavior, Defendants refuse to acknowledge his mental condition has improved, nor have Defendants recommended release. Though Class member Waters has never engaged in any sexually inappropriate behavior while in SPTP, Defendant's yearly reports of Class member Waters' supposed mental condition still reads Class member Waters meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

251.    Defendants have deprived Class member Lee Desmond White liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Class member White has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and

170

omissions. Defendants extended the amount of phases they require Class member White to complete from five phases to seven phases, though K.S.A. Statutes' only requirement for completing treatment and release is that Class member White's mental condition has so changed that he is no longer dangerous. K.S.A. Statutes do not require completion of phases. Defendants have never provided Class member White an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and *specific* anticipated time frame for promotion to the next phase and eventual release. Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants have shuffled Class member White from one therapist to another. He has had at least twelve therapists in thirteen years. It is unknown whether any of his therapists have been qualified. They have only been temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Class member White. Defendants overcrowd therapy groups with at least eight residents so that Class member White does not get a fair chance to present his necessary work, receive adequate feedback, and improve enough so that he can advance as appropriate. Defendants cancel groups several times per quarter so that Class member White does not get a fair chance to improve and advance as appropriate. Defendants have impeded Class member White's progress so that he cannot advance as appropriate by only allowing him to present his required material (autobiography, victim sheets, relapse prevention plan, etc.) once or twice per quarter. This quarter Class member White was not allowed to present his material even once. Defendants have impeded Class member White's progress so that he cannot advance as appropriate. After thirteen years, Class member White is still stuck in phase three. Defendants have forced Class member White to re-present his autobiography, victim sheets, and relapse prevention plan when starting a new group and when getting shuffled to a new therapist, though Class member White had previously completed this requirement. Defendants have impeded Class member White's progress so that he cannot advance as appropriate by dropping him from phase two to phase one. Defendants have impeded Class member White's progress so that he cannot advance as appropriate by forcing him to repeat phase two five times because they lost his paperwork, and because they forced him to represent all his material because of starting a new group with a new therapist. Defendants have impeded Class member White's progress so that he cannot advance as appropriate by holding him back from advancing to the next phase of the program for failing a polygraph. Though Class member White has no serious difficulty in controlling his behavior, Defendants refuse to acknowledge his mental condition has improved, nor have Defendants

171

recommended release. Though Plaintiff White has never engaged in any sexually inappropriate behavior while in SPTP, Defendant's yearly reports of Class member White's supposed mental condition still reads Class member White meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

252.    Defendants have deprived Class member Jerry Wilhelmi liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Class member Wilhelmi has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants extended the amount of phases they require Class member Wilhelmi to complete five phases to seven phases, though K.S.A. Statutes' only requirement for completing treatment and release is that Class member Wilhelmi's mental condition has so changed that he is no longer dangerous. K.S.A. Statutes do not require completion of phases. Defendants have never provided Class member Wilhelmi an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and *specific* anticipated time frame for promotion to the next phase and eventual release. Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants have shuffled Class member Wilhelmi from one therapist to another. He has had over seven therapists in ten years. It is unknown whether any of his therapists have been qualified. They have only been temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Class member Wilhelmi. Defendants overcrowd therapy groups with at least nine residents so that Class member Wilhelmi does not get a fair chance to present his necessary work, receive adequate feedback, and improve enough so that he can advance as appropriate. Defendants cancel groups several times per quarter so that Class member Wilhelmi does not get a fair chance to improve and advance as appropriate. Defendants have impeded Class member Wilhelmi's progress so that he cannot advance as appropriate. After ten years, Class member Wilhelmi is still stuck in phase three. Defendants have forced Class member Wilhelmi to re-present his autobiography, victim sheets, and relapse prevention plan four times when starting a new group and when getting shuffled to a new therapist, though Class member Wilhelmi had previously completed this requirement. Defendants have impeded Class member Wilhelmi's progress so that he cannot advance as appropriate by holding him

172

back from advancing to the next phase of the program because his therapist and an activity therapist said he was moving too *quickly* through the program. Though Class member Wilhelmi has no serious difficulty in controlling his behavior, Defendants refuse to acknowledge his mental condition has improved, nor have Defendants recommended release. Though Class member Wilhelmi has never engaged in any sexually inappropriate behavior while in SPTP, Defendant's yearly reports of Class member Wilhelmi's supposed mental condition still reads Class member Wilhelmi meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

253.    Defendants have deprived Plaintiff Travis Williams liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Plaintiff Williams has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants extended the amount of phases they require Plaintiff Williams to complete from five phases to seven phases, though K.S.A. Statutes' only requirement for completing treatment and release is that Plaintiff Williams' mental condition has so changed that he is no longer dangerous. K.S.A. Statutes do not require completion of phases. Defendants have never provided Plaintiff Williams an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and *specific* anticipated time frame for promotion to the next phase and eventual release. Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants have shuffled Plaintiff Williams from one therapist to another. He has had at least thirteen therapists in eleven years. At least eight of his therapists have not been qualified. They have only been temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Plaintiff Williams. Defendants overcrowd therapy groups with twelve to thirteen residents so that Plaintiff Williams does not get a fair chance to present his necessary work, receive adequate feedback, and improve enough so that he can advance as appropriate. Defendants cancel groups several times per quarter so that Plaintiff Williams does not get a fair chance to improve and advance as appropriate. Defendants have impeded Plaintiff Williams' progress so that he cannot advance as appropriate. After twelve years, Plaintiff Williams is still stuck in phase three. Defendants have forced Plaintiff Williams to re-present his autobiography, victim sheets, and relapse prevention plan seven to ten times when starting a new group and when getting

173

shuffled to a new therapist, though Plaintiff Williams had previously completed this requirement. Defendants have impeded Plaintiff Williams' progress so that he cannot advance as appropriate by dropping him to level zero for getting caught with an x-rated DVD, sending him to the Intensive Treatment Unit for two quarters. Defendants have impeded Plaintiff Williams' progress so that he cannot advance as appropriate by forcing him to repeat a phase four different times. Defendants have impeded Plaintiff Williams' progress so that he cannot advance as appropriate by refusing to advance him to the next phase because his Treatment Needs Assessment Scores weren't high enough, and because they "had no room" for him on the next phase. Defendants have impeded Plaintiff Williams' progress so that he cannot advance as appropriate by holding him back from advancing to the next phase of the program because his therapist and an activity therapist said he was moving too *quickly* through the program. Defendants have impeded Plaintiff Williams' progress so that he cannot advance as appropriate by holding him back from advancing to the next phase of the program for failing a polygraph. Though Plaintiff Williams has no serious difficulty in controlling his behavior, Defendants refuse to acknowledge his mental condition has improved, nor have Defendants recommended release. Though Plaintiff Williams has never engaged in any sexually inappropriate behavior while in SPTP, Defendant's yearly reports of Plaintiff Williams' supposed mental condition still reads Plaintiff Williams meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

254.    Defendants have deprived Plaintiff Larry E. Wright liberty on basis of a treatable condition for which they failed and refused to treat the condition in violation of his Fourteenth Amendment Due Process Constitutional rights. Plaintiff Wright has been subject to and injured by Defendants and suffered damages as a direct and proximate result of Defendant's acts and omissions. Defendants have never provided Plaintiff Wright an *Individualized* Treatment Plan with concrete information concerning his criteria to progress through the treatment and *specific* anticipated time frame for promotion to the next phase and eventual release. Defendants' claim promotion and release are indeterminate, are not sufficient. Defendants have shuffled Plaintiff Wright from one therapist to another. He has had at least three therapists in one year. None of his therapists have been qualified. They have only been temporary trainees, interns, or post-docs. Defendants only employ these therapists for one year, long enough for these therapists to receive their training and move on. Defendants only provide three hours of group therapy per week, and one hour of individual therapy per quarter (90 days) to Plaintiff Wright. Defendants overcrowd therapy groups with residents so that

174

Plaintiff Wright does not get a fair chance to present his necessary work, receive adequate feedback, and improve enough so that he can advance as appropriate. Defendants cancel groups at least four times per quarter so that Plaintiff Wright does not get a fair chance to improve and advance as appropriate. Defendants have impeded Plaintiff Wright's progress so that he cannot advance as appropriate by only allowing him to present his required material (autobiography, victim sheets, relapse prevention plan, etc.) once per quarter. Defendants have forced Plaintiff Wright to re-present his autobiography, victim sheets, and relapse prevention plan when starting a new group and when getting shuffled to a new therapist, though Plaintiff Wright had previously completed this requirement. Though Plaintiff Wright has never engaged in any sexually inappropriate behavior while in SPTP, Defendant's yearly reports of Plaintiff Wright's supposed mental condition still reads Plaintiff Wright meets the definition of a person who suffers from a mental abnormality or personality disorder that has not so changed that it would be safe for him to be placed in transitional release at this time. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

255.    As a result of Defendants' acts, omissions, practices and conduct, Plaintiffs and Class members have been deprived of their constitutionally protected liberty interest in receiving adequate treatment.

256.    Defendant's acts and omissions are both shocking and intolerable and a continuing mistreatment of a constitutional stature.

257.    Plaintiff and Class members have been subject to and injured by these alleged violations and suffered the same or similar damages as a direct and proximate result of Defendants' acts, omissions, practices and conduct as specifically set forth above. Unless relief is granted, Plaintiffs and Class members will continue to be injured by and suffer damages as a direct and proximate result of Defendants' acts and omissions specifically set forth above. The remedy of which is immediate release with prejudice.

## Count II

### Violation of the Fifth Amendment to the United States Constitution

258.    Plaintiffs incorporate all previous allegations as if fully set forth herein.

259.    Defendants' Kansas Sexually Violent Predator Act (KSVPA) allows violation of the Fifth Amendment's protection against self-incrimination. The Self-Incrimination Clause of the Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." The Self-Incrimination Clause applies to the States through the Fourteenth Amendment.

175

260.    By involuntarily confining Plaintiffs and Class members at the conclusion of their
criminal sentences, due to asserted mental health disorders, but withholding adequate treatment for
those disorders, Defendants have demonstrated that the KSVPA as applied is so punitive in nature, or
purpose and effect it negates Kansas' civil intent, and therefore violates the Double Jeopardy Clause of
the Fifth Amendment to the United States Constitution. Where a defendant has provided the clearest
proof that the statutory scheme is so punitive either in purpose or effect as to negate the state's intention
that the proceeding be civil, it must be considered criminal. See *United States v. Ward*, 448 U.S. 1242,
248-249, 65 L. Ed. 2d 742, 100 S. Ct. 2636. Double Jeopardy does apply because the sanction to be
imposed in the second proceeding is punitive in nature so that the proceeding is essentially criminal.
See *In re Pers. Restraint of Andre Brigham Young*, 122 Wn. 2d 1.

261.    "[D]ue process requires that the nature of commitment bear some reasonable relation to
the purpose for which the individual is committed." See *Foucha v. Louisiana*, 504 U.S. 71, 79, 112 S.
Ct. 1780, 118 L. Ed. 2d 437 (1992); *Jackson v. Indiana*, 406 U.S. 715, 738, 92 S. Ct. 1845, 32 L. Ed. 2d
435 (1972). On Tuesday, November 12th, 2013, just after noon, Anna Emerson, the wife of Resident
Cecil Emerson, called Angela DeRocha, Kansas Department for Aging and Disability Services
Spokesperson, to complain about Risk Management accusing Cecil of sneaking in contraband. While
discussing this subject Ms. DeRocha told Mrs. Emerson, "To begin with this program was not designed
to be a treatment program. It was created because those men are a danger to themselves and the
general public." Defendants clearly do not view the program as a real treatment program. In Ms.
DeRocha's own words, the program is designed to confine the Plaintiffs and Class members because
they consider them dangerous, not to provide them treatment. SPTP therefore does *not* bear some
reasonable relation to the purpose for which the Plaintiffs and Class members were committed. SPTP
therefore is used simply to impose punishment, a mechanism for retribution or general deterrence.
Where the treatment provisions were adopted as a sham or mere pretext, indicating the forbidden
purpose to punish. See *Kansas v. Hendricks*, 521 U.S. 346 at [2087] JUSTICE KENNEDY, and
*Kansas v. Hendricks*, 521 U.S. 346 beginning at [2090] DISSENT BY: JUSTICE BREYER. Evidence
the KSVPA as applied is punitive in nature, and therefore violates not only the Ex Post Facto Clause of
the United States Constitution, but the Double Jeopardy Clause of the Fifth Amendment to the United
States Constitution as well.

262.    According to the Yearly Reports of Plaintiffs and Class members Ronald Alan Baker,
Steven Earl Roberts, Danny Wassell Stanley, Tyrone R. Tschantz, and Harvey Darrel Hickman. On
every conclusion on every Plaintiffs' and Class members' Yearly Report, Defendants state...

176

'Therefore,... Mr.... remains a "sexually violent predator" because he continues to meet the definition of "a person who *has been* convicted of a sexually violent offense," to wit..., and who suffers from a mental abnormality or personality disorder which makes it likely that he will engage in repeat acts of sexual violence. I further conclude that Mr.... mental abnormality or personality disorder has not so changed that it would be safe for Mr.... to be placed in Transitional Release at this time.' Defendants use no actuarial instruments to measure Plaintiffs' or Class members' *current* mental condition from which they form their conclusion. Defendants base their conclusion solely on Plaintiffs' and Class members' *past* conviction of a sexually violent offense, not on their *current* mental condition. Since Plaintiffs and Class members have already served their punishment for their past convictions, yet Defendants continue to confine Plaintiffs and Class members based solely on those past convictions, Defendants have made the KSVPA as applied so punitive in nature that it violates the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, that it does *not* bear some reasonable relation to the purpose for which the Plaintiffs and Class members were committed, that it is used simply as a mechanism for retribution, and that it is both shocking and intolerable and a continuing mistreatment of a constitutional stature. See *Exhibit J, Integrated Treatment Plans and Yearly Reports of Resident's Mental Condition of Plaintiffs and Class members Ronald Alan Baker, Steven Earl Roberts, Danny Wassell Stanley, Tyrone R. Tschantz, and Harvey Darrel Hickman.*

263.    The Kansas Sexually Violent Predator Act (KSVPA) does not require a finding of mental illness to confine someone in a civil proceeding. That failure means that the Act violates constitutional due process requirements. The Hendricks Court should have upheld the decision of the Kansas Supreme Court on this issue, and found the Act unconstitutional. Furthermore, despite the civil label attached to the Kansas statute, Hendricks' confinement is "punishment" for a criminal act, and therefore violates the Double Jeopardy and Ex Post Facto Clauses of the United States Constitution. See *Journal of Criminal Law & Criminology, Spring,* 1998, 88J. Crim. L. & Criminology 985, *SUPREME COURT REVIEW: "MENTAL ILLNESS": A SEXUALLY VIOLENT PREDATOR IS PUNISHED TWICE FOR ONE CRIME,* By Eli M. Rollman.

264.    The Hendricks Court should have held that because the Act does not require a finding of "mental illness," the law fails to meet one of the constitutional requirements in the two – prong test for civil commitment set out in *Addington v. Texas*, 441 U.S. 418 (1979). While the Act requires a finding of "mental abnormality or personality disorder," such language fails the Addington test - contrary to Justice Thomas' opinion that it is equivalent to "mental illness." Though the Court has used various language to convey the same meaning as "mental illness," Justice Thomas failed to address the telling

177

factor that the Kansas legislature itself admitted that persons covered by the Act do not have a mental illness. Granted, the Court has consistently allowed the states flexibility in their choice of statutory language. In this instance, however, the choice language used in the Violent Sexual Offender Act must be analyzed in conjunction with the Kansas general civil commitment statute, which is specifically applicable to mentally ill individuals. By contrast, the Violent Sexual Offender Act does not require a finding of mental illness. In fact, according to the Kansas legislature, it was enacted specifically to apply to a category of individuals who are not mentally ill. Regardless of Kansas' interest in confining dangerous sexual offenders, it may not do so in a civil proceeding absent a finding of mental illness. The people to whom the Act applies do not suffer from mental illness, and therefore could not be held under the general civil commitment statute. See *Treatment Act For Mentally Ill Persons*, Kan. Stat. Ann. § 59-2901 to § 59-2941, §59-2943, § 59-2944. *Journal of Criminal Law & Criminology,* Spring, 1998, 88J. Crim. L. & Criminology 985, *SUPREME COURT REVIEW: "MENTAL ILLNESS": A SEXUALLY VIOLENT PREDATOR IS PUNISHED TWICE FOR ONE CRIME*, By Eli M. Rollman.

265.    Notwithstanding the Act's placement in the state's civil code, Kansas punishes Hendricks by subjecting him to the Act's proceedings. In so doing, the state violates the constitutional prohibitions against double jeopardy and ex post facto laws. Hendricks and the State of Kansas agree that the Double Jeopardy and Ex Post Facto Clauses apply only in the case of a criminal sanction, not a civil one. Therefore, the issue is whether, despite the Act's "civil" label, it should be considered "criminal." The first step of the two – step Allen test (*Allen v. Illinois*, 478 U.S. 364, 368 (1986)) is to look at the language of the statute itself. While the Act is in the civil code, that is not the central concern of the legislature. The obvious objective of the Act was the removal from the community of certain persons who are thought likely to commit a crime. Also relevant is the fact that the structure of the Act in several ways is similar to a typical criminal law. Like criminal imprisonment, the result of civil commitment is involuntary incarceration, and that incarceration is a basic objective of the Act. The confinement triggered by the Act is imposed only on persons who have committed a crime. Procedures and standards implemented under the Act, including the use of prosecutors and defense attorneys, trial by jury, and a requirement of proof beyond a reasonable doubt, are "traditionally associated with the criminal law." Applying the second step of the Allen test and looking behind the Act's "civil" label bolsters the argument that its intent and/or effect is obviously punishment. First, legislative history sheds light on the legislature's goals. Then - Kansas State Attorney General Robert Stephan made abundantly clear his belief that dangerous sex offenders should never be released. Then – Kansas Special Attorney General, (later) Kansas Attorney General Carla Stoval agreed, "We cannot

open our prison doors and let these animals back into our communities. If we do – we are accomplices to the atrocities which they will surely commit." Testimony during hearings on the Act showed the lack of concern about treatment. A representative of the Kansas Psychological Association cautioned that permanent incarceration would result from civil commitment. However, the legislature's purpose in enacting the statute was simply to incarcerate persons such as Hendricks. Treatment was not on the agenda. The lack of treatment for Hendricks was not due to a determination by the Kansas legislature that there is no effective treatment for violent sexual offenders. Rather, the State has paid lip service to providing treatment, but only as an excuse to indefinitely detain individuals such as Hendricks. The State's interest in confining Hendricks is admittedly a legitimate one: Kansas is predicting that he will commit a crime in the future. Hendricks might very well agree with such a prediction. Nevertheless, the Constitution does not allow for imprisonment based on a prediction of future criminal conduct. In Foucha (*Foucha v. Louisiana*, 504 U.S. 71 (1992)), the Court unequivocally held that a prediction of dangerousness, standing alone, is not enough to allow the State to impose civil confinement. Additional proof of the Kansas legislature's primarily punitive goal in creating the Act lies in the fact that the Act does not provide methods less restrictive than incarceration. The use, or at a minimum the consideration, of less restrictive methods would be expected if the legislature's goal were truly non-punitive. Therefore, even though the statute has a civil label, the Court should have held that punishment is the intent of the Act. To further punish Hendricks, who already had been sentenced to serve time in prison, and who already had served that time, constitutes a violation of the Ex Post Facto and Double Jeopardy Clauses of the United States Constitution. See *Treatment Act For Mentally Ill Persons*, Kan. Stat. Ann. § 59-2901 to § 59-2941, §59-2943, § 59-2944. *Journal of Criminal Law & Criminology,* Spring, 1998, 88J. Crim. L. & Criminology 985, *SUPREME COURT REVIEW: "MENTAL ILLNESS": A SEXUALLY VIOLENT PREDATOR IS PUNISHED TWICE FOR ONE CRIME*, By Eli M. Rollman.

266.    The Supreme Court erred in *Kansas v. Hendricks*, 521 U.S. 346 by allowing the civil commitment of Leroy Hendricks under the Kansas Sexually Violent Predator Act. The Court should have held that the Act does *not* satisfy the Addington test for civil commitment (*Addington v. Texas*, 441 U.S. 418 (1979). The Addington Court established that a finding of "mental illness" is a requisite for civil commitment. The Kansas Sexually Violent Predator Act falls short of requiring such a finding, and therefore should have been struck down as a violation of due process. Furthermore, the clear intent of Kansas in implementing the Act is to punish the perpetrators of sex crimes above and beyond whatever sanctions are applied in the state criminal justice system. A second punishment for a single

crime runs afoul of the Constitution's prohibition on double jeopardy. See *Treatment Act For Mentally Ill Persons*, Kan. Stat. Ann. § 59-2901 to § 59-2941, §59-2943, § 59-2944. *Journal of Criminal Law & Criminology,* Spring, 1998, 88J. Crim. L. & Criminology 985*, SUPREME COURT REVIEW: "MENTAL ILLNESS": A SEXUALLY VIOLENT PREDATOR IS PUNISHED TWICE FOR ONE CRIME*, By Eli M. Rollman.

267.    Mental Health America (MHA) believes that these (sexual predator) laws do not constitute sound public policy. They focus on punishment rather than treatment, deal with people who often do not have a treatable mental illness, increase stigma, distort civil commitment, risk the safety of other persons in mental health facilities, divert resources from mental health care and inappropriately burden the mental health system with a criminal justice function for which it is not funded or equipped. See *Exhibit C: Mental Health America, Position Statement 55: Confining Sexual Predators in the Mental Health System*.

268.    The KSVPA statute *does* violate the Double Jeopardy Clause of the United States Constitution's Fifth Amendment. The State did enact the statute with punitive intent and therefore establishes criminal proceedings. Initiation of commitment proceedings under the statute against a person upon his imminent release from prison after serving a sentence for the offense(s) which led to his being declared a violent sexual predator *does* constitute a second prosecution. The provision *does* impose punishment because the state *did* enact the statute with punitive intent, establishing criminal proceedings and punitive involuntary civil commitment pursuant to the statute. Choosing to set apart any group of people and deny them civil, constitutional, and human rights threatens the rights of every person in our nation.

269.    The KSVPA statute *does* violate the Double Jeopardy Clause of the United States Constitution's Fifth Amendment with punitive intent because it *does not* afford Plaintiffs and Class members the same status as others who have been civilly committed, *denies* adequate recommended treatment, and *does not* permit immediate release upon a showing that the Plaintiff or Class member is no longer dangerous or mentally impaired. Commitment under the Act *does* implicate criminal punishment because it *is* retributive. The Act separates SVP's from *all* other civil commitments. The conditions surrounding the confinement are *not* the same conditions for any other civilly committed patient and therefore *do* suggest a punitive purpose. The confinement's potentially indefinite duration is linked to a punitive objective because Plaintiffs and Class members are *not* permitted *immediate* release upon a showing that they are no longer dangerous, even though their mental abnormality no longer caused them to be a threat to others. Defendants do not measure Plaintiff's and Class member's

dangerousness or mental abnormality, their excuse is that Plaintiffs and Class members must complete all phases of the program, though the longest a Plaintiff or Class member can be legally detained pursuant to a single judicial proceeding is one year. Defendants violate this rule continuously by refusing to measure Plaintiff's and Class member's dangerousness or mental abnormality and by refusing to release Plaintiffs and Class members immediately when they are no longer dangerous, or when their mental abnormality or personality disorder no longer causes them to be a threat to others.

270.    In *Kansas v. Hendricks*, the KSVPA was found constitutional because, "the committing court was obligated to conduct an annual review to determine whether continued detention was warranted. Kan. Stat. Ann. § 59-29a08." And, "even without the Secretary's permission, the confined person could at any time file a release petition. Kan. Stat. Ann. § 59-29a11. If the court found that the State could no longer satisfy its burden under the initial commitment standard, the individual would be freed from confinement." Defendants do not conduct an annual review to determine whether continued detention is warranted. Defendants prepare a document by an unqualified "professional." In the document, Defendants merely state on every Plaintiff's and Class member's so-called *Yearly Report of Resident's Mental Condition* that, "In order to successfully complete the program, residents are required to complete *all* phases of the program, including any and all requisites associated with each phase, to the satisfaction of the program." Defendants fail and refuse to examine each Plaintiff's and Class member's current mental condition yearly to determine whether continued detention is warranted. Furthermore, Defendants fail and refuse to measure Plaintiff's and Class member's current mental condition to determine that said mental abnormality or personality disorder has or has not so changed that Plaintiffs and Class members are safe to be released. Instead, Defendants, without examining Plaintiff's and Class member's current mental condition, merely conclude that Plaintiffs and Class members remain dangerous and that their mental abnormality or personality disorder has not so changed that it would be safe to place them in Transitional Release at this time. See *Exhibit J, Integrated Treatment Plans and Yearly Reportsof Resident's Mental Condition of Plaintiffs and Class members Ronald Alan Baker, Steven Earl Roberts, Danny Wassell Stanley, Tyrone R. Tschantz, and Harvey Darrel Hickman*. Yet, in *Kansas v. Hendricks*, Dr. William S. Logan, a forensic psychiatrist, stated that it was not possible to predict with any degree of accuracy the future dangerousness of a sex offender. See *Kansas v. Hendricks*, 521 U.S. 346.

         *Kansas v. Hendricks*, 'States have in certain narrow circumstances provided for the forcible civil detainment of people who are unable to control their behavior and who thereby pose a danger to the public health and safety... The statute thus requires proof or more than a mere

181

predisposition to violence; rather, it requires evidence of past sexually violent behavior and a present mental condition that creates a likelihood of such conduct in the future if the person is not incapacitated... A finding of dangerousness, standing alone, is ordinarily not a sufficient ground upon which to justify indefinite involuntary commitment... It requires a finding of future dangerousness, and then links that finding to the existence of a "mental abnormality" or "personality disorder" that makes it difficult, if not impossible, for the person to control his dangerous behavior. Kan. Stat. Ann. § 59-29a02(b)(1994)... Although we recognize that a "civil label is not always dispositive," *Allen v. Illinois*, 478 U.S. 364, 366, 92 L. Ed. 2d 296, 106 S. Ct. 2988 (1986) at 369, we will reject the legislature's manifest intent only where a party challenging the statute provides "the clearest proof" that "the statutory scheme [is] so punitive either in purpose or effect as to negate [the State's] intention" to deem it "civil." *United States v. Ward*, 448 U.S. 242, 248-249, 65 L. Ed. 2d 742, 100 S. Ct. 2636 (1980). In those limited circumstances, we will consider the statute to have established criminal proceedings for constitutional purposes.' See *Kansas v. Hendricks*, 521 U.S. 346. Without proof of Plaintiff's and Class member's *present* mental condition, Defendants cannot link future dangerousness to the existence of a *current* "mental abnormality" or "personality disorder," nor can they even prove future dangerousness alone for Plaintiffs and Class members, without a true, current mental evaluation, by a qualified professional, of each and every Plaintiff and Class member. The court should therefore reject Kansas legislature's and Defendant's manifest intent because Plaintiffs and Class members have provided "the clearest proof" that "the statutory scheme [is] so punitive... as to negate [the State's] intention" to deem it "civil." The court must therefore consider the statute consider the statute to have established criminal proceedings for constitutional purposes. Since Defendants cannot satisfy its burden under the initial commitment standard, Plaintiffs and Class members must be freed from confinement.

271.    Consider the Justice Breyer's dissent in *Kansas v. Hendricks*. Justice BREYER, with whom Justices STEVENS and SOUTER join, and with whom Justice GINSBURG joins as to Parts II and III, dissenting. See *Kansas v. Hendricks*, 521 U.S. 346. Defendants did not provide Hendricks with any treatment until after his release from prison and only adequate treatment thereafter. Justice Breyer finds these features of the Act convince him that the Act was not simply an effort to commit Hendricks civilly, but an effort to inflict further punishment upon him. As well, Defendants have not provided a majority of Plaintiffs and Class members with any treatment until after their release from prison and for all Plaintiffs and Class members, only inadequate treatment thereafter. Justice Breyer is correct, the Act is not simply an effort to commit Plaintiffs and Class members, but an effort to inflict further punishment upon them. The Ex Post Facto Clause therefore prohibits the Act's application to

182

Plaintiffs and Class members who committed their crimes prior to its enactment. The Double Jeopardy Clause also prohibits the Act's application to Plaintiffs and Class members who have already been punished for their crimes.

U.S. Supreme Court Justices should have upheld the Kansas Supreme Court ruling that Kansas had not satisfied the "mentally ill" requirement of the Due Process Clause because Plaintiffs and Class members, like Hendricks, are not "mentally ill." And that Kansas has not satisfied what the court believes is a "substantive due process" requirement, the provision of treatment. Most Plaintiffs and Class members have been diagnosed with a paraphilia, especially pedophilia. Justice Breyer cites R. Slevenko, *Psychiatry and Criminal Culpability* 57 (1995) and Schopp & Sturgis, *Sexual Predators and Legal Mental Illness for Civil Commitment*, 13 Behav. Sci. & The Law 437, 451-452 (1995) testimony that paraphilias are not mental illness and the mental illness requirement is therefore not satisfied. The Kansas Supreme Court concluded that Hendricks' confinement violated the Due Process Clause because the Due Process Clause requires a State to provide treatment. Defendants have not provided Plaintiffs and Class members with adequate treatment and therefore Plaintiff's and Class member's confinement also violates the Due Process Clause, as Justice Breyer opines in *Kansas v. Hendricks*.

Kansas argues pedophilia can be treated but it has not provided that treatment adequately. The Due Process Clause forbids the confinement of Plaintiffs and Class members unless Kansas provides them with the treatment it concedes is available. Treatment provided, being inadequate, therefore violates Plaintiff's and Class member's Due Process rights, and the KSVPA as applied is therefore unconstitutional, the remedy of which is immediate release of all Plaintiffs and Class members with prejudice.

KSVPA violates the Federal Constitution's Ex Post Facto Law because it inflicts a greater punishment on Plaintiffs and Class members than did the law "annexed to" their "crimes" when they "committed" them. The Ex Post Facto Clause "forbids the application of any new punitive measure to a crime already consummated." Though U.S. Supreme Court Justices found the Act is not "punitive," Justice Breyer disagrees. Citing resemblances between the Act's "civil commitment" and traditional criminal punishments: like criminal imprisonment, the Act's civil commitment amounts to "secure" confinement and "incarceration against one's will;" those whom the Act confines and ordinary prisoners are treated alike; a basic objective of the Act is incapacitation, which, as *Blackstone* said in describing an objective of criminal law, is to "deprive the party injuring of the power to do future mischief;" incapacitation is one important purpose of criminal punishment; "one of the reasons society

imprisons those convicted of crimes is to keep them from inflicting future harm, but that does not make imprisonment any less punishment;" the Act, like criminal punishment, imposes that confinement (or sanction) only upon an individual who has previously committed a criminal offense; the Act imposes that confinement through the use of persons (county prosecutors), procedural guarantees (trial by jury, assistance of counsel, psychiatric evaluations), and standards ("beyond a reasonable doubt") traditionally associated with the criminal law; criminal behavior triggers the Act; the presence of criminal law-type procedures. If these obvious similarities cannot by themselves prove that Kansas' "civil commitment" statute is criminal, neither can the word "civil" written into the statute, KSA § 59-29a01, by itself prove the contrary. The Court has reiterated that a "civil label is not always dispositive," that in close cases the label is "not of paramount importance."

According to Justice Breyer, "'I would place particular importance upon those features that would likely distinguish between a basically punitive and a basically non-punitive purpose, when the State believes that treatment does exist, and then couples that admission with a legislatively required delay of such treatment (as Kansas does) until a person is at the end of his jail term (so that further incapacitation is therefore necessary), such a legislative scheme begins to look punitive."

In *People v. Allen* the State Supreme Court had found the proceedings "essentially civil" because the statute's aim was to provide "treatment, not punishment." Kansas' scheme is essentially as punitive as that imposed upon felons without "adequate" "care and treatment... designed to effect recovery." The KSVPA is not non-punitively motivated as evidenced by the fact it confines because of a dangerous mental abnormality but does not adequately seek to help the individual overcome that abnormality. According to Justice Breyer, 'a statutory scheme that provides confinement that does not reasonably fit a practically available, medically oriented treatment objective, more likely reflects a primary punitive legislative purpose. The State Supreme Court here (Kansas), unlike the state court in *Allen*, has held that treatment is not a significant objective of the Act. The Kansas court wrote that the Act's purpose is "segregation of sexually violent offenders" with "treatment" a matter that was "incidental at best." By way of contrast, in *Allen* the Illinois court had written that "treatment, not punishment" was "the aim of the statute." Ordinarily "we must... accept the State Court's view of the purpose of its own law." The record provides support for the Kansas court's conclusion. The Kansas statute insofar as it applies to previously convicted offenders, such as Hendricks (and Plaintiffs and Class members), commits, confines, and treats those offenders after they have served their entire criminal sentence. The time-related circumstances seem deliberate. An Act that simply seeks confinement, of course, would not need to begin civil commitment proceedings sooner. This is to say,

184

the timing provisions of the statute confirm the Kansas Supreme Court's view that treatment was not a particularly important legislative objective. Testimony of Terry Davis, SRS Director of Quality Assurance (pointing out that treatment under the Act takes place in surroundings very similar to those in which prisoners receive treatment). See Testimony of Dr. Befort at State Habeas Corpus Proceeding (stating that Kansas offers similar treatment, on a voluntary basis to prisoners). Kansas need not postpone treatment in order to make certain that sex offenders serve their full terms of imprisonment, i.e., to make certain they receive the entire punishment that Kansas criminal law provides. To the contrary, the statement in the Act itself, that the Act aims to respond to special "long term" "treatment needs," suggests that treatment should begin during imprisonment." If long-term treatment needs, rather than further punishment were "Kansas' primary aim, the state would require that treatment begins soon after conviction, not 10 or more years later." The Statute does not require the committing authority to consider the possibility of using less restrictive alternatives, such as post release supervision, halfway houses, or other methods that *amici* supporting Kansas here have mentioned. The laws of many other states require such a consideration. This Court has said that a failure to consider or to use, "alternative and less harsh methods" to achieve a non-punitive objective can help to show that legislature's "purpose... was to punish." Legislation that seeks to help the individual offender as well as to protect the public would avoid significantly greater restriction of an individual's liberty than public safety requires. Legislation that seeks almost exclusively to incapacitate that individual through confinement, however, would not necessarily concern itself with potentially less restrictive forms of incapacitation. I would re-emphasize that this is not a case in which the State claims there is no treatment potentially available. Rather, Kansas, and supporting *amici*, argue that pedophilia is treatable. Six states with laws that seek to protect the public from mentally abnormal, sexually dangerous individuals (unlike Kansas) require consideration of less restrictive alternatives. Only one state other than Kansas, namely Iowa, both delays civil commitment (and consequent treatment) and does not explicitly consider less restrictive alternative. But the law of that State applies prospectively only, thereby avoiding *ex post facto* problems. Thus the practical experience of other States, as revealed by their statutes, confirms what the Kansas Supreme Court's finding, the timing of the civil commitment proceeding, and failure to consider less restrictive alternatives, themselves suggest, namely, that for *Ex Post Facto* Clause purposes, the purpose of The Kansas Act (as applied to previously convicted offenders) has a punitive, rather than a purely civil, purpose.'

According to Justice Breyer, 'When a State decides offenders can be treated and confines an offender to provide that treatment, but then refuses to provide it, that refusal to treat while a person

is fully incapacitated begins to look punitive... There is no evidence in the record that contradicts the finding of the Kansas court. Thus, *Allen's* approach - - its reliance on the State Court - - if followed here would mean the Act as applied is punitive... In *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 9 L. Ed. 2d 644, 83 S. Ct. 554 (1963), this court listed seven factors that helped it determine whether a particular statute was primarily punitive for purposes of applying the Fifth and Sixth Amendments. Those factors include whether a sanction involves an affirmative restraint, how history has regarded it, whether it applies to behavior already a crime, the need for a finding of scienter, its relationship to a traditional aim of punishment, the presence of a non-punitive alternative purpose, and whether it is excessive in relation to that purpose. This Court has said these seven factors are "neither exhaustive nor dispositive," but nonetheless "helpful." *Ward*, 448 U.S. At 249. I believe the Act before us involves an affirmative restraint historically regarded as punishment; imposed upon behavior already a crime after a finding of scienter; which restraint, namely confinement, serves a traditional aim of punishment, doe not primarily serve an alternative purpose (such as treatment) and is excessive in relation to any alternative purpose assigned. The statutory provisions before us do amount to punishment primarily because, as I have said, the legislature did not tailor the statute to fit the non-punitive civil aim of treatment, which it concedes exists in Hendrick's case. The Clause in these circumstances does not stand as an obstacle to achieving important protections for the public's safety; rather it provides an assurance that, where so significant a restriction of an individual's basic freedoms is at issue, a State cannot cut corners. Rather, the legislature must hew to the Constitution's liberty – protecting line.' The fact that Defendants have not provided Plaintiffs and Class members with "adequate treatment" makes the KSVPA punitive and unconstitutional as applied. Plaintiffs and Class members have been and continue to be injured by Defendant's shocking and intolerable continuing mistreatment of a constitutional stature. The remedy of which is immediate release with prejudice.

272. The *September 2013 Legislative Post Audit Report* mentions Kansas' SPTP requires Plaintiff's and Class member's risk level for re-offending be reduced to 'practically nil' before they can be released from confinement. See *Exhibit H, 2013 Legislative Post Audit Committee, Performance Audit Report, Larned State Hospital: Reviewing the Operations of the Sexual Predator Treatment Program*. This is an impossible standard which makes it impossible for Plaintiffs and Class members to "progress through the program as appropriate." See *Exhibit B, 2013 Larned State Hospital Fiscal Budget Report*, page 700. As well, this impossible standard makes it impossible for Plaintiffs and Class members to "be cured or to improve the mental condition for which they were confined" so they may be released. See *Turay v. Seling*, 108 F. Supp. 2d 1148. Defendants design of a program with

impossible release standards makes the SPTP egregiously over-restrictive and impermissibly punitive, which therefore violates the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution.

273.    Defendants fail and refuse to abide by the "built-in year-long limit to a single commitment after which time, the court must again determine beyond a reasonable doubt that the individual still satisfies the commitment standard." No court hearing upon yearly review is ever · triggered to make such a determination. In fact, Defendants have written a limit to when a hearing can be called for into the KSVPA. See K.S.A. § 59-29a11(a) "Nothing in this act shall prohibit a person from filing a petition for transitional release, conditional release or final discharge pursuant to this act. However, if a person has previously filed a petition for transitional release, conditional release or final discharge *without the secretary of the department of social and rehabilitation services approval* and the court determined either upon review of the petition or following a hearing, that the petitioner's petition was frivolous or that the petitioner's condition had not so changed that the person was safe to be at large, then *the court shall deny the subsequent petition* unless the petition contains facts upon which a court could find the condition of the petitioner had so changed that a hearing was warranted. Upon receipt of a first or subsequent petition from committed persons without the secretary's approval, the court shall endeavor whenever possible to review the petition and determine if the petition is based upon frivolous grounds and if so *shall deny the petition without a hearing*." Defendants do not provide the yearly hearing to determine beyond a reasonable doubt that Plaintiffs and Class members still satisfy the commitment standard, which is required to make the KSVPA Constitutionally permissible. In fact, Plaintiff's and Class member's yearly reports state, "Annual Notice Of Right To Petition For Release From Treatment Over The Secretary's Objection." Defendants do not provide the hearing for yearly review, they *object* to it. If Plaintiffs and Class members want their right to a yearly hearing they must file the petition themselves (provided they can figure out how – most have no lawyer). Unfortunately, most courts reject the Plaintiff's and Class member's petitions and deny them their right to a yearly hearing. Furthermore, if the court feels the first petition filed by a Plaintiff or Class member for his rightful yearly hearing was "frivolous" all subsequent petitions will therefore be "denied without a hearing." Most lawyers assigned by the court to represent Plaintiffs and Class members refuse to file the petition for the Plaintiffs and Class members, and when Plaintiffs and Class members attempt to file their own petition the court tells them they cannot file without a lawyer. This makes the KSVPA as applied egregiously over restrictive and impermissibly punitive because Defendants in reality *do not* limit the duration of Plaintiff's and Class member's confinement.

187

Defendants fail and refuse to permit immediate release upon a showing that the Plaintiff or Class member is no longer dangerous or mentally impaired.

274.    KSVPA is over broad and vague because it does not define the terms "violent" and "predator" and because a person may be found to be a SVP based on hearsay from a police report or on allegations of a sex crime for which the person has been acquitted. Judges at civil commitment proceedings and the KSVPA should carefully scrutinize prior evaluations of sex offenders performed by non-testifying experts and factual information concerning offenses contained in pre-sentence investigation reports ("PSI's") or in Medical Evaluations so that their use is not abused. Thus, the fact that a testifying expert may claim that factual information contained in PSI's or Medical Evaluations (which the SVP may deny as true) is of the type of information "reasonably relied upon" by experts in their field, should not automatically shield such hearsay from scrutiny under N.J.R.E. 703. AE.F. 377 N.J. SUPER. At 490-493. See also N.J.S.A. 30:4-27.27(b)(c). Defendants admitted hearsay evidence into the trial of all Plaintiffs and Class members to civilly commit them.

275.    The Supreme Court held – that the Fifth Amendment right against compelled self-incrimination is not violated by a prison sexual-abuse treatment program which imposes loss of various prison privileges for failure to participate in a counseling program that requires the inmates to complete an unprivileged sexual history form which details all prior sexual activities, regardless of whether such activities constitute uncharged criminal offenses. In upholding the constitutionality of the treatment program both the plurality and the concurring Justices noted that failure to participate did not affect eligibility for good time credits or parole. Yet, the Superior Court of New Jersey, Appellate Division, invalidated a New Jersey statute to the extent it permitted good time credits to be withheld or revoked based upon a prisoner's refusal to disclose information about past events for which he could face subsequent prosecution. *Bender v. New Jersey Dept. of Corrections*, 356 N.J. Super. 432, 812 A.2d 1154 (App. Div. 2003). *Donhauser v. Goord*, 314 F. Supp. 2d 119, 127 (N.D.N.Y. 2004) holds that ("requiring plaintiffs as part of the [sexual offender counseling program] to divulge a history of sexual conduct, including illegal acts for which no criminal charges have been brought, or else face a loss of good time credits, violates his Fifth Amendment privilege against self-incrimination"). The Fifth Amendment right against self-incrimination remains available to a prisoner (and a civilly-committed SVP) despite his conviction. See *Minnesota v. Murphy*, 464 U.S. 420, 426, 104 S. Ct. 1136, 79 L. Ed. 2d 409 (1984). "When a witness can demonstrate a fear of prosecution, which is more than fanciful or merely speculative, he has a claim of privilege that meets constitutional muster." *In re Corrugated Container Antitrust Litigation*, 213 U.S. App. D.C. 319, 662 F. 2d 875, 883 (D.C. Cir. 1981) (citing *In*

188

*re Folding Carton Antitrust Litigation*, 609 F. 2d 867, 871 (7th Cir. 1979). See *Fournier v. Corzine*, 2007 U.S. Dist. LEXIS 54110.

Supreme Court Justices erred when they held, the Fifth Amendment right against compelled self-incrimination is not violated by a prison sexual-abuse treatment program which imposes loss of various privileges for failure to participate in a counseling program that requires the inmates to complete an unprivileged sexual history form which details all prior sexual activities, regardless of whether such activities constitute uncharged criminal offenses. Defendants use information gathered from Plaintiff's and Class member's unprivileged sexual history forms while they are participating in the Sex Offender Treatment Program while completing their sentence in the Kansas Department of Corrections as coerced evidence during what amounts to a criminal trial, disguised as a sexually violent predator civil commitment hearing, that violates Plaintiff's and Class member's Fifth Amendment privilege against self-incrimination constitutional rights, because Defendants (namely the Attorney General through his representative) enters Plaintiff's and Class member's sexual history forms into evidence and presents them as evidence regardless of Plaintiff's and Class member's objections at their SVP hearings. This evidence is used to civilly-commit Plaintiffs and Class members against their will. Defendants *do* withhold good time credits based upon Plaintiffs and Class members refusal to disclose information about past events for which he could face subsequent prosecution. Furthermore, Defendants withhold parole from Plaintiffs and Class members based upon Plaintiffs and Class members refusal to disclose information. Then Defendants use this very same information to civilly-commit Plaintiffs and Class members. Defendants withhold good time credits and parole through craft and deceit. First, Plaintiffs and Class members are forced to participate in the Sex Offender Treatment Program. Refusal to participate results in loss of privileges and/or forced segregation. As part of this punishment for not participating, Plaintiff's and Class member's Unit Team Counselor withholds a portion of their good time credits at their next review. Any Plaintiff or Class member who is reviewed for parole will be passed by the parole board based on his disciplinary record. Furthermore, if Plaintiffs and Class members agree to participate in Sex Offender Treatment Program while in the K.D.O.C., but refuse to disclose information about past events for which he could face subsequent prosecution, Defendants punish Plaintiffs and Class members refusal by kicking them out of the Sex Offender Treatment Program. Any Plaintiff or Class member kicked out of the program is punished through a loss of privileges and/or forced segregation. During Plaintiffs and Class members next review the Unit Team Counselor will withhold a portion of their good time credits. At Plaintiff's or Class member's next parole hearing, Plaintiffs and Class members are passed by the parole board based

on his disciplinary record.

Plaintiffs and Class members can demonstrate realistic fear of prosecution which is more than fanciful and speculative. Plaintiffs and Class members suffer the very *real* possibility that Plaintiffs and Class members could be subject to future prosecution for admitting their responsibility for the crimes for which they were not convicted. Plaintiff's and Class member's real fear of prosecution stems from the very real admission of their responsibility for the crimes for which they were not convicted. Defendants prosecute Plaintiffs and Class members against their will, withholding Plaintiff's and Class member's liberty rights.

Finally, Plaintiffs and Class members can demonstrate real fear of prosecution while in the KSVPA SPTP program since their therapists admit that they have a duty to report any unprosecuted crimes admitted to by Plaintiffs and Class members. Yet, to advance through the program as appropriate Defendants force Plaintiffs and Class members to admit their responsibility for the crimes for which they were convicted and for crimes for which they were not convicted. The possibility that Plaintiff's admissions during their therapy and treatment programs could, in a very real way, subject Plaintiffs and Class members to future prosecution for admitting their responsibility for the crimes of which they were convicted and were not convicted. This is not remote, nor speculative. Therapists, namely Tapatha Strickler, and Carolyn Carlson can testify that should Therapists receive enough information, they are obligated to report the violation, which is passed to the police and probable future conviction of the Plaintiff or Class member on a new charge. See *Stachulak v. Coughlin*, 520 F. 2d 931, "Principles of due process in general must govern proceedings under Sexually Dangerous Persons Act and Defendant is entitled to confront and cross examine witnesses, to right against self-incrimination, and to speedy trial."

276. Ex Post Facto and Double Jeopardy. Consider, *In re Pers. Restraint of Andre Brigham Young,* 'The purpose of the ex post facto prohibition is to give individuals fair warning of the effect of legislative acts and to restrict the power of the State to impose arbitrary or vindictive legislation. *Weaver v. Graham*, 450 U.S. 24, 67 L. Ed. 2d 17, 101 S. Ct. 960 (1981). The commitment provisions also violate the prohibition on double jeopardy. U.S. Const. amend. 5. The double jeopardy clause protects against multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717, 23 L. Ed. 2d 656, 89 S. Ct. 2072, 89 S. Ct. 2089 (1969). When the government has already imposed a criminal penalty, the double jeopardy clause precludes the government from seeking additional punishment in a second proceeding if it is dissatisfied with the sanction obtained in the first. *United States v. Halper*, 490 U.S. 435, 449-50, 104 L. Ed. 2d 487, 109 S. Ct. 1892 (1989).

Because RCW 71.09 authorizes retroactive extension of a criminal sentence if the State is dissatisfied with the original length, it violates both of these provisions. The majority argues that these provisions do not apply because the Statute is civil rather than criminal in nature. However, a statute must be deemed criminal in nature when the statute is "so punitive either in purpose of effect" as to negate a legislature's intent to establish a civil statute. *United States v. Ward*, 448 U.S. 242, 248, 65 L. Ed. 2d 742, 100 S. Ct. 2636 (1980). The factors to be considered in deciding whether a statute has a criminal or civil purpose include whether the act disavows all interest in punishment, whether it provides treatment, and whether release is possible at any time. *Allen v. Illinois*, 478 U.S. 364, 92 L. Ed. 2d 296, 106 S. Ct. 2988 (1986). The statute in *Allen* allowed the State to divert persons charged with crimes from the criminal system to the civil system for treatment of mental illness. In contrast, the sexually violent predator Statute is not an alternative to criminal imprisonment. It allows the State to seek a criminal conviction against an individual, and only after the individual has completed his or her sentence does the Statute purportedly seek to provide specialized "care and treatment" for the individual. See RCW 71.09.030, .060. Far from disavowing criminal punishment, such punishment is an essential component of the Statute's commitment provisions. Although the Statute provides for treatment, this goal is completely subordinated to punishment. An individual's need for diagnosis and treatment is *never* sufficiently compelling under the Statute until the individual is nearing the end of his or her criminal sentence. The timing alone is a strong indication that the Legislature was less interested in treatment than in confinement. While both the Illinois statute in *Allen* and the Washington Statute provide for an indefinite period of confinement, there are important procedural differences. In Illinois, an individual may file a petition for release at any time and is entitled to a case review every 6 months. The court is required to hear all petitions. Here a petition for release normally must be authorized by the Department of Social and Health Services. Although an individual may petition over the Department's objection, he or she must then prevail at a show cause hearing in order to obtain a trial. Once a person has petitioned over the Department's objection and been denied, the court is mandated to deny subsequent petitions unless the person can make a showing of changed circumstances in the petition itself. Case reviews are conducted only once a year. Based on a comparison of these factors, RCW 71.09 is punitive in purpose and effect. Therefore, the prohibitions against ex post facto laws and double jeopardy apply here, and the Statute is unconstitutional.' See *In re Pers. Restraint of Andre Brigham Young*, 122 Wn.2d 1.

Also consider *McKune v. Lile*, 'Lile was a prisoner in the Kansas prison system and had been sentenced for kidnapping, rape, and aggravated sodomy... Prison officials ordered him to

participate in a sexual abuse treatment program. As part of the treatment, inmates are forced to disclose all prior sexual activities as well as "accept responsibility" for the crime for which they were sentenced. A polygraph examination is used to verify the accuracy and completeness of the offender's sexual history. No immunity is afforded to inmates participating in the program, leaving open the possibility that they could be prosecuted based in part upon the admissions made in the treatment program... Lile refused to participate in the program on the ground that required disclosures violated his Fifth Amendment privilege against self-incrimination. Failure to participate can result in reduction in visitation rights, earnings, work opportunities, ability to send money to family, canteen expenditures, and access to personal television. In addition, Lile could be transferred to a maximum security unit where conditions were not as nice.' *McKune v. Lile*, 122 S. Ct. 2017 (2002). See *The Champion*, December 2002, *Self-Incrimination – Prisoner Sex Offender Treatment Program*. KSVPA does violate the Fifth Amendment privilege against self-incrimination because Defendants require Plaintiffs and Class members to disclose all prior sexual activities as well as "accept responsibility" for the crime for which they were sentenced. Defendants require Plaintiffs and Class members pass a polygraph examination to verify the accuracy and completeness of the Plaintiff's or Class member's sexual history. No immunity is afforded the Plaintiff or Class member, leaving open the possibility of future prosecution. Evidence gathered by Defendants through Plaintiff's and Class member's polygraphs in a very real sense can be used against them to civilly-commit them and/or for future prosecution. Plaintiff's and Class member's therapists warn Plaintiffs and Class members that they have no right to withhold information and no immunity from future prosecution or punishment. Defendants do punish Plaintiffs and Class members for failing the polygraph, refusing treatment, or refusing to take the polygraph. Defendants can reduce visitation rights, earnings, work opportunities, ability to send money to family, canteen expenditures, access to personal television , loss of level, loss of phase, loss of various privileges. Defendants will withhold good time credits, withhold parole, and/or force Plaintiffs and Class members into segregation for failure to participate, or for failing a polygraph, which amounts to threat of longer incarceration. Plaintiffs and Class members can demonstrate realistic fear of prosecution and suffer from the very "real" possibility that they could be subject to future prosecution for participating in the polygraph. Plaintiffs and Class members should only be compelled to answer incriminating questions if the Plaintiff and Class member is offered use immunity.

In addition to violating due process, the Statute's commitment provisions... "In conclusion, I would hold that Washington's sexually violent predator Statute, RCW 71.09, violates petitioners' rights to substantive due process and violates the constitutional prohibition against ex post

192

facto laws and double jeopardy." See *In re Pers. Restraint of Andre Brigham Young*, 122 Wn. 2d 1. Defendants' KSVPA statutes violate both ex post facto and double jeopardy laws. KSVPA statutes make more burdensome the punishment for a crime, after its commission. Though Kansas has already imposed a criminal penalty, Defendants seek additional punishment for Plaintiffs and Class members in a second proceeding. Defendants therefore authorize retroactive extension of a criminal sentence. KSVPA must be deemed criminal in nature because the statute is "so punitive in purpose and effect" as to negate the legislature's intent to establish a civil statute. KSVPA is *not* an alternative to criminal imprisonment. It allows Defendants to seek a criminal conviction against – Plaintiffs and Class members, and only after the Plaintiff or Class member has completed his sentence does the Statute purportedly seek to provide a specialized "care and treatment" for the Plaintiff or Class member. Punishment is an essential component of the Statute's commitment provisions. Although the Statute claims to provide for treatment, this goal is completely subordinated to punishment. Plaintiffs' and Class members' need for diagnostic and treatment is *never* sufficiently compelling under the Statute until the Plaintiff or Class member is nearing the end of his or her criminal sentence. The timing alone is a strong indication that Kansas' Legislature was less interested in treatment than in confinement. While both the Illinois statute and the Kansas Statute provide for an indefinite period of confinement, there are important procedural differences. In Illinois, an individual may file a petition for release at any time and is entitled to a case review every 6 months. The court is required to hear all petitions. In Kansas, a petition for release must be authorized by the Kansas Department for Aging and Disability Services. Although a Plaintiff or Class member may petition over the Department's objection, he must then prevail at a show of cause hearing in order to obtain a trial. Once a Plaintiff or Class member has petitioned over the Department's objection has been denied, the court is mandated to deny subsequent petitions unless the person can make a showing of changed circumstances in the petition itself (even though the burden is supposed to be on the State to prove beyond a reasonable doubt every year that the Plaintiff's or Class member's mental condition has not changed). Case review are conducted only once a year. Based on a comparison of these factors, KSVPA is punitive in purpose and effect. Therefore, the prohibitions against ex post facto laws and double jeopardy apply here, and the Statute is unconstitutional.

## Count II Actual Harm

277. Plaintiffs incorporate all actual harm previously cited as if fully set forth herein.

278. Defendants refuse Class member Tyrone Tschantz adequate treatment. Though he asked for individual therapy from his therapist for two weeks because he was suffering from severe

depression, his therapist would not give him therapy until he got into trouble and received a disciplinary report. Furthermore, the entire first six months Class member Tschantz was in SPTP his therapist only allowed him two individual therapy sessions. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

279.    Defendants refuse to provide Plaintiff Vance Walters adequate amount of therapy hours. Defendants only provide Plaintiff Walters three hours of treatment/therapy per week. The other so-called twenty hours per week are merely activities, which Defendants force Plaintiff Walters and his fellow Plaintiffs and Class members to attend. Defendants refuse to provide Plaintiff Walters unstructured yard/activity time. Furthermore, Defendants have removed and refuse to provide vocational trade programs for Plaintiff Walters and his fellow Plaintiffs and Class members. As well, Defendants have placed severe restrictions on what Plaintiff Walters can purchase and own and which vendors he can purchase them from. Defendants severely restrict or prevent Plaintiff Walters from spending his own money as he chooses. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

280.    As a result of Defendant's acts, omissions, practices and conduct, Plaintiffs and Class members have been deprived of their constitutionally protected right to be free from double punishments for the same crime.

281.    Defendant's acts and omissions are both shocking and intolerable and a continuing mistreatment of a constitutional stature.

282.    Plaintiff and Class members have been subject to and injured by these alleged violations and suffered the same or similar damages as a direct and proximate result of Defendants' acts, omissions, practices and conduct as specifically set forth above. Unless relief is granted, Plaintiffs and Class members will continue to be injured by and suffer damages as a direct and proximate result of Defendants' acts and omissions specifically set forth above. The remedy of which is immediate release with prejudice.

## Count III

### Cruel and Unusual Punishment

### Violation of the Eighth Amendment to the United States Constitution

283.    Plaintiffs incorporate all previous allegations as if fully set forth herein.

284.    The Eighth Amendment to the United States Constitution, which prohibits cruel and unusual punishments, requires that persons who are involuntarily confined due to an asserted mental health disorder be provided with adequate treatment for that disorder. By failing to provide such

194

treatment for the Plaintiffs and Class members, Defendants have violated the Eighth Amendment.

285.    Involuntary commitment of sex offenders to mental health treatment facilities after they complete prison terms for serious sex offenses is an inappropriate response to the problem. The mental health system is for treatment, not punishment. The mental health system is not the appropriate place for long-term confinement of sexual predators. Sexual predator statutes usually state that the continued confinement of sex offenders is for the safety of the public, not the treatment of the offender. The dissent in the Hendrick's case agreed with the Kansas Supreme Court that the purpose of the Kansas Statute was punishment. While public safety is an appropriate societal goal, the purpose of the mental health system is treatment. See *Exhibit C, Mental Health America Position Statement 55: Confining Sexual Predators in the Mental Health System.*

286.    Defendants require Plaintiffs and Class members pass a series of polygraph examinations before they are allowed to advance through the phases of the Kansas Sexual Predator Treatment Program, in violation of Plaintiff's and Class member's constitutional rights. Defendants' use of the polygraph constitutes a death sentence because any Plaintiff or Class member who cannot pass the polygraph for any reason bars them from progression through the phases of the treatment program, thereby requiring them to remain civilly confined until their death. Defendants' use of the polygraph therefore violates Plaintiffs' and Class members' constitutional protection against cruel and unusual punishment under the Eighth Amendment to the United States Constitution. Defendants' use of the polygraph to keep Plaintiffs and Class members civilly confined until their death is both shocking and intolerable and a continuing mistreatment of a constitutional stature. Defendants have failed and refused to make reasonable efforts to provide adequate sex offender treatment to Plaintiffs and Class members. Defendants have thereby denied the Plaintiffs and Class members any meaningful opportunity to regain their liberty. Defendants' conduct demonstrates a deliberate indifference to their statutory obligation to carry out their prescribed course of sex offender treatment. Defendants' indifference to their statutory obligation to provide Plaintiffs and Class members adequate treatment, and indifference toward providing Plaintiffs and Class members any meaningful opportunity to regain their liberty is shocking and intolerable and a continuing mistreatment of a constitutional stature. The United States Supreme Court has stated that, in a program designed to treat and incapacitate, due process requires that the conditions and duration of treatment must bear some reasonable relation to the purpose for which the person is confined. See *Seling v. Young*, 531 U.S. 250, 265, 121 S. Ct. 727, 148 L. Ed. 2d 734 (2001). SPTP does not offer a realistic opportunity to be cured or improve the mental condition for which the Plaintiffs and Class members were involuntarily committed. It is unknown

whether the past or present polygrapher(s) are or have been qualified to administer the polygraph examination and whether they lack or lacked proper training and experience to perform the test. Plaintiffs and Class members frequently fail their polygraph test due to high anxiety, stress, and nervousness, rather than being deceitful in the answers to the questions on the test. It is not established whether the polygraph or the testing procedure is reliable. Due process requires that the polygraph examiner is someone who is properly trained and the testing procedure is reliable. Otherwise, the SPTP does not offer Plaintiffs and Class members a realistic opportunity to be cured or to improve his mental condition and there is no reasonable relation between the conditions and duration of the SPTP and the purpose for Plaintiffs and Class members confinement. See *Seling*, 531 U.S. At 265. Plaintiffs and Class members have been and continue to be injured by the acts and omissions of the Defendants. Unless relief is granted, Plaintiffs and Class members will continue to be injured by and suffer damages as a direct and proximate result of Defendants' acts and omissions specifically set forth above. The remedy of Defendants' acts and omissions is a finding of SPTP as unconstitutional and therefore the immediate release for all Plaintiffs and Class members with prejudice.

## Count III Actual Harm

287. Defendants have mounted night lights above the beds of Plaintiffs and Class member's beds, which will not turn off. These night lights shine directly into Plaintiff's and Class member's eyes all night, which restricts and interferes with Plaintiff's and Class member's health, rest and sleep. Defendant's use of night lights is torture and cruel and unusual punishment.

288. Class member Callow has been injured by Defendant's use of night lights. The night lights shine in his eyes and severely restrict and interfere with his health, rest and sleep. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

289. Plaintiff Michael Gallagher has been verbally and mentally abused by Defendant's staff members. Nor have Defendant's provided more considerate conditions to accommodate his Parkinson's disorder. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

290. Class member Charles Smeltzer has been injured by Defendant's use of night lights. The night lights shine into his eyes and severely restrict and interfere with his health, rest and sleep.

291. Plaintiff David Thayer was molested by an SPTP staff member. Defendants fired the male staff member, but also punished Plaintiff Thayer, though he was a victim of a crime. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

292. Defendants have violated Plaintiff Harvey Hickman's due process rights. They have written disciplinary reports and initiated punishment with no disciplinary hearing. Furthermore,

Defendants have taken property away from Plaintiff Hickman, lost it, and failed to return his property or reimburse him for his property without due process. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

293.    Defendants denied Class member Ritchie his right to eat and his right to attend religious services. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

294.    Consider *Truidalle v. Taylor*, 'The plaintiff, a state prisoner, claims that the water supply at the Stateville Correctional Center is "toxic," undrinkable, and has caused him health problems... The plaintiff has filed multiple grievances complaining that the water is dirty, filthy, and unsafe to drink. All of the grievances have been denied, leaving the plaintiff and other inmates with no choice but to drink the water unless they can afford bottled water... Accepting the plaintiff's allegations as true, the court concludes that his amended complaint states a viable Eighth Amendment claim. If the plaintiff can prove that the water at Stateville is unsafe to drink and that the defendants have refused to take remedial action, then the plaintiff may be entitled to relief under the Civil Rights Act... The Constitution requires correctional officials to house the plaintiff under "humane conditions" and to provide him with adequate food and water, among other basic needs. *Sain v. Budz*, No. 05 C 6394, 2006 U.S. Dist. LEXIS 8271, 2006 WL 539351, \*2 (N.D. Ill. Mar. 3, 2006) (Conlon, J.), citing *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2D 811 (1994)... "The state must provide an inmate with a 'healthy, habitable environment.'... The Eighth Amendment, furthermore, prohibits deliberate indifference to inmates' health and safety. Failure to take reasonable measures in the face of a substantial risk of serious harm violates the Constitution. *Farmer v. Brennan*, 511 U.S. 825, 845, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994); *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011). Prison officials violate an inmate's constitutional rights in conditions-of-confinement cases where the alleged deprivation is "sufficiently serious" (the objective standard) and (2) the officials act with deliberate indifference (the subjective standard). *Farmer*, 511 U.S. at 834; *Lehn v. Holmes*, 364 F.3d 862, 872 (7th Cir. 2004)... a plaintiff must show that the challenged conditions of confinement are objectively so serious as to amount to the denial of a basic human need... This was one of the prison conditions for which the Eighth Amendment required a remedy, even though it was not alleged that the likely harm would occur immediately and even though the possible infection might not affect all of those exposed. **We would think that a prison inmate also could successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery.** 509 U.S. at 33 (emphasis added). "Poisoning the prison water supply or deliberately inducing cancer in a prisoner would be forms of cruel and unusual punishment, and might be even if the harm was probabilistic or future rather than

certain and immediate." *Carroll v. DeTella*, 255 F.3d 470, 472 (7th Cir. 2001), citing *Helling*, 509 U.S. At 33-34... For liability to attach, a defendant "must both be aware of the facts from which an inference could be drawn that a substantial risk of harm exists, and he must also draw that inference." *Farmer*, 511 U.S. at 838; *Brown v. Budz*, 398 F.3d 904, 913 (7th Cir. 2005); *Riccardo v. Rausch*, 375 F.3d 521, 525 (7th Cir. 2004). The subjective prong has two subparts: (a) knowledge of the risk, *Brown* at 913, and (b) a disregard of that risk. *Id.* At 916... "Deliberate indifference 'is more than negligence and approaches intentional wrongdoing.'" *Johnson v. Snyder*, 444 F.3d 579, 585 (7th Cir. 2006), quoting *Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir. 1998). "[T]he corrections officer must have acted with the equivalent of criminal recklessness.'" See *Truidalle v. Taylor, 2011 U.S. Dist. LEXIS 148228*.

        Defendants have violated both Plaintiff's and Class member's Eighth Amendment right to be free from cruel and unusual punishment and their Fourteenth Amendment right to be free from punishment, neglect, abuse, physical restraint, medication used as punishment, and an unnecessarily punitive environment. Similar to Truidalle, Defendants knew their actions, omissions, and the environment they have created are causing Plaintiffs and Class members injury. Plaintiffs and Class members have filed numerous grievances which have been denied by Defendants, giving Plaintiffs and Class members no means of relief. Defendants interfere with Plaintiff's and Class member's health, rest, and sleep with night lights that shine in their eyes all night long. Defendants verbally and mentally abuse Plaintiffs and Class members. Defendants have denied some Plaintiffs and Class members their right to eat. Defendants have denied some Plaintiffs and Class members their right to visitation. Defendants have denied Plaintiffs and Class members their right to a humane psychological and physical environment. Defendants have neglected to maintain the physical plant in a continuous good state of repair and operation so as to insure the health, comfort, safety and well-being of Plaintiffs and Class members. Defendants have denied Plaintiffs and Class members an adequate heating and ventilation system. Defendants fail to clean out the heating and ventilation system, which is full of black mold, which directly affects Plaintiff's and Class member's health, such as limiting their ability to breath. Defendants deny Plaintiffs and Class members proper medical treatment. Defendants fail and refuse to provide Plaintiffs and Class members with a "healthy and habitable environment." Defendants acts and omissions have created conditions of confinement so serious as to deny Plaintiff's and Class member's basic human needs. Defendants insistence on housing Plaintiffs and Class members in buildings rampant with black mold, while lying about such black mold existing, and merely covering it up with paint when questioned, caused Plaintiffs and Class members actual harm,

198

actual breathing and respiratory problems, possible cancer, possible brain problems, even possible death, which is cruel and unusual punishment because the harm is probabilistic and future, as well as immediate, while Defendants are well aware of the harm and choose to deny that such harm exists. Defendants *are* both aware of the facts that the substantial risk exists and disregard that risk. Defendants deliberate indifference *is* intentional wrongdoing.

295. As a result of Defendant's acts, omissions, practices and conduct, Plaintiffs and Class members have been deprived of their constitutionally protected right to be protected from cruel and unusual punishments.

296. Defendant's acts and omissions are both shocking and intolerable and a continuing mistreatment of a constitutional stature.

297. Plaintiff and Class members have been subject to and injured by these alleged violations and suffered the same or similar damages as a direct and proximate result of Defendants' acts, omissions, practices and conduct as specifically set forth above. Unless relief is granted, Plaintiffs and Class members will continue to be injured by and suffer damages as a direct and proximate result of Defendants' acts and omissions specifically set forth above. The remedy of which is immediate release with prejudice.

## Count IV

### Violation of the Americans With Disabilities Act, 42 U.S.C. § 12132

298. Plaintiffs incorporate all previous allegations as if fully set forth herein.

299. The mental abnormalities and personality disorders that formed the basis for the civil commitment of Plaintiffs and Class members constitute disabilities as that term is used in the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12102.

300. Defendants have discriminated against the Plaintiffs and Class members in violation of the ADA, because they have failed and refused to reasonably accommodate their handicaps by providing adequate mental health care; they have denied the Plaintiffs and Class members access to mental health treatment and educational, vocational and physical fitness programs afforded generally to other civilly committed persons; they have excluded the Plaintiffs and Class members from participation in and denied them the benefits of the services, programs, or activities of a public entity on the basis of disability; and they have failed to administer services, programs and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities in violation of 2b C.F.R. § 35.1 30(d).

301. As a result of Defendant's acts, omissions, practices and conduct, Plaintiffs and Class

members have been deprived of their constitutionally protected right to be protected from cruel and unusual punishments.

302.    Defendant's acts and omissions are both shocking and intolerable and a continuing mistreatment of a constitutional stature.

303.    Plaintiff and Class members have been subject to and injured by these alleged violations and suffered the same or similar damages as a direct and proximate result of Defendants' acts, omissions, practices and conduct as specifically set forth above. Unless relief is granted, Plaintiffs and Class members will continue to be injured by and suffer damages as a direct and proximate result of Defendants' acts and omissions specifically set forth above. The remedy of which is immediate release with prejudice.

## Count V

## Violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794

304.    Plaintiffs incorporate all previous allegations as if fully set forth herein.

305.    Defendants have discriminated against the Plaintiffs and Class members in violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, as amended by the Civil Rights Restoration Act of 1987, by failing to reasonably accommodate their handicaps, failing to provide adequate mental health care; excluding them from participation in and denying them the benefits of programs for which they would otherwise be qualified, by reason of their disability, subjecting them to discrimination based on their disabilities; and denying them access to mental health treatment, educational, vocational and physical fitness programs.

## Count V Actual Harm

306.    Defendants have denied Plaintiff Michael Gallagher proper medical treatment. Defendants medical board has canceled a doctor's order for an EEG test for movement disorder and nerve conduction after he was diagnosed with Parkinson's disease in 2002. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

307.    As a result of Defendant's acts, omissions, practices and conduct, Plaintiffs and Class members have been deprived of their constitutionally protected right to be protected rehabilitation rights.

308.    Defendant's acts and omissions are both shocking and intolerable and a continuing mistreatment of a constitutional stature.

309.    Plaintiff and Class members have been subject to and injured by these alleged violations and suffered the same or similar damages as a direct and proximate result of Defendants' acts,

omissions, practices and conduct as specifically set forth above. Unless relief is granted, Plaintiffs and Class members will continue to be injured by and suffer damages as a direct and proximate result of Defendants' acts and omissions specifically set forth above. The remedy of which is immediate release with prejudice.

### Count VI

**Violation of the Right to Adequate Treatment and Civil Rights of Civilly Committed Persons in Violation of the Fourteenth Amendment to the United States Constitution; K.S.A. § 59-2978; K.S.A. § 59-29a22; *Turay v. Seling*, 108 F. Supp. 2D 1148 [Turay Standards]; *Turay v. Seling*, 1999 Wash. LEXIS 74 (2000) [Turay Standards]; and *Davis v. Watkins*, 384 F. Supp. 1196**

310.   Plaintiffs incorporate all previous allegations as if fully set forth herein.

311.   Defendants have failed and refused to provide the Plaintiffs and Class members with minimally adequate mental health treatment, thereby depriving them of a realistic opportunity to be cured or to improve the mental condition for which they were confined or regain their liberty, in violation of the Fourteenth Amendment to the United States Constitution.

312.   SPTP as applied to Plaintiffs and Class members is inadequate to cure their conditions or lead to their eventual release.

313.   Plaintiffs incorporate argument #197 as if fully set forth herein.

314.   The Fourteenth Amendment guarantees that "[n]o State shall... deprive any person of life, liberty, or property without due process of law." *U.S. Constitution Amendment XIV, § 1.*

315.   The Fourteenth Amendment due process requires that the conditions and duration of confinement have some reasonable relation to the purpose for which persons are committed. Civilly committed persons may be subjected to liberty restrictions reasonably related to legitimate government objectives and that are not tantamount to punishment as determined by reasonable professional judgment. Confinement that continues after the person no longer meets the statutory requirements for commitment violates due process.

316.   Defendants have violated K.S.A. § 59-2978; K.S.A. § 59-29a22; *Turay v. Seling*, 108 F. Supp. 2d 1148; and *Turay v. Seling*, 1999 Wash. LEXIS 74 (2000) by failing to provide for the prompt and adequate diagnosis, care, treatment, training and rehabilitation of the Plaintiffs and Class members, failing to ensure that the Plaintiffs and Class members receive mental health care and other professional services in accordance with accepted, professional standards, ethics and practices, and failing to allow the Plaintiffs and Class members to participate meaningfully in planning their own treatment.

317.   Defendants have violated K.S.A. § 59-29a22; *Turay v. Seling*, 108 F. Supp. 2d 1148; and

*Turay v. Seling*, 1999 Wash. LEXIS 74 (2000); and *Davis v. Watkins*, 384 F. Supp. 1196 by failing to provide adequate care and individualized treatment to the Plaintiffs and Class members appropriately tailored to their specific needs in 'a "road map" in a manner understandable to the resident.' See *Davis v. Watkins*, 384 F. Supp. 1196.

318.    Based on the policy and procedures created and implemented by Defendants, Plaintiffs and Class members spend no more than six or seven hours per week in treatment, their treatment plans are not detailed and individualized, the treatment staff is not qualified to treat sex offenders, and staffing levels are too low.  Plaintiffs and Class members are not progressing through the treatment program and are instead remaining in the first three phases of treatment for years.

319.    Defendants have failed and refused to provide Plaintiffs and Class members with minimally sufficient group and/or individual therapy.  Based on the policies and procedures created and implemented by Defendants, Plaintiffs and Class members are not progressing through the treatment program as necessary because Plaintiffs and Class members spend no more than three hours in group therapy per week and no more than one hour of individual therapy per quarter with only three hours of group therapy per week, there are not enough hours of group therapy for the Plaintiffs and Class members to get enough opportunity to present, receive feedback, and receive therapy.

320.    Defendants have failed and refused to staff the SPTP with a sufficient number of qualified therapists and other mental health professionals to treat the Plaintiffs and Class members, whose numbers continue to grow.

321.    Defendants have failed and refused to provide for qualified educational counselors with a major in the area which they are teaching, specifically trained for the class and/or subject they are teaching, and continuing education and training for the educational counselors and clinical staff.  Psycho-educational classes are administered by poorly trained/incompetent clinicians called Activity Therapists.

322.    Defendants have failed and refused to provide adequate, competent staff, a sufficient number of qualified therapists, and a sufficient number of qualified mental health professionals, supervised by a qualified mental health professional.  Therapist turnover is too high.  Most therapists use SPTP as a training ground, and remain in the program one year at most.  This is anti-therapeutic.  SPTP should employ only the most qualified therapists for such a serious program, and Plaintiffs and Class members cannot build trust with their therapists, knowing the therapist is only a trainee, who will be leaving soon.  And each new therapist forces the Plaintiff and Class member to re-present material he has already presented.

323.   Defendants have failed and refused to provide sufficient office space on each unit to house qualified health professionals.

324.   Based on the policy and procedures created and implemented by Defendants SPTP currently consists of seven unnecessary phases, which Defendants demand the Plaintiffs and Class members complete. See *Exhibit J, Integrated Treatment Plans and Yearly Reports of Resident's Mental Condition of Plaintiffs and Class members Ronald Alan Baker, Steven Earl Roberts, Danny Wassell Stanley, Tyrone R. Tschantz, and Harvey Darrel Hickman.* Even though K.S.A. § 59-29a07(a) establishes the criteria for a sexually violent predator's release is "the person's mental abnormality or personality disorder has so changed that the person is safe to be at large," this standard has nothing to do with completing seven phases. Furthermore, Defendants require Plaintiffs and Class members have "no more victims." See *Exhibit S, The Sexual Predator Treatment Program of Kansas, Resident Handbook, November 2013,* pp. 3-4. This is an impossible standard that cannot be measured, and further violates K.S.A. § 59-29a07(a).

325.   Defendants have failed and refused to provide Plaintiffs and Class members with timely and accurate feedback concerning progress, goals and advancement.

326.   Defendants have failed and refused to provide Plaintiffs and Class members minimally adequate job training, job opportunities, and educational opportunities.

327.   Defendants have failed and refused to comply with internal management policies and procedures.

328.   Defendants have failed and refused to provide Plaintiffs and Class members an unrestricted right to visitation. Only six Plaintiffs or Class members are allowed in the visiting room at a time. Defendants claim it is a security issue because there is not enough staff to monitor the Plaintiffs or Class members and their visitors. Defendants know how many visitors will show up on any given visitation day because visitors must be pre-approved for each visitation. Defendants have no excuse and should be obligated to schedule the staff necessary to be assigned specifically to the visiting room for each specific visiting day. Defendants deny the Plaintiffs and Class members their right to unrestricted visitation when there are too many visitations scheduled for a specific visitation day. Furthermore, on the first Saturday of every month, Defendants set aside the day for child visitations, and will not let any other Plaintiff or Class member have a visit, if he does not have a child who is visiting.

329.   Defendants have failed and refused to assist Plaintiffs and Class members with meaningful discharge planning.

330.    Defendants have failed and refused to provide Plaintiffs and Class members a realistic opportunity to progress to transition. Defendants have failed and refused to progress Plaintiffs and Class members who are eligible for transition, claiming transition is at capacity. Defendants have failed and refused to progress Plaintiffs and Class members as appropriate. The program as designed does not allow Plaintiffs and Class members to transition from phase five to transition until they have completed eleven outings. These outings cost money, however, Plaintiffs and Class members in phase five are housed at Jung building. Plaintiffs and Class members moved to Jung building are not provided nor guaranteed a job. Without a job the Plaintiffs and Class members cannot afford the outings and therefore will not be allowed to progress. Defendants have failed and refused to provide Plaintiffs and Class members the opportunity to progress through the program as appropriate in violation of the Fourteenth Amendment Due Process Clause of the United States Constitution which requires state officials to provide civilly-committed persons with access to mental health treatment that gives them a realistic opportunity to be cured or to improve the mental condition for which they were confined. See Exhibit *B, 2013 Larned State Hospital Fiscal Budget Report*, p. 700, "The current transitional program (MiCo House) is located on the grounds of Osawatomie State Hospital in Miami County. State law limits the number of residents in transitional program to eight per county. As of November 2011, there were 8 persons in the program. The SPTP was determined constitutional because it provides residents the opportunity to progress through the program as appropriate. The agency indicates that failure to provide this opportunity to progress because the transition program is at capacity could jeopardize the SPTP's constitutionality and residents could challenge their civil commitment in court." With the opening of the Parson's State Hospital Transition House, Plaintiffs and Class members are still not provided the opportunity to progress because Transition is still at capacity. SPTP as implemented is unconstitutional. According to the *Larned State Hospital Fiscal Budget Report* for 2013, p. 709, "Since 1994, 265 persons have been committed to the SPTP. Of the residents presently assigned to the SPTP, more than one third have been received within the past five years. According to the agency, the steady increase in referrals to the program and the length of time it takes to complete the program combine to create a continuing budget and public policy challenge. The following summarizes the status of 246 persons currently committed to the SPTP: 2 persons have completed the final conditional release stage; 4 persons are on conditional release; 13 persons were released by the courts due to timely filing issues (these issues were later corrected by legislative action); 16 persons have died; 17 new commitments have been made to date in CY 2011; and 229 persons are currently in the SPTP as of November 15, 2011: 217 persons on the campus of Larned State

Hospital; 4 persons in DOC (due to parole violations); an 8 persons residing at the MiCo House (transition house) on the campus of Osawatomie State Hospital. SPTP's physical capacity is 214 beds with 214 residents currently assigned. The program is budgeted to serve 177 persons." Note: Some of the statistics in the *Larned State Hospital Fiscal Budget Report* for 2013 are not up to date. For example, 27 persons have died while at SPTP, not 16.

The fact that SPTP is growing rapidly, more than one third of the persons committed to the SPTP have been received within the past five years, and Defendants are not letting anyone out, 3 persons have completed the final conditional release stage (since 1994!), and Defendants are not providing Plaintiffs and Class members the opportunity to progress through the program as appropriate because the transition program is at capacity, makes the SPTP as implemented unconstitutional, and the civil commitment of all Plaintiffs and Class members unconstitutional. The remedy for Defendants' violation of Plaintiffs' and Class members' constitutional rights and continued mistreatment of a constitutional stature is immediate release with prejudice. Class member David Sipe has been and continues to be injured by the shocking and intolerable acts and omissions of the Defendants, to wit actual harm being, the District Court ruled Class member Sipe be placed in Transitional Release as of 2012. However, as of 2014 Defendants have not allowed him to move to Transitional Release because, "Transition is full." See *Exhibit Q, Class Action Questionnaire of David H. Sipe*.

331.    Defendants have failed and refused to provide Plaintiffs and Class members with a current examination of their current mental condition made once every year in violation of K.S.A. § 59-29a08(a), K.S.A. § 59-29a08(c), K.S.A. § 59-29a08(d), K.S.A.§ 59-29a18(a), K.S.A. § 59-29a18(b), and K.S.A. § 59-29a19(b) requires that the Plaintiff or Class member be released *when* his *current* mental condition has so changed that he is safe to be released. Defendants refuse to measure the Plaintiff's or Class member's current mental condition or admit it has so changed that the Plaintiff or Class member is safe to be released until he has completed all seven phases. According to the Yearly Reports of Plaintiffs and Class members Ronald Alan Baker, Steven Earl Roberts, Danny Wassell Stanley, Tyrone R. Tschantz, and Harvey Darrel Hickman, on every Yearly Report of every Plaintiff and Class member under *Plan for Upcoming Year*, Defendants state, "In order to successfully complete the program, residents are required to complete all phases of the program including any and all requisites associated with each phase to the satisfaction of the program." See *Exhibit J, Integrated Treatment Plans and Yearly Reports of Resident's Mental Condition of Plaintiffs and Class members Ronald Alan Baker, Steven Earl Roberts, Danny Wassell Stanley, Tyrone R. Tschantz, and Harvey Darrel Hickman*. However, completing phases is *no* requirement of law. Only the examination of the

Plaintiff's and Class member's current mental condition. Plaintiffs incorporate argument #200 as if fully set forth herein.

332.    K.S.A. § 59-29a08(c), K.S.A. § 59-29a18(a), and K.S.A. § 59-29a19(b) require that Plaintiff's and Class member's hearing to determine whether probable cause exists to believe that the person's mental abnormality or personality disorder has so changed that the person is safe to be placed in transitional, conditional or final release be set in the same district court in which the Plaintiff or Class member was originally civilly committed. Typically this means the hearing is presided over by the same judge who presided over the original civil commitment hearing. This is a conflict of interest. The judge is more concerned with upholding his original finding, dissuading public disapproval, and retaining his position, than making the unpopular ruling which would allow transitional, conditional or final release for an SVP.

333.    Defendants have violated *Davis v. Watkins*, Right-To-Treatment. In *Davis v. Watkins*, 'The court agreed with the parties that the State, upon committing an individual "until he regains his sanity," incurred a responsibility to provide such care as was reasonably calculated to achieve that goal... Finally, the court set minimum constitutional standards for adequate treatment...

I. DEFINITIONS AND OCCUPATIONAL GUIDELINES

3(A) Qualified Mental Health Professional shall include the following:

a. *A unit director shall be a psychiatrist who is Board Certified in the field of psychiatry* with four (4) years in mental health administration or who has a master's degree in hospital administration and four (4) years experience in the administration of a mental hospital.

b. A psychiatrist shall be a physician licensed to practice medicine by the State... with three (3) years of residency training in psychiatry.

c. A social worker shall have a master's degree in social work (M.S.W.) from an accredited university and meet the minimum requirements for certification by the Academy of Certified Social Workers and two (2) years clinical experience in the treatment of mentally ill individuals under the supervision of a qualified mental health professional.

d. A registered nurse shall be so licensed by the State... and have at least two (2) years of clinical experience in the treatment of mentally ill individuals under the supervision of a qualified mental health professional.

e. Consultant shall mean an individual who possesses the qualifications for a qualified mental health professional, *supra*, depending on his or her profession...

3(B) Non Professional Staff Member shall be those employees, including "psychiatric technicians" and

others, who do not meet the requirements of a qualified mental health professional, yet whose duties require patient contact as an integral part of their employment...

a. *A physician shall be licensed to practice medicine in the State...*

b. *An educational counselor shall be so certified by the State... having graduated with a bachelor's degree with a major in the area in which they are teaching...*

4) *Evaluation team means those persons commissioned by the... Department... to evaluate the mental condition and need for further confinement and treatment of the patients committed* to... State Hospital. There shall be at least three (3) evaluation teams composed of at least three (3) persons, of whom one must be a Board Certified psychiatrist, or at least Board Eligible. Other members of the team may be *a clinical psychologist with at least a Ph.D in psychology or a social worker with at least a M.S.W. degree*. The Department shall have the discretion to appoint the team within those guidelines. The Department shall make reasonable efforts to appoint individuals to the team who are *not employed by the Department...*

II. *A. Persons Committed While on Parole or After Criminal Conviction; Persons Retained Beyond Maximum Criminal Sentence...*

3) *Unless the team finds that the patient is both mentally ill or retarded and dangerous*, as defined in paras. 1(a) and (b), *supra, the patient shall be released* pursuant to appropriate procedures...

III. MINIMUM CONSTITUTIONAL STANDARDS FOR ADEQUATE TREATMENT FOR PATIENTS COMMITTED TO... STATE HOSPITAL

*A. Placement of Patients in the Least Restrictive Setting.*

1) *The defendants shall place all persons admitted to the Department... in the Least Restrictive Confinement*, which means the minimum limitation of movement or activity of a patient or resident necessary to provide reasonable assurance that his dangerousness would not constitute a significant risk to others and in which treatment or habilitation continues to the fullest extent possible.

*B. Individualized Treatment Plans.*

1) *Each patient shall have a comprehensive physical and mental examination and a review of behavioral status by an appropriate specialist to determine if his admission is appropriate within 72 hours after admission to the hospital.*

2) *Each patient shall have an initial individualized treatment plan.* The plan shall be developed by appropriate qualified mental health professionals, including his ward psychiatrist, and

implemented as soon as possible, but in no event later than three (3) to five (5) days after the patient's admission. Thereafter, each patient shall have a final individualized treatment plan which shall be developed and implemented within fourteen (14) days of the patient's admission. Each final treatment plan shall contain:

a. *A statement of the nature of the specific limitations and abilities, specific problems, and specific needs of the patient.*

b. *A statement of the patient's current mental status and the least restrictive treatment conditions necessary to achieve the treatment purposes of his commitment.*

c. The name and title of the qualified mental health professionals who are members of the patient's treatment team.

d. *A statement and rationale for the plan of treatment for achieving these intermediate and long-range goals.*

e. *A description of intermediate and long-range treatment goals, with a projected timetable for their attainment.*

f. *Criteria for release to less restrictive setting for habilitation, including criteria for discharge and a projected date for discharge with a post-discharge treatment program.*

g. The name of the mental health professional responsible for implementation and monitoring of the initial and final individualized treatment plan.

h. A notation of any therapeutic tasks to be performed by the patient.

3) The treatment plan shall be continuously reviewed by the treatment team responsible for the patient's individualized treatment plan. The treatment team shall evaluate the patient's treatment program with respect to the validity of the present course of treatment and his need for a maximum security psychiatric facility. *An estimated time for release shall be determined at each such review and made part of his or her record.* This review shall not be less than once a week for the first month, once a month for the first ninety (90) days, and then at least every ninety (90) days thereafter. A report of all such reviews shall be placed in the patient's medical files and sent to his or her attorney, and his or her spouse, parents or guardian.

4) I*n the interest of continuity of care, one qualified mental health professional shall be responsible for supervising the implementation of the treatment plan, integrating the various aspects of the treatment program and recording the patient's progress, as measured by objective indicators. This qualified mental health professional shall also be responsible for insuring that the patient is released when appropriate into a less restrictive rehabilitative setting...*

208

8) *No later than fifteen (15) days after a patient is committed to the hospital, the Superintendent of the hospital or his appointed professionally qualified agent shall examine the patient and shall determine whether the patient continues to require hospitalization and whether a treatment plan comporting with requirements of this section has been implemented. If the patient, in his opinion, no longer requires hospitalization, or if a treatment plan has not been implemented, he must return the patient to the committing court, transfer the patient to a less restrictive facility within the Department, institute appropriate commitment procedures, or release the patient from the institution.*

9) *The Department of Mental Health and Mental Retardation and its agents have an affirmative duty to provide adequate transitional treatment and care for all patients released after a period of confinement to... State Hospital. Transitional care and treatment possibilities include, but are not limited to, psychiatric day care, treatment in the home by a visiting therapist, nursing home or extended care, outpatient treatment, and treatment in psychiatric ward of a general hospital.*

10) *The Superintendent of the hospital shall report in writing to the next of kin or guardian of the patient at least every six (6) months on the patient's progress towards his eventual habilitation.* Such report shall also state any appropriate habilitation program which has not been afforded to the resident because of inadequate habilitation resources. This report may be the most recent entry into the patient's medical records as set forth in para. 6(h), *supra.*' See *Davis v. Watkins*, 384 F. Supp. 1196.

334.    Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to provide Plaintiffs and Class members qualified unit directors. SPTP unit directors are not Board Certified psychiatrists.

335.    Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to provide Plaintiffs and Class members with a physician licensed to practice medicine in the State of Kansas. Defendants employ only an Advanced Practicing Registered Nurse who sees the Plaintiffs and Class members, attempts to diagnose Plaintiff's and Class member's medical needs, and prescribes medicine for Plaintiffs and Class members, supposedly under the license of a licensed physician. However, the entire campus of Larned State Hospital only has one licensed physician, who never sees the Plaintiffs or Class members.

336.    Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to provide Plaintiffs and Class members qualified educational counselors, certified by the State of Kansas, nor having graduated with a bachelors degree with a major in the area in which they are teaching. SPTP Activity Therapists who have a bachelors degree do not necessarily have their major in the area in which they are teaching.

337.    Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to provide Plaintiffs and Class members with an Evaluation Team commissioned to evaluate Plaintiff's and Class member's mental conditions and need for further confinement and treatment.

338.    Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to provide Plaintiffs and Class members clinical psychologists with a Ph.D. in psychology.

339.    Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to provide Plaintiffs and Class members sufficient qualified professionals. According to the *2012 Joint Commission Hospital Accreditation Report*,

1) 'Chapter: Human Resources. Standard Text: The hospital verifies staff qualifications. Primary Priority Focus Area: Organizational Structure. Score: Insufficient Compliance. Observation(s): The hospital must assure that personnel are licensed or meet other applicable standards that are required by State or local laws. This Standard is NOT MET as evidenced by: Review of the HR files of the Infection Control Nurse revealed that her license expired 9/30/11. Review of the HR file for an "Agency" nurse revealed that the license had expired 9/30/11.'

2) "Chapter: Leadership. Standard Text: A chief executive manages the hospital. Primary Priority Focus Area: Staffing. Score: Insufficient Compliance. Observation(s): The medical staff has lost almost two thirds of the members over the past five years due to turnover and elimination of positions. There has not been the capacity to recruit and retain medical staff because of competitive economic forces."

3) "Chapter: Leadership. Standard Text: Those who work in the hospital are focused on improving safety and quality. Primary Priority Focus Area: Staffing. Score: Insufficient Compliance. Observation(s): The number of qualified therapists, support personnel, and consultants must be adequate to provide comprehensive therapeutic activities consistent with each patient's active treatment program. This Standard is NOT MET as evidenced by: A random review of staffing data for the 1st week of December 2011, the 1st week of January 2012, and the 1st week of February 2012. Significant staffing concerns were noted, namely: 1) During the week of December 1-7, 2012, the SPTP unit (Sexual Predator Treatment Program) was short staffed 56 shifts. These shortages were a combination of RNs, LPNs, licensed mental health techs, and non-licensed mental health techs. A conversation with the Director of Nursing revealed that the current nursing staff turnover is 29.9%. The RN turnover is 42.5%. The LPN/LMHT turnover is 32.1% and the MH/DD (non-licensed) turnover is 26.3%. The

hospital currently has 84.5 fillable positions with 53.5 of them being in direct patient care. A review of the Human Resources report dated March 7, 2012 showed that the hospital is not market competitive in salaries. The staff turnover and vacancies are alarming and may have directly contributed to care concerns identified throughout this report, such as medication management, provisions of care, and record of care."

4) "Chapter: Medical Staff. Standard Text: The organized medical staff oversees the quality of patient care, treatment, and services provided by practitioners privileged through the medical staff process. Primary Priority Focus Area: Information Management. Score: Insufficient Compliance. Observation(s): There is no directive in the medical staff bylaws or its rules and regulations or in any policy which specifies the minimal content of medical histories and physicals."

5) "Chapter: Medical Staff. Standard Text: The hospital collects information regarding each practitioner's current license status, training, experience, competence, and ability to perform the requested privilege. Primary Priority Focus Area: Credentialed Practitioners. Score: Insufficient Compliance. Observation(s): The clinical director, service chief, or equivalent must meet the training and experience requirements for examination by the American Board of Psychiatry and Neurology or the American Osteopathic Board of Neurology and Psychiatry. The Standard is NOT MET as evidenced by: The medical director resigned three months prior to the survey. No one currently on the staff meets the qualifications required. The facility because of its location and fiscal limitation is unable to recruit a person with the required qualifications."

6) "Chapter: Medical Staff. Standard Text: The decision to grant or deny a privilege(s), and/or to renew an existing privilege(s), is an objective, evidence-based process. Primary Priority Focus Area: Credentialed Practitioners. Score: Insufficient Compliance. Observation(s): The medical staff must examine credentials of candidates for medical staff membership and make recommendations to the governing body on the appointment of the candidates. This Standard is NOT MET as evidenced by: The medical staff and governing body had developed explicit criteria for specific privileges. For example primary care physician without any postgraduate or continuing education in the assessment and the treatment of psychiatric patients was given the same full privileges as those who had completed full post graduate training in the field in which they were given privileges. No documentation in the credentials file contained any evidence of any education or training in the performance of a complete psychiatric examination." See *Exhibit M: 2012 The Joint Commission, Larned State Hospital, Hospital Accreditation Report*, pp. 9-13 and 17-20.

340.    Based on the policy and procedures created and implemented by Defendants, Defendants

have failed and refused to release Plaintiffs and Class members who are not both mentally ill or retarded and dangerous pursuant to *Davis v. Watkins*, 384 F. Supp. 1196.

341. Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to place Plaintiffs and Class members in the Least Restrictive Confinement.

342. Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to provide Plaintiffs and Class members with a review of their behavioral status by an appropriate specialist to determine if their admission is appropriate, within 72 hours after admission to SPTP, nor thereafter.

343. Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to provide Plaintiffs and Class members a true individualized treatment plan. Current so-called treatment plans provided by Defendants are generic and nearly identical for every Plaintiff and Class member. Treatment plans do not state the nature of the specific limitations and abilities, specific problems, or specific needs of the Plaintiff or Class member. Treatment plans do not state the Plaintiff's or Class member's current mental status or the least restrictive treatment conditions necessary to achieve the treatment purposes of his commitment. Treatment plans do not provide criteria for release to less restrictive setting for habilitation, nor criteria for discharge or a projected date for discharge, nor a post-discharge treatment program. Current so-called treatment plans provided by Defendants state nothing more than *Criteria For Transfer* with a blanket statement that the Plaintiff or Class member must complete all assigned classes, etc. An identical statement which can be found on every Plaintiff's and Class member's treatment plan, because the treatment plans are not individualized as required. As well, current so-called treatment plans provided by Defendants state nothing more than *Estimated Transfer Date* is indeterminate, given current phase and long-term nature of treatment programming.

344. Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to continuously review Plaintiff's and Class member's treatment plans to determine an estimated time for release for Plaintiffs and Class members.

345. Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to assign a qualified mental health professional responsible for supervising the implementation of the treatment plan, integrating the various aspects of the treatment program and recording the patient's progress. Defendants fail and refuse to measure Plaintiff's and Class member's progress by objective indicators. Defendants fail and refuse to assign Plaintiffs and Class members a qualified mental health professional. Plaintiffs and Class members are shuffled from treatment

212

therapist to treatment therapist. With each new phase of the program Plaintiffs and Class members are always re-assigned to a new treatment therapist. Because no treatment therapist typically works for the SPTP for more than a year (most are interns, trainees, or post-docs), Plaintiffs and Class members may even be re-assigned a new treatment therapist several times in any given phase, or even multiple times in any given year.

346. Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to assign a qualified mental health professional responsible for insuring the Plaintiff or Class member is released, when appropriate, into a less restrictive rehabilitative setting.

347. Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to examine the Plaintiffs or Class members within fifteen (15) days after commitment by the Superintendent or his appointed professionally qualified agent to determine whether the Plaintiff or Class member continues to require hospitalization or whether a treatment plan comporting with said requirements has been implemented. Defendants have failed and refused to return Plaintiffs or Class members to their committing court, transfer Plaintiffs or Class members to a less restrictive facility, institute appropriate commitment procedures, or release the Plaintiffs or Class members from the institution, who no longer require hospitalization, or who have no adequate treatment plan implemented.

348. Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to provide adequate transitional treatment and care for Plaintiffs and Class members which include but are not limited to, psychiatric day care, treatment in the home by a visiting therapist, nursing home or extended care, out-patient treatment, and treatment in a psychiatric ward of a general hospital.

349. Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to provide Plaintiffs and Class members a report, by the Superintendent of the hospital, in writing, to the next of kin or guardian or the patient at least every six (6) months on the Plaintiff's or Class member's progress towards eventual habilitation.

350. Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to furnish indigent Plaintiffs and Class members, at public expense, ordinary postage for their personal use in dispatching a maximum of five (5) letters per week.

351. Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to make provisions for Plaintiffs and Class members to *make* local calls at no charge.

213

352. Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to provide Plaintiffs and Class members telephone calls that are not monitored. When Plaintiffs and Class members place telephone calls to loved ones, on the SPTP pay phone system, the recording, when the Plaintiff or Class member's loved one answers, announces to the Plaintiff's or Class member's loved one that all calls are monitored and/or recorded.

353. Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to provide Plaintiffs and Class members with *unrestricted* right to visitation, at all reasonable times, including the right to visit with their own children.

354. Based on the policy and procedures created and implemented by Defendants, Defendants have censored books, periodicals, and newspapers supplied to, purchased by, or given to Plaintiffs and Class members of the institution.

355. Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to provide Plaintiffs and Class members access to members of their treatment team, the Ombudsperson or the Superintendent at any reasonable time or place. Defendants have required Plaintiffs and Class members to obtain special permission to meet with or talk with said individuals during periods even when their time is not otherwise scheduled.

356. Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to provide counseling or other treatment for homosexuality. Defendants have failed and refused to provide adequate and appropriate protection for Plaintiffs or Class members subject to homosexual or other assaults by other patients.

357. Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to provide adequate and regular opportunity for Plaintiffs and Class members to launder their own clothing. Defendants force Plaintiffs and Class members to send their clothing to a central laundry where their clothing is laundered by Kansas Department of Corrections prisoners.

358. Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused Plaintiffs and Class members their right to own personal possessions.

359. Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to allow Plaintiffs and Class members privacy and solitude in their own rooms whenever they desire.

360. Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to provide Plaintiffs and Class members with a diet which provides

214

a minimum of the recommended daily dietary allowances as developed by the National Academy of Sciences. Defendants do not provide a menu that is satisfying, nor provides the recommended daily dietary allowances. Defendants spend less per person for raw food than the most recent per person cost of the moderate cost food plan for the Midwest region of the United States.

361.     Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to meet minimum standards for restaurant health requirements. The kitchen and food services unit is not regularly inspected by public health inspectors. Plaintiffs and Class members do not receive correct prescribed diets.

362.     Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to serve food fresh and at proper temperatures.

363.     Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to provide a humane physical environment within facilities designed to make a positive contribution to the effective attainment of treatment goals of the institution.

364.     Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to establish routine maintenance and repair procedures to insure the physical plant is kept in a continuous good state of repair and operational so as to insure the health, comfort, safety and well-being of Plaintiffs and Class members.

365.     Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to make appropriate provisions to permit non-ambulatory Plaintiffs and Class members to communicate their needs to the staff. Defendants have disabled Plaintiff's and Class member's room intercom system, in the Dillon building, so that Plaintiffs and Class members are unable to contact staff, nor communicate their needs to staff in case of emergency. Defendants have failed and refused to provide emergency buttons in the showers, so that Plaintiffs and Class members who may slip and fall or experience any other emergency situation in the shower have no way of contacting staff, nor communicating their needs to staff in case of emergency.

366.     Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to provide adequate heating and ventilation systems. Dillon building heating systems are inadequate to provide comfort in the winter. The rooms are too cold. Dillon building air conditioning is inadequate to provide comfort in the summer. The rooms are too hot. Dillon building ventilation systems are old and filthy. The ventilation system filters have not been changed, and the ducts have not been cleaned in years. The Dillon building is a "sick building." The air quality is unhealthy. The ducts are full of black mold. Plaintiffs and Class members have

frequently became ill from breathing the contaminated air in the Dillon building.

367.    Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to meet all fire and safety standards established by the state and locality. Safety inspections are not conducted by supervisory personnel every three (3) months. According to the *2012 Joint Commission Hospital Accreditation Report*, "Chapter: Environment of Care. Standard Text: The hospital maintains fire safety equipment and fire safety building features. Primary Priority Focus Area: Physical Environment. Score: Insufficient Compliance. Observation(s): Facilities, supplies, and equipment must be maintained to ensure an acceptable level of safety and quality. This Standard is NOT MET as evidenced by: The total inventory of fire safety equipment indicated by the contracted fire alarm contractor was inconsistent from year to year, even though staff indicated there were no changes in the fire alarm systems." See *Exhibit M: 2012 The Joint Commission, Larned State Hospital, Hospital Accreditation Report*, p.7.

368.    Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to provide office space on any unit to house any of the necessary qualified mental health professionals, the Unit Director, psychiatrists, psychologists, social workers, registered nurse or a mental health associate. Such persons are not readily accessible to Plaintiffs or Class members.

369.    Based on the policy and procedures created and implemented by Defendants, Plaintiffs and Class members are not progressing through the treatment program as necessary because Activity Therapists and Treatment Therapists are constantly canceling the already too few group therapy sessions, individual therapy sessions, psycho-educational classes, and activity classes. Between July 8th, 2013 and March 31st, 2014 for example: Treatment Therapists canceled one hundred and ninety five (195) hours of group therapy, plus an undetermined number of individual therapy hours; while Activity Therapists canceled forty two (42) hours of psycho-educational classes, and two hundred and sixty seven (267) activity classes.

370.    Based on the policy and procedures created and implemented by Defendants, Plaintiffs and Class members are not progressing through the treatment program as necessary because Defendants are constantly switching Plaintiffs' and Class members' Treatment Therapists and/or groups, and forcing Plaintiffs and Class members to have to re-present material such as: self-disclosure, autobiography, victim disclosure sheets, and relapse prevention plans which they have already presented.

371.    Based on the policy and procedures created and implemented by Defendants, Plaintiffs

216

and Class members are not progressing through the treatment program as necessary because Defendants do not employ enough Treatment Therapists to provide adequate treatment. There are approximately seven (7) Treatment Therapists for the over two hundred forty one (241) Plaintiffs and Class members currently committed at the SPTP. Treatment Therapists' case loads average from forty six (46) to over sixty (60) Plaintiffs and Class members each. Treatment Therapists cannot provide adequate individualized treatment with that many Plaintiffs and Class members on their case load. Treatment Therapists are required to handle clients in numbers that far exceed their licensing, and in ways that violate the regulations of the Kansas Behavioral Sciences Regulatory Board. In February 2014 Defendants fired the only qualified Treatment Therapist in the Dillon building, Licensed Clinical Therapist Tapatha Strickler. Ms. Strickler was competent, effective, and Plaintiffs and Class members liked her. When Defendants fired her, over one hundred fifty (150) Plaintiffs and Class members were left with no qualified Treatment Therapist. Plaintiffs and Class members pray the court call Tapatha Strickler to testify to these facts.

372.   Based on the policy and procedures created and implemented by Defendants, Plaintiffs and Class members are not progressing through the treatment program as necessary because Plaintiffs and Class members are forced to enroll in psycho-educational and activity classes. Psycho-educational and activity classes are not offered to all Plaintiffs and Class members because they fill up very quickly. Plaintiffs and Class members who enroll after the first groups who have enrolled, often do not get to take the psycho-educational or activity class they need, because these classes are already full. Plaintiffs and Class members who are not allowed to take these classes because they are full, cannot progress through the treatment program until they take these classes and pass them.

373.   Based on the policy and procedures created and implemented by Defendants, Plaintiffs and Class members are not progressing through the treatment program as necessary because the polygraph is used to punish and hold Plaintiffs and Class members back from advancing and to move Plaintiffs and Class members back from a higher phase to a lower phase. Polygraphs are used to slow Plaintiffs and Class members from progressing appropriately through treatment. In phase three (3) Plaintiffs and Class members are forced to re-present victim disclosures they already presented in phase two (2) before they are allowed to take the victim polygraph. Only once they have finished presenting these victim disclosures will Defendants schedule the victim polygraph for the Plaintiffs and Class members. The Plaintiffs and Class members must successfully pass the victim polygraph and wait four months (for no particular reason) before he is allowed to take the sexual behavior polygraph. The Plaintiffs and Class members must pass the sexual behavior polygraph before even being considered

217

for promotion to phase four (4). The Plaintiffs and Class members must wait six (6) months after passing the sexual behavior polygraph (for no particular reason) before being allowed to take a "maintenance polygraph." The Plaintiffs and Class members must have re-presented all their victim disclosures, re-presented their autobiography, successfully passed the victim polygraph, successfully passed the sexual behavior polygraph, presented half their relapse prevention plan, completed Dialetical Behavior Skills Training, and wait another six (6) months before successfully passing the "maintenance polygraph" before Defendants will even consider allowing Plaintiffs and Class members to progress to phase four (4). Plaintiffs and Class members must wait another six (6) months and successfully pass another "maintenance polygraph" before Defendants will even consider allowing Plaintiffs and Class members to progress to phase five (5). If Plaintiffs and Class members fail the "maintenance polygraph" or pass it, but Defendants, for whatever reason, decide not to promote the Plaintiff or Class member to phase five (5), the Plaintiff or Class member must then wait another six (6) months before being allowed to take another "maintenance polygraph" and must successfully pass that polygraph before Defendants will even consider allowing Plaintiffs and Class members to progress to phase five (5). Defendants use the polygraph to hold Plaintiffs and Class members back from progressing in the same manner at each and every successive phase after phase two (2). Defendants punish Plaintiffs and Class members by holding them back from advancing, or moving them back from a higher phase to a lower phase not only if they fail a polygraph, but also if the polygraph is determined to be inconclusive. An inconclusive result is *not* deceptive. The polygraph should not be used punitively, especially just because it cannot assess a positive response. Some Plaintiffs and Class members cannot pass the polygraph because of heart problems, Plaintiff Danny Stanley, for example. Plainriff Michael Mellon was held back in 2008 from advancing from phase four (4) to phase five (5) because the polygraph was inconclusive four (4) times – because he has high blood pressure. Some of the Plaintiffs and Class members are fed up with being punished with the polygraph and have stopped participating in treatment as a result. In December 2013, Class member Derek Simmons was punished for failing the polygraph and was moved back from phase four (4) to phase three (3).

374.    Based on the policy and procedures created and implemented by Defendants, Plaintiffs and Class members are not being released because the program was intentionally designed by Defendants to be indeterminate. The majority of Plaintiffs and Class members have been in SPTP at least eight (8) years or more, including those who have died. The following graph charts the number of years each Plaintiff and Class member has been at the Sexual Predator Treatment Program:

218

**Number of Years at Sexual Predator Treatment Program**



According to Licensed Clinical Psychologist Tapatha Strickler, "Treatment that lasts longer than three years becomes harmful instead of healing." This statistic can be found in numerous medical journals.

375.    Based on the policy and procedures created and implemented by Defendants, Plaintiffs and Class members are not progressing through the treatment program as necessary because Defendants have filled group therapy groups with too many Plaintiffs and Class members in each group. This does not allow Plaintiffs and Class members adequate opportunity to present, receive feedback, and receive therapy. With too many Plaintiffs and Class members in each group, each Plaintiff or Class member does not get enough opportunity to present, because too many Plaintiffs and Class members before him also need to present.

376.    Based on the policy and procedures created and implemented by Defendants, Plaintiffs and Class members are not progressing through the treatment program as necessary simply because his therapist or an activity therapist feels he is moving "too quickly" through the program.

377.    Based on the policy and procedures created and implemented by Defendants, Plaintiffs and Class members are not progressing through the treatment program as necessary because SPTP as implemented is based on the "Relapse Prevention Model." However, the Relapse Prevention Model is a failure, as widely known by the professional psychiatric community. Defendants are therefore guilty of implementing and continuing a known failure, and therefore guilty of refusing to provide the Plaintiffs and Class members with minimally adequate mental health treatment, thereby depriving Plaintiffs and Class members a realistic opportunity to be cured or to improve the mental condition for which they were confined, or to regain their liberty. According to *The Vermont Bar Journal & Law Digest*, "The early models of psychological treatment for sex offenders were based on relapse prevention. Relapse prevention models were focused on identifying high-risk situations that could lead

219

to relapse and on eliminating deviance. However, review of the relapse prevention models of treatment failed to consistently demonstrate efficacy. Recent research in the field of sex offender treatment rejects the relapse prevention model." See *Exhibit A, The Vermont Bar Journal & Law Digest*, Summer 2013, 39 Ver. B.J. & L. Dig. 26 *"Sex Offenders And The Law,"* By Renee Sorrentino, M.D.

378.    Based on the policy and procedures created and implemented by Defendants, Defendants are not providing Plaintiffs and Class members adequate treatment. Treatment provided by Defendants is merely a disguise, not applied adequately, and is the same as intentionally choosing not to provide adequate treatment, nor adequate opportunity to progress through the program as appropriate or receive a reasonable opportunity to improve or be cured. The SPTP is therefore a prison masquerading as a treatment facility.

379.    The U.S. Supreme Court has made clear, however, that adequate treatment is a fundamental prerequisite to any civil commitment program. Without adequate treatment providing a path to an individual's potential release, civil commitment becomes state-imposed criminal punishment, but a civilly committed individual lacks the procedural protections typically afforded a criminal defendant. See the *Boston College Law Review*, November 2008, 49 B.C.L. Rev. 1383, *Article: The Constitutionality of Civil Commitment and The Requirement of Adequate Treatment*, by Douglas G. Smith.

380.    According to Dr. Austin DesLauriers, retired SPTP Clinical Program Director, "The Washington statute was copied virtually verbatim and submitted to the Kansas Legislature. Despite the concerns of many that the law was unconstitutional and would be overturned in court, it was unanimously passed by the Kansas Senate, by a large majority in the House, and signed into law by the governor May 5, 1994." See *Exhibit T: Corrections Today*, October 2002, *Kansas' Sex Offender Treatment Program – Aims to Reduce Recidivism*, By Austin DesLauriers, p. 119. (Austin T. DesLauriers, Ph.D., is a licensed psychologist in Kansas, and has been Clinical Program Director of the Kansas Sexual Predator Treatment Program since 1995, until his retirement in 2014).

According to the *Boston College Law Review*, "In 1994, a federal jury in the State of Washington found that Washington's Special Commitment Center ("SCC") was not providing residents with constitutionally adequate treatment." See the *Boston College Law Review*, November 2008, 49 B.C.L. Rev. 1383, *Article: The Constitutionality of Civil Commitment and The Requirement of Adequate Treatment*, by Douglas G. Smith.

It stands to reason, if the very program with which Kansas' Sexual Predator Treatment Program was copied after was found to not be providing residents with constitutionally adequate

treatment, then Kansas' Sexual Predator Treatment Program cannot be providing Plaintiffs and Class members with constitutionally adequate treatment either. It was, after all, from the Washington case with which we get the Turay Standards (minimum professional treatment standards which define the scope of the constitutional right to treatment). See *Turay v. Seling*, 108 F. Supp. 2d 1148; and *Turay v. Seling*, 1994 Wash. LEXIS 74 (2000). Yet, when Class member Randall Ritchie asked the Administrative Program Director, the Clinical Program Director, and his Treatment Therapist if they intended to adopt the Turay Standards, these Defendants did not know what the Turay Standards are.

381.    Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to provide intellectually challenged Plaintiffs and Class members with the treatment and/or educational opportunity to progress through the treatment program as necessary. In phase one (1), phase two (2), and phase three (3) Defendants do provide intellectually challenged Plaintiffs and Class members with parallel educational opportunities, because intellectually challenged Plaintiffs and Class members cannot understand the standard class material. However, no such parallel educational opportunities exist in phase four (4), phase five (5), phase six (6), or phase seven (7) of the program. No intellectually challenged Plaintiff or Class member as yet has been allowed, by Defendants, to progress past phase three (3) of the SPTP program.

382.    The acts and omissions of Defendants, specifically set forth above, constitute an unreasonable failure to provide Plaintiffs and Class members with "access to mental health treatment that gives them a realistic opportunity to be cured or to improve the mental condition for which they were confined" in violation of the Fourteenth Amendment to the United States Constitution.

383.    Plaintiffs and Class members have been subject to and injured by these alleged violations and suffered damages as a direct and proximate result of Defendants acts and omissions as specifically set forth above. Unless relief is granted, Plaintiffs and Class members will continue to be injured by and suffer damages as a direct and proximate result of Defendants' acts and omissions specifically set forth above.

## Count VI Actual Harm

384.    Plaintiffs incorporate all actual harm previously cited in Count I as if fully set forth herein.

385.    Defendants refuse Class member Tyrone Tschantz adequate treatment. Though he asked for individual therapy from his therapist for two weeks because he was suffering from severe depression, his therapist would not give him therapy until he got into trouble and received a disciplinary report. Furthermore, the entire first six (6) months Class member Tschantz was in SPTP

his therapist only allowed him two individual therapy sessions. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

386.    Defendants refuse to provide Plaintiff Vance Walters adequate amount of treatment/therapy hours. Defendants only provide Plaintiff Walters three (3) hours of treatment/therapy per week. The other so-called twenty (20) hours per week are merely activities, which Defendants force Plaintiff Walters and his fellow Plaintiffs and Class members to attend. Defendants refuse to provided Plaintiff Walters unstructured yard/activity time. Furthermore, Defendants have removed and refuse to provide vocational trade programs for Plaintiff Walters and his fellow Plaintiffs and Class members. As well, Defendants have placed severe restrictions on what Plaintiff Walters can purchase and own and which vendors he can purchase them from. Defendants severely restrict or prevent Plaintiff Walters from spending his own money as he chooses. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

387.    Defendants have violated Plaintiff Harvey Hickman's due process rights. They have written disciplinary reports and initiated punishment with no disciplinary hearing. Furthermore, Defendants have taken property away from Plaintiff Hickman, lost it, and failed to return his property or reimburse him for his property, without due process. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires*.

388.    As a result of Defendant's acts, omissions, practices and conduct, Plaintiffs and Class members have been deprived of their constitutionally protected right to adequate treatment, and civil rights of civilly committed persons.

389.    Defendant's acts and omissions are both shocking and intolerable and a continuing mistreatment of a constitutional stature.

390.    Plaintiff and Class members have been subject to and injured by these alleged violations and suffered the same or similar damages as a direct and proximate result of Defendants' acts, omissions, practices and conduct as specifically set forth above. Unless relief is granted, Plaintiffs and Class members will continue to be injured by and suffer damages as a direct and proximate result of Defendants' acts and omissions specifically set forth above. The remedy of which is immediate release with prejudice.

## Count VII

**Denial of Right to be Free from Punishment, Neglect, Abuse, Physical Restraint, Medication used as Punishment, and an unnecessarily Punitive Environment in Violation of the Fourteenth Amendment to the United States Constitution; K.S.A. § 59-29a22(b)(5)(B); K.S.A. § 59-29a22(b)(6)(A); K.S.A. § 59-29a22(b)(7); and K.S.A. § 59-29a22(b)(9).**

391.    Plaintiffs incorporate all previous allegations as if fully set forth herein.

392.    The Fourteenth Amendment guarantees that "[n]o State shall... deprive any person of life, liberty, or property, without due process of law." U.S. Constitution Amendment XIV, § 1.

393.    Fourteenth Amendment due process requires that the conditions and duration of confinement have some reasonable relation to the purpose for which persons are committed. Civilly committed persons may be subjected to liberty restrictions reasonably related to legitimate government objectives and that are not tantamount to punishment as determined by reasonable professional judgment.

394.    Since its inception in 1994 SPTP has became an increasingly punitive confinement facility.

395.    Based on the policy and procedures created and implemented by Defendants, Plaintiffs and Class members are housed in a facility resembling a prison, which is more restrictive than a maximum security prison. Plaintiffs and Class members do not have a reasonable grievance procedure to use when they are punished with DARs and Disciplinary Reports because the Disciplinary Hearing Officer is an SPTP employee and any appeals are heard by the SPTP Administrative Program Director.

396.    Based on the policy and procedures created and implemented by Defendants, Plaintiffs and Class members are punished by having their property, privileges, and rights removed, and by having their rights to access activities and areas of the facility limited or completely taken away or being placed in protective isolation in the ITU at the Isaac Ray building, North three (3).

397.    Based on the policy and procedures created and implemented by Defendants, Plaintiffs and Class members are not allowed to possess certain property and the grievance procedure for confiscated property leaves Plaintiffs and Class members no reasonable way to challenge the confiscation because the only person Plaintiffs and Class members can appeal to is the Administrative Program Director. The Administrative Program Director is biased because he created the policies and procedures that led to the confiscation of the property.

398.    Based on the policy and procedures created and implemented by Defendants, Plaintiffs and Class members are denied access to adequate group therapy.

399.    Based on the policy and procedures created and implemented by Defendants, Defendants can punish Plaintiffs and Class members by taking away their employment options.

400.    Based on the policy and procedures created and implemented by Defendants, they cause random searches of Plaintiff's and Class member's persons, property, and cells. Plaintiffs and Class members are placed in restraints any time they leave the secure facility.

401.    The punitive policies, procedures, and practices of Defendants are not reasonably related to the purpose for which Plaintiffs and Class members have been civilly committed, which is treatment. Denying Plaintiffs and Class members their liberty without a proper therapeutic purpose constitutes inherently punitive detention. According to *U.S. v. Gartner*, "even a civil penalty is considered a punishment if the sanction cannot be fairly said to serve a remedial purpose, but instead as a deterrent or retribution." See *U.S. v. Gartner*, 93 F. 3d 633, cert. Denied 519 US 1047. And according to *E.B. v. Verniero*, 'even when punishment is neither the actual or objective purpose of the law, civil sanctions may constitute punishment if the effects or "sting" are harsh enough to be considered a punishment, and must be evaluated in light of importance of any legitimate governmental interest served.' See *E.B v. Verniero*. 119 F. 3d, rehearing denied 127 F. 3d 298, cert. Denied, 522 US 1110.

402.    The acts and omissions of Defendants constitute a deprivation of Plaintiffs' and Class members' constitutional right to be free from punishment in violation of Plaintiffs' and Class members' rights protected by the Fourteenth Amendment of the United States Constitution.

403.    Plaintiffs and Class members have been subject to and injured by these alleged violations and suffered damages as a direct and proximate result of Defendants' acts and omissions specifically set forth above. Unless relief is granted, Plaintiffs and Class members will continue to be injured by and suffer damages as a direct and proximate result of Defendants' acts and omissions specifically set forth above.

404.    Based on the policy and procedures created and implemented by Defendants, Plaintiffs and Class members personal property rights are continuously being taken away. Personal property policies have become increasingly restrictive every year since the programs inception in 1994. Personal property Defendants decide to restrict, even though Plaintiffs and Class members were allowed to own it previously, becomes considered contraband by Defendants, who then take Plaintiff's and Class member's right to own that property away from them. After eighteen years of the SPTP's existence, Defendants recently adopted the more restrictive property and security rules nearly word – for – word from the Kansas Department of Corrections Property and Security Rulebook. Defendants adoption of the KDOC Property and Security rules makes the SPTP an unnecessarily punitive

environment, as restrictive as the KDOC and a continuing mistreatment of a constitutional stature.

405.    Based on the policy and procedures created and implemented by Defendants, Defendants issue demands for reimbursement of the costs of Plaintiff's and Class member's treatment and stay at the SPTP on LSH grounds. Plaintiffs and Class members have been injured and continue to be injured by Defendants collection of funds from Plaintiffs and Class members resident accounts to pay for Plaintiff's and Class member's room and board. Defendants (namely KDADS) is not authorized by law to demand reimbursement from Plaintiffs and Class members for their hospitalization because they are legally disabled by virtue of their confinement. Plaintiffs and Class members have been specifically injured by Defendants who withdraw funds from Plaintiff's and Class member's personal accounts as collection for room and board. Defendants demand reimbursement from Plaintiffs and Class members, though Defendants already fund Larned State Hospital primarily from three sources. The first is the State General Fund, which consists of money collected through various statewide taxes. The second is the Hospital Fee Fund, which includes collections from Medicare, private payments, Social Security, and insurance. The third source is Federal Title XIX funding, which is earned as disproportionate share hospital funding at the state mental health hospitals. The Disproportionate Share Program allows extra Medicaid payments to hospitals serving a disproportionate number of Medicaid-eligible and low income patients. See *Exhibit B, 2013 Larned State Hospital Fiscal Budget Report*, p. 702.

Defendants have made demand against Plaintiffs and Class members for reimbursement of the costs of their institutionalization. Defendants have a duty to provide Plaintiffs and Class members prompt and adequate treatment, rehabilitation and educational services appropriate for such patient's condition; and a humane psychological and physical environment within the hospital facilities. All facilities shall be designed to afford patients with comfort and safety, to promote dignity and ensure privacy. Facilities shall also be designed to make a positive contribution to the effective attainment of the treatment goals of the hospital; respect and recognition of the patient's dignity and individuality by all employees of the treatment facility; the right of the patient to spend such patient's money as such patient chooses. See *K.S.A. § 59-29a22*. Defendants have a duty to pay for Plaintiff's and Class member's treatment through the State General Fund, the Hospital Fee Fund, and Federal Title XIX funding. Plaintiffs and Class members have the right to spend such Plaintiff's and Class member's money as such Plaintiffs and Class members choose. Defendants have no right to charge and collect room and board fees from Plaintiffs and Class members.

By making demand for reimbursement, Defendants have clearly placed Plaintiffs and

225

Class members under an obligation to pay a portion, if not all, of the costs of their maintenance, care, and treatment at Larned State Hospital. See *K.S.A. § 59-2006(c)*. Plaintiffs and Class members should not be required to reimburse any costs associated with their maintenance, care, and treatment because their confinement constitutes legal disability. Plaintiffs and Class members have presented this argument to Defendants and this argument has been rejected.

      *K.S.A. § 59-2006* provides: "(a) Payment for the maintenance, care and treatment of any patient in a state institution irrespective of the manner of such patient's admission shall be paid by the patient, by the conservator of such patient's estate or by any person bound by law to support such patient."

      Defendants have the affirmative duty to serve written demand for reimbursement upon Plaintiffs and Class members as a patient at Larned State Hospital. *K.S.A. § 59-2006(b)*; *K.S.A. § 59-2006b(c)*. Compliance with the initial demand requirements of *K.S.A. § 59-2006(a)* and *(b)* is not a discretionary function but a ministerial one. Plaintiff's and Class member's legal disability bars Defendant's ability to recover reimbursement from Plaintiffs and Class members. However, Defendants have actively demanded and recovered room and board reimbursement from Plaintiffs and Class members and Plaintiffs and Class members have therefore been subject to and injured by these violations and suffered damages as a direct and proximate result of Defendant's acts and omissions as specifically set forth above. Unless relief is granted, Plaintiffs and Class members will continue to be injured by and suffer damages as a direct and proximate result of Defendant's acts and omissions specifically set forth above.

    406.   Based on the policy and procedures created and implemented by Defendants, Plaintiffs' and Class members' right to privacy has been taken away by Defendants. Defendants refuse to allow Plaintiffs and Class members the right to cover their window, even temporarily, from the inside while toileting and/or changing clothes. Defendants will write a disciplinary report against any Plaintiff and Class member who covers his window from the inside while toileting or changing clothes. Defendants will then take disciplinary action against said Plaintiff or Class member. Defendant's excuse for such violation is that the Plaintiff's or Class member's window is covered by a curtain from the outside, and that curtain satisfies any reasonable expectation of privacy. Unfortunately, Defendants refuse to admit that the outside window being covered by a curtain at all times does *not* allow for reasonable protection of privacy, because Defendants (staff) *can* and *do* lift the curtain at any time, as well as do other residents who check to see if the Plaintiff or Class member is in his room, before knocking. Such invasion of privacy fully exposes the Plaintiff or Class member when toileting or changing clothes.

226

This invasion of privacy violates the Plaintiff's or Class member's dignity, and boundaries, and causes the Plaintiff or Class member embarrassment. This violation of the Plaintiff's or Class member's dignity is shocking and intolerable conduct, which causes actual emotional and psychological harm, which is anti-therapeutic, because it destroys the therapeutic environment for the Plaintiff or Class member, in violation of *K.S.A. § 59-29a22(b)(9)*, "A right to humane psychological and physical environment within the hospital facilities. All facilities shall be designed to afford patients with comfort and safety, to promote dignity and ensure privacy. Facilities shall also be designed to make a positive contribution to the effective attainment of the treatment goals of the hospital."; *K.S.A. § 59-29a22(b)(13)*, "The right to be treated with respect and recognition of the patient's dignity and individuality by all employees of the treatment facility."; and *K.S.A. § 59-29a22(b)(19)*, "Reasonable protection of privacy in such matters as toileting and bathing." Furthermore, Defendants violation of Plaintiff's and Class member's dignity is a continuing mistreatment of a constitutional stature because it violates the due process clause of U.S. Const. Amend. XIV, which requires state officials to, provide civilly-committed persons with access to mental health treatment that gives them a realistic opportunity to be cured or to improve the mental condition for which they were confined. This rule applies to sex offenders, and lack of funds, staff or facilities cannot justify the State's failure to provide those confined with that treatment necessary for rehabilitation. Civilly-committed sex offenders are entitled by law to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish. See *Turay v. Seling*, 108 F. Supp. 2d 1148.

Defendants destroy the mental health treatment they are obligated to provide Plaintiffs and Class members, thus denying the Plaintiffs and Class members a realistic opportunity to be cured or to improve the mental condition for which they were confined because the violation of the Plaintiff's and Class member's dignity is shocking and intolerable to a sex offender. This violation of Plaintiff's and Class member's privacy, when exposed on the toilet, or while attempting to change, is devastating to a sex offender, because it brings back memories of when his boundaries were violated and he was abused as a child and therefore impedes the mental health treatment Defendants are required to provide. Furthermore, Defendant's denial of Plaintiff's and Class member's right to privacy is a violation of the Turay Standards, 'A treatment oriented "flavor" to the facility that is lacking a Department of Corrections "flavor."' See *Turay v. Seling*, 1999 Wash. LEXIS 74 (2000), and "more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." See *Turay v. Seling*, 108 F. Supp. 2d 1148. Because even criminals have a reasonable expectation of privacy while toileting or changing, the fact that Defendants (staff) or other residents can

peek in on Plaintiffs and Class members while criminals can toilet and change behind curtains and partitions without being violated makes SPTP conditions *more* restrictive than prison.

Defendant's policy is arbitrary, as it's so-called security concern does *not* over-rule the Plaintiff's or Class member's right to privacy, because Defendants know very well that staff have only to knock on Plaintiff's or Class member's door and ask for a response while the Plaintiff's or Class member's window is temporarily covered for toileting or clothes changing, and the Plaintiff or Class member will answer to confirm his presence and well – being. If the Plaintiff or Class member does not answer after a second knock and response request, the staff have a key and may open the Plaintiff's or Class member's door to check on his safety. This was the procedure, which worked well, before the policy was arbitrarily changed, and on it's face, as applied to Plaintiffs and Class members, as implemented, has resulted in deprivation of Plaintiff's and Class member's protected interest in liberty without adequate notice, and opportunity to be heard. See *Pawnee County Case No. 2012-CV-14 Billy D. Noble v. Shawn Sullivan and Cecil W. Emerson v. Shawn Sullivan (Right to Privacy/Window Covering).*

407.    As a result of Defendant's acts, omissions, practices and conduct, Plaintiffs and Class members have been deprived of their constitutionally protected right to be free from punishments, neglect, abuse, physical restraint, medication used as punishment, and an unnecessarily punitive environment.

408.    Defendant's acts and omissions are both shocking and intolerable and a continuing mistreatment of a constitutional stature.

409.    Plaintiff and Class members have been subject to and injured by these alleged violations and suffered the same or similar damages as a direct and proximate result of Defendants' acts, omissions, practices and conduct as specifically set forth above. Unless relief is granted, Plaintiffs and Class members will continue to be injured by and suffer damages as a direct and proximate result of Defendants' acts and omissions specifically set forth above. The remedy of which is immediate release with prejudice.

## Count VIII

## Denial of Least Restrictive Alternative Confinement in Violation of the Fourteenth Amendment to the United States Constitution

410.    Plaintiffs incorporate all previous allegations as if fully set forth herein.

411.    The Fourteenth Amendment guarantees that "[n]o State shall... deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1.

228

412. Fourteenth Amendment due process requires that the conditions and duration of confinement have some reasonable relation to the purpose for which persons are committed as determined by reasonable professional judgment.

413. Civilly committed persons may be subjected to liberty restrictions reasonably related to legitimate government objectives and that are not tantamount to punishment. Confinement that continues after the person no longer meets the statutory requirements for commitment violates due process.

414. In determining whether a statute is civil or criminal, a court should consider whether the sanction involves an affirmative disability or restraints, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment, retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned. See *In re Personal Restraint of Andre Brigham Young*, 122 Wn. 2d 1. Defendant's SVPA is criminal: it involves an affirmative restraint, as implemented mirrors historically regarded punishment, comes into play only on a finding of scienter, its operation promotes the traditional aims of punishment, retribution and deterrence, the behavior to which it applies is already a crime, and is excessive in relation to the alternative purpose assigned. KSVPA is criminal because it fails to consider less restrictive alternatives to indefinite confinement in prison-like facilities. Such less restrictive alternatives Defendants refuse to consider include community-based treatment.

415. Defendants have failed to explore options other than lifetime civil commitment, and thus, have created an "oppressive, discriminatory, counterproductive and anti-therapeutic environment."

416. The SPTP, as implemented, does not provide a less restrictive alternative to confinement at the secure facility. Therefore, it is not reasonably related to a legitimate government objective. Not all Plaintiffs and Class members have the same level of security needs, however, the SPTP as implemented does not account for this possibility. Also, if a Plaintiff or Class member no longer meets the statutory requirements for civil commitment, Defendants refuse to release the Plaintiff or Class member to a less restrictive facility or program until the Plaintiff or Class member has completed all seven phases. No matter what phase the Plaintiff or Class member is in when his current mental condition has clearly changed so that the Plaintiff or Class member is safe to be released, though *K.S.A. § 59-29a08(c), K.S.A. § 59-29a08(d), K.S.A. § 59-29a18(a), K.S.A. § 59-29a18(b), and K.S.A.*

§ 59-29a19(b) requires that he be released, Defendants refuse to measure the Plaintiff's or Class member's current mental condition or admit it has so changed that the Plaintiff or Class member is safe to be released until he has completed all seven phases. Completing phases is *no* requirement of law. Only the examination of the Plaintiffs' and Class members' current mental condition. According to *The Citebook*, "If at any time, the confined person is adjudged 'safe to be at large,' he is statutorily entitled to immediate release. Kan. Stat. Ann. § 59-29a07 (1994). Kan. v. Hendricks, 521 U.S. 346. The amount of time an individual can be incapacitated pursuant to a single judicial proceeding is one year. Kan. Stat. Ann. *§ 59-29a08*. If Kansas seeks to continue the detention beyond that year, a court must once again determine beyond a reasonable doubt that the detainee satisfies the definition of a sexually violent predator with serious difficulty controlling his dangerous behavior, whose mental abnormality or personality disorder has not so changed that he would be safe to be released." See *The Citebook*, by Tony Darwin at [519]. As such, the SPTP as implemented fails to satisfy the legitimate governmental objective of treating SPTP patients and preventing re-offending behavior.

417.   Defendants have violated *Davis v. Watkins*, 'Placement of Patients in the Least Restrictive Setting... "The defendants shall place all persons admitted in the Least Restrictive Confinement, which means the minimum limitation of movement or activity of a patient or resident necessary to provide reasonable assurance that his dangerousness would not constitute a significant risk to others and in which treatment or habilitation continues to the fullest extent possible."' See *Davis v. Watkins*, 384 F. Supp. 1196.

418.   It is generally agreed that civil commitment is not appropriate if a less restrictive alternative is appropriate and available,1 but courts have disagreed about whether this principle applies to sex offender commitments. The Washington Supreme Court enforced the principle, as a matter or constitutional law, in *In re Young*.2

The Wisconsin Sexually Dangerous Person statute requires that those committed under its authority be provided "care and treatment of the person in the least restrictive manner consistent with the requirements of the person."3  The Wisconsin Supreme Court has identified these provisions of the state's sex offender commitment law as crucial to its decision holding Wisconsin's law constitutional.4  At a minimum, the Supreme Court has stated that "due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed."... The language of the statute provides the best evidence of this reasonable relationship. Individuals found to be sexually violent persons are committed to the custody of DHS "for control, care and treatment" in "the least restrictive manner consistent with the requirements of the person and in

230

accordance with the court's commitment order."**5**

**1.** See *In re Young*, 857 P. 2d 989, 1001 (Wash. 1993); See also *Michael L. Perlin, Law and Mental Disability* § 1.29 (1994); *Bell v. Wolfish*, 441 U.S. 520,539 n, 20 (1979) (failure to consider, or to use, "alternative and less harsh methods" to achieve a non-punitive objective can help to show that a legislature's "purpose... was to punish."); *County of Hennepin v. Levine*, 345 N.W. 2d 217, 219-220 (C Minn. 1984) (court held that least restrictive alternative principle is "emphasized" in the state's civil commitment statute); *Welsch v. Likins*, 373 F. Supp. 487, 501-502 (D. Minn. 1974) (least restrictive alternatives is a constitutional requirement for commitment).

**2.** See *In re Young*, 857 P. 2d 989, 1011 (1993) ("Petitioners argue that the Statute violates equal protection because it does not require consideration of less restrictive alternatives to confinement... We agree.").

**3.** Wisconsin Statute § 980.06(2)(b)(1997).

**4.** See *Wisconsin v. Post*, 541 N.W. 2d 115 (Wis. 1995).

**5.** See *Wisonsin v. Post*, 541 N.W. 2d 115 at 122 (Wis. 1995).

See *The Sexual Predator, Chapter 3 Defending Sex Offender Commitment Cases*, By Eric S. Janus, J.D. And Lisbeth J. Nudell, J.D.

419.    Defendants have failed and refused to provide Plaintiffs and Class members with the least restrictive confinement through the use of county jails for the purpose of detaining persons awaiting involuntary civil commitment proceedings. That detaining persons in the county jail while awaiting involuntary civil commitment proceedings violates those persons' substantive and procedural due process rights. See *Lynch v. Baxley*, 744 F. 2d 1452 (October 1984, Alabama), Finding: "We forbid the use of jails for the purpose of detaining persons awaiting involuntary civil commitment proceedings, finding that to do so violates those persons' substantive and procedural due process rights."

420.    Plaintiffs incorporate argument #406 as if fully set forth herein.

421.    Defendants have imposed a punishment of Plaintiffs and Class members as applied through the KSVPA statutes, because Defendants fail to consider a less restrictive alternative. See *Furman v. Georgia*, 408 U.S. 238 (1972): "The Court will consider whether a punishment is (a) too extreme or barbaric; (b) arbitrarily imposed; (c) excessive, disproportionate, or inconsistent with contemporary norms; or (d) unnecessary to achieve a penal purpose that could be served by a less severe punishment." (John Q. LaFond, "*Preventing Sexual Violence: How Society Should Cope Wit Sex Offenders*." *American Psychological Association*, 2005, p. 180).

231

## Count VIII Actual Harm

422.   Plaintiff Richard Cochran has been denied his right to receive treatment in the least restrictive alternative confinement.  See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaire.*

423.   As a result of Defendant's acts, omissions, practices and conduct, Plaintiffs and Class members have been deprived of their constitutionally protected right to a less restrictive alternative placement in violation of their rights guaranteed under the Fourteenth Amendment to the United States Constitution.

424.   Defendant's acts and omissions are both shocking and intolerable and a continuing mistreatment of a constitutional stature.

425.   Plaintiff and Class members have been subject to and injured by these alleged violations and suffered the same or similar damages as a direct and proximate result of Defendants' acts, omissions, practices and conduct as specifically set forth above.  Unless relief is granted, Plaintiffs and Class members will continue to be injured by and suffer damages as a direct and proximate result of Defendants' acts and omissions specifically set forth above.  The remedy of which is immediate release with prejudice.

## Count IX

## Denial of Right to be Free from Inhumane Treatment in Violation of the Fourteenth Amendment to the United States Constitution

426.   Plaintiffs incorporate all previous allegations as if fully set forth herein.

427.   The Fourteenth Amendment guarantees that "[n]o State shall... deprive any person of life, liberty, or property, without due process of law."  U.S. Const. Amend. XIV, § 1.  Fourteenth Amendment due process requires that the conditions and duration of confinement have some reasonable relation to the purpose for which persons are committed.  Civilly committed persons may be subjected to liberty restrictions reasonably related to legitimate government objectives and that are not tantamount to punishment as determined by reasonable professional judgment.  Confinement that continues after the person no longer meets the statutory requirements for commitment violates due process.

428.   *K.S.A. § 59-2978(a)* provides that "Every patient being treated in any treatment facility, in addition to all other rights preserved by the provisions of this act, shall have the following rights: (12) to be treated humanely consistent with generally accepted ethics and practices."

429.   *K.S.A. § 59-29a22(b)* provides that "Each patient shall have the following rights: (9) A

232

right to a humane psychological and physical environment within the hospital facilities. All facilities shall be designed to afford patients with comfort and safety, to promote dignity and ensure privacy. Facilities shall also be designed to make a positive contribution to the effective attainment of the treatment goals of the hospital."

    430.   Consider *Davis v. Watkins*, 'III. MINIMUM CONSTITUTIONAL STANDARDS FOR ADEQUATE TREATMENT FOR PATIENTS COMMITTED TO LIMA STATE HOSPITAL

*C. Treatment of Patients in the Most Humane Psychological and Physical Environment.*

1) The patient shall have a right to dignity, privacy and humane care.

2) *Patients shall have a right to the least restrictive conditions necessary to achieve the purposes of their commitment in accordance with their individual treatment plan.*

3) *Residents shall lose none of the rights enjoyed by citizens of... and of the United States solely by reason of their admission or commitment to the institution, except as expressly determined by an appropriate court.*

4) No person shall be deemed incompetent to manage his affairs, to contract, to hold professional and occupational or vehicle operators licenses, to marry and obtain a divorce, to register and to vote, or to make a will solely by reason of his commitment or admission to the hospital.

5) *The institution shall provide, under appropriate supervision, suitable opportunities for the residents' interaction with members of the opposite sex, including the right to furlough visit*, except where a qualified mental health professional responsible for the formulation of a particular resident habilitation plan writes an order to the contrary and explains the reasons therefor.

6) The opportunity for religious worship shall be accorded to each resident who desires such worship. *Provisions for religious worship shall be made available to all residents on a non-discriminatory basis.* No individual shall be coerced into engaging in such religious activities.

7) *The institution shall prohibit corporal punishment, mistreatment, neglect or abuse in any form of any patient...*

9) *A patient at... State Hospital shall have a right to receive prompt and adequate medical treatment for a physical ailment and for the prevention of any illnesses or disability. Such medical treatment shall meet standards of the medical practice of the community. A physician must be available at the institution or on call at all times. Every entering patient must be given a thorough and complete medical examination before being assigned to a ward. Thereafter, each patient must be given a medical examination every year. There must be a daily sick call attended by a licensed physician who shall make rounds to each ward in the institution...*

10) Patients shall be entitled to send and receive sealed mail in accordance with the following standard:

b. *Proper arrangements shall be made to ensure that all patients may freely obtain writing materials and postage from the commissary, and indigent patients shall be furnished at public expense, writing materials and ordinary postage for their personal use in dispatching a maximum of five (5) letters per week...*

11) Patients at the hospital shall have the right to make telephone communication with persons outside the institution pursuant to orderly procedures set up by the mental health professionals on each ward upon the following conditions:

a. Provisions shall be made for as many telephone calls as are necessary for a person who is without counsel to obtain counsel; this shall be done at the patient's expense unless a qualified mental health professional approves the telephone call at public expense.

b. *Provisions shall be made for patients to make local calls during stated hours at no charge.*

c. Provisions shall be made for patients to make long distance phone calls during stated hours, the cost to be borne by the patient, except in those instances where the individual is indigent, and the patient's treatment team authorizes such a call.

d. *Patients' telephone calls shall not be monitored.* Patients' right to communication shall not be prohibited except to the extent that the qualified mental health professional responsible for the formulation of the patient's treatment plan writes an order imposing special restrictions and explains the reasons for any such restrictions. This written order must be renewed every thirty (30) days if any restrictions are to be continued.

12) *Patients in the hospital shall have unrestricted right to visitation, at all reasonable times, including the right to visit with their own children...*

13) *There shall be no censorship of books or periodicals including newspapers supplied to, purchased by, or given to patients of the institution...*

D. *Patients' Rights.*

1) *Patients shall have access to members of their treatment team, the Ombudsman and the Superintendent at all reasonable times and places, and patients shall not be required to obtain special permission to meet with or talk with said individuals during periods when their time is not otherwise scheduled.*

2) *Patients shall be provided counseling or other treatment for homosexuality, and defendants shall provide adequate and appropriate protection for patients subject to homosexual or other assaults by other patients...*

234

*E. Patients' Personal Possessions.*

8) *The institution shall make provisions for the adequate and regular laundering of residents' clothing...*

10) *Each patient shall have the right to keep and use his own personal possessions except if it was determined that such clothes or personal possessions may be determined to be dangerous, either to himself or others by a qualified mental health professional...*

16) *Patients shall be allowed privacy and solitude in their own rooms whenever they desire,* unless otherwise determined by a qualified mental health professional or unless such privacy would interfere with the patient's participation in a treatment program in which he is enrolled...

*F. Diet and Food Services.*

1) A nourishing, well-balanced diet shall be provided to each patient.

2) *The patients' diet shall provide a minimum of the recommended daily dietary allowance as developed by the National Academy of Sciences. Menus shall be satisfying and shall provide the recommended daily dietary allowances.* In developing such menus, the institution shall utilize the modern cost food plan of the United States Department of Agriculture. *The institution shall not spend less per person for raw food, including the value of donated food, than the most recent per person cost of the moderate cost food plan for the Midwest region of the United States,* as compiled by the United States Department of Agriculture, for appropriate groupings of residents, discount of any savings which might result from the institutional procurement of such food.

3) Patients, except for the non-ambulatory, shall eat or be fed in dining rooms.

4) Provisions shall be made for special therapeutic diets and for substitutes at the request of the patient, or his guardian or next of kin in accordance with the religious requirements of any resident's faith.

5) *The diet manual should be approved by the medical staff of the institution. There should be written policies and procedures relating to the safety and sanitation of the services, preparation and handling of the food,* the care and cleaning of equipment and work areas, including the washing of dishes in the hospital. To this extent, the serving employed, the kitchen, the kitchen equipment, the food storage area and all persons employed in and around the kitchen and handling food *shall meet minimum standards for restaurant health requirements. The kitchen and food services unit shall be regularly inspected by public health officials* on the same basis as restaurants serving the public, and the recommendations or requirements made by the public health authorities as the result of such inspection shall be implemented by the defendants within the time allowed therefor by said public health authorities. *Written policies and procedures governing dietary activity should cover a system to insure that patients receive correct prescribed diets.*

235

6) *Food shall be served at proper temperatures, fresh, and in reasonable varieties.*

7) *Food shall be protected from contamination and spoilage and should be distributed under safe and sanitary conditions.* No food should be stored on the floor of walk-in refrigerators. *The dietary service should conduct periodic acceptance studies among the patients.* Disposable containers and utensils should be discarded after one use. And the hospital should develop written regulations governing smoking within the kitchen area and should make the regulations known to the dietary personnel, to the patients, and to the public.

8) The denial of a nutritionally adequate diet shall not be used as a punishment...

*G. Physical Facilities.*

1) *Patients have the right to a humane physical environment within the hospital facilities. These facilities shall be designed to make a positive contribution to the effective attainment of treatment goals of the institution...*

9) *Pursuant to an established routine maintenance and repair program, the physical plant shall be kept in a continuous good state of repair and operational so as to insure the health, comfort, safety and well-being of the patients, and so as not to impede in any manner the treatment programs of the patients.*

10) *Adequate heating and ventilation systems and equipment shall be afforded to maintain temperatures and air changes which are required for the comfort of residents at all times.* Ventilation systems shall be adequate to remove steam and offensive odors or to mask such odors.

11) *Thermostatically controlled hot water shall be provided in adequate quantities and maintained at the required temperature for the resident use* (approximately 110 degrees Fahrenheit at the fixture) and for mechanical dishwasher machine and laundry use (approximately 180 degrees Fahrenheit)...

13) *The physical facilities must meet all fire and safety standards established by the state and locality.* In addition, the institution shall meet the provisions of the life safety code of the National Fire Prevention Association (21st edition, 1967), and standards promulgated by the Occupational Health and Safety Administration, including, but not limited to, the installation of an automatic fire detection and sprinkler system. This will include a provision that all hazardous  areas should be protected by both a two-hour fire resistive construction and appropriate automatic fire extinguishing systems. Kitchen exhausts will be provided with automatic carbon dioxide or dry chemical extinguishing systems. All buildings housing patients should have an electrically supervised, manually operated fire alarm system that transmits an alarm automatically to the local fire department. *A record of safety inspection should be maintained. Such inspections should be conducted by supervisory personnel every three (3) months*

*and recorded.* Stairwells and exists should be kept clear of obstacles which would present a hazardous condition in case of fire. Such exits should be clearly indicated with appropriate signs and illuminated at night. The hospital should implement the State Fire Marshall's recommendations of August 23, 1973, without further delay.

14) *There shall be provided on each unit of the hospital sufficient office space to house the necessary qualified mental health professionals, the Unit Director, psychiatrists, psychologists, social workers, registered nurse and mental health associate. Such persons shall be readily accessible to the patient population* and, in turn, the patient shall be accessible to them.' See *Davis v. Watkins*, 384 F. Supp. 1196.

431.   Based on the policy and procedures created and implemented by Defendants, they subject Plaintiffs and Class members to inhumane treatment through the punitive and unnecessarily restrictive living conditions at the SPTP. Plaintiffs and Class members have their rights restricted for minor violations of SPTP facility rules. They receive inadequate meals. They are subject to arbitrary discipline and decision-making by SPTP staff.

432.   Defendants have an obligation to provide Plaintiffs and Class members proper medical treatment. Based on the policy and procedures created and implemented by Defendants, they subject Plaintiffs and Class members to inhumane treatment through denial of proper medical treatment.

433.   Defendants have an obligation to establish and maintain a proper routine maintenance and repair program. Based on the policy and procedures created and implemented by Defendants, they subject Plaintiffs and Class members to inhumane treatment through denial of a proper routine maintenance and repair program, and denial of an adequate heating and ventilation system and equipment.

434.   Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to provide Plaintiffs and Class members the least restrictive conditions necessary achieve the purposes of their commitment in accordance with their "individual" treatment plan.

435.   Based on the policy and procedures created and implemented by Defendants, Defendants have denied and/or restricted Plaintiffs' and Class members' rights, though Plaintiffs and Class members, upon release from prison, are entitled to the rights enjoyed by citizens of Kansas and of the United States.

436.   Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to provide, under appropriate supervision, suitable opportunities for

the Plaintiffs' or Class members' interaction with members of the opposite sex, including the right to furlough visit.

437.    Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to provide an Ombudsman to whom any corporal punishment, mistreatment, neglect or abuse in any form of any Plaintiff or Class member shall be reported immediately.

438.    Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to provide prompt and adequate medical treatment to Plaintiffs and Class members. Medical treatment provided by Defendants does not meet standards of the medical practice of the community. Defendants do not provide an available physician at the institution or on call at all times. Medical treatment is only provided by an Advanced Practicing Registered Nurse. Plaintiffs and Class members are not given a thorough and complete medical examination every year. Defendants do not provide a daily sick call, nor is any sick call attended by a licensed physician, nor does any physician make any rounds to any ward in the institution.

439.    Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to furnish indigent Plaintiffs and Class members at public expense, ordinary postage for their personal use in dispatching a maximum of five (5) letters per week.

440.    Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to make provisions for Plaintiffs and Class members to make local calls at no charge.

441.    Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to provide Plaintiffs and Class members telephone calls that are not monitored. When Plaintiffs and Class members place telephone calls to loved ones, on the SPTP pay phone system, the recording, when the Plaintiff's or Class member's loved one answers, announces to the Plaintiff's or Class member's loved one that all calls are monitored and/or recorded.

442.    Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to provide Plaintiffs and Class members with *unrestricted* right to visitation, at all reasonable times, including the right to visit with their own children.

443.    Based on the policy and procedures created and implemented by Defendants, Defendants have censored books, periodicals, and newspapers supplied to, purchased by, or given to Plaintiffs and Class members of the institution.

444.    Based on the policy and procedures created and implemented by Defendants,

Defendants have failed and refused to provide Plaintiffs and Class members access to members of their treatment team, the Ombudsperson or the Superintendent at any reasonable time or place. Defendants have required Plaintiffs and Class members to obtain special permission to meet with or talk with said individuals during periods even when their time is not otherwise scheduled.

445.    Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to provide counseling or other treatment for homosexuality. Defendants have failed and refused to provide adequate and appropriate protection for Plaintiffs or Class members subject to homosexual or other assaults by other patients.

446.    Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to provide adequate and regular opportunity for Plaintiffs and Class members to launder their own clothing. Defendants force Plaintiffs and Class members to send their clothing to a central laundry where their clothing is laundered by Kansas Department of Corrections prisoners.

447.    Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused Plaintiffs and Class members their right to own personal possessions.

448.    Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to allow Plaintiffs and Class members privacy and solitude in their own rooms whenever they desire.

449.    Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to provide Plaintiffs and Class members with a diet which provides a minimum of the recommended daily dietary allowances as developed by the National Academy of Sciences. Defendants do not provide a menu that is satisfying, nor provides the recommended daily dietary allowances. Defendants spend less per person for raw food than the most recent per person cost of the moderate cost food plan for the Midwest region of the United States.

450.    Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to meet minimum standards for restaurant health requirements. The kitchen and food services unit is not regularly inspected by public health inspectors. Plaintiffs and Class members do not receive correct prescribed diets.

451.    Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to serve food fresh and at proper temperatures. Food is not protected from contamination and spoilage nor distributed under safe and sanitary conditions. The

239

dietary service does not conduct periodic acceptance studies among Plaintiffs and Class members.

452.    Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to provide a humane physical environment within facilities designed to make a positive contribution to the effective attainment of treatment goals of the institution.

453.    Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to establish routine maintenance and repair procedures to insure the physical plant is kept in a continuous good state of repair and operational so as to insure the health, comfort, safety and well-being of Plaintiffs and Class members.

454.    Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to make appropriate provisions to permit non-ambulatory Plaintiffs and Class members to communicate their needs to the staff. Defendants have disabled Plaintiffs' and Class members' room intercom system, in the Dillon building, so that Plaintiffs and Class members are unable to contact staff, nor communicate their needs to staff in case of emergency. Defendants have failed and refused to provide emergency buttons in the showers, so that Plaintiffs and Class members who may slip and fall or experience any other emergency situation in the shower have no way of contacting staff, nor communicating their needs to staff in case of emergency.

455.    Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to provide adequate heating and ventilation systems. Dillon building heating systems are inadequate to provide comfort in the winter. The rooms are too cold. Dillon building air conditioning is inadequate to provide comfort in the summer. The rooms are too hot. Dillon building ventilation systems are old and filthy. The ventilation system filters have not been changed, and the ducts have not been cleaned in years. The Dillon building is a sick building. The air quality is unhealthy. The ducts are full of black mold. Plaintiffs and Class members frequently become ill from breathing the contaminated air in the Dillon building.

456.    Based on the policy and procedures created and implemented by Defendants, Defendants have failed and refused to meet all fire and safety standards established by the state and locality. See *Exhibit M; 2012 The Joint Commission, Larned State Hospital, Hospital Accreditation Report*, p. 7.

457.    Plaintiffs incorporate argument #406 as if fully set forth herein.

458.    Defendants fail to clean out the heating and ventilation system, which is full of black mold, as well as other pollutants. Plaintiffs and Class members have become physically ill from breathing the polluted air. Twenty seven (27) residents have died over the SPTPs twenty (20) year

history. Suspiciously Resident Dee Jay McClure developed airborne MRSA just before he died in 2013. These cases could very well be connected to the poor air quality from the Defendant's negligence in maintaining the heating and air system. Plaintiffs and Class members have difficulty breathing in the Dillon building. Class member Tyrone Tschantz suffers from asthma. He has not had as much difficulty breathing in his life as he has had while in SPTP. Class member Randall Ritchie has exercise induced asthma, which only presented while exercising in the past. Since he has been in SPTP, he has had to begin carrying a rescue inhaler, because he has developed difficulty breathing even while not exercising. Furthermore, the Dillon basement and pipe tunnel is full of asbestos, which is a know pathogen. On October 30, 2013 at 9:15 am Doctor Mabugat, SPTP psychiatrist called Class member Randall Ritchie to his office to talk about his medication. They discussed Randall's problems with asthma and allergies and how they have gotten worse since he has been in LSH, SPTP Dillon building. Doctor Mabugat mentioned, "A lot of residents are having trouble with their breathing and allergies in the Dillon building." He stated that, "This (Dillon) building was built in the 30's, I think, the ventilation system is old and no good – who knows what's in there. I have allergies myself. Normally I have no trouble. But when I come into this building I get very sick. My nose runs and I sneeze all day, and find it hard to breath. Yet, when I leave, I have no trouble at all, until I return to the building." Again, on December 2, 2013 Doctor Mabugat called Class member Michael Chubb to his office. While discussing Michael's medication, Doctor Mabugat stated, "I always get sick when I come into the Dillon building. I get itchy, watery eyes. My nose gets stuffed up and starts running. I get dizzy and have trouble breathing. I begin sneezing, coughing, and wheezing. It is episodic, every time I come into the Dillon building. The nurses always have to ask me if I am okay. Yet, when I leave the building and go home, I never have any trouble at all. Not until I return." When black mold is discovered, Defendants dispatch paint crews to "cover up" the problem by painting over it. The black mold is never removed, nor is the problem fixed. The dangerous black mold remains underneath the fresh paint, producing more toxic black mold spores. The black mold eventually grows back through the fresh paint and continues to poison the Plaintiffs and Class members.

459.    Defendants have resorted to threatening and bullying employees who have a legitimate excuse, such as a doctor's order, limiting the number of hours they can work. Yet, those employees are still being forced to work long hours (mandating overtime). As a result, many employees have quit recently, leaving SPTP more short staffed than ever. Morale is low, stress is high, the level of care and treatment is affected by frustrated employees who have lost the desire to provide adequate care and treatment to Plaintiffs and Class members. Plaintiffs and Class members are injured by the neglect and

inhumane treatment they experience at the hands of frustrated employees.

460.    Plaintiffs and Class members, no longer being prisoners, have had their civil rights restored. *K.S.A. § 59-2978(a)(3)* entitles Plaintiffs and Class members to conjugal visits. Based on the policy and procedures created and implemented by Defendants they refuse to provide Plaintiffs and Class members with facilities for those conjugal visits. Denial of conjugal visits for married couples is inhumane treatment in violation of the Fourteenth Amendment to the United States Constitution.

461.    Plaintiffs and Class members are not allowed to wash their own laundry. Money Defendants allocated toward Plaintiff's and Class member's own laundry facility was used by Defendants to remodel the laundry facility for the KDOC Larned Correctional Mental Health Facility. Plaintiffs and Class members are not given a choice, they must send their laundry to the KDOC laundry facility for washing, or wear dirty clothes. Minimum custody prisoners wash Plaintiff's and Class member's clothes. Plaintiff's and Class member's clothes are labeled by Defendants, with iron-on labels which provide Plaintiff's and Class member's personal information, such as: First, middle, and last name, patient number, that the Plaintiff or Class member is committed to the Sexual Predator Treatment Program (SPTP), and which building and unit the Plaintiff or Class member is housed in. Prisoners who wash Plaintiff's and Class member's clothes have full access to Plaintiff's and Class member's personal information. This is a HIPPA violation. Furthermore, the prisoners often maliciously steal and/or destroy Plaintiff's or Class member's laundry. Plaintiffs and Class members have no means of complaint or reimbursement when their laundry is purposely stolen, damaged, or destroyed. Grievances are not taken seriously and are never answered satisfactorily. Plaintiffs and Class members are simply told they own their clothes and send it to the laundry at their own risk. Defendants refuse to remedy the problem or reimburse the Plaintiffs and Class members for their loss.

462.    Minimum custody prisoners are often brought onto SPTP grounds to perform menial maintenance and repairs, though Plaintiffs and Class members could perform these tasks themselves. When prisoners are brought onto SPTP grounds, they come into contact with Plaintiff's and Class member's personal information, which is displayed on their doors, and on the personal identification cards they are required to wear, and display, at all times. This is a HIPPA violation.

463.    The acts and omissions of Defendants constitute deprivation of Plaintiff's and Class member's constitutional right to be free from inhumane treatment in violation of their rights guaranteed under the First and Fourteenth Amendments to the United States Constitution.

464.    Plaintiffs and Class members have been subject to and injured by these alleged violations and suffered damages as a direct and proximate result of Defendant's acts and omissions as

242

specifically set forth above. Unless relief is granted, Plaintiffs and Class members will continue to be injured by and suffer damages as a direct and proximate result of Defendant's acts and omissions specifically set forth above.

## Count IX Actual Harm

465.    Defendants have mounted night lights above the beds of Plaintiff's and Class member's, which will not turn off. These night lights shine directly into Plaintiff's and Class member's eyes all night, which restricts and interferes with Plaintiff's and Class member's health, rest and sleep. Defendant's use of night lights is torture and cruel and unusual punishment.

466.    Defendants have denied Class member Timothy Anderson proper medical treatment. Based on the policy and procedures created and implemented by Defendants, they subject Class member Anderson to inhumane treatment through denial of proper medical treatment to wit actual harm being, in September 2005 Class member Anderson had severe stomach cramps. He went to sick call and was told by the APRN that he was merely experiencing gas. Class member Anderson's subsequent complaints were ignored. Three (3) days later Class member Anderson began throwing up and was finally sent to the hospital in Great Bend, Kansas by ambulance, for emergency gall bladder surgery.

In the Spring of 2013 Class member Anderson developed a rash on his lower leg and ankles. Class member Anderson went to sick call where the APRN told him it was "just a rash." She gave him some cream which has been ineffective. To date medical staff has done nothing to effectively help Class member Anderson heal. His rash has never healed. See *Exhibit Q, Plaintiff's and Class Member's Resident's Class Action Questionnaires*.

467.    Defendant have denied Class member Paul Blumenshine proper medical treatment. Defendants refuse to give Class member Blumenshine any tests to determine why he has blackouts. On three separate occasions Defendants medical board have canceled a doctor's order for Class member Blumenshine for prostate surgery. See *Exhibit Q, Plaintiff's and Class Member's Resident's Class Action Questionnaires*.

468.    Defendants denied Class member Robert Boatright proper medical treatment. In August 2012 Class member Boatright complained of chest pains, arm pain, and trouble breathing. He passed out in the day room, where he lay for forty five minutes while MH/DD staff called for the nurse, who never came. So MH/DD staff called medical emergency. The nurse came and put Class member Boatright in his bed on an I.V.. Class member Boatright died later that night. He had a heart attack and a vein burst, which caused him to bleed out.

469.    Class member Callow has been injured by Defendant's use of night lights. The night

243

lights shine in his eyes and severely restrict and interfere with his health, rest and sleep.

470.    Defendants have denied Plaintiff Richard Cochran proper medical treatment. Defendants refuse to give Plaintiff Cochran an MRI or CAT scan to determine physical impairment Plaintiff Cochran contends exists. Defendant's medical board has restricted his right to an MRI or CAT scan, though the Ph.D. had written a doctor's order for these tests. See *Exhibit Q, Plaintiff's and Class Member's Resident's Class Action Questionnaires*.

471.    Defendants have denied Class member Toby Dillingham proper medical treatment. In March 2013 Class member Dillingham went to sick call and saw the APRN because his foot was hurting so badly he could not walk on it. The APRN told him he needed an x-ray. Defendant's medical board canceled the doctor's order for Class member Dillingham's x-ray. Defendants forced Class member Dillingham to live with the pain of a broken foot. One year later Defendants finally x-rayed Class member Dillingham's foot. The APRN confirmed that Class member Dillingham had a broken foot, but told him there was nothing they could do for him because his foot had already healed improperly.

In 2013 Class member Dillingham went to sick call for severe allergies. The APRN examined him and told him he had nose polyps. The APRN referred him to an Ear, Nose and Throat Specialist. Defendant's medical board canceled the doctor's order for Class member Dillingham to see an Ear, Nose and Throat Specialist.

In 2013 Class member Dillingham requested for an approval to purchase an air purifier to alleviate his severe allergies and to reduce the allergens in the air which are causing him migraine headaches. Defendants first approved Class member Dillingham's request but when he tried to purchase the air purifier, Defendants refused to let him have it. See *Exhibit Q, Plaintiff's and Class Member's Resident's Class Action Questionnaires*.

Defendants denied Class member Dillingham his right to medication. See *Exhibit P, Plaintiff's and Class member's Resident Grievance Forms*, grievance dated 4/19/12.

Defendants denied Class member Dillingham's doctor appointment four times. See *Exhibit P, Plaintiff's and Class member's Resident Grievance Forms*, grievance dated 6/6/12.

472.    Plaintiff Michael Gallagher has been verbally and mentally abused by Defendant's staff members. Defendants have not provided more considerate conditions to accommodate his Parkinson's disorder. Defendants have denied Plaintiff Gallagher proper medical treatment. Defendant's medical board has canceled a doctor's order for an EEG test for movement disorder and nerve conduction after he was diagnosed with Parkinson's disorder in 2002. See *Exhibit Q, Plaintiff's and Class Member's*

244

*Resident's Class Action Questionnaires.*

473.    Defendants have denied Plaintiff Harvey Hickman proper medical treatment. Defendants refuse to treat a lump on his left shoulder blade that has been there for over four years. Defendants have denied him hearing aides because they say, "They are not medically necessary." Defendant's medical board canceled a doctor's order for an x-ray for Plaintiff Hickman's broken foot. After three days Plaintiff Hickman was finally allowed an x-ray, which revealed that Plaintiff Hickman did have a broken foot. Defendants still refused to treat Plaintiff Hickman's broken foot. See *Exhibit Q, Plaintiff's and Class Member's Resident's Class Action Questionnaires.*

474.    Defendants have denied Class member Steven Islam proper medical treatment. Defendants refuse to allow Class member Islam his pain medication for his severe back pain. Defendant's medical board has on several occasions canceled a doctor's order for Class member Islam to see an ear specialist because his ears bleed and he suffers from hearing loss. See *Exhibit Q, Plaintiff's and Class Member's Resident's Class Action Questionnaires,* and *Exhibit P, Plaintiff's and Class member's Resident Grievance Forms,* grievance dated 9/17/13.

Defendants refused to treat Class member Islam for severe chest pains though he had been complaining for two days. It was not until another resident called his family member and that family member called the Director of Nursing that Defendants took Class member Islam to the Larned Hospital Emergency room. The emergency room doctor determined that Class member Islam had suffered a mild heart attack. He gave Defendants strict instructions to monitor Class member Islam closely and return him to the hospital immediately if he experienced any future symptoms. A few days later Class member Islam again experienced chest pains and complained. Defendant's nursing staff refused to treat him. They simply gave MH/DD staff instructions to take his vital signs and have him relax for a half hour. A half hour later the nursing staff again instructed MH/DD staff to take Class member Islam's vital signs and have him relax for another half hour. Again, it was not until Class member Islam's fellow resident called his family member and that family member again called the Director of Nursing that Defendants took Class member Islam back to the Larned Hospital Emergency room, where the emergency room doctor determined Class member Islam was suffering another heart attack. The emergency room doctor determined Class member Islam's heart blockage was so severe that they had to perform emergency surgery to put a stint in his heart.

475.    Defendants denied Class member Max Johnson proper medical treatment. Max Johnson passed away December 12th, 2009. Defendants list his cause of death as cancer. On December 12th, 2009, at approximately 3:00 pm, Class member Johnson told MH/DD staff he was not feeling good and

wanted to go to the hospital. MH/DD staff took him to Nurse Judy, who told him he could "stay here and die." Nurse Judy sent him back to his room. After supper, Class member Johnson told MH/DD staff he wasn't feeling good and wanted to go to the hospital. Defendants refused to take him. Between approximately 10:30 pm and 11:00 pm Defendants finally took Class member Johnson to the hospital, he died en-route.

476.    Defendants have denied Class member Lenny Lowry proper medical treatment. Defendant's medical board canceled a doctor's order June 2014 for a cast on his broken foot, after he had an x-ray proving he had a broken foot. Though the doctor confirmed Class member Lowry's foot was fractured in two places, Defendant's medical staff told Class member Lowry, "It's only fractured, you'll have to live with it."

477.    Defendants have denied Class member Eddie Martin proper medical treatment. Defendants refuse to allow Class member Martin his pain medication though he has chronic back pain, mild scoliosis, and a deteriorating disk.

Defendants deny Class member Martin his reasonable right to privacy. Though he has a sign on the curtain, over his window, on his door, asking staff members to knock first, staff members ignore his wishes and open his curtain to look into his room, without warning. Defendants do not respect Class member Martin's reasonable right to privacy while toileting and changing. See *Exhibit Q, Plaintiff's and Class Member's Resident's Class Action Questionnaires.*

478.    Defendants denied Class member Dee Jay McClure proper medical treatment. Class member McClure suffered from brain cancer and had much of his brain removed. He could not sit up on his own, turn himself, go to the bathroom on his own, bath himself, or even feed himself. Class member McClure required constant care and attention. February 2013, Class member McClure caught internal MRSA, which nearly killed him because the staff let it progress for several weeks before reporting it for treatment. Class member McClure was in constant pain and frequently cried out for help. Though MH/DD staff were assigned to sit in his room with him to monitor him, some of them ignored him, some yelled at him to shut up, and some even fell asleep. Because Dee Jay could not feed himself, and some staff refused to feed him, he got very little to eat. On Wednesday, April 3rd, 2013 the medical staff took Class member McClure off of one-on-one care. Class member McClure laid in his room all night without adequate care. During the day MH/DD staff put him in a wheel chair and left him sitting alone in the day room all day. On April 5th, 2013, in the morning, MH/DD staff found Class member McClure lethargic and unresponsive and had him transported to Wesley Medical Center in Wichita, Kansas. There he suffered from a brain hemorrhage and stroke. On April 8th, 2013 Class

member McClure passed away in the hospital. Before his death, Class member McClure's brother found a nursing home (in 2010) that would have accepted him (because Class member McClure was an invalid and therefore could not harm himself or anyone else and was *no* threat to society), but Defendants refused to release him.

479.    Defendants have denied Class member Richard Miller proper medical treatment. Defendants refused to allow Class member Miller his pain medication after he had surgery. Class member Miller had to file a lawsuit to get his pain medication. Defendant's medical board canceled a doctor's order for a shot for the Osteoarthritis in Class member Miller's shoulder. Defendant's medical board canceled a doctor's order for surgery for his big toe. See *Exhibit Q, Plaintiff's and Class Member's Resident's Class Action Questionnaires.*

480.    Defendants have denied Plaintiff Eric Patterson proper medical treatment. Defendants force a diet upon him against his will. Defendants fired Plaintiff Patterson from a "Vocational Training Program" job for medication reasons, though *K.S.A. § 59-29a22(b)(A)* says each patient has the right to "refuse all medication and treatment...", while *K.S.A. § 59-29a22(b)(B)* says each patient has the right "medication may not be used as punishment..." See *Exhibit Q, Plaintiff's and Class Member's Resident's Class Action Questionnaires.*

481.    Defendants have denied Plaintiff Ramon Perez proper medical treatment. Defendants violate his right to refuse medication, medical procedures, and treatment. Defendants force a diet upon him against his will. See *Exhibit Q, Plaintiff's and Class Member's Resident's Class Action Questionnaires.*

482.    Based on the policy and procedures created and implemented by Defendants, they subject Class member Randall Ritchie to inhumane treatment through denial of proper medical treatment to wit actual harm being Class member Ritchie has a Vocational Training Program (VTP) job and takes medication for asthma, allergies, athlete's foot, injured knees, enlarged prostate, vitamins, krill oil, and sleep disorder. Defendants have been changing his medication times without his approval. They have split his medication times up to three times per day. His medication times interfere with his sleep schedule and his classes. When Class member Ritchie requested Defendants combine his medication times to ten (10) pm and ten (10) am, because he was already taking medication at that time, Defendants refused, and changed his medication times back to eight (8) am and eight (8) pm. against his wishes. This time does not work for Class member Ritchie, so he refused to take it anymore. Defendants threatened to punish Class member Ritchie by taking his job away if he refused to take his medication at Defendant's convenience. Defendants violated Class member Ritchie's rights

to refuse medication and to not be punished by refusing medication. See *K.S.A. § 59-29a22(b)(5)* "Have the following rights, under the following procedures, to refuse medication and treatment: (A) Have the right to refuse all medication and treatment except as ordered by a court or in a situation in which the medication or treatment is necessary to prevent serious physical harm to the patient or to others. (B) Medication may not be used as punishment, for the convenience of staff, as a substitute for a treatment program, or in quantities that interfere with a patient's treatment program."

Defendants have denied Class member Randall Ritchie proper medical treatment. Defendants have refused to treat Class member Ritchie's dislocated collar bone, broken finger, allergies, or injured knees. Defendants refuse to test Class member Ritchie's allergies so he can receive the proper allergy medication. Defendant's medical board canceled a doctor's order and a physical therapist's order for knee braces for Class member Ritchie's injured knees. Class member Ritchie has trouble breathing because Defendants have housed him in a building that is full of black mold and poor ventilation, though Class member Ritchie suffers from asthma and allergies.

Defendants charged Class member Ritchie for his medical procedures, even though Defendants are responsible for Class member Ritchie's care and treatment. See *Exhibit P, Plaintiff's and Class member's Resident Grievance Forms* for examples of the medical bills Defendants sent to Class member Ritchie.

Defendants denied Class member Ritchie his right to eat. See *Exhibit P, Plaintiff's and Class member's Resident Grievance Forms*, grievance dated 2/14/14.

483. Defendants have denied Plaintiff James Roberts proper medical treatment. Defendant's medical board canceled a doctor's order for Plaintiff Roberts to see a dentist for his abscessed tooth. See *Exhibit Q, Plaintiff's and Class Member's Resident's Class Action Questionnaires.*

484. Defendants have denied Plaintiff James Rowray proper medical treatment. Defendants force a diet upon him against his will. Defendants violate his right to refuse medication.

Defendants deny Plaintiff James Rowray his reasonable right to privacy. See *Exhibit Q, Plaintiff's and Class Member's Resident's Class Action Questionnaires.*

485. Defendants have denied Class member Jimmie Sebek proper medical treatment. Defendants refused to treat Class member Sebek when he broke his wrist. Though Class member Sebek had a broken wrist, Defendants refused to put a cast on his wrist. See *Exhibit Q, Plaintiff's and Class Member's Resident's Class Action Questionnaires.*

486. Class member Charles Smeltzer has been injured by Defendant's use of night lights. Defendants have mounted night lights above the bed of Class member Smeltzer, which will not turn

off. These night lights shine directly into Class member Smeltzer's eyes all night, which restricts and interferes with his health, rest and sleep. Defendant's use of night lights is torture and cruel and unusual punishment. See *Exhibit Q, Plaintiff's and Class Member's Resident's Class Action Questionnaires.*

487.    Defendants deny Class member Nicholas Stape his reasonable right to privacy. See *Exhibit Q, Plaintiff's and Class Member's Resident's Class Action Questionnaires.*

488.    Defendants have denied Class member Randal Terrel proper medical treatment. Defendant's medical board canceled a doctor's order for Class member Terrel for a colonoscopy. See *Exhibit Q, Plaintiff's and Class Member's Resident's Class Action Questionnaires.*

489.    Defendants have denied Plaintiff David Thayer proper medical treatment. Defendant's medical board canceled a doctor's order for Plaintiff Thayer for hernia surgery. Defendant's medical board refused to allow Plaintiff Thayer hernia surgery for two years, even though he was suffering with intense pain from a softball sized hernia. Plaintiff Thayer still suffers from pain and discomfort, though he has finally had hernia surgery. Defendants refuse Plaintiff Thayer follow up treatment to treat the cause of his further pain and discomfort. Plaintiff Thayer has trouble breathing because Defendants have housed him in a building that is full of black mold and poor ventilation.

Plaintiff David Thayer was molested by an SPTP staff member. Defendants fired the male staff member, but also punished Plaintiff Thayer, though he was a victim of a crime. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaires.*

490.    Defendants have denied Class member Tyrone Tschantz proper medical treatment. Defendant's medical board twice canceled a doctor's order for Class member Tschantz for hernia surgery. Defendant's medical board refused to allow Class member Tschantz hernia surgery for seven months. Defendants refused to treat Class member Tschantz' infected sutures after his hernia surgery. His sutures became infected because Defendant's medical staff refused to even examine his sutures, though Class member Tschantz made numerous complaints.

Defendant's medical board canceled a doctor's order six times for Class member Tschantz to see an eye doctor to get glasses. Class member Tschantz suffered from headaches and could not see well, which interfered with his psycho-educational classes and his treatment. Defendants refused to allow Class member Tschantz to see an eye doctor for nine months.

Defendant's medical board canceled a physical therapist's order for Therabands, so Class member Tschantz could do shoulder exercises to rehabilitate his injured back and shoulder. After Class member Tschantz complained for four months, Defendants made him pay for his own Therabands, but

Defendants never ordered them. To date, though Class member Tschantz has paid for the Therabands, he has never received them.

Defendants refuse to allow Class member Tschantz to order an air purifier, though he is a severe asthmatic and cannot breath properly, because the building Defendants house him in has poor air circulation and the ventilation system is full of black mold.

491. Defendants have denied Plaintiff Vance Walters proper medical treatment. Defendants prescribed Depacote for Plaintiff Walters over three years ago. Plaintiff Walters developed stroke-like symptoms and went to sick call, where Defendant's medical staff quickly dismissed him. Defendants made no effort to treat Plaintiff Walters. Eventually Plaintiff Walters could not pick himself up off the floor and could not bathe himself. Defendants had to take Plaintiff Walters to the emergency room after he urinated on himself because he could not pick himself up off the floor to reach the stool just three feet away. At the emergency room the doctor determined Depacote was the problem and recommended Plaintiff Walters be taken off the medication. After a few weeks Plaintiff Walters improved.

Defendants refused four separate requests by Plaintiff Walters for a procedure to determine the extent of his ADD.

In July 2013 Defendants again prescribed Depacote for Plaintiff Walters without his knowledge or approval. Plaintiff Walters began experiencing unbearable intolerance to noise, violent involuntary jerking, clumsiness, and severe sensitivity to sunlight. On September 19th, 2013 Plaintiff Walters submitted a request to see APRN Barbara Nelson, where he discovered the psychiatrist Dr. Mabugat had placed him back on Depacote. Though Plaintiff Walters explained his history of severe reaction to Depacote and requested that he be taken off of Depacote immediately, Defendants refuse to take him off this medication, which clearly causes him severe health problems. Defendants therefore refuse Plaintiff Walters proper medical treatment. See *Exhibit Q, Plaintiff's and Class Member's Resident's Class Action Questionnaires.*

492. Based on the policy and procedures created and implemented by Defendants, they subject Class member Jeff Waugh to inhumane treatment through denial of proper medical treatment to wit actual harm being Class member Waugh has asthma, yet Defendants do not allow him to carry a rescue inhaler. When he has an attack, he has to suffer, because the nurses will not allow Plaintiffs and Class members to get medication any time they need them. Staff must call the nurses and ask if they can bring the resident up, even in the case of an emergency, and the nurses response is usually, "I am busy, but I will let you know when you can bring him up." Nurses usually choose to make the resident

250

wait up to a half an hour. In some cases they don't let them come up at all. When Class member Waugh is in distress and needs to use his rescue inhaler this is very dangerous, inhumane, shocking and intolerable, and in the most serious case, could put his life in jeopardy.

493.    Defendants have denied Class member Lee Desmond White proper medical treatment. Defendant's medical board canceled a doctor's order for Class member White after he broke his shoulder. See *Exhibit Q, Plaintiff's and Class Member's Resident's Class Action Questionnaires.*

494.    Defendants have denied Plaintiff Travis Williams proper medical treatment. Defendant's medical board canceled a doctor's order for Plaintiff Williams' special shoes. See *Exhibit Q, Plaintiff's and Class Member's Resident's Class Action Questionnaires.*

495.    Defendants denied Class member Darwin C. Williams proper medical treatment. On August 24, 2013 Class member Williams died of a heart attack brought on when Defendant's medical staff administered the wrong medication.

496.    As a result of Defendant's acts, omissions, practices and conduct, Plaintiffs and Class members have been deprived of their constitutionally protected right to be free from inhumane treatment in violation of their rights guaranteed under the Fourteenth Amendment to the United States Constitution.

497.    Defendant's acts and omissions are both shocking and intolerable and a continuing mistreatment of a constitutional stature.

498.    Plaintiff and Class members have been subject to and injured by these alleged violations and suffered the same or similar damages as a direct and proximate result of Defendants' acts, omissions, practices and conduct as specifically set forth above. Unless relief is granted, Plaintiffs and Class members will continue to be injured by and suffer damages as a direct and proximate result of Defendants' acts and omissions specifically set forth above. The remedy of which is immediate release with prejudice.

## Count X

## Denial of the Right to Religion and Religious Freedom in Violation of the First and Fourteenth Amendments to the United States Constitution

499.    Plaintiffs incorporate all previous allegations as if fully set forth herein.

500.    The Fourteenth Amendment guarantees that "[n]o State shall... deprive any person of life, liberty, or property, without due process of law." United States Constitution Amendment XIV, § 1.

501.    Fourteenth Amendment due process requires that the conditions and duration of confinement have some reasonable relation to the purpose for which persons are committed. Civilly

committed persons may be subjected to liberty restrictions reasonably related to legitimate government objectives and that are not tantamount to punishment as determined by reasonable professional judgment.

502. Civilly committed patients are entitled to some degree of protection under the First Amendment that is broader than that held by prisoners but less than what is held by members of free society. Policies or restrictions of First Amendment rights must be reasonably related to legitimate institutional and therapeutic interests.

503. Based on the policy and procedures created and implemented by Defendants, they are violating Plaintiffs' and Class members' rights to religious freedom through the SPTP's policies, procedures and practices. Defendants cause Plaintiffs and Class members to be monitored when they are having private meetings with religious persons such as clergy members and religious volunteers and during religious services. They do not permit Plaintiffs and Class members to wear yarmulkes or kufis or any other religious apparel in the dining hall or anywhere other than on the living unit and to their specific religious call out. They do not permit Plaintiffs and Class members to possess certain religious property, including certain religious medallions, pendants, arrow heads, and many other religious items. Defendants limit the types and number of religious items Plaintiffs and Class members may have in their personal property. Plaintiffs and Class members are allowed only one bible at a time. Defendants only allow Plaintiffs and Class members to have religious feasts once a year, despite the fact that most religious groups believe in and observe more than one religious feast per year, and despite the fact that Plaintiffs and Class members have offered to pay for those feasts. Also, Defendants do not allow Plaintiff's and Class member's separate religious groups to have their own religious leader, specifically trained in their religious beliefs. Defendants force all Plaintiffs and Class members to answer to one so-called "All Faith" Chaplain, regardless of their particular religious beliefs. The Chaplain, however, is biased, and only versed in Christian beliefs.

504. These policies, procedures and practices are not related to a legitimate institutional or therapeutic interest of the Defendants.

505. See *Beaulieu v. Ludeman*, 690 F. 3d 1017, 1039 (8th Cir. 2012)(applying the four – factor Turner test to a First Amendment claim asserted by civilly committed sex offenders where the parties agreed to its application). Courts consider four criteria in applying this test: (1) whether there is a valid, rational connection between the regulation and legitimate governmental interests put forward to justify it; (2) whether alternative means of exercising their rights remain open to the prisoners; (3) whether accommodation of the asserted rights will trigger a ripple effect on fellow inmates and prison

officials; and (4) whether a ready alternative to the regulation would fully accommodate the prisoners' rights at de minimis cost to the valid penological interest. *Beaulieu*, 690 F. 3d at 1039 (quoting *Benzel v. Grammer*, 869 F. 2d 1105, 1108 (8th Cir. 1989)).

In order to succeed on a claim asserted under this Free Exercise Clause of the First Amendment, Plaintiffs must ultimately establish that the challenged regulations place a "substantial burden" on Plaintiffs' ability to practice their religions. See *Patel v. U.S. Bureau of Prisons*, 515 f. 3d 807, 815 (8th Cir. 2008); *Weir v. Nix*, 114 F. 3d 817, 820 (8th Cir. 1997) ("[A] person claiming that a governmental policy or action violates his right to exercise his religion freely must establish that the action substantially burdens his sincerely held religious belief.") To substantially burden one's free exercise of religion, a regulation must: (1) significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs"; (2) "meaningfully curtail a person's ability to express adherence to his or her faith"; or (3) "deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion." *Patel*, 515 F. 3d 813) quoting *Murphy v. Mo. Dep't of Corr.*, 372 F. 3d 979, 988 (8th Cir. 2004)).

Defendants have restricted Plaintiffs' and Class members' religious freedom. That restriction serves no legitimate governmental interest. Defendants left Plaintiffs and Class members no alternative means of exercising their religious rights. Defendant's restrictions place a substantial burden on Plaintiffs' and Class members' sincerely held religious beliefs and their ability to practice their religions. Defendant's restrictions significantly inhibit Plaintiffs' and Class members' expression of their individual religious beliefs. Defendant's restrictions significantly curtail Plaintiffs' and Class members' ability to express adherence to their faith. And Defendant's restrictions deny Plaintiffs and Class members reasonable opportunities to engage in activities fundamental to their religion.

506. Based on the policy and procedures created and implemented by Defendants, they are violating Plaintiffs' and Class members' rights to religious freedom through SPTP's policies, procedures and practices. Defendants infringe upon Plaintiffs' and Class members' sincerely held religious beliefs through arbitrary denials of requested religious meals. While one religious meal is allowed for christians per year, most other religious meals are denied, regardless of Plaintiffs' and Class members' sincerely held religious beliefs. Religious meal portions provided by Defendants are inadequate as well.

507. Based on the policy and procedures created and implemented by Defendants, they are violating Plaintiffs' and Class members' rights to religious freedom through SPTP's policies, procedures and practices. Defendants infringe upon Plaintiffs' and Class members' sincerely held religious beliefs

253

through arbitrarily denying them the right to make and/or own sacred religious objects such as Native American fans.

## Count X Actual Harm

508.    Defendants have denied Plaintiff Ronald Baker his right to religion and religious freedom. Defendants have refused to allow Plaintiff Baker his right to participate in the Native American smudge and sweat lodge observances on many occasions. See *Exhibit Q, Plaintiff's and Class Member's Resident's Class Action Questionnaires*.

509.    Defendants have denied Class member Paul Blumenshine his right to religion and religious freedom. Defendants refused religious meals for Native Americans. The right to religious meals for Native Americans was taken away by Chaplain Hal. See *Exhibit Q, Plaintiff's and Class Member's Resident's Class Action Questionnaires.*

510.    Defendants have denied Class member Paul Douglas his right to religion and religious freedom. Defendants refuse to allow Class member Douglas his right to purchase and prepare food in accordance with his religious beliefs. See *Exhibit Q, Plaintiff's and Class Member's Resident's Class Action Questionnaires.*

511.    Defendants have denied Class member Edward Franklin his right to religion and religious freedom. Defendants have denied Class member Franklin the right to cover his head in accordance with his Moorish religious beliefs. See *Exhibit Q, Plaintiff's and Class Member's Resident's Class Action Questionnaires.*

512.    Defendants have denied Class member Steven Islam his right to religion and religious freedom. Defendants refuse religious meals for Native Americans. Defendants refuse to allow Native Americans to smudge their rooms. Defendants refuse to allow Native Americans to purchase and own religious items. Defendants refuse to allow Class member Islam to own an Islamic Prayer Rug because he is a member of the Native American call-out. Defendants refuse to allow Class member Islam to observe both his Native American beliefs along with his Islamic beliefs. See *Exhibit Q, Plaintiff's and Class Member's Resident's Class Action Questionnaires.*

Defendants denied Class member Islam his right to cover his head in accordance with his Islamic religious beliefs. See *Exhibit P, Plaintiff's and Class member's Resident Grievance Forms.*

513.    Defendants have denied Class member Eddie Martin his right to religion and religious freedom. Defendants refuse religious meals for Native Americans. See *Exhibit Q, Plaintiff's and Class Member's Resident's Class Action Questionnaires.*

514.    Defendants have denied Plaintiff Michael Mellon his right to religion and religious

freedom. Defendants refuse religious meals for Native Americans. Defendants refuse to allow Native Americans to observe their religious ceremonies at their own time. Defendants refuse to recognize Native American bylaws. See *Exhibit Q, Plaintiff's and Class Member's Resident's Class Action Questionnaires.*

515.   Defendants refuse to allow Class member Julius Orton his right to religion and religious freedom. Defendants have denied Class member Orton his right to cover his head in accordance with his Jewish religious beliefs.

516.   Defendants have denied Plaintiff Eric Patterson his right to religion and religious freedom. Defendants have refused to allow him his Druid books. Defendants refuse to allow Plaintiff Patterson his right to religious items central to his Druidic beliefs, such as: feathers, crystals and stones. Defendants refuse religious meals for Druids. Defendants refuse Druids to prepare their own food in observance of their religious beliefs. Defendants refuse Druids their right to religious festivals which include religious feasts. Defendants refuse Druids their right to pre-approved religious tools during religious ceremonies. Defendants tore down the Druid sacred grove and deny Druids their right to worship. Defendants have forced a diet upon Plaintiff Patterson in violation of his religious beliefs. See *Exhibit Q, Plaintiff's and Class Member's Resident's Class Action Questionnaires.*

517.   Defendants have denied Class member Ritchie his right to religion and religious freedom. On several occasions MH/DD staff have refused to allow Class member Ritchie to attend religious services, even though the Chaplain announced the service and Class member Ritchie asked MH/DD staff multiple times to take him to the service. (Residents are not allowed movement outside of their living unit without staff escort). See *Exhibit P, Plaintiff's and Class member's Resident Grievance Forms*, grievance dated 6/28/13.

518.   Defendants have denied Class member Charles Smeltzer his right to religion and religious freedom. Defendants refuse to allow Native Americans to purchase and own religious items. See *Exhibit Q, Plaintiff's and Class Member's Resident's Class Action Questionnaires.*

519.   Defendants have denied Plaintiff Billy Stanley his right to religion and religious freedom. Defendants refuse religious meals for Native Americans. Defendants refuse to allow Native Americans to purchase and own religious items. See *Exhibit Q, Plaintiff's and Class Member's Resident's Class Action Questionnaires.*

520.   Defendants have denied Plaintiff David Thayer his right to religion and religious freedom. Defendants refuse to allow Plaintiff Thayer his right as a Native American to purchase and own religious items. Defendants refuse Native Americans their right to own religious items central to

their religious ceremonies. See *Exhibit Q, Plaintiff's and Class Member's Resident's Class Action Questionnaires.*

521. Defendants refuse to allow Class member Owen Waters his right to religion and religious freedom. On several occasions MH/DD staff have refused to allow Class member Waters to attend religious services. See *Exhibit Q, Plaintiff's and Class Member's Resident's Class Action Questionnaires.*

522. Defendants refuse to allow Plaintiff Travis Williams his right to religion and religious freedom. Defendants refuse to allow Pagan and Native American religious practices. Defendants refuse to allow Pagans and Native Americans their right to own religious items central to their religious ceremonies. Defendants show a lack of respect for Plaintiff Williams' personal religious beliefs and practices. SPTP policy that governs all religions is a carbon copy of the Kansas Department of Correction's IMPP's that covers religion, which makes the SPTP as punitive as prison, though Defendants must provide an environment less restrictive than prison, which is designed to punish. See *Exhibit Q, Plaintiff's and Class Member's Resident's Class Action Questionnaires.*

523. As a result of Defendant's acts, omissions, practices and conduct, Plaintiffs and Class members have been deprived of their constitutionally protected right to freedom of religious expression, religion, privileges, and immunities guaranteed by the First and Fourteenth Amendments to the United States Constitution.

524. Defendant's acts and omissions are both shocking and intolerable and a continuing mistreatment of a constitutional stature.

525. Plaintiff and Class members have been subject to and injured by these alleged violations and suffered the same or similar damages as a direct and proximate result of Defendants' acts, omissions, practices and conduct as specifically set forth above. Unless relief is granted, Plaintiffs and Class members will continue to be injured by and suffer damages as a direct and proximate result of Defendants' acts and omissions specifically set forth above. The remedy of which is immediate release with prejudice.

## Count XI

### Unreasonable Restriction of Free Speech and Free Association in Violation of the First Amendment to the United States Constitution

526. Plaintiffs incorporate all previous allegations as if fully set forth herein.

527. Civilly committed patients are entitled to some degree of protection under the First Amendment that is broader than that held by prisoners but less than what is held by members of free

256

society. Policies or restrictions of First Amendment rights must be reasonably related to legitimate institutional and therapeutic interests as determined by reasonable professional judgment.

528.    "First Amendment rights cannot be suppressed by mere speculation or a vivid imagination." See *McCutchen v. The Federal Election Commission* (2014), Justice Roberts.

529.    Based on the policy and procedures created and implemented by Defendants, they have placed restrictions on free association by limiting contact among Plaintiffs and Class members, as well as other patients.

530.    Based on the policy and procedures created and implemented by Defendants, they have limited the ability of Plaintiffs and Class members to use the phone by charging a prohibitively high amount for phone use. Also, Plaintiffs and Class members are not able to call 800 numbers. This issue denies Plaintiffs and Class members the ability to contact their lawyers, because the lawyer will not accept collect calls from "Inmate Calling Solutions," the phone service provider.

531.    Based on the policy and procedures created and implemented by Defendants, they have limited Plaintiffs' and Class members' access to certain newspapers and magazines and remove or censor articles from the newspapers and magazines that are provided.

532.    These policies, procedures and practices are not related to a legitimate institutional or therapeutic interest of the Defendants.

533.    As a result of Defendant's acts, omissions, practices and conduct, Plaintiffs and Class members have been deprived of their constitutionally protected right to freedom of speech, association, expression, privileges, and immunities guaranteed by the First Amendment to the United States Constitution.

534.    Defendant's acts and omissions are both shocking and intolerable and a continuing mistreatment of a constitutional stature.

535.    Plaintiff and Class members have been subject to and injured by these alleged violations and suffered the same or similar damages as a direct and proximate result of Defendants' acts, omissions, practices and conduct as specifically set forth above. Unless relief is granted, Plaintiffs and Class members will continue to be injured by and suffer damages as a direct and proximate result of Defendants' acts and omissions specifically set forth above. The remedy of which is immediate release with prejudice.

257

## Count XII

### Unreasonable Searches and Seizures in Violation of the Fourth Amendment
### to the United States Constitution

536.    Plaintiffs incorporate all previous allegations as if fully set forth herein.

537.    Under the Fourth Amendment, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated..." In an institutional setting, the need for the search must be balanced against the invasion of personal rights that the search entails.

538.    Defendants consistently violate Plaintiffs' and Class members' Fourth Amendment rights through their search policies, procedures and practices.

539.    As part of their practices and policies, Defendants conduct random cell searches and personal property seizures without any probable cause or purpose.

540.    These searches policies, procedures and practices unnecessarily invade the personal rights of Plaintiffs and Class members.

541.    See *Bailey v. Howard*, 272 P. 3d 1287.  Just as Bailey was deprived of property without the process due under the Act, and the SPTP's indifference to its statutory obligation to protect Bailey's right to procedural due process is "shocking," Defendants have and continue to violate Plaintiff's and Class member's right to be free from unreasonable searches and seizures, deprive Plaintiffs and Class members of property without due process, and Defendant's continuing indifference to their statutory obligation to protect Plaintiff's and Class member's procedural due process is "shocking."

542.    As a result of Defendant's acts, omissions, practices and conduct, Plaintiffs and Class members have been deprived of their constitutionally protected right to be free from unreasonable searches and seizures in violation of their rights guaranteed under the Fourth Amendment to the United States Constitution

543.    Defendant's acts and omissions are both shocking and intolerable and a continuing mistreatment of a constitutional stature.

544.    Plaintiff and Class members have been subject to and injured by these alleged violations and suffered the same or similar damages as a direct and proximate result of Defendants' acts, omissions, practices and conduct as specifically set forth above.  Unless relief is granted, Plaintiffs and Class members will continue to be injured by and suffer damages as a direct and proximate result of Defendants' acts and omissions specifically set forth above.  The remedy of which is immediate release with prejudice.

## Count XIII

## Denial of the Right to be Confronted with the Witnesses against him Clause of the
## Sixth Amendment to the United States Constitution

545. Plaintiffs incorporate all previous allegations as if fully set forth herein.

546. Under the Sixth Amendment, "[t]he accused shall enjoy the right... to be confronted with the witnesses against him."

547. Defendants consistently violate Plaintiffs' and Class members' Sixth Amendment rights during the evaluations at Larned State Hospital, the Defendants such as: Tom Kinlen, Superintendent of Larned State Hospital; and Derek Schmidt, Attorney General of the State of Kansas, use as a fact finding mission to gather evidence, which they use as hearsay evidence, along with hearsay evidence gathered from police reports and from evidence gathered against them while in Kansas Department of Corrections Sex Offender Treatment Program. The Defendants use this evidence as hearsay evidence during the hearing in which they accuse Plaintiffs and Class members as Sexually Violent Predators. Defendants contend this evidence is fact, without calling the witnesses against Plaintiffs and Class members, or allowing Plaintiffs and Class members to be confronted with the witnesses against them.

548. Defendants use hearsay evidence from police reports or an allegation of a sex crime for which the Plaintiff or Class member has been acquitted, and information gathered from Plaintiff's and Class member's unprivileged sexual history form which they are required to complete while in sex offender treatment during SVP hearings to civilly-commit Plaintiffs and Class members as an sexually violent predator. Defendants abuse factual information concerning offenses contained in pre-sentence investigation reports (PSIs") or in medical evaluations. The fact that a testifying expert may claim that factual information contained in PSIs or medical evaluations (which Plaintiffs and Class members may deny as true) is of the type of information "reasonably relied upon" by experts in their field, should not automatically shield such hearsay from scrutiny. Defendants used hearsay evidence to obtain Plaintiff's and Class member's SVP civil commitments. Therefore, Plaintiffs and Class members commitments were based on hearsay evidence. See *Stachulak v. Coughlin*, 520 F. 2d 931, "Principles of due process in general must govern proceedings under Sexually Dangerous Persons Act and Defendant is entitled to confront and cross examine witnesses, to right against self-incrimination, and to speedy trial."

### Count XIII Actual Harm

549. Defendants have violated Class member Nicholas Stape's right to confront the witnesses against him by writing disciplinary reports against him, refusing to let him know who wrote these disciplinary reports, and enforcing punishment against Class member Stape without allowing him the

259

right to face his accuser. See *Exhibit Q, Plaintiff's and Class Member's Resident's Class Action Questionnaires.*

550. As a result of Defendant's acts, omissions, practices and conduct, Plaintiffs and Class members have been deprived of their constitutionally protected right to be confronted with the witnesses against them in violation of their rights guaranteed under the Sixth Amendment to the United States Constitution

551. Defendant's acts and omissions are both shocking and intolerable and a continuing mistreatment of a constitutional stature.

552. Plaintiff and Class members have been subject to and injured by these alleged violations and suffered the same or similar damages as a direct and proximate result of Defendants' acts, omissions, practices and conduct as specifically set forth above. Unless relief is granted, Plaintiffs and Class members will continue to be injured by and suffer damages as a direct and proximate result of Defendants' acts and omissions specifically set forth above. The remedy of which is immediate release with prejudice.

## Count XIV

### Violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution

553. Plaintiffs incorporate all previous allegations as if fully set forth herein.

554. Under the Fourteenth Amendment, "[A]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any State deprive any person of life, liberty, or property, without due process of law, nor; deny to any person within its jurisdiction the equal protection of the laws."

555. Based on the K.S.A. SVP Statutes as applied Defendants have violated Plaintiffs' and Class members' right to equal protection under the Fourteenth Amendment to the United States Constitution.

556. The civil commitment standards under *K.S.A. § 59-29a01* through *K.S.A. § 59-29a24* are inconsistently implemented, as evidenced by the variance in the number or Plaintiffs and Class members civilly committed to SPTP over time and over various geographic locations. The inconsistent implementation demonstrates that civil commitment determinations are not based on professional judgment. Rather, they are arbitrary and politically influenced.

557. The Attorney General and his assistance are responsible for choosing who should be

260

civilly committed. The Attorney General, Derek Schmidt, is therefore responsible for inconsistently implemented civil commitment standards under *K.S.A. § 59-29a01* through *K.S.A. § 59-29a24*.

558. Psychologists employed by Larned State Hospital, and who answered to Austin DesLauriers, retired Clinical Program Director; Tom Kinlen, Superintendent of Larned State Hospital; and Shawn Sullivan, Secretary of Kansas Department for Aging and Disability Services, are responsible for performing initial evaluations of and testifying against Plaintiffs and Class members to decide who should be civilly committed. The retired Clinical Program Director, Austin DesLauriers; Superintendent, Tom Kinlen; and Secretary, Shawn Sullivan, are therefore responsible for inconsistently implemented civil commitment standards under *K.S.A. § 59-29a01* through *K.S.A. § 59-29a24*.

559. All Defendants, as State employees, ultimately answer to Governor Sam Brownback. Therefore, Governor Sam Brownback is responsible for inconsistently implemented civil commitment standards under *K.S.A. § 59-29a01* through *K.S.A. § 59-29a24*.

560. If Plaintiffs and Class members had been provided their Equal Protection rights, a great number of them would never have been civilly committed in the first place. If Plaintiffs and Class members were currently provided their Equal Protection regarding their actual current mental conditions, a great number of them would be released, because they do not currently fit the criteria for civil commitment.

561. Defendants consistently violated Plaintiffs' and Class members' Fourteenth Amendment Equal Protection rights prior to civil commitment, while implementing civil commitment, and during their ongoing civil commitment.

562. Defendants suggest that though most Plaintiffs and Class members completed Sex Offender Treatment Program (SOTP) in prison, that SOTP in prison is not effective for Plaintiffs and Class members. Defendants suggest that because SOTP is not effective, Plaintiffs and Class members must be civilly committed and must remain civilly committed to receive adequate treatment. However, Defendants do not apply this suggestion equally. For many sex offenders, the fact they have completed SOTP in prison, is viewed favorably. See *Exhibit G, April 2005 Legislative Post Audit Committee Performance Audit Report of Larned State Hospital: Reviewing the Growth In the Sexual Predator Program*, p. 36. Quoting Roger Werholtz, Secretary of Kansas Department of Corrections, "The current Kansas Department of Corrections Sex Offender Treatment Program is a comprehensive, well – researched and successful program... The Sex Offender Treatment Program as it is currently designed has a high level of success with candidates who are amenable to that level of treatment."

261

563.   Defendants have created and implemented as applied statutes designed to discriminate against and harm Plaintiffs and Class members, a politically unpopular group, based solely on the basis of their status as a hated minority of offenders. Current recidivism rates prove sex offenders have a lower recidivism rate than *all* other criminals with the exception of murderers. According to Dan Montaldi, Former Director of Florida's Civil Commitment Program For Sex Offenders, in *The Sun Sentinel – Sex Offenders Unleashed*, 'As a group sex offenders are "statistically unlikely to reoffend." Current assessment procedures are systematically overestimating the risk that a paroling offender will commit another sex offense.' See *Romer v. Evans*, 517 U.S. 620 (1996). "If the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare desire to harm a politically unpopular group cannot constitute a legitimate governmental interest."

564.   "The majority's rewriting of the Statute raises new equal protection concerns... This is pure preventive detention." See *In re Pers. Restraint of Andre Brigham Young*, 122 Wn. 2d 1. 'Finally, the majority's rewriting of the Statute raises new equal protection concerns. By reading in this new requirement, the court creates two classes of persons under the same statute: those incarcerated versus those who are not. This is a distinction without a difference. Immediately upon release, an individual must now commit an overt act to be incarcerated under the Statute, whereas the day before release, the same individual could be committed without proof of an overt act. This new distinction is arbitrary, violating even a rational basis review. Equal protection requires that "persons similarly situated with respect to the legitimate purposes of the laws receive like treatment". *In re Knapp, 102 Wash. 2d 466, 473, 687 P.2d 1145 (1984)*. The purpose of the Statute is to prevent sexual predators from re-offending and thereby protect the community. It is difficult to see the difference between an individual the day before he or she leaves prison versus an individual the day after departing from jail. The only rationale offered by the majority is that an incarcerated individual does not have the opportunity to commit a recent overt act. I disagree. Evidence amounting to a "recent overt act" is often present even while in jail. Such evidence could be based on prison activities or conduct, such as inappropriate drawings of sexual encounters with children. The court cannot choose to have two standards for commitment: one for those presently incarcerated and another for everybody else. [21] The United States Supreme Court has been careful to harmonize the constitutional requirements for civil commitment in the ordinary situation with those arising when there has been a finding of insanity at a *criminal* trial. See *Jones v. United States, 463 U.S. 354, 77 L. Ed. 2d 694, 103 S. Ct. 3043 (1983)*. Although the majority's requirement of a recent overt act by released individuals harmonizes RCW 71.09 with the State's short-term detention statute, RCW 71.05, [22] this requirement does not render the

262

Statute constitutional. Under the majority's interpretation, incarcerated individuals still face the potential for lifetime detention based only on the possibility of future dangerousness. Because incarceration under the Statute can follow a long prison term and because the majority does not require a recent overt act for these individuals, the determination that they are "dangerous" is not even based on the same standard used for others who are civilly committed. If an individual once committed a sex crime and someone thinks that individual is still dangerous, the Statute authorizes a lifetime term in a mental facility. This is pure preventive detention.'

## Count XIV Actual Harm

565.    Class member Edward Franklin has been discriminated against by Defendants. He has been treated differently from other residents based on his race.

566.    As a result of Defendant's acts, omissions, practices and conduct, Plaintiffs and Class members have been deprived of their constitutionally protected right to the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution

567.    Defendant's acts and omissions are both shocking and intolerable and a continuing mistreatment of a constitutional stature.

568.    Plaintiff and Class members have been subject to and injured by these alleged violations and suffered the same or similar damages as a direct and proximate result of Defendants' acts, omissions, practices and conduct as specifically set forth above. Unless relief is granted, Plaintiffs and Class members will continue to be injured by and suffer damages as a direct and proximate result of Defendants' acts and omissions specifically set forth above. The remedy of which is immediate release with prejudice.

## Count XV

### Kansas K.S.A. § 59-29a01 through K.S.A. § 59-29a24

### SVP Statutes are Unconstitutional as Applied

569.    Plaintiffs incorporate all previous allegations as if fully set forth herein.

570.    A statute that violates constitutional rights when enforced is unconstitutional as applied to those whose rights are violated.

571.    Defendants are violating Plaintiffs' and Class members' constitutional rights through their enforcement of *K.S.A. § 59-29a01* through *K.S.A. § 59-29a24* SVPA statutes, under which all Plaintiffs and Class members are civilly committed to SPTP.

572.    KSVPA laws "shock the conscience." Kansas Sexually Violent Predator Act as applied is so onerous it shocks human logic and reason. KSVPA laws are exclusive to sex offenders even

263

though all other criminals, except murderers, have a higher recidivism rate than sex offenders. Yet, such civil commitment laws are applied only to sex offenders. According to Dan Montaldi, Former Director of Florida's Civil Commitment Program For Sex Offenders, in *The Sun Sentinel – Sex Offenders Unleashed*, sex offenders are 'discriminated against "solely on the basis of their status as a hated minority of offenders." As a group, sex offenders are "statistically unlikely to re-offend." In a free society, the civil rights of even "society's most feared and despised members" are an important moral concern. "Current assessment procedures are systematically overestimating the risk that a paroling offender will commit another sex offense." Three independent auditors reviewed data from both a 2011 state analysis and an internal recidivism study conducted by the SVP program in Florida. Consistent with recent research, the auditors also recommended re-examining the practice of mandating lengthy treatment that can lead to demoralization and, in some cases, iatrogenic (or harmful) effects.' See *The Guardian – How 'Civil Commitment' enables detention of sex offenders*, Thursday 26, September 2013, By James Ridgeway, "The recidivism rate for sex offenders in general is low, with government statistics showing the rate at around 57%, versus 60% for all criminal activity."

573.   Non-criminal confinement must have a non-criminal purpose. The civil commitment statute mandates that during involuntary detention or commitment pursuant to *K.S.A. §59-29a09*, the patient is entitled to all constitutionally required treatment. "The involuntary detention or commitment of persons under this act shall conform to constitutional requirements for care and treatment." *K.S.A. § 59-29a09*.

574.   SPTP as applied to Plaintiffs and Class members is inadequate to cure their condition or lead to their eventual release.

575.   Defendants' acts and omissions are both shocking and intolerable and a continuing mistreatment of a constitutional stature. See *Leamer v. Fauver*, 288 F. 3d 532, 546 (3d Cr. 2002). The SPTP personnel were compelled to carry out a prescribed course of sex offender treatment, Defendants indifference to their statutory obligation is deemed shocking. See *Smith, The Constitutionality of Civil Commitment and the Requirement of Adequate Treatment*, 49 B.C.L. Rev. 1383, 1384 (Nov. 20080 (Suggesting that "[W]ithout adequate treatment providing a path to an individual's potential release, civil commitment becomes state – imposed criminal punishment"); *Sharp v. Weston*, 233 F. 3d 1166, 1172 (9th Cir. 2000) (holding that due process requires that civilly committed persons be provided "a realistic opportunity to be cured or improve the mental condition for which they were confined"); *Ohlinger v. Watson*, 652 F.2d 775, 777-78 (9th Cir. 1980) (stating civilly committed persons are entitled to mental health treatment that gives them a realistic opportunity to be cured and released; standard is

one only required to provide a "reasonable level of treatment based upon a reasonable cost and time basis"); *Cross v. Harris*, 418 F.2d 1095, 1107, 135 U.S. App. D.C. 259 (D.C. Cir. 1969) (due process commands that conditions and duration of confinement bear some reasonable relation to its civil purpose--treatment--without which incapacitation serves as mere preventive detention, "a warehousing operation for social misfits"); and *Reno v. Flores* (1993), 507 U.S. 292, 301-302, 'While the state may claim a compelling interest in deterring convicted sex offenders from re-offending, there are certain fundamental rights that are being infringed upon, and thus "more than a compelling interest is needed to survive constitutional scrutiny. The statute must be narrowly tailored to meet the compelling interest."'

576.    Rehabilitation of SVPs is of paramount governmental interest, however, there is virtually no evidence to support Defendant's notion KSVPA laws work as intended.

577.    Defendants' implementation of *K.S.A. § 59-29a01* through *K.S.A. § 59-29a24* SVPA Statutes violates Plaintiffs' and Class members' constitutional rights to due process protections. Additionally, the application of *K.S.A. § 59-29a01* through *K.S.A. § 59-29a24* SVPA Statutes to Plaintiffs and Class members is punitive, not therapeutic, in nature, rendering it unconstitutional. The punitive policies, procedures, and practices of Defendants are not reasonably related to the purpose for which Plaintiffs and Class members have been civilly committed, which is treatment. Denying Plaintiffs and Class members their liberty without a proper therapeutic purpose constitutes inherently punitive detention. According to *U.S. v. Gartner*, "even a civil penalty is considered a punishment if the sanction cannot be fairly said to serve a remedial purpose, but instead as a deterrent or retribution." See *U.S. v. Gartner*, 93 F. 3d 633, cert. Denied 519 US 1047. And according to *E.B. v. Verniero*, 'even when punishment is neither the actual or objective purpose of the law, civil sanctions may constitute punishment if the effects or "sting" are harsh enough to be considered a punishment, and must be evaluated in light of importance of any legitimate governmental interest served.' See *E.B v. Verniero*. 119 F. 3d, rehearing denied 127 F. 3d 298, cert. Denied, 522 US 1110.

578.    Defendants have adopted policies and procedures which mirror KDOC policies and procedures. Furthermore, Defendants have adopted their Resident Rulebook directly from the KDOC regulations and rules. See *Sandin v. Conner*, 515 U.S. 472, 115 S. Ct. 2293, "States may under certain circumstances, by adopting prison regulations, create liberty interest which are protected by due process."

579.    Involuntary commitment of sex offenders to mental health treatment facilities after they complete prison terms for serious sex offenses is an inappropriate response to the problem. The mental

health system is for treatment, not punishment. The mental health system is not the appropriate place for long-term confinement of sexual predators. Sexual predator statutes usually state that the continued confinement of sex offenders in mental health systems is for the safety of the public, not the treatment of the offender. The dissent in the Hendricks case agreed with the Kansas Supreme Court that the purpose of the Kansas Statute was punishment. While public safety is an appropriate societal goal, the purpose of the mental health system is treatment. See *Exhibit C: Mental Health America, Position Statement 55: Confining Sexual Predators in the Mental Health System*.

580.    Mental Health America (MHA) believes that these (sexual predator) laws do not constitute sound public policy. They focus on punishment rather than treatment, deal with people who often do not have a treatable mental illness, increase stigma, distort civil commitment, risk the safety of other persons in mental health facilities, divert resources from mental health care and inappropriately burden the mental health system with a criminal justice function for which it is not funded or equipped. See *Exhibit C: Mental Health America, Position Statement 55: Confining Sexual Predators in the Mental Health System*.

581.    The Kansas Sexual Predator Statute distorts the meaning and practice of civil commitment. The basic rationale of involuntary confinement is that the person is found to be dangerous to self or others at the time of the commitment, that he or she receives treatment and that the confinement is time-limited and paired with a course of treatment. None of these essential elements is present in the case of a sex offender committed after serving a prison sentence in Kansas. Thus, sexual predator commitments are an abuse of civil commitment. See *Exhibit C: Mental Health America, Position Statement 55: Confining Sexual Predators in the Mental Health System*. In Kansas' Sexual Predator Treatment Program Defendants give lip service to treatment, but the so-called treatment is inadequate and does not allow Plaintiffs and Class members to progress as appropriate and be cured or improve their mental condition so they may be released. Plaintiffs' and Class members' confinement is indefinite, not time-limited, as is required.

582.    Defendants use past acts, which the accused has already served his time for, to predict so-called "future dangerousness" without actually measuring the Plaintiff's or Class member's actual current mental condition, as required by *K.S.A. § 59-29a08(a)*. Defendants have failed and refused to provide Plaintiffs and Class members with a current examination of their current mental condition made once every year, in violation of *K.S.A. § 59-29a08(a)*. Plaintiffs incorporate argument #200 as if fully set forth herein. See *Tot v. U.S.*, 319 U.S. 463, "The mere knowledge of a person's past behavior does not justify a belief the person will automatically re-offend."

266

583. The KSVPA is over broad and vague. It does not define "personality disorder," while "mental abnormality" is too over broad and vague.

584. The release standards are inconsistent and inherently biased. The release of only three (3) Plaintiffs or Class members over the twenty (20) year life of the SPTP program demonstrates that the treatment program is a result of orders from political leaders and is not based on professional judgment.

585. The actuarial instruments used by Defendants to civilly commit Plaintiffs and Class members are flawed.

586. The hearing court used to keep Plaintiffs and Class members civilly – committed are not a neutral adjudicator. Defendants use the court and judge who civilly – committed Plaintiffs and Class members in the first place, to keep Plaintiffs and Class members committed. The court and judge are clearly biased, no judge would opine against his own previous ruling.

587. The KSVPA violates Ex Post Facto and Double Jeopardy protection of the Fourteenth Amendment to the United States Constitution.

588. The KSVPA violates the Privilege Against Self-Incrimination Clause of the Fifth Amendment to the United States Constitution, "No person shall... be compelled in any criminal case to be a witness against himself." and the SVPA violates the Sixth Amendment to the United States Constitution, "The accused shall enjoy the right... to be confronted with the witnesses against him." Plaintiffs and Class members have been found as SVP's based on hearsay evidence from information collected against them by their therapists, in violation of their privilege against self-incrimination. The information was used in court against the Plaintiffs and Class members in violation against their privilege to be confronted with the witnesses against them. Witnesses are generally not called in SVP hearings, while the information is merely read as an accusation and is accepted as fact. See *Stachulak v. Coughlin*, 520 F. 2d 931, "Principles of due process in general must govern proceedings under Sexually Dangerous Persons Act and Defendant is entitled to confront and cross examine witnesses, to right against self-incrimination, and to speedy trial."

589. Because Defendants were not fulfilling their legal obligation to provide accused SVP's with a trial within sixty days, as originally set forth in *K.S.A. § 59-29a06*, accused SVPs Frankie G. Brown, Otis Goodale, John Hargis, Michael Lair, Richard G. Rios, Edgar Searcy, and Robert Ward were all released through the courts. As a result, Defendants amended *K.S.A. § 59-29a01* to read, "Notwithstanding any other evidence of legislative intent, it is hereby declared that any time requirements set forth in K.S.A. § 59-29a01 et seq., and amendments thereto, either as originally

267

enacted or as amended, are intended to be directory and not mandatory and serve as guidelines for conducting proceedings under K.S.A. § 59-29a01 et seq., and amendments thereto." As written and applied *K.S.A. § 59-29a01* is *Unconstitutional*. Legal time limits must be mandatory, not directory, otherwise Defendants may hold Plaintiffs and Class members and future suspected SVPs in the county jail, potentially for life, without even charging him with a crime. See *Lynch v. Baxley*, 744 F. 2d 1452 (Oct. 1984, Alabama), Finding: "We forbid the use of jails for the purpose of detaining persons awaiting involuntary civil commitment proceedings, finding that to do so violates those person's substantive and procedural due process rights (violates least restrictive confinement)." See also *Stachulak v. Coughlin*, 520 F. 2d 931, "Principles of due process in general must govern proceedings under Sexually Dangerous Persons Act and Defendant is entitled to confront and cross examine witnesses, to right against self-incrimination, and to *speedy trial*."

590.    The misinformation and stigmatization Defendants used to justify harsh sexual offense laws undermine the welfare of society, creating panic and distrust. Besides murderers, sex offenders have the lowest recidivism rate of any other criminal. In New York State the recidivism rate for sex offenders has been shown to be lower than any other crime except murder. Sex offenders have the lowest rates of recidivism in Missouri, 5.3%. These States' (Recidivism Rate) all fell at 4% or below: CA (2010); CN (2012); IN (2008); MN (2007); NM (2012); NY (2007); TX (2001); WA (2005). Colorado reported for 1,904 offenders in the community, only 11 (.5%) were re-convicted (Kansas Sex Offender Policy Board, 2008). See *Exhibit U: Recidivism Statistics – Kansas Department of Aging Forensics Task Force Presentation May 13, 2013*, p. 9. This statistic does not even indicate the re-convictions were for sex offenses. An indication that recidivism for sex offenses may statistically be even lower than .5%. "Among nearly 30,000 prisoners released in 15 states in 1994; Released prisoners with the highest rearrest rates were robbers (70.2%), burglars (74.0%), larcenists (74.6%), motor vehicle thieves (78.8%), those in prison for possessing or selling stolen property (77.4%), and those in prison for possessing, using, or selling illegal weapons (70.2%); Released prisoners with the lowest rearrest rates were those in prison for homicide (40.7%), rape (46.0%), other sexual assault (41.4%), and driving under the influence (51.5%); Within 3 years 2.5% of released rapists were arrested for another rape."

| Appendix table 2. Targeted sample sizes by offense type | |
| --- | --- |
| Most serious release offense | Targeted sample size in each State |
| Homicide | 80 |
| Rape/Sexual assault | All |
| Robbery | 180 |
| Aggravated assault | 180 |
| Burglary | 220 |
| Larceny/motor vehicle theft | 220 |
| Fraud | 60 |
| Drug trafficking | 380 |
| Drug possession | 120 |
| Weapons offense | 40 |
| Driving under the influence | 120 |
| Other public order | 120 |
| Other | 120 |

Note: For one State (California), targeted sample sizes are 2 times those shown.

See *Exhibit U: Recidivism Statistics – U.S. Department of Justice, Bureau of Justice Statistics, Special Report, Recidivism of Prisoners Released in 1994*, By Patrick a. Langan, Ph.D. and David J. Lavin, Ph.D. *BJS Statisticians*, pp. 1 and 12. According to this statistic, nationwide, other than homicide, rape, and sexual assault have the lowest rate of recidivism of any crime. Notice this statistic does not measure whether those who committed rape or other sexual assault committed another sexual offense. It only measured whether a person who had committed rape or other sexual assault committed any new offense, such as shoplifting. In fact, of the 46.0% of those who committed rape originally and re-offended, only 2.5% were arrested for another rape. Furthermore, according to Appendix A table 2, the targeted sample size of those examined for re-offense, *all* those originally arrested for Rape or Sexual assault were measured, while only 40 to 380 of any offender having committed any other crime were measured. Which means the sample size observed for Rape or Sexual assault was much larger than the sample size observed for any other crime. Not all other criminals were sampled. Had *all* offenders been observed for all other crimes to measure their exact recidivism rates, recidivism rates for Rape or Sexual assault may even be significantly lower than *all* other offenses. This is an indication the statisticians were biased and intended to manipulate the results to make the recidivism rate for Rape or Sexual assault appear more likely than it actually is, and sex offenders therefore, more dangerous than they actually are. Sex Offender recidivism, however, is still obviously lower than all other crime, save homicide. "KDOC Recidivism Rates: 2008 Releases, Sex Offenders 41.8% Overall, 38.4% Conditional Violators, 3.5% Convicted (New Offenses)." See *Exhibit U: Recidivism Statistics – 2013 KDOC Key Indicators Report*, p.4. According to the Kansas Department of Corrections (KDOC)

269

41.8% of Sex Offenders released in 2008 returned to prison. However, of those 41.8%, 38.4% were Conditional Violators. Only 3.5% Sex Offenders were convicted of a new offense. Notice this statistic, again, does not measure whether the Sex Offender committed a new sexual offense. It only measured whether the Sex Offender committed any new offense, such as shoplifting.

Defendant's use of actuarials which falsely project Plaintiffs and Class members as high risk to re-offend, in stark contrast to actual recidivism rates which indicate otherwise is an obvious misuse of information designed solely for the unconstitutional purpose of incapacitating Plaintiffs and Class members as a mechanism for retribution or general deterrence. "Choosing to set apart any group of people and deny them civil constitutional, and human rights threatens the rights of every person in our nation." *Reform Sex Offender Laws, Inc.* If sex offenses have lower recidivism rates than all other crimes except homicide, why are sex offenders targeted above all other criminals for civil commitment?! This contradicts a sex offenders so-called dangerousness as used to civilly commit him.

591.    Compelling evidence indicates that civil commitment programs may actually increase the risk of sexual violence in the community. The expense of SVP programs is wildly out of proportion to their benefit. See *Journal of Sexual Offender Civil Commitment: Science and The Law*, 1, 141-149 (2006), *The Vilification of Sex Offenders: Do Laws Targeting Sex Offenders Increase Recidivism and Sexual Violence*.

592.    *The American Psychiatric Association* has maintained for over twenty (20) years that predictions of future threat (dangerousness) are wrong in at least two out of every three cases.

593.    To question our retention of a system that weighs the costs and risks against it's identifiable benefits. The use of future dangerousness in this context is leading to unnecessary and unconstitutionally protected punishment, lacking both incapacitation and retributive rationales. See *Baze v. Rees* – Justice Stevens.

594.    Virtually every Plaintiff or Class member civilly committed was diagnosed with one (or a combination) of: Pedophilia, Paraphilia NOS, Personality Disorder NOS, or Antisocial Personality Disorder. Arguably these disorders are either too nonspecific to be legitimate, or do not demonstrate the volitional impairment necessary to qualify the Plaintiff or Class member for civil commitment.

595.    Defendants are the same agency that performs the evaluations to civilly commit Plaintiffs and Class members, and treat them once they have been civilly committed. The evaluation for civil commitment should not be conducted by the same agency that treats them. This creates bias and an incentive to "lock them up", a reluctance to admit Plaintiffs and Class members are "no longer dangerous", and a suspicion of the system by Plaintiffs and Class members, which is anti-therapeutic.

270

596.     Defendants use evidence during civil commitment hearings whose probative value is substantially outweighed by the danger of unfair prejudice against Plaintiffs and Class members. See *In re Pers. Restraint of Andre Brigham Young*, 122 Wn. 2d 1. Defendants reject testimony by Plaintiff's and Class member's Independent Evaluators, yet weigh heavily the State's "expert," biased opinion, which is paid for by the State, and said expert is a hired gun whose income derives solely from opining Plaintiffs and Class members fit the criteria for Sexually Violent Predator. Such biased opinion is dangerously unfair prejudice. Said prejudicial evidence should be excluded.

597.     KSVPA as applied fails to provide Plaintiffs and Class members adequate treatment. SPTP is based on the relapse prevention model. Defendants fail to utilize best practices, nor do they familiarize themselves with the most current literature detailing treatment modalities and treatment principles. "The early models of psychological treatment for sex offenders were based on relapse prevention. Relapse prevention models were focused on identifying high-risk situations that could lead to relapse and eliminating deviance. However, review of the relapse prevention models of treatment failed to consistently demonstrate efficacy. Recent research in the field of sex offender treatment rejects the relapse prevention model... Best practices in sex offender treatment utilize the most current evidence assessment strategies and tools for the evaluation of offenders. The research in the field rapidly changes as we learn more about those factors, which are most closely tied to sexual re-offenses. As such, treatment providers must be familiar with the most current literature detailing treatment modalities and treatment principles. Currently the Association for the Treatment of Sexual Abusers (ATSA) is establishing guidelines for best practices in sex offender management. FOOTNOTE – 1: n10F. Thibault et al., WFSBP Task Force on Sexual Disorders, The World Federation of Societies of Biological Psychiatry (WFSBP) Guidelines for the Biological Treatment of Paraphilias, 11 WORLD J. BIOL. PSYCH. 604 (2010)." See *The Vermont Bar Journal& Law Digest*, Summer, 2013, 39 Ver. B.J. & L. Dig. 26, *DEPARTMENT: SEX OFFENDERS AND THE LAW*, by Renee Sorrentino, M.D.

598.     Based on the policy and procedures created and implemented by Defendants, Defendants are not providing Plaintiffs and Class members adequate treatment. Treatment provided by Defendants is merely a disguise, not applied adequately, and is the same as intentionally choosing not to provide adequate treatment, nor adequate opportunity to progress through the program as appropriate, nor reasonable opportunity to improve or be cured. The SPTP is therefore a prison masquerading as a treatment facility.

599.     Sexual Predator Legislation is Criminal Justice Legislation in Disguise. Kansas' sexual predator laws blur the lines between the mental health and criminal justice systems in ways that

confuse policy makers, including judges, mislead the public and are unfair even to those who, due to their behavior, may be deserving of long-term incarceration. The criminal justice system is intended to punish only those persons who commit crimes of their own free will. Thus, all five states provide some form of an insanity defense for those whose crimes are closely related to serious mental illness. Other provisions in the criminal law requiring proof of a specific mental state also contribute to this important protection. Thus, only those persons who choose to commit a sex offense should be convicted and punished for these offenses. The United States Supreme Court has determined that only those sexual predators who are unable to control their sexually violent behavior may be committed under sexual predator laws. See *Seling v. Young*, 531 U.S. 250 (2001). Conversely, sexual predator laws are only applied to persons who have already been convicted and served a term of imprisonment, having been found criminally responsible for their sexually violent behavior. It is unfair to first punish someone (find him/her at fault) for a crime and then commit the person because his/her criminal behavior is caused by a mental illness and, therefore, not his/her fault. In *Kansas v. Crane*, 534 U.S. 407 (2002), the Court could not reach a consensus on what evidence was needed to establish that someone could not control his/herself and rejected the Kansas Supreme Court's interpretation of the State's statute. See *Exhibit C: Mental Health America, Position Statement 55: Confining Sexual Predators in the Mental Health System*.

600.   Defendants are violating Plaintiffs' and Class members' constitutional rights according to *Davis v. Watkins*, 384 F. Supp. 1196, A. Persons Committed While on Parole or After Criminal Conviction; Persons Retained Beyond Maximum Criminal Sentence, and through their enforcement of *K.S.A. § 59-29a01* through *K.S.A. § 59-29a24* SVP Statutes, under which Plaintiffs and Class members are civilly committed to SPTP. In *Davis v. Watkins*, "3) Unless the team finds that the patient is both mentally ill or retarded and dangerous, as defined in paras. 1(a) and (b), *supra*, the patient shall be released pursuant to appropriate procedures."

601.   The KSVPA Statutes require evidence of historical sex – related misconduct. The conduct must be harmful, *recent*, and sex related. In nearly every civil commitment hearing Defendants have used evidence of past acts of sexual misconduct to opine that Plaintiffs and Class members are sexually dangerous predators. However, "The further the predictive behavior is from the observed behavior in terms of time or setting, the less accurate the prediction is likely to be," *Randy K. Otto, Prediction of Dangerous Behavior: A Review and Analysis of Second Generation Research, 5 Forensic Rep. 103, 128 (1992)*.

'[T]he "clear danger" to others must be "demonstrated" by past acts and a prediction of

272

future dangerousness... Clearly, *the more remote the pas acts are in time, the less predictive value they have*.' See *In re Brown*, 414 N.W. 2d 800, 803 (Minn. Ct. App. 1987) (emphasis added).

Defendants make no attempt to produce recent acts of sexual misconduct. They rely on historical acts, which in most cases occurred many years before the SVPA hearings. Most Plaintiffs and Class members completed lengthy prison sentences, with no acts of sexual misconduct in prison, before the State of Kansas filed SVPA complaints against them. Yet, Defendants presented evidence of the long past acts of sexual misconduct in court as *proof* of future dangerousness. 'If the respondent has been incarcerated for any length of time prior to the commitment proceedings – and this is often the case – the state and its experts perforce rely heavily on "dated" evidence.'

Defendants claim that past acts of sexual misconduct accurately predict Plaintiffs and Class members are likely to commit future acts of sexual misconduct. However, "It has been demonstrated that sex offenders generally are much more likely to commit a nonsexual crime than they are to commit another sexual offense." See *Allen J. Beck & Bernard E. Shipley, U.S. Dep't of Justice, Recidivism of Prisoners Released in 1983* (1989); *Washington State Institute for Public Policy, Sex Offenses in Washington State: August 1998 Update*, p. 35. (showing that most felony offenses committed by sex offenders considered for commitment are non-sex felonies).

Finally, in *Kansas v. Hendricks*, Dr. William S. Logan, a forensic psychiatrist, stated that it was not possible to predict with any degree of accuracy the future dangerousness of a sex offender. See *Kansas v. Hendricks*, 521 U.S. 346.

602.    The mental status element of the KSVPA Statute is vaguely defined in terms of mental abnormality or personality disorder. "Judicial construction of the term leaves the impression that nearly anything will do as proof of mental disorder. The notion of impaired control has been widely criticized by forensic psychologists and other members of the medical establishment. Judicial discussions of impaired control are often – perhaps most often – an amalgam of various facts of dubious relevance without an explicit theoretical framework to define what does and does not constitute impaired *ability* to control sexual behavior."

603.    Defendants accept the commission of numerous acts of sexual violence as proof of impaired control, without further discussing whether Plaintiffs or Class members are *presently capable* of controlling the violent behavior. Since KSVPA commitment laws are being used to indeterminately confine Plaintiffs and Class members who have completed or are about to complete criminal sentences, there is often little or no evidence of recent sexual misconduct to support a finding of impaired control. However, Defendants have accepted evidence of generic misbehavior under controlled circumstances

273

as proof of impaired control. The relevance of this type of proof depends on a showing of a relationship between the individual's sexual misconduct and this generalized incapacity to control. It is logical to conclude that the absence of misbehavior in a controlled setting evidences the *ability* to control one's behavior. "Clinicians have little ability to predict post-institutional behavior on the basis of its institutional precedents."

604.    Though many Plaintiffs and Class members struggled with alcoholism and/or drug addiction, many Plaintiffs and Class members gave up alcohol and drugs before conviction. In some cases, Plaintiffs and Class members were "clean" many years before conviction, and have been "clean" ever since. Defendants discount the proof of the Plaintiff's and Class member's ability to avoid the precursors of sexual violence – for example, excessive drinking – demonstrates volitional control over their own behaviors, including volitional control over sexual impulses.

605.    There is no biological or physiological evidence for Defendants' concept of Plaintiff's and Class member's lack of mental control: "Unless... specific physical connections that bypass mental control can be shown, there is no scientific warrant to assume, and no scientific way to determine, that a particular course of conduct, or more generally that *all* conduct associated with mental malfunction, is to be viewed as beyond the power of mind to control." *Herbert Fingarette & Ann Fingarette Hasse, Mental Disabilities and Criminal Responsibility (1979)* (emphasis on original). pp. 64-65.

Writing specifically about sex offenders, W.L. Marshall, one of the editors of a treatise on sexual assault cited with approval by the Washington Supreme Court in *In re Young*, 857 P. 2d 989 (1993), expresses skepticism that any sex offense is beyond the control of the offender: "It is our view that sexual offenders are not suffering from any disease and that their behavior is not out of their control, as such a medical model would imply. In fact, it is clear from an examination of the behavior of these men that their offending is very well controlled." *W.L. Marshall et al., Present Status and Future Directions*, in *Handbook of Sexual Assault 389, 391 (W.L. Marshall et at., eds., 1990)*. Alexander D. Brooks, also cited by the court in *In re Young*, makes the same point: 'Of course, not all rapists fit the paraphilic rationale. Many rapists are "mentally normal" in the sense that their rapes do not stem from pathology. To be identified as coming with the terms of "mentally abnormal," a rapist selected for civil commitment should have a recurrent, compulsive urge and pathological need to repetitively carry out psychologically driven rape.' *Alexander D. Brooks, The Constitutionality and Morality of Civilly Committing Violent Sexual Predators, 15 U. Puget Sound L.R. 709, 732 (1992)*.

Further, many scholars assert that much sexual violence is not a product of sexual impulses. These observations undercut the assumption that sexual behavior can be assigned causes in

the manner required by Kansas' sex offender commitment laws. See e.g., *Margit C. Henderson & Seth C. Kalichman, Sexually Deviant Behavior and Schizotypy: A Theoretical Perspective with Supportive Data, 61 Psychiatric Q. 273, 274 (Winter 1990)* (describing "powers, and control," "express anger," "sadistic arousal," and "impulsivity and antisocial character" as the "motivational dynamics" for rape in some research.); *W.L. Marshall et al., Issues in Sexual Assault,* in *Hand-book of Sexual Assault 3, 5 (W.L. Marshall et al., eds., 1990)* [hereinafter has] (The "offender's attitudes and beliefs are important components of the psychological processes leading to a sexual assault, as well as of the man's apparent inability (or willingness) to refrain from repeated offending."); *Raymond A. Knight & Robert A. Prentky, Classifying Sexual Offenders: the Development and Corroboration of Taxonomic Models,* in *HSA, 2344* (enumerating four distinct "motivations" for rape; only one involves sexualized deviance, which "appear[s] to be related to enduring behavioral patterns that distinguish particular groups of offenders."). See also *Judith L. Herman, Sex Offenders: A Feminist Perspective,* in *HSA, 177, 181-182* (there is no "readily apparent mental disorder that characterizes sex offenders." 'A feminist analysis of sexual assault contends that men engage in sexual assault not only because it is condoned or permitted but also because it is rewarding. Sexual assault asserts male dominance and intimidates women, it also provides the aggressor with "sexual pleasure.'"); *W.L. Marshall & H.E. Barbaree, An Integrated Theory of the Etiology of Sexual Offending,* in *HSA, 257* (discussing the role of "sociocultural attitudes" that shape the "expression of sexual needs" and the control of aggression); *Park Elliot Dietz, "Sex Offenses: Behavioral Aspects,"* in *4 Encyclopedia of Crime and Justice 1485, 1485-1490 (Sanford M. Kadish ed. 1983)* (only a small portion of rapists have sexually deviant impulses; the author emphasizes and describes the heterogeneity of sexual impulses that lead to crime).

606.    Defendants rely heavily on *The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders' (DSM)* clinical diagnosis to prove Plaintiffs and Class members suffer from a mental abnormality or personality disorder which makes them dangerous, causing them difficulty in controlling their behavior, and therefore civilly committable. The clinical diagnosis of a *DSM* mental disorder is not sufficient to establish the existence for legal purposes of a "mental disorder," "mental disability," "mental disease," "mental defect," "mental abnormality," or "personality disorder." In determining whether Plaintiffs or Class members meet a specified legal standard (e.g., for competence, criminal responsibility, or disability), additional information is required beyond that contained in the *DSM* diagnosis. Moreover, the fact that a Plaintiff's or Class member's presentation meets the criteria for a *DSM* diagnosis does not carry any necessary implication regarding the Plaintiff's or Class member's degree of control over one's behaviors that may be associated with the

275

disorder. Even when diminished control over one's behavior is a feature of the disorder, having the diagnosis in itself does not demonstrate that a particular Plaintiff or Class member is (or was) unable to control his or her behavior at a particular time.

The "reliability" of *DSM* diagnosis is questionable. See *Stuart A. Kirk & Herb Kutchins, The Selling of DSM: The Rhetoric of Science in Psychiatry (1992)*. Reliability is the extent to which different examiners, assessing the same individual, will assign the same diagnosis. Clinicians frequently differ in their assessments of a particular case. Nor has the "validity" of the *DSM* ever been established. In general, validity means that a set of diagnostic criteria accurately identifies a supposed instance of mental disorder. Four aspects of validity are relevant here: 1. Do the diagnostic criteria accurately identify the presence of the targeted condition? See *Robert D. Hare et al., Psychopathy and the DSM IV Criteria for Antisocial Personality Disorder, 100 J. Abnormal Psychol. 391, 392 (1991)* ("[C]oncerns have been expressed about [DSM-III-R's] content – and construct – related validity, in particular, about its relation to clinical conceptions of psychopathy... [T]here is a lack of of congruence between the DSM-III-R criteria for APD and other well-established conceptions of psychopathy..."). 2. Is the condition a true "mental disorder"? See *Jerome C. Wakefield, Disorder as Harmful Dysfunction: A Conceptual Critique of DSM-III-R's Definition of Mental Disorder, 99 Psychol. Rev. 232 (1992)*. 3. Do the diagnostic criteria have "predictive" value? 4. Is the meaning of "mental disorder" in the DSM the same as the meaning of the "mental abnormality" or "personality disorder" element in the text of the commitment law? Each of these questions must be directed toward the Defendants. The basis for commitment is undermined by every answer in the negative.

The *DSM* employs a *categorical* system to diagnose mental abnormality or personality disorder, in which subtle differences between individual cases are sacrificed for the sake of broad applicability. The human psychological traits the *DSM* purports to categorize are *continuously distributed* phenomena; distortion is inevitable when these phenomena are modeled categorically. See *Seymour L. Halleck et al., Speaking for the American Psychiatric Association Task Force* in *The Use of Psychiatric Diagnosis in the Legal Process: Task Force Report of the APA, 20 Bull. Am. Acad. Psychiatry Law 481, 493 (1992)*, "emphasizes the equivocal nature of the concept: The line between an irresistible impulse and an impulse not resisted is probably no sharper than that of twilight and dusk." The report continues: The problem of determining volitional capacity in the legal context is also compounded by the reality that the law often seeks to draw bright categorical lines. Yet, volitional capacity is almost always a quantitative rather than an all-or-none issue. It is rare for mental disorders to be associated with incapacities which obviate the possibility that the patient can make more than one

behavioral response to a situation. Because some element of choice (however difficult that choice may be) is usually present, it is rarely correct to talk about behavioral symptoms as "involuntary" or "beyond the patient's control." *Halleck* at 492-493.

For example, *DSM* behaviors admit of various degrees in their manifestation, from mild to severe; the assignment of diagnostic categories obtains notwithstanding these important distinctions. Nor does the *DSM* provide for the termination of diagnosis once applied; they remain applicable even when a disorder is in "partial remission." See *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994)*, p. 2. For example, a person who fits the APD definition retains this diagnosis even though his or her behavior may change significantly over time. Defendants should have to determine whether the condition is properly classified as *mild* or moderate in degree, in full or partial *remission*.

Although *DSM* categories sweep very broadly, despite expert opinion, in many, if not most cases, a particular diagnostic category does not currently apply to the Plaintiffs and/or Class members and is, therefore, in apposite to the legal determination of mental abnormality or personality disorder. Defendants attempt to use old data as the basis for a current diagnosis. Experts on the prediction of violence generally agree that clinical diagnosis is a poor predictor of violence. See *E. P. Mulvey, Assessing the Evidence of a Link Between Mental Illness and Violence, 45 Hosp. & Comm. Psychiatry 663, 665 (1994)* ("active symptoms are probably more important as a risk factor than is simply the presence of an identifiable disorder... The pattern of their findings points to the importance of active symptomatology rather than simply to the presence of a mental disorder as a risk factor for violence.").

Most sex offender commitment respondents are criminally responsible and competent despite a *DSM* diagnosis. For a discussion of these issues as they apply to personality disorders see *Comment, The Psychopath and the Definition of "Mental Disease or Defect" Under the Model Penal Code Test of Insanity: A Question of Psychology or a Question of Law?, 69 Neb. L. Rev. 190 (1990)*, and *Abraham Rudnick & Amihay Levy, Personality Disorders and Criminal Responsibility: A Second Opinion, 17 Int'l J.L. & Psychiatry 409 (1994)* (both concluding that personality disorders do not constitute conditions that relieve a person from criminal responsibility).

These facts support the argument that the KSVPA statute, as applied to the Plaintiffs and Class members, is unconstitutional.

In the *DSM-IV*, each of the mental disorders is conceptualized as a clinically significant behavioral or psychological syndrome or pattern that occurs in an individual and that is associated with

present distress (e.g., painful symptom or with a significantly increased risk of suffering death, disability, or an important loss of freedom. It must currently be considered a manifestation of a behavioral, psychological, or biological dysfunction in the individual. Neither deviant behavior (e.g., political, religious, or sexual) nor conflicts that are primary between the Plaintiffs or Class members and society are mental disorders unless the deviance or conflict is a symptom of a dysfunction in the Plaintiff or Class member. See *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994)*, pp. xxi-xxii.

607. Defendants use the *DSM* diagnosis of either Antisocial Personality Disorder (APD) and/or Paraphilia/Pedophilia, in nearly all cases to civilly commit Plaintiffs and Class members under the KSVPA Statutes. However, the *DSM* diagnostic criteria for APD are exceedingly broad. Some estimate that the diagnosis could apply to up to 80 percent of all prisoners. Some doubt whether the APD diagnosis identifies a true "mental abnormality" or "personality disorder" at all. See *Mark D. Cunningham & Thomas J. Reidy, Antisocial Personality Disorder and Psychopathy: Diagnostic Dilemmas in Classifying Patterns of Antisocial Behavior in Sentencing Evaluations, 16 Behav. Sci. Law 333, 340 (1998)*; *Rosalie Wells, a Fresh Look at the Muddy Waters of Psychopaty, 63 Psychological Rep. 843, 846 (1988)*; *James S. Wulach, Diagnosing the DSM-III Antisocial Personality Disorder, 14 Prof. Psychol. Res. & Prac. 330 (1983)*.

*Antisocial Personality Disorder* is the *DSM's* term for a particular disorder of the *personality*, but its diagnostic criteria are defined primarily in terms of *behavior.* In the absence of an underlying dysfunction of the Plaintiff or Class member, APD is a misdiagnoses: Neither deviant behavior (e.g., political, religious, or *sexual*) nor *conflicts that are primarily between the individual and society* are mental abnormalities or personality disorders *unless* the deviance or conflict is a symptom of a *dysfunction* in the individual. Deviant or antisocial behavior is not itself proof of mental abnormality or personality disorder. The persistent *pattern* of behavior is the key to allowing an inference of underlying "dysfunction." See *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994)*, p. xxii.

The *DSM* is quite specific as to the kind of pattern that must exist for behavior to be classified as a personality disorder. It is an enduring pattern of inner experience and behavior that... *is pervasive and inflexible, has an onset in adolescence or early adulthood, is stable over time, and leads to distress or impairment*. See *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994)*, p. 630.

Defendants have failed to prove Plaintiff's and Class member's so-called APD is

pervasive and inflexible, has an onset in adolescence or early adulthood, is stable over time, *and* leads to distress or impairment when diagnosing Plaintiffs and Class members.

Furthermore, not all "enduring patterns" are disorders. According to the *DSM*, "*personality traits* are enduring patterns of perceiving, relating to, and thinking about the environment and oneself that are exhibited in a wide range of social and personal contexts." The *DSM* carefully distinguishes *personality traits* from disorders: Personality Disorders must be distinguished from *personality traits that do not reach the threshold for a Personality Disorder. **Personality traits are diagnosed as a Personality Disorder only when they are inflexible, maladaptive, and persisting and causes significant functional impairment or subjective distress.** See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4*ᵗʰ* ed. 1994)*, p. 633. (emphasis added).

Defendants often misdiagnose Plaintiffs and Class members with APD who merely exhibit personality traits, but that are not necessarily enduring nor inflexible.

Defendant's clinicians attach an APD label to Plaintiffs and Class members without careful criterion-by-criterion assessment of the Plaintiffs and Class members. Expert diagnostic assessments should look not only for the presence of the criteria, but also for their stability. Defendants ignore evidence that the Plaintiffs and Class members adapt their behavior to a variety of environments, such as reducing their antisocial behavior in a prison or institutional setting, which undercuts the "maladaptivity" and stability aspects of the APD diagnosis. Defendant's clinicians base their diagnosis on old patterns of behaviors and then use the diagnostic label to describe current behaviors or to predict future ones. Defendants diagnosis is improper because Plaintiff's and Class member's current behaviors do not meet the diagnostic criteria. Plaintiffs and Class members have not demonstrated the stability and maladaptivity necessary to diagnose APD. The SPD diagnosis is not predictive of antisocial behaviors because its application, according to the Defendant's clinicians, now encompass pro social behaviors. Such an indiscriminate diagnostic category is not a reliable basis for civil commitment determinations. The fact that the Plaintiffs and Class members were not in any physical fights the many years they served their prison sentences, before Defendants civilly committed them, nor have they recently been in physical fights while in the SPTP, contraindicates the following behavioral "feature" of the APD diagnosis: "Individuals with Antisocial Personality Disorder tend to be irritable and aggressive and may repeatedly get into physical fights or commit acts of physical assault." See *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4ᵗʰ ed. 1994)*, p. 646.

279

Plaintiffs and Class members have been in closely supervised or highly structured environments an average ten to twenty years without any violent acts for the vast majority of them. The absence of fights evidences Plaintiffs and Class members adapt to their environment.

To be considered a "disorder," the behavior indicated by the APD diagnosis: *Must be "inflexible," (i.e., "exhibited in a wide range of social and personal contexts"), "enduring," and "pervasive across a broad range of personal and social situations"; *Must be "maladaptive"; and *Must "cause significant functional impairment or subjective distress" that "leads to clinically significant distress or impairment in social, occupational, or other important areas of function." See *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994)*, p. 630.

The absence of "clinically significant... impairment in social, occupational, or other important areas of functioning" for Plaintiffs and Class members across a range of situations proves Defendants' APD diagnosis for Plaintiffs and Class members is inappropriate.

Finally, of the two hundred forty one (241) Plaintiffs and Class members currently committed to the SPTP, only four (4) are less than thirty (30) years old, while forty six (46) are between the ages of thirty – thirty nine (30-39), sixty five (65) are between the ages of forty – forty nine (40-49), eighty eight (88) are between the ages of fifty – fifty nine (50-59), fifty one (51) are between the ages of sixty – sixty nine (60-69), and forty (40) are over seventy plus (70+) years of age. Plaintiffs and Class members therefore do not fit the criteria for the APD diagnosis of which Defendants erroneously labeled Plaintiffs and Class members, since there is general agreement that APD tends to "remit as the individual grows older, particularly by the fourth decade [age 30-39] of life." See *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994)*, p. 648.

Defendants misdiagnose Plaintiffs and Class members with Paraphilia/Pedophilia and/or refuse to admit when Plaintiffs and Class members show signs of partial to full remission of Paraphilia/Pedophilia Disorder. The *DSM* criteria for Paraphilia/Pedophilia require *intense* urges specifically directed at deviant sexual objectives. Rape is not in itself evidence of a *DSM* paraphilia, though some rape behaviors might constitute a paraphilic disorder. See *G.G. Abel & J.L. Rouleau, The Nature and Extent of Sexual Assault,* in *Hand-book of Sexual Assault*, pp. 18-20.

Sexual misconduct has many causes; certainly some misconduct is not based on deviant sexual impulses – and is, therefore, not paraphilic. See *Park Elliot Dietz, Sex Offenses: Behavioral Aspects,* in *4 Encyclopedia of Crime and Justice*, p. 1489 (*Sanford M. Kadish ed., 1983*) (only a small portion of convicted rapists have paraphilias or are preferentially aroused by rape imagery).

280

The DSM definition does not have "exit criteria" for paraphilias. Defendants therefore refuse to recognize that Plaintiffs and Class members who may have at one point fit the criteria for Paraphilia/Pedophilia diagnosis are in partial and/or full remission and therefore no longer fit the criteria for Paraphilia/Pedophilia diagnosis. Defendants fail and refuse to acknowledge shifting time referents, where diagnosis that purport to describe Plaintiff's and Class member's current condition are based on *remote* conduct.

608.    Defendants rely heavily on Plaintiff's and Class member's prior misconduct to predict future dangerousness, while downplaying Plaintiff's and Class member's evidence of rehabilitation while in prison. A conclusion which does not allow for Plaintiff's and Class member's subsequent growth. Without proof of future dangerousness, Plaintiffs and Class members do not fit the criteria for a finding of Sexually Violent Predator. Defendants civilly commit Plaintiffs and Class members under the KSVPA statutes who they cannot prove will be dangerous if released, are therefore violating Plaintiff's and Class member's constitutional rights, making the KSVPA statutes as applied unconstitutional. Sex offenders are much more likely to commit a crime than they are to commit another sexual crime. See *Allen J. Beck & Bernard E. Shipley, U.S. Dep't of Justice, Recidivism of Prisoners Released in 1983 (1989); Washington State Institute for Public Policy, Sex Offenses in Washington State: August 1998 Update.* (51.5 percent of released rapists were rearrested on some charge; 7.7 percent were rearrested on a rape charge).

The potential threat posed by the Plaintiffs and Class members in commitment proceedings must have resulted from a mental abnormality or personality disorder. However, the idea of assigning a single or even a primary cause to a given action conflicts with much of what is known about human sexual violence. Sexual violence is heterogeneous. Many studies emphasize the heterogeneity of sex offenders. See *Margit C. Henderson & Seth C. Kalichman, Sexually Deviant Behavior and Schizotypy: A Theoretical Perspective With Supportive Data, 61 Psychiatric Q. (Winter 1990)*; See also *Park Elliot Dietz, Sex Offenses: Behavioral Aspects,* in *4 Encyclopedia of Crime and Justice (Sanford Mikadish ed., 1983); R.K. Hanson et al., Long-term Recidivism of Child Molesters, 61 J. Consulting & Clinial Psychol. 646 (1993).*

Current research suggests that violent behavior results from a complex interaction among a variety of social, clinical, personality, and environmental factors, and that "mental disorder", "mental abnormality", or "personality disorder" may not be one of them: Occasionally sex offending arises as a result of mental illness but more commonly it comes about through a complex mixture of influences which include social attitudes and individual training, level of personal morality and respect

281

for others, the strength of sexual drives and directions in which these drives have developed, the ability to acquire legitimate sexual partners, and the presence of anxiety – or anger – laden emotional responses in ordinary sexual interactions. See *Adarsh Kaul, Sex Offenders – Cure or Management?, 33 Med. Sci. & L. 207 (1993)*.

　　　　Researchers in developmental psychopathology posit overlapping pathways to violent criminality and mental disorder, suggesting that violence and mental disorder are part of a larger constellation of maladaptive outcomes rather than links in a clearly causal chain of events. See *E.P. Mulvey, assessing the Evidence of a Link Between Mental Illness and Violence, 45 Hosp. & Comm. Psychiatry (1994)*, P. 665.

　　　　Personality disorders and paraphilias do not vitiate personal choice. See *Thomas A. Widigar & Timothy J. Trull, Personality Disorders and Violence, in Violence and Mental Disorders (J. Monahan & H. Steadman, eds., 1994)*, p. 216. Since personality disorders and paraphilias do not vitiate personal choice, Defendants erroneously determine Plaintiffs and Class members are a risk for future sexual misconduct as a result of a mental abnormality or personality disorder rather than a personal choice. Even if a disorder predisposes one to act in a particular way, the choice to *follow* that predisposition is a matter of individual choice; at most, the mental abnormality or personality disorder merely influences the menu of possible behaviors. See *Park Elliot Dietz, Sex Offenses: Behavioral Aspects,* in *4 Encyclopedia of Crime and Justice (Sanford M. Kadish ed., 1983)*, p. 1490. ("The paraphilia determines the form of the offense, not the fact of its taking place. Failure to control or find lawful outlets for deviant sexual impulses must not be confused with incapacity to control these impulses"). See also *State v. Sickler, 889 P. 2d 1301 (Or. App. 1995)* (evidence of "causation" insufficient to support commitment).

609.　In *Kansas v. Hendricks*, KSVPA was found constitutional because, "the committing court was obligated to conduct an annual review to determine whether continued detention was warranted. K.S.A. § 59-29a08." And, "even without the Secretary's permission, the confined person could at any time file a release petition. K.S.A. § 59-29a11. If the court found that the State could no longer satisfy its burden under the initial commitment standard, the individual would be freed from confinement." Defendants *do not* conduct an annual review to determine whether continued detention is warranted. Defendants prepare a document by an unqualified "professional." In the document, Defendants merely state on every Plaintiff's and Class member's so-called *Yearly Report of Resident's Mental Condition* that, "In order to successfully complete the program, residents are required to complete all phases of the program, including any and all requisites associated with each phase, to the

282

satisfaction of the program." Defendants fail and refuse to examine each Plaintiff's and Class member's current mental condition yearly to determine whether continued detention is warranted. Furthermore, Defendants fail and refuse to measure Plaintiff's and Class member's current mental condition to determine that said mental abnormality or personality disorder has or has not so changed that Plaintiffs and Class members are safe to be released. Instead, Defendants, without examining Plaintiff's and Class member's current mental condition, merely conclude that Plaintiffs and Class members remain dangerous and that their "mental abnormality or personality disorder has not so changed that it would be safe to place them in Transitional Release at this time." See *Exhibit J, Integrated Treatment Plans and Yearly Reports of Resident's Mental Condition of Plaintiffs and Class members Ronald Alan Baker, Steven Earl Roberts, Danny Wassell Stanley, Tyrone R. Tschantz, and Harvey Darrel Hickman*. Yet, in *Kansas v. Hendricks*, Dr. William S. Logan, a forensic psychiatrist, stated that it was not possible to predict with any degree of accuracy the future dangerousness of a sex offender. See *Kansas v. Hendricks*, 521 U.S. 346.

In *Kansas v. Hendricks*, 'States have in certain narrow circumstances provided for the forcible civil detainment of people who are unable to control their behavior and who thereby pose a danger to the public health and safety... The statute thus requires proof of more than a mere predisposition to violence; rather, it requires evidence of past sexually violent behavior and a present mental condition that creates a likelihood of such conduct in the future if the person is not incapacitated... A finding of dangerousness, standing alone, is ordinarily not a sufficient ground upon which to justify indefinite involuntary commitment... It requires a finding of future dangerousness, and then links that finding to the existence of a "mental abnormality" or "personality disorder" that makes it difficult, if not impossible, for the person to control his dangerous behavior. Kan. Stat. Ann. § 59-29a02(b) (1994)... Although we recognize that a "civil label is not always dispositive," See *Allen v. Illinois, 478 U.S. 364, 366, 92 L. Ed. 2d 296, 106 S. Ct. 2988 (1986) at 369*, we will reject the legislature's manifest intent only where a party challenging the statute provides "the clearest proof" that "the statutory scheme [is] so punitive either in purpose of effect as to negate [the State's] intention to deem it "civil." See *United States v. Ward, 448 U.S. 242, 248-249, 65 L. Ed. 2d 742, 100 S. Ct. 2636 (1980)*. In those limited circumstances, we will consider the statutes to have established criminal proceedings for constitutional purposes.' See *Kansas v. Hendricks*, 521 U.S. 346. Without proof of Plaintiff's and Class member's *present* mental condition, Defendants cannot prove Plaintiffs and Class members have a current mental abnormality or personality disorder, which has not so changed... Nor can Defendants claim Plaintiffs and Class members pose a future danger – though "A finding of

dangerousness, standing alone, is ordinarily not sufficient ground upon which to justify indefinite involuntary commitment." Defendants cannot link future dangerousness to the existence of a *current* "mental abnormality" or "personality disorder", nor can they even prove future dangerousness alone for Plaintiffs and Class members, without a true current mental evaluation, by a qualified professional, of each and every Plaintiff and Class member. The court should therefore reject Kansas legislature's and Defendant's manifest intent because Plaintiffs and Class members have provided "the clearest proof" that "the statutory scheme [is] so punitive... as to negate [the State's] intention" to deem it "civil." The court must therefore consider the statute to have established criminal proceedings for Constitutional purposes. Since Defendants cannot satisfy its burden under the initial commitment standard, Plaintiffs and Class members must immediately be freed from confinement, with prejudice.

610.    In *Kansas v. Hendricks*, 'Hendricks argues that the Act is necessarily punitive because it fails to offer any legitimate "treatment." Without such treatment, Hendricks asserts, confinement under the Act amounts to little more than disguised punishment. Hendricks' argument assumes that treatment for his condition is available, but that the State has failed (or refused) to provide it. The Kansas Supreme Court, however, apparently rejected this assumption, explaining: "It is clear that the overriding concern of the legislature is to continue the segregation of sexually violent offenders from the public. Treatment with the goal of reintegrating them into society is incidental, at best. The record reflects that treatment for sexually violent predators is all but nonexistent. The legislature concedes that sexually violent predators are not amenable to treatment under [the existing Kansas involuntary commitment statute]. If there is nothing to treat under [that statute], then there is no mental illness. In that light, the provisions of the Act for treatment appear somewhat disingenuous." 259 Kan. at 258, 912 P.2d at 136. It is possible to read this passage as a determination that Hendricks' condition was *untreatable* under the existing Kansas civil commitment statute, and thus the Act's sole purpose was incapacitation. Absent a treatable mental illness, the Kansas court concluded, Hendricks could not be detained against his will... Alternatively, the Kansas Supreme Court's opinion can be read to conclude that Hendricks' condition is treatable, but that treatment was not the State's "overriding concern," and that no treatment was being provided (at least at the time Hendricks was committed). 259 Kan. at 258, 912 P.2d at 136. See also *ibid.* ("It is clear that the primary objective of the Act is to continue incarceration and not to provide treatment")... Indeed, critical language in the Act itself demonstrates that the Secretary of Social and Rehabilitation Services, under whose custody sexually violent predators are committed, has an obligation to provide treatment to individuals like Hendricks. § 59-29a07(a) ("If the court or jury determines that the person is a sexually violent predator, the person shall

284

be committed to the custody of the secretary of social and rehabilitation services for *control, care and treatment* until such time as the person's mental abnormality or personality disorder has so changed that the person is safe to be at large" (emphasis added)). Other of the Act's sections echo this obligation to provide treatment for committed persons. See, *e.g.*, § 59-29a01 (establishing civil commitment procedure "for the long-term care and treatment of the sexually violent predator"); § 59-29a09 (requiring the confinement to "conform to constitutional requirements for care and treatment"). Thus, as in *Allen*, "the State has a statutory obligation to provide 'care and treatment for [persons adjudged sexually dangerous] designed to effect recovery,'" 478 U.S. at 369 (quoting Ill. Rev. Stat., ch. 38, P 105-8 (1985)), and we may therefore conclude that "the State has . . . provided for the treatment of those it commits." 478 U.S. At 370... By furnishing such treatment, the Kansas Legislature has indicated that treatment, if possible, is at least an ancillary goal of the Act, which easily satisfies any test for determining that the Act is not punitive. Where the State has "disavowed any punitive intent"; limited confinement to a small segment of particularly dangerous individuals; provided strict procedural safeguards; directed that confined persons be segregated from the general prison population and afforded the same status as others who have been civilly committed; recommended treatment if such is possible; and permitted immediate release upon a showing that the individual is no longer dangerous or mentally impaired, we cannot say that it acted with punitive intent.' See *Kansas v. Hendricks, 521 U.S. 346.* The justices erred. Hendricks was correct. KSVPA as applied is, in fact, punitive because, though it is required to provide adequate treatment, it fails to offer any legitimate treatment. Any treatment provided by Defendants is mere smoke and mirrors. Defendants fail and refuse to provide any meaningful treatment which allows Plaintiffs and Class members to move forward toward release, as required. Defendants true purpose *is* punishment in disguise. Plaintiffs and Class members are amenable to treatment, yet Defendants refuse to provide legitimate treatment. The Kansas Supreme Court was correct, the overriding concerns of the KSVPA is continued segregation of sexually violent offenders from the public though Plaintiffs and Class members have already paid their debt to society. Defendants claim KSVPA purpose is treatment is mere lip service. The provisions of the Act for treatment *are* disingenuous. Defendants refusal to provide genuine treatment proves the Act's sole purpose is, in fact, incapacitation. "It *is* clear that the primary objective of the Act is to continue incarceration and not to provide treatment." Even though 'The Fourteenth Amendment Due Process Clause of the United States Constitution requires state officials to provide civilly-committed persons, such as these plaintiffs, with access to mental health treatment that gives them a realistic opportunity to be cured or to improve the mental condition for which they were confined. See

285

_Youngberg v. Romeo_, 457 U.S. 307, 319-22, 73 L. Ed. 2d 28, 102 S. Ct. 2452 (1982); _Ohlinger v._
_Watson_, 652 F.2d 775, 778 (9th Cir. 1980). This rule applies to sex offenders, and "lack of funds, staff
or facilities cannot justify the State's failure to provide [those confined] with that treatment necessary
for rehabilitation." _Ohlinger v. Watson_, 652 F.2d at 778-79. The _Youngberg_ constitutional
standard "determines whether a particular decision has substantially met professionally accepted
minimum standards." _Society for Good Will to Retarded Children, Inc. v. Cuomo_, 737 F.2d 1239, 1248
(2nd Cir. 1984). Accordingly, these plaintiffs, and others involuntarily confined through civil
proceedings, cannot simply be warehoused and put out of sight; they must be afforded adequate
treatment. Although confined, they are not prisoners. They are entitled by law to "more considerate
treatment and conditions of confinement than criminals whose conditions of confinement are designed
to punish." _Youngberg_, 457 U.S. At 322.' See _Turay v. Seling, 108 F. Supp. 2d 1148._

    Defendants do not provide treatment that gives Plaintiffs and Class members a _realistic_
opportunity to be cured or to improve the mental condition for which they were confined. Defendants
have not met professionally accepted minimum standards. Defendants have warehoused Plaintiffs and
Class members and failed and refused to provide minimally adequate treatment. Defendants fail and
refuse to release Plaintiffs and Class members as soon as their mental abnormality or personality
disorder has so changed that the Plaintiff or Class member is safe to be at large. Confinement of
Plaintiffs and Class members by Defendants therefore _does not_ conform to constitutional requirements
for care and treatment. By _not_ furnishing constitutionally required adequate care and treatment for
Plaintiffs and Class members, though Defendants "disavowed any punitive intent," Plaintiffs and Class
members have provided "the clearest proof" that "the statutory scheme [is] so punitive either in
purpose or effect as to negate [the State's] intention" to deem it "civil." Defendants have not followed
strict procedural safeguards. Defendants have not afforded Plaintiffs and Class members the same
status as others who have been civilly committed. Defendants have not provided Plaintiffs and Class
members adequate treatment, though treatment is possible. Defendants have not permitted Plaintiffs
and Class members immediate release upon a showing that the Plaintiff or Class member is no longer
dangerous or mentally impaired. Defendants therefore have acted with punitive intent. The Act
therefore is punitive, violates the double jeopardy and ex post facto clauses of the United States
Constitution and must therefore require the immediate release or all Plaintiffs and Class members with
prejudice.

  611. In _Kansas v. Hendricks_, according to Justice Kennedy, "A law enacted after commission
of the offense and which punishes the offense by extending the term of confinement is a textbook

example of an *ex post facto* law. If the object or purpose of the Kansas law had been to provide treatment but the treatment provisions were adopted as a sham or mere pretext, there would have been an indication of the forbidden purpose to punish... Confinement of such individuals is permitted even if it is pursuant to a statute enacted after the crime has been committed and the offender has begun serving, or has all but completed serving, a penal sentence, provided there is no object or purpose to punish. See *Baxstrom* v. *Herold,* 383 U.S. 107, 111-112, 15 L. Ed. 2d 620, 86 S. Ct. 760 (1966)... If the civil system is used simply to impose punishment after the State makes an improvident plea bargain on the criminal side, then it is not performing its proper function. These concerns persist whether the civil confinement statute is put on the books before or after the offense. We should bear in mind that while incapacitation is a goal common to both the criminal and civil systems of confinement, retribution and general deterrence are reserved for the criminal system alone. On the record before us, the Kansas civil statute conforms to our precedents. If, however, civil confinement were to become a mechanism for retribution or general deterrence, or if it were shown that mental abnormality is too imprecise a category to offer a solid basis for concluding that civil detention is justified, our precedents would not suffice to validate it." See *Kansas v. Hendricks*, 521 U.S. 346.

KSVPA *is* a textbook example of an ex post facto law given the fact that it was enacted after commission of the offense in a great many Plaintiff's and Class member's cases, and punishes the offense by extending the term of confinement. Defendants claim the purpose of the KSVPA was to provide treatment, but the treatment provisions have been adopted as a sham and mere pretext, given the fact that the Defendants still do not provide constitutionally required adequate care and treatment that gives them a *realistic* opportunity to be cured or to improve the mental condition for which they were confined. Defendants purpose for the KSVPA therefore *is* the forbidden purpose to punish. Defendants *are* using the civil system to impose punishment, retribution and general deterrence reserved for the criminal system alone, and mental abnormality *is* too imprecise a category to offer a solid basis for concluding that civil detention is justified. KSVPA as applied is therefore unconstitutional.

612. Consider Justice Breyer's dissent in *Kansas v. Hendricks*, 521 U.S. 346. Defendants did not provide Hendricks with any treatment until after his release from prison and only inadequate treatment thereafter. Justice Breyer finds these features of the Act convince him that the Act was not simply an effort to commit Hendricks civilly, but an effort to inflict further punishment upon him. As well, Defendants have not provided a majority of Plaintiffs and Class members with any treatment until after their release from prison and for all Plaintiffs and Class members, only inadequate treatment

thereafter. Justice Breyer is correct, the Act is not simply an effort to commit Plaintiffs and Class members, but an effort to inflict further punishment upon them. The Ex Post Facto Clause therefore prohibits the Act's application to Plaintiffs and Class members who committed their crimes prior to its enactment. The Double Jeopardy Clause also prohibits the Act's application to Plaintiffs and Class members who have already been punished for their crimes.

U.S. Supreme Court Justices should have upheld the Kansas Supreme Court ruling that Kansas had not satisfied the "mentally ill" requirement of the Due Process Clause because Plaintiffs and Class members, like Hendricks, are not "mentally ill." And that Kansas has not satisfied what the court believes is a "substantive due process" requirement, the provision of treatment. Most Plaintiffs and Class members have been diagnosed with a paraphilia, especially pedophilia. Justice Breyer cites *R. Slovenka, Psychiatry and Criminal Culpability 57 (1995)* and *Schopp & Sturgis, Sexual Predators and Legal Mental Illness for Civil Commitment, 13 Behav. Sci. & The Law 433, 451-452 (1995)* testimony that paraphilias are not mental illness and the mental illness requirement is therefore not satisfied. The Kansas Supreme Court concluded that Hendrick's confinement violated the Due Process Clause because the Due Process Clause requires a State to provide treatment to those it civilly confines, but Kansas did not provide Hendricks with significant treatment. Defendants have not provided Plaintiffs and Class members with adequate treatment and therefore Plaintiff's and Class member's confinement also violates the Due Process Clause, as Justice Breyer opines.

Kansas argues pedophilia can be treated but it has not provided that treatment adequately. The Due Process Clause forbids the confinement of Plaintiffs and Class members unless Kansas provides them with the treatment it concedes is available. Treatment provided, being inadequate, therefore violates Plaintiff's and Class member's Due Process rights, and the SVPA as applied is therefore unconstitutional, the remedy of which is immediate release of all Plaintiffs and Class members with prejudice.

KSVPA violates the Federal Constitution's *Ex Post Facto* Law because it inflicts a greater punishment on Plaintiffs and Class members than did the law annexed to their "crimes" when they "committed" them. The Ex Post Facto Clause "forbids the application of any new punitive measure to a crime already consummated." Though some U.S. Supreme Court Justices found the Act is not "punitive," Justice Breyer disagrees. Citing resemblances between the Act's "civil commitment" and traditional criminal imprisonment the Act's civil commitment amounts to "secure" confinement and "incarceration against one's will;" those whom the Act confines and ordinary prisoners are treated alike; a basic objective of the Act is incapacitation, which, as Blackstone said in describing an objective

288

of criminal law, is to "deprive the party injuring of the power to do future mischief;" incapacitation is one important purpose of criminal punishment; "one of the reasons society imprisons those convicted of crimes is to keep them from inflicting future harm, but that does not make imprisonment any less punishment;" the Act, like criminal punishment, imposes its confinement (or sanction) only upon an individual who has previously committed a criminal offense; the Act imposes that confinement through the use of persons (county prosecutors), procedural guarantees (trial by jury, assistance of counsel, psychiatric evaluations), and standards ("beyond a reasonable doubt") traditionally associated with the criminal law; criminal behavior triggers the Act; the presence of criminal law-type procedures. If these obvious similarities cannot by themselves prove that Kansas' "civil commitment" statute is criminal, neither can the word "civil" written into the statute, *K.S.A. § 59-29a01*, by itself proves the contrary. The Court has reiterated that a "civil label is not always dispositive," that in close cases the label is "not of paramount importance."

As Justice Breyer points out, the fact the State of Kansas believes treatment does exist, but couples that admission with a legislatively required delay of such treatment until the Plaintiffs and Class members are at the end of their prison term (so that further incapacitation is therefore necessary), "such a legislative scheme begins to look punitive."

In *People v. Allen* the State Supreme Court found the proceedings "essentially civil" because the statute's aim was to provide "treatment, not punishment." Kansas' scheme is essentially as punitive as that imposed upon felons without "adequate" "care and treatment... designed to effect recovery." The KSVPA is not nonpunitively motivated as evidenced by the fact it confines because of a dangerous mental abnormality but does not adequately seek to help the individual overcome that abnormality. According to Justice Breyer, 'a statutory scheme that provides confinement that does not reasonably fit a practically available, medically oriented treatment objective, more likely reflects a primarily punitive legislative purpose... the State Supreme Court here (Kansas), unlike the state court in *Allen,* has held that treatment is not a significant objective of the Act. The Kansas court wrote that the Act's purpose is "segregation of sexually violent offenders," with "treatment" a matter that was "incidental at best." 259 Kan. at 258, 912 P.2d at 136. By way of contrast, in *Allen* the Illinois court had written that "'treatment, not punishment'" was "the aim of the statute." *Allen, supra,* at 367 (quoting *People* v. *Allen,* 107 Ill. 2d at 99-101, 481 N.E.2d at 694-695)... (ordinarily "we must . . . accept the State Court's view of the purpose of its own law"); *Romer* v. *Evans,* 517 U.S. 620 (1996) (slip op., at 4); *Hernandez* v. *New York,* 500 U.S. 352, 366-370, 114 L. Ed. 2d 395, 111 S. Ct. 1859 (1991) (plurality); *id.*, at 372 (O'CONNOR, J., concurring); *Edwards* v. *Aguillard,* 482 U.S. 578, 594, n. 15, 96

L. Ed. 2d 510, 107 S. Ct. 2573 (1987); but see [***529] *Department of Revenue* [**2093] *of Mont.* v. *Kurth Ranch,* 511 U.S. at 776, 780, n. 18; *Stone* v. *Graham,* 449 U.S. 39, 40-43, 66 L. Ed. 2d 199, 101 S. Ct. 192 (1980) *(per curiam); Consolidated Edison Co. of N. Y.* v. *Public Serv. Comm'n of N. Y.,* 447 U.S. 530, 533, 535-537, 65 L. Ed. 2d 319, 100 S. Ct. 2326 (1980), although the level of deference given to such findings varies with the circumstances, *Crawford* v. *Board of Ed. of Los Angeles,* 458 U.S. 527, 544, n. 30, 73 L. Ed. 2d 948, 102 S. Ct. 3211 (1982), and is not always as conclusive as a state court's construction of one of its statutes, [*384] see, *e.g.*, *R. A. V.* v. *St. Paul,* 505 U.S. 377, 381, 120 L. Ed. 2d 305, 112 S. Ct. 2538 (1992). For example, *Allen*'s dissenters, as well as its majority, considered the state court's characterization of the state law's purpose an important factor in determining the constitutionality of that statute. *Allen*, *supra*, at 380 (STEVENS, J., dissenting) (describing the state court as "the final authority on the . . . purpose" of the statute)... The record provides support for the Kansas court's conclusion... the Kansas statute insofar as it applies to previously convicted offenders, such as Hendricks, commits, confines, and treats those offenders *after* they have served virtually their entire criminal sentence. That time-related circumstance seems deliberate... An Act that simply seeks confinement, of course, would not need to begin civil commitment proceedings sooner... This is to say, the timing provisions of the statute confirm the Kansas Supreme Court's view that treatment was not a particularly important legislative objective... Testimony of Terry Davis, SRS Director of Quality Assurance, *id.,* at 78-81 (pointing out that treatment under the Act takes place in surroundings very similar to those in which prisoners receive treatment)... See Testimony of Dr. Befort at State Habeas Proceeding, App. 399, 406-408 (describing treatment as ward milieu and group therapy); *id.,* at 416-417 (stating that Kansas offers similar treatment, on a voluntary basis, to prisoners)... Hence, assuming arguendo that it would be otherwise permissible, Kansas need not postpone treatment in order to make certain that sex offenders serve their full terms of imprisonment, *i.e.*, to make certain that they receive the entire punishment that Kansas criminal law provides. To the contrary, the statement in the Act itself, that the Act aims to respond to special "long term" "treatment needs," suggests that treatment should begin during imprisonment... If long-term treatment needs, rather than further punishment were "Kansas' primary aim, the state would require that treatment begin soon after conviction, not 10 or more years later." The Statute does not require the committing authority to consider the possibility of using less restrictive alternatives, such as postrelease supervision, halfway houses, or other methods that *amici* supporting Kansas here have mentioned. Brief for the Menninger Foundation et al. as *Amici Curiae* 28; Brief for the Association for the Treatment of Sexual Abusers as *Amicus Curiae* 11-12. The laws of many other States require such

consideration. See Appendix, *infra.* [\*\*2095] [\*388] This Court has said that a failure to consider, or to use, "alternative and less harsh methods" to achieve a nonpunitive objective can help to show that legislature's "purpose . . . was to punish." *Bell* v. *Wolfish,* 441 U.S. 520, 539, n. 20, 60 L. Ed. 2d 447, 99 S. Ct. 1861 (1979). And one can draw a similar conclusion here. Legislation that seeks to help the individual offender as well as to protect the public would avoid significantly greater restriction of an individual's liberty than public safety requires. See Keilitz, Conn, & Gianpetro, *Least Restrictive Treatment of Involuntary Patients: Translating Concepts into Practice*, 29 St. Louis U. L. J. 691, 693 (1985) (describing "least restrictive alternative" provisions in the ordinary civil commitment laws of almost all States); Lyon, Levine, & Zusman, *Patients' Bill of Rights: A Survey of State Statutes*, 6 Mental Disability L. Rep. 178, 181-183 (1982) (same). Legislation that seeks almost exclusively to incapacitate the individual through confinement, however, would not necessarily concern itself with potentially less restrictive forms of incapacitation. I would reemphasize that this is not a case in which the State claims there is no treatment potentially available. Rather, Kansas, and supporting *amici,* argue that pedophilia is treatable. See *supra,* at 6... Six states with laws that seek to protect the public from mentally abnormal, sexually dangerous individuals (unlike Kansas) require consideration of less restrictive alternatives. Only one State other than Kansas, namely Iowa, both delays civil commitment (and consequent treatment) and does not explicitly consider less restrictive alternatives. But the law of that State applies prospectively only, thereby avoiding *ex post facto* problems. See Iowa Code Ann. § 709C.12 (Supp. 1997) (Iowa SVP act only "applies to persons convicted of a sexually violent offense on or after July 1, 1997"); see also Appendix, *infra.* Thus the practical experience of other States, as revealed by their statutes, confirms what the Kansas Supreme Court's finding, the timing of the civil commitment proceeding, and the failure to consider less restrictive alternatives, themselves suggest, namely, that for *Ex Post Facto* Clause purposes, the purpose of the Kansas Act (as applied to previously convicted offenders) has a punitive, rather than a purely civil, purpose... '

According to Justice Breyer, 'when a State decides offenders can be treated and confines an offender to provide that treatment, but then refuses to provide it, the refusal to treat while a person is fully incapacitated begins to look punitive... There is no evidence in the record that contradicts the finding of the Kansas court. Thus, *Allen's* approach--its reliance on the State court--if followed here would mean the Act as applied to *Leroy Hendricks* (as opposed to others who may have received treatment or who were sentenced after the effective date of the Act), is punitive... I believe the Act before us involves an affirmative restraint historically regarded as punishment; imposed upon behavior already a crime after a finding of scienter; which restraint, namely confinement, serves a traditional aim

consideration. See Appendix, *infra.* [\*\*2095] [\*388] This Court has said that a failure to consider, or to use, "alternative and less harsh methods" to achieve a nonpunitive objective can help to show that legislature's "purpose . . . was to punish." *Bell* v. *Wolfish,* 441 U.S. 520, 539, n. 20, 60 L. Ed. 2d 447, 99 S. Ct. 1861 (1979). And one can draw a similar conclusion here. Legislation that seeks to help the individual offender as well as to protect the public would avoid significantly greater restriction of an individual's liberty than public safety requires. See Keilitz, Conn, & Gianpetro, *Least Restrictive Treatment of Involuntary Patients: Translating Concepts into Practice*, 29 St. Louis U. L. J. 691, 693 (1985) (describing "least restrictive alternative" provisions in the ordinary civil commitment laws of almost all States); Lyon, Levine, & Zusman, *Patients' Bill of Rights: A Survey of State Statutes*, 6 Mental Disability L. Rep. 178, 181-183 (1982) (same). Legislation that seeks almost exclusively to incapacitate the individual through confinement, however, would not necessarily concern itself with potentially less restrictive forms of incapacitation. I would reemphasize that this is not a case in which the State claims there is no treatment potentially available. Rather, Kansas, and supporting *amici,* argue that pedophilia is treatable. See *supra,* at 6... Six states with laws that seek to protect the public from mentally abnormal, sexually dangerous individuals (unlike Kansas) require consideration of less restrictive alternatives. Only one State other than Kansas, namely Iowa, both delays civil commitment (and consequent treatment) and does not explicitly consider less restrictive alternatives. But the law of that State applies prospectively only, thereby avoiding *ex post facto* problems. See Iowa Code Ann. § 709C.12 (Supp. 1997) (Iowa SVP act only "applies to persons convicted of a sexually violent offense on or after July 1, 1997"); see also Appendix, *infra.* Thus the practical experience of other States, as revealed by their statutes, confirms what the Kansas Supreme Court's finding, the timing of the civil commitment proceeding, and the failure to consider less restrictive alternatives, themselves suggest, namely, that for *Ex Post Facto* Clause purposes, the purpose of the Kansas Act (as applied to previously convicted offenders) has a punitive, rather than a purely civil, purpose... '

According to Justice Breyer, 'when a State decides offenders can be treated and confines an offender to provide that treatment, but then refuses to provide it, the refusal to treat while a person is fully incapacitated begins to look punitive... There is no evidence in the record that contradicts the finding of the Kansas court. Thus, *Allen*'s approach--its reliance on the State court--if followed here would mean the Act as applied to *Leroy Hendricks* (as opposed to others who may have received treatment or who were sentenced after the effective date of the Act), is punitive... I believe the Act before us involves an affirmative restraint historically regarded as punishment; imposed upon behavior already a crime after a finding of scienter; which restraint, namely confinement, serves a traditional aim

291

of punishment, does not primarily serve an alternative purpose (such as treatment) and is excessive in relation to any alternative purpose assigned. 372 U.S. At 168-169... The statutory provisions before us do amount to punishment primarily because, as I have said, the legislature did not tailor the statute to fit the nonpunitive civil aim of treatment, which it concedes exists in Hendricks' case. The Clause in these circumstances does not stand as an obstacle to achieving important protections for the public's safety; rather it provides an assurance that, where so significant a restriction of an individual's basic freedoms is at issue, a State cannot cut corners. Rather, the legislature must hew to the Constitution's liberty-protecting line. See The Federalist, No. 78, p. 466 (C. Rossiter ed. 1961) (A. Hamilton).'

        The fact that Defendants have not provided Plaintiffs and Class members with "adequate treatment" makes the KSVPA punitive and unconstitutional as applied. Plaintiffs and Class members have been and continue to be injured by Defendant's shocking and intolerable continuing mistreatment of a constitutional stature. The remedy of which is immediate release of all Plaintiffs and Class members with prejudice.

    613.    Supreme Court Justices erred when they held the KSVPA constitutional. The justices' decision suggests, for social control purposes, the majority is comfortable with expansive legislative definitions of "mental disorder," "mental abnormality," or "personality disorder" that go far beyond what the drafters of the standard diagnostic nomenclature ever intended.

        Supreme Court Justices' decision strains to characterize a punitive statute – *the most punitive of any* of the SVPA laws – as "civil," in a way that can only be characterized as "pretextual."

        Supreme Court Justices conflate and confuse legal and medical terminology and miss the point captured clearly and concisely by the Kansas Supreme Court: 'Mental illness is defined in K.S.A. § 59-2902(h) as meaning any person who: "(1) [I]s suffering from a severe mental disorder to the extent that such person is in need of treatment; (2) lacks capacity to make an informed decision concerning treatments; and (3) is likely to cause harm to self or others." Here, neither the language of the Act nor the State's evidence supports a finding that "mental abnormality or personality disorder," as used in K.S.A. § 59-29a02(a) is a "mental illness" as defined in K.S.A. § 59-2902(h). Absent such a finding, the Act does not satisfy the constitutional standard set out in *Addington* and *Foucha*. Justice White, speaking for the majority of the United States Supreme Court in *Foucha*, clearly stated that to definitely confine as dangerous one who has a personality disorder or antisocial personality but is not mentally ill is constitutionally impossible. *Foucha v. Louisiana, 504 U.S. 71 at 78*. Similarly, to indefinitely confine as dangerous one who has a mental abnormality is constitutionally impermissible.'

    614.    Plaintiffs incorporate argument #273 as if fully set forth herein.

615. The September 2013 Legislative Post Audit Report mentions Kansas' SPTP requires Plaintiff's and Class member's risk level for re-offending be reduced to 'practically nil' before they can be released from confinement. See *Exhibit H, 2013 Legislative Post Audit Committee, Performance Audit Report, Larned State Hospital: Reviewing the Operations of the Sexual Predator Treatment Program*. This is an impossible standard which makes it impossible for Plaintiffs and Class members to "progress through the program as appropriate." See *Exhibit B, 2013 Larned State Hospital Fiscal Budget Report*, p. 700. As well, this impossible standard makes it impossible for Plaintiffs and Class members to "be cured or to improve the mental condition for which they were confined" so they may be released. See *Turay v. Seling, 108 F. Supp. 2d 1148*. Defendants design of a program with impossible release standards makes the SPTP egregiously over-restrictive and impermissibly punitive, and therefore unconstitutional as applied.

616. Temporary Licensed Psychologists who are conducting evaluations of Plaintiffs and Class members, for Defendants, are not being supervised while conducting their evaluations, in violation of K.A.R. 102-1-5a. Doctor Rebecca Farr, who evaluated Class member Randall Ritchie, was not supervised by a fully Licensed Clinical Psychologist at any time during her evaluation of Class member Ritchie. Doctor Farr has since twice failed her licensing test to become a fully Licensed Clinical Psychologist in the State of Kansas. This failure and the fact that she was never supervised should call her evaluation itself into question. Temporary Licensed Psychologists who performed their evaluations unsupervised should be discredited, their evaluations should not be admissible, Defendants cannot claim beyond a reasonable doubt that those Plaintiffs and Class members evaluated by unsupervised Temporary Licensed Psychologists meet the criteria for civil commitment. The remedy for violating Plaintiffs' and Class members' constitutional rights under these circumstances is immediate release with prejudice.

617. Defendants are holding Plaintiffs and Class members illegally, based on an evaluation by discredited Licensed Psychologist Rex Rosenberg. Rex Rosenberg was fired by Defendants because he claimed sex offenders are possessed by *Demons*. Defendants refuse to re-evaluate or release Plaintiffs and Class members who were evaluated by Rex Rosenberg, even though all of his evaluations have been discredited. Since these evaluations are discredited, Defendants cannot claim beyond a reasonable doubt that Plaintiffs and Class members meet the criteria for civil commitment. The remedy for violating Plaintiffs' and Class members' constitutional rights under these circumstances is immediate release with prejudice.

618. Plaintiffs incorporate argument #406 as if fully set forth herein.

## Count XV Actual Harm

619.    Plaintiffs incorporate all previous actual harm as if fully set forth herein.

620.    Defendants claim KSVPA is constitutional because K.S.A. § 59-29a07(a) supposedly guarantees that Plaintiffs and Class members shall be committed to the custody of the secretary of social and rehabilitation services for control, care and treatment until such time as the person's mental abnormality or personality disorder has so changed that the person is safe to be at large, and *K.S.A. § 59-29a08(a)* supposedly guarantees that Plaintiffs and Class members shall have a current examination of the person's mental condition made once every year. Defendants *do not* measure Plaintiff's and Class member's current mental condition ever. Defendant's so-called *Resident's Yearly Reports* do not evaluate Plaintiff's and Class member's current mental condition, nor do they evaluate Plaintiffs or Class members as an individual. These *Yearly Reports* prove SPTP is nothing more than a "cookie cutter" program. Defendant's *Yearly Reports* nearly the exact same wording throughout the *Yearly Reports* for every Plaintiff and every Class member, especially in the *Conclusion* paragraph. Defendants merely change the name of the Plaintiff or Class member on each *Yearly Report* form.

See *Exhibit J, Integrated Treatment Plans and Yearly Reports of Resident's Mental Condition of Plaintiffs and Class members Ronald Alan Baker, Steven Earl Roberts, Danny Wassell Stanley, Tyrone R. Tschantz, and Harvey Darrel Hickman.* See *Document #1*, this document includes three pages from *Plaintiff Ronald Baker's Integrated Treatment Plans* and seven pages from his *Yearly Reports*. Notice on his *2003 Integrated Treatment Plan*, page 1, under *Estimated Length of Stay*, it reads Two and a Half to Five Years. On his *2004 Integrated Treatment Plan*, page 2, under *Estimated Length of Stay*, it reads Three to Five Years. And on his *2008 Integrated Treatment Plan*, page 3, it no longer even gives an estimated length of stay, yet under *Estimated Transfer Date*, it reads Indeterminate. From 2003 to 2008 the SPTP went from an estimated length of two and a half to five years, to an indeterminate length. This proves Defendants are intentionally making SPTP longer and more difficult to complete, though their own statute requires only that Plaintiff's and Class member's mental abnormality or personality disorder so change that he is safe to be at large.

See *Plaintiff Ronald Baker's 2003 Integrated Treatment Plan*, page 1, under *Criteria For Discharge*, it reads completion of all programs requirement and release from the courts. On his *2004 Integrated Treatment Plan*, page 2, under *Criteria For Discharge*, it reads upon completion of Phase Five... The resident will be recommended to the Transition Board... There the resident will complete the remaining Phases of the program. And on his *2008 Integrated Treatment Plan*, page 3, it no longer gives *Criteria for Discharge*, yet under *Criteria For Transfer,* it reads... complete and pass all

assigned Core and Supplementary Classes... achieve and maintain a minimum rating of nine on all categories of the Criminogenics Needs Assessment; achieve Phase Five... achieve long-term goals... From 2003 to 2008 the SPTP went from an achievable *Criteria For Discharge* to a much less attainable *Criteria For Transfer*. Again, this proves Defendants are intentionally making SPTP longer and more difficult to complete.

See *Document #1*, page 4, *Plaintiff Ronald Baker's May 1, 2011 Yearly Report, Document ID: 3309242*, The first sentence reads that Mr. Ronald A. Baker was admitted to the Sexual Predator Treatment Program (SPTP) on April 15, 2003. While *Document #1*, page 6, *Plaintiff Ronald Baker's June 13, 2003 Yearly Report, Document ID: 4098849*, the first sentence reads that Mr. Ronald A. Baker was admitted to the Sexual Predator Treatment Program (SPTP) on June 4, 2003. If Defendants cannot get such a simple thing as Plaintiff Baker's admission date correct, how professional are they? How can Plaintiff's and Class member's or the courts trust any other information provided by the Defendants or their Yearly Reports?

See *Documents #1, #2, and #3*. *Document #1*, page 4, *Plaintiff Ronald Baker's May 1, 2011 Yearly Report, Document ID: 3309242*, second paragraph begins, "I have known Mr. Baker..."; *Document #1*, page 6, *Plaintiff Ronald Baker's June 13, 2013 Yearly Report, Document ID: 4098840*, second paragraph begins, "I have known Mr. Baker..."; *Document #2*, page 1, *Class member Steven Roberts' March 6, 2011 Yearly Report*, second paragraph begins, "I have known Mr. Roberts...", and *Document #3*, page 5, *Plaintiff Danny Stanley's February 4, 2010 Yearly Report*, second paragraph begins, "I have known Mr. Stanley...". These four separate Yearly Reports are not only reports spanning a three year period, but they are three very different men, yet the paragraphs from their supposed *individual* evaluations are not only nearly identical in form and wording, in some cases they are literally identical. This proves Defendants do not individually evaluate Plaintiffs and Class members, but use blanket statements fashioned intentionally to prevent Plaintiffs and Class members from progressing and inevitably from re-entering society.

See *Documents #1, #2, #3, #4, and #5*. *Document #1*, page 4, *Plaintiff Ronald Baker's May 1, 2011 Yearly Report, Document ID: 3309242*; *Document #1*, page 6, *Plaintiff Ronald Baker's June 13, 2013 Yearly Report, Document ID: 4098849*; *Document #2*, page 1, *Class member Steven Roberts' March 6, 2011 Yearly Report*; *Document #2*, page 4, *Class member Steven Roberts' December 30, 2011 Yearly Report, Document ID: 3636998*; *Document #3*, page 1, *Plaintiff Danny Stanley's February 16, 2009 Yearly Report*; *Document #3*, page 5, *Plaintiff Danny Stanley's February 4, 2010 Yearly Report*; *Document #3*, page 7, *Plaintiff Danny Stanley's December 29, 2011 Yearly Report*,

*Document ID: 3612904*; *Document #4*, page 3, *Class member Tyrone Tschantz' August 1, 2013 Yearly Report, Document ID: 4133378*; *Document #5*, page 1, *Harvey Hickman's February 6, 2012 Yearly Report, Document ID: 3695015*; and *Document #5*, page 4, *Harvey Hickman's March 11, 2013 Yearly Report*, *Document ID: 4036869*; on each report, on the first page is always a section titled either *Past History* or *Sexual History*. Rather than evaluating Plaintiffs and Class members for what they are today, what they have learned and applied, the interventions they have incorporated, or the accomplishments they have achieved, Defendants are using the Plaintiff's and Class member's *past* and *history* as an excuse to say Plaintiffs and Class members have not changed and therefore should not be released.

        See *Documents #1, #2, #3, #4, and #5. Document #1*, page 5, *Plaintiff Ronald Baker's May 1, 2011 Yearly Report, Document ID: 3309242*; *Document #1*, page 8, *Plaintiff Ronald Baker's June 13, 2013 Yearly Report, Document ID: 4098849*; *Document #2*, page 3, *Class member Steven Roberts' March 6, 2011 Yearly Report*; *Document #2*, page 7, *Class member Steven Roberts' December 30, 2011 Yearly Report, Document ID: 3636998*; *Document #3*, page 4, P*laintiff Danny Stanley's February 16, 2009 Yearly Report*; *Document #3*, page 6, *Plaintiff Danny Stanley's February 4, 2010 Yearly Report*; *Document #3*, page 9, *Plaintiff Danny Stanley's December 29, 2011 Yearly Report*, *Document ID: 3612904*; *Document #3*, page 12, *Plaintiff Danny Stanley's November 3, 2012 Yearly Report*, *Document ID: 3949079*; *Document #4*, page 5, *Class member Tyrone Tschantz' August 1, 2013 Yearly Report, Document ID: 4133378*; *Document #5*, page 3, *Harvey Hickman's February 6, 2012 Yearly Report, Document ID: 3695015*; and *Document #5*, page 8, *Harvey Hickman's March 11, 2013 Yearly Report*, *Document ID: 4036869*; on each report, on the last page is always a section titled *Conclusion*. Each and every one of these sections, regardless of which report from which year, nor which Plaintiff or Class member who the *Yearly Report* is for, the *Conclusion* is completely identical, *word-for-word*, with only the Plaintiff's or Class member's name changed, or the statement of what his original crime was, being specific to the Plaintiff or Class member the *Yearly Report* is supposed to be for. Each and every *Yearly Report Conclusion* reads exactly, 'I therefore conclude that Mr. _____ remains a "Sexually Violent Predator" because he continues to meet the definition of "a person who has been convicted of a sexually violent offense," to wit: _____, and who suffers from a mental abnormality or personality disorder which makes it likely that he will engage in repeat acts of sexual violence. I further conclude that Mr. _____ mental abnormality or personality disorder has not so changed that it would yet be safe for Mr. _____ to be placed in Transitional Release at this time.' Rather than evaluating Plaintiffs and Class members as individuals or considering their true

accomplishments, Defendants are simply using blanket, previously prepared, forms designed to not only keep a Plaintiff or Class member from progressing, but inevitably from re-entering society. SPTP is more like a prison masquerading as a treatment facility than a treatment facility legitimately designed to treat and rehabilitate Plaintiffs and Class members.

See *Document #4*, page 4, *Class member Tyrone Tschantz' August 1, 2013 Yearly Report, Document ID: 4133378*, in the section titled *PROGRESS IN PROGRAM THIS YEAR*, first paragraph reads, "This section of the report contains the perspectives, and sometimes quotes, of the resident, staff members who work with *Mr. Pew* on a daily basis, and his treatment team." If this is an actual individual evaluation of Class member Tyrone Tschantz' current mental condition, why does it have *Mr. Pew's* name in it? Defendant's error not only proves a glaring lack of professionalism by the Defendants, but proves these *Yearly Reports* are nothing more than a "cookie cutter" form used by a "cookie cutter" program.

See *Document #5*, page 1, *Plaintiff Harvey Hickman's February 6, 2012 Yearly Report, Document ID: 3695015*, under the section titled *Past History* and *Document #5*, page 4-5, *Plaintiff Harvey Hickman's March 11, 2013 Yearly Report, Document ID: 4036869*, under the section titled *Sexual History*, comparing the two sections from the two different *Yearly Reports* shows a completely different sexual history Defendants claim belong to Plaintiff Hickman. Plaintiff Hickman contends the *Sexual History* recorded by Defendants in the March 11, 2013 *Yearly Report* belongs to someone else, not Plaintiff Hickman, while the sexual history recorded by Defendants under *Past History* in the February 6, 2012 *Yearly Report* does belong to him. Defendant's error not only proves a glaring lack of professionalism by the Defendants, but proves these *Yearly Reports* are nothing more than a "cookie cutter" form used by a "cookie cutter" program.

621.    Defendants have refused to provide all Plaintiffs and Class members with a legitimate grievance procedure. Plaintiff's and Class member's grievances are denied, ignored, disregarded, answered sarcastically, answered inadequately, or answered with the pretense of resolving the grievance (yet no real effort to provide remedy for the Plaintiff or Class member is ever attempted). See *Exhibit P, Plaintiff's and Class member's Resident Grievance Forms*.

622.    See *Exhibit P, Plaintiff's and Class member's Resident Grievance Forms*, for specific examples that show Defendants refuse to implement a grievance system that gives Plaintiffs and Class members a realistic expectation to have their grievances addressed and resolved. Defendants generally ignore Plaintiff's and Class member's grievances, answer them sarcastically, or make excuses to defend the staff rather than actually addressing the problem. Included in *Exhibit P* are grievances answered

297

unsatisfactorily for Class member Toby Dillingham, Class member Boyd Huntington, Class member Steven Islam, and Class member Randall Ritchie.

623.    Defendants deny Plaintiffs and Class members employment and vocational training, choosing to employ only the most qualified Plaintiffs and Class members by the so-called vocational training program, where Plaintiffs and Class members receive no vocational training at all. Defendants expect all Plaintiffs and Class members to already possess the necessary work skills to perform the "vocational training" job. See *Exhibit P, Plaintiff's and Class member's Resident Grievance Forms*, for examples of SPTP Vocational Training Work Program *rejection* letters received by Class member David Harris, Class member Randall Ritchie, Plaintiff James Rowray, and Class member Randal Terrel.

624.    Class member Callow has been denied the right to contact his bank and spend his own money as he chooses because Defendant's current telephone system restricts his ability to make and receive telephone calls to his bank. See *K.S.A. § 59-29a22(b)(16)* and *K.S.A. § 59-29a22(b)(22)*.

Defendants have placed severe restrictions on what Class member Callow can purchase, and own, and which vendors he can purchase them from. Defendants do not allow Class member Callow to purchase products with metal construction, which severely restricts or prevents Class member Callow from spending his own money as he chooses.

Defendants restrict Class member Callow's ability to alter or repair his own property, forcing him to buy new items, such as a television set, when a minor repair could fix the problem and save him hundreds of dollars. Defendant's policy severely restricts Class member Callow from spending his own money as he chooses. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaire*.

625.    Plaintiff Richard Cochran has been denied his right to make and receive telephone calls as he chooses because of Defendant's restrictive current telephone system.

Plaintiff Cochran has been denied his right to receive treatment in the least restrictive alternative confinement.

Plaintiff Cochran has been denied freedom to hold a job and support himself.

Plaintiff Cochran has been denied an actual evaluation of his *current* mental condition made yearly by Defendants. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaire*.

626.    Defendants have denied Class member Toby Dillingham his right to send and receive mail. See *Exhibit P, Plaintiff's and Class member's Resident Grievance Forms*, Resident Grievance dated 7/23/12.

627. Class member Paul Douglas has been denied his right to have contact with his attorney. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaire*.

628. Defendants have violated Plaintiff Harvey Hickman his due process rights. They have written disciplinary reports and initiated punishment with no disciplinary hearing. Furthermore, Defendants have taken property away from Plaintiff Hickman, lost it, and failed to return his property or reimburse him for his property without due process. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaire*.

629. Defendants have denied Class member Boyd Huntington his right to own property already approved, for which he has a receipt of ownership. Defendants took Class member Huntington's slot radio card and MP3 player without due process. See *Exhibit P, Plaintiff's and Class member's Resident Grievance Forms*, Resident Grievance dated 4/23/13 and 9/8/13.

630. Defendants have forced Class member Edwin Lopez to re-present all his material (such as autobiography, victim sheets, and relapse prevention plan, etc.) without any results. Class member Lopez has not been allowed to move past phase three. Furthermore, Defendants do not provide enough therapists to provide adequate treatment to Class member Lopez. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaire*.

631. Defendants have placed severe restrictions on what Class member Eddie Martin can purchase and own and which vendors he can purchase them from. Defendants severely restrict or prevent Class member Martin from spending his own money as he chooses. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaire*.

632. Defendants have placed severe restrictions on what Plaintiff Michael D. Mellon can purchase and own and which vendors he can purchase them from. Defendants severely restrict or prevent Plaintiff Mellon from spending his own money as he chooses. Furthermore, Defendants refuse to allow Plaintiff Mellon his visitation rights with his step children, even though he has no offense against a child. See *Exhibit P, Plaintiff's and Class member's Resident Grievance Forms*, and *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaire*.

633. Defendants have placed severe restrictions on what Class member Mark Palmer can purchase and own and which vendors he can purchase them from. Defendants severely restrict or prevent Class member Palmer from spending his own money as he chooses. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaire*.

634. Defendants have denied Plaintiff James Rowray employment and have therefore denied him a way to support himself. Defendants have denied Plaintiff Rowray reasonable access to an

attorney and/or legal representation. Defendants have denied Plaintiff Rowray his right to privacy. Defendants have denied Plaintiff Rowray his right to cook and eat his own food. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaire*.

635.    Defendants have placed severe restrictions on what Class member Lonnie Ryan can purchase and own and which vendors he can purchase them from. Defendants severely restrict or prevent Class member Ryan from spending his own money as he chooses. Class member Ryan has been denied the right to contact his bank and credit card companies and spend his own money as he chooses because Defendant's current telephone system restricts his ability to make and receive telephone calls to his bank. See *K.S.A. § 59-29a22(b)(16)* and *K.S.A. § 59-29a22(b)(22)*. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaire*.

636.    Defendants denied Class member Randall Ritchie his right to a visit from his wife. See *Exhibit P, Plaintiff's and Class member's Resident Grievance Forms*, Resident Grievance dated 1/13/13.

Defendants denied Class member Ritchie his right to own property which was pre-approved for him to own. See *Exhibit P, Plaintiff's and Class member's Resident Grievance Forms*, Resident Grievance dated 3/19/13.

Defendants served Class member Ritchie and his fellow Plaintiffs and Class members spoiled food on 4/4/13, which was left-over from 3/31/13. Defendants committed food health violations by serving food which was over forty eight hours old. See *Exhibit P, Plaintiff's and Class member's Resident Grievance Forms*, Resident Grievance dated 4/4/14.

637.    Class member Charles Smeltzer has been denied his right to make and receive telephone calls he chooses because of Defendant's restrictive current telephone system. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaire*.

638.    Defendants have placed severe restrictions on what Plaintiff Billy Stanley can purchase and own and which vendors he can purchase them from. Defendants severely restrict or prevent Plaintiff Stanley from spending his own money as he chooses. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaire*.

639.    Defendants have placed severe restrictions on what Class member Nicholas Stape can purchase and own and which vendors he can purchase them from. Defendants severely restrict or prevent Class member Stape from spending his own money as he chooses. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaire*.

640.    Defendants refuse Class member Tyrone Tschantz adequate treatment. Though he asked

300

for individual therapy from his therapist for two weeks because he was suffering from severe depression, his therapist would not give him therapy until he got into trouble and received a disciplinary report. Furthermore, the entire first six months Class member Tschantz was in SPTP his therapist only allowed him two individual therapy sessions. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaire*.

641.    Defendants refuse to provide Plaintiff Vance Walters adequate amount of treatment/therapy hours. Defendants only provide Plaintiff Walters three hours of treatment/therapy per week. The other so-called twenty (20) hours per week are merely activities, which Defendants force Plaintiff Walters and his fellow Plaintiffs and Class members to attend. Defendants refuse to provide Plaintiff Walters unstructured yard/activity time. Furthermore, Defendants have removed and refuse to provide vocational trade programs for Plaintiff Walters and his fellow Plaintiffs and Class members. As well, Defendants have placed severe restrictions on what Plaintiff Walters can purchase and own and which vendors he can purchase them from. Defendants severely restrict or prevent Plaintiff Walters from spending his own money as he chooses. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaire*.

642.    Defendants have placed severe restrictions on what Class member Owen Waters can purchase and own and which vendors he can purchase them from. Defendants severely restrict or prevent Class member Waters from spending his own money as he chooses. Even though Class member Waters is indigent, he receives fifteen dollars per month indigent pay, however, Defendants refuse to allow Class member Waters to spend his indigent pay as he chooses. Defendants force Class member Waters, his fellow indigent Plaintiffs and his fellow indigent Class members to spend their indigent pay only at Keefe. Keefe is a company which has a suspicious contract with Larned State Hospital, which jacks up the prices of the items they sell by at least ten to twenty percent higher than Class member Waters and his fellow indigent Plaintiffs and Class members would be able to purchase from Walmart, for example. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaire*.

643.    Defendants have placed severe restrictions on what Class member Jerry Wilhelmi can purchase and own and which vendors he can purchase them from. Defendants severely restrict or prevent Class member Wilhelmi from spending his own money as he chooses. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaire*.

644.    Defendants have placed severe restrictions on what Plaintiff Travis Williams can purchase and own and which vendors he can purchase them from. Defendants severely restrict or

prevent Plaintiff Williams from spending his own money as he chooses. See *Exhibit Q, Plaintiff's and Class member's Resident's Class Action Questionnaire*.

645.   The acts and omissions of Defendants render *K.S.A. § 59-29a01* through *K.S.A. § 59-29a24* unconstitutional as applied. As a result of Defendant's acts, omissions, practices and conduct, Plaintiffs and Class members have been deprived of their constitutionally protected rights.

646.   Defendant's acts and omissions are both shocking and intolerable and a continuing mistreatment of a constitutional stature.

647.   Plaintiff and Class members have been subject to and injured by these alleged violations and suffered the same or similar damages as a direct and proximate result of Defendants' acts, omissions, practices and conduct as specifically set forth above. Unless relief is granted, Plaintiffs and Class members will continue to be injured by and suffer damages as a direct and proximate result of Defendants' acts and omissions specifically set forth above. The remedy of which is immediate release with prejudice.

## Count XVI
### Violation of Court Ordered Treatment

648.   Plaintiffs incorporate all previous allegations as if fully set forth herein.

649.   Civil commitment to the SPTP occurs after a judicial proceeding. When a judge ruled the Plaintiffs and Class members were SVP under *K.S.A. § 59-29a01* through *K.S.A. § 59-29a24*, that is a determination that they must enter a secure treatment facility. Therefore, the court has ordered that Plaintiffs and Class members receive proper sex offender treatment.

650.   Plaintiffs and Class members are not receiving adequate treatment. Defendants have violated court ordered treatment to Plaintiffs and Class members and this failure constitutes contempt of court.

651.   Plaintiffs and Class members spend no more than three (3) hours per week in group therapy treatment, no more than four (4) hours per week in psycho-educational classes while in basic core, no more than two (2) hours per week in psycho-educational classes while in advanced core, no more than one (1) hour per month in individual therapy, their treatment plans are not detailed and individualized, the treatment staff is not qualified to treat sex offenders, and staffing levels are far too low. Plaintiffs and Class members are not progressing through the treatment program and are instead getting stuck in the first three (3) phases of treatment.

652.   The acts and omissions of Defendants constitute a failure to satisfy court ordered treatment to Plaintiffs and Class members. As a result of Defendant's acts, omissions, practices and

conduct, Plaintiffs and Class members have been deprived of their constitutionally protected rights.

653.    Defendant's acts and omissions are both shocking and intolerable and a continuing mistreatment of a constitutional stature.

654.    Plaintiffs and Class members have been subject to and injured by these alleged violations and suffered the same or similar damages as a direct and proximate result of Defendants' acts, omissions, practices and conduct as specifically set forth above.  Unless relief is granted, Plaintiffs and Class members will continue to be injured by and suffer damages as a direct and proximate result of Defendants' acts and omissions specifically set forth above.  The remedy of which is immediate release with prejudice.

<div align="center">

**Count XVII**

**Breach of Contract**

</div>

655.    Plaintiffs incorporate all previous allegations as if fully set forth herein.

656.    Defendants' failure to provide Plaintiffs and Class members the treatment contracted for in the Consent for Participation in Sex Offender Treatment form constitutes a breach of contract. Plaintiffs and Class members have been damaged as a direct and proximate result of Defendants' breach because they have not been provided adequate treatment and have been restrained indefinitely in the SPTP program.

657.    SPTP has breached its contract to provide treatment to the Plaintiffs and Class members who signed the form consenting to sex offender treatment.  The type and amount of treatment provided and the staff that provides that treatment falls well below constitutional standards, well below contract standards and well below the reasonable performance of the treatment program created by SPTP's own policies.

658.    Defendants collect money from Medicare, Medicaid and SRS in the name of Plaintiffs and Class members, refuse to allow Plaintiffs and Class members to draw their own Medicaid, Medicare, Disability and/or Retirement payments, while at the same time charging Plaintiffs and Class members per Diem for their own treatment.  Defendants charge Plaintiffs and Class members who have "VTP" jobs, room and board, and collect room and board directly out of their pay.  Defendants fail to provide Plaintiffs and Class members the treatment contracted that they charge Plaintiffs and Class members for.  See *Exhibit B, 2013 Larned State Hospital Fiscal Budget Report.*

659.    The acts and omissions of Defendants constitute a breach of contract.  As a result of Defendant's acts, omissions, practices and conduct, Plaintiffs and Class members have been deprived of their constitutionally protected rights.

<div align="center">303</div>

660.    Defendant's acts and omissions are both shocking and intolerable and a continuing mistreatment of a constitutional stature.

661.    Plaintiff and Class members have been subject to and injured by these alleged violations and suffered the same or similar damages as a direct and proximate result of Defendants' acts, omissions, practices and conduct as specifically set forth above. Unless relief is granted, Plaintiffs and Class members will continue to be injured by and suffer damages as a direct and proximate result of Defendants' acts and omissions specifically set forth above. The remedy of which is immediate release with prejudice.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

a.    That the Court determine that this action may be maintained as a class action under Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, that Plaintiffs be certified as class representatives, the Court appoint counsel for the Plaintiffs, and Plaintiffs' counsel be appointed as counsel for the Class;

b.    That the unlawful conduct alleged herein be declared to be illegal and in violation of the federal and state constitutional, statutory and common law claims alleged herein;

c.    That the Court adjudge and declare that the acts, omissions, policies and practices of the Defendants violate the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; the American with Disabilities Act; the Rehabilitation Act; the rights of civilly committed persons under 29 U.S.C. § 794; K.S.A. § 59-29a01 through K.S.A. § 59-29a24; K.S.A. § 59-2978; K.S.A. § 39-1603; *Turay v. Seling*, 108 F. Supp. 2d 1148*; Turay v. Seling,* 1999 Wash. LEXIS 794; and *Davis v. Watkins*, 384 F. Supp. 1196;

d.    That the Court find the KSVPA as implemented unconstitutional;

e.    That the remedy for a finding the KSVPA as implemented unconstitutional is immediate release of the Plaintiffs and Class members with prejudice;

f.    That the remedy for a finding the KSVPA as implemented is unconstitutional is the immediate removal of the SVP label from Plaintiffs and Class members;

g.    That the Court order Defendants to provide proper treatment, appropriate and less restrictive alternatives, and in general operate SPTP without an improper purpose of punishment;

h.    That Defendants be enjoined together with their agents, officials, employees and all persons acting in concert with them, under color of law or otherwise, from engaging in the same or similar practices described herein;

304

i.    Order Defendants, together with their agents, officials, employees and all persons acting in concert with them, under color of law or otherwise to take all necessary actions to: (1) provide Plaintiffs and Class members with twenty (20) hours of therapeutic programming, including sufficient and effective group therapy for their mental abnormalities and personality disorders (ten hours of group therapy per week), together with meaningful individual therapy (one hour per week) where clinically indicated; unstructured recreational activity does not count as therapeutic programming for purposes of the twenty (20) hours per week of therapeutic programming; (2) provide ten (10) hours of professionally led psycho-educational programming per week, including GED coursework; (3) staff the SPTP with an adequate number of licensed qualified therapists (8 therapists per every 50 Plaintiffs and Class members) and other mental health professionals to treat the Plaintiffs and Class members; (4) provide for the continuing education and training of the SPTP clinical staff; (5) explain adequately to Plaintiffs and Class members the standards and criteria used to evaluate their progress through the treatment program and their readiness for conditional discharge; (6) provide Plaintiffs and Class members with timely and accurate feedback concerning their treatment progress, their goals for future treatment, and their prognosis for future advancement through the program; (7) provide Plaintiffs and Class members with an adequate internal complaint system or other mechanism to communicate complaints concerning their mental health treatment; (8) comply with their own internal management policies and procedures; (9) assist the Plaintiffs and Class members with meaningful discharge planning; (10) provide minimally adequate job training, work opportunities, and educational opportunities within SPTP.  Provide an individual vocational assessment of each Plaintiff and Class member within forty five (45) days of final commitment, develop a plan for building on his skills and strengths, and offer each Plaintiff and Class member an average of ten (10) weekly hours of minimum wage institutional (paid) work or other real vocational training.  Plaintiffs and Class members will also be provided ten (10) hours of educational activities per week, including GED coursework; (11) Provide a Treatment Ombudsperson who has the education and experience necessary to successfully complete the duties outlined in this document. The Treatment Ombudsperson shall: a) determine whether a Plaintiff or Class member's complaint is within or without the scope of his/her duties, and send the Plaintiff or Class member a standard notice of this determination within thirty days of receipt of the complaint form, b) investigate complaints and take action appropriately tailored to the nature of the Plaintiff or Class member complaint, c) send the Plaintiff or Class member an initial written response to the Plaintiff's or Class member's complaint within thirty (30) days of sending the standard notice. The response will document the Treatment Ombudsperson's efforts in investigating and resolving the

complaint, and any results obtained, d) timely notify the Plaintiff or Class member, in writing, of any additional information or results obtained after sending the initial written response, e) correspond with the SPTP Administrative Program Director and Clinical Program Director regarding issues in the treatment program the Treatment Ombudsperson deems sufficiently systemic from a review of the residents' complaints, f) document all oral correspondence from the Plaintiffs or Class members, g) attend a regular Plaintiff and Class member community meeting to: (i) explain the role of the Treatment Ombudsperson to the Plaintiffs and Class members, (ii) answer any questions regarding the practices and procedures of the Treatment Ombudsperson, and (iii) inform the Plaintiffs and Class members of the status of any systemic treatment problems reported to the Administrative Program Director or Clinical Program Director of the SPTP; (12) provide professionally monitored self-help groups for at least ninety (90) minutes per week, provided willing and appropriate Plaintiffs and Class members are available to facilitate self-help groups; (13) provide regularly scheduled community meetings; (14) provide unstructured recreational activities six (6) days per week, which do not count as "therapeutic programming" for purposes of the twenty (20) hours per week of therapeutic programming; (15) provide treatment adequately tailored to the specific needs of each Plaintiff and Class member; (16) hire and retain sufficient qualified mental health professionals with training in sex offender specific treatment; (17) provide Plaintiffs and Class members with Comprehensive Individualized Treatment Plans narrowly tailored to the individual Plaintiff's or Class member's needs, reviewed every three (3) months by the Plaintiff's or Class member's treatment team and every six (6) months by the SPTP Treatment Progress Review Board; (18) provide Plaintiffs and Class members objective criteria needed to meet the goals of their individualized recommendations for their treatment plans, including anticipated time frames for completion of the objective criteria and for attainment of their ultimate treatment goals, and anticipated time frame for promotion for the next phase of the program; (19) require the social work staff at SPTP to develop a discharge plan for Plaintiffs and Class members ready for release, which includes requiring the staff to assist with housing, employment and obtaining the support necessary for discharge; (20) retain independent experts in the field or sex offender treatment and have at least one (1) expert visit the facility per quarter. The expert will evaluate the SPTP program, report his or her findings to the SPTP Administrative Program Director and Clinical Program Director and provide continuing education to the SPTP's therapists and staff; (21) appoint a neutral monitor by the Court. The monitor will be responsible for conducting annual inspections of the facility, during which he or she will be given full access to the facilities, Plaintiffs and Class members and staff. The monitor will prepare a written report regarding Defendant's compliance for the period

306

being evaluated, which will be provided to counsel for Plaintiffs and Defendants. Defendants will then respond to the monitor's report; (22) reduce the SPTP to an eighteen (18) month program; (23) after eighteen (18) months treatment in SPTP, release the Plaintiffs and Class members to an eighteen (18) month community-based treatment program, provided by a community mental health center; (24) create a sponsor program consisting of community sponsors who will provide moral support to released Plaintiffs and Class members, who will help hold a Plaintiff and Class member accountable for his behavior, and who will help the Plaintiff and Class member find employment and housing. Adopt Circles of Support and Accountability (COSA), a nationally accepted rehabilitation and monitoring program designed to help the most dangerous sex offenders re-integrate into society after release from prison and civil commitment programs; (25) create a centralized State Court by the Court, which is unbiased, and not affiliated in any way with the Attorney General's Office, The Kansas Department for Aging and Disability Services, or Larned State Hospital, to provide: a) Sexual Predator evaluations. A pool of unbiased Independent Evaluators, comprised of professionally licensed psychiatrists and/or psychologists. The suspected SVP should be evaluated by three separate evaluators from the pool of evaluators. The Independent Evaluators shall not be employed by or affiliated in any way with the Attorney General's Office, The Kansas Department for Aging and Disability Services, or the Larned State Hospital. The Court will weigh the majority opinion more heavily than the opinion of the dissenting party; (26) repeal K.S.A. § 59-29a01 final sentence, "Notwithstanding any other evidence of legislative intent, it is hereby declared that any time requirements set forth in K.S.A. § 59-29a01 et seq., and amendments thereto, either as originally enacted or as amended, are intended to be directory and not mandatory and serve as guidelines for conducting proceedings under K.S.A. § 59-29a01 et seq., and amendments thereto." K.S.A time requirements must be mandatory or the statute as implemented is unconstitutional; (27) re-evaluate all Plaintiff and Class members who were evaluated by and recommended for civil commitment by Rex Rosenberg. Rex Rosenberg was discredited and therefore his evaluations should not be admissible. Plaintiffs and Class members must be re-evaluated or released immediately; (28) release all Plaintiffs and Class members who were evaluated by temporary licensed psychologists who were unsupervised. As a temporary licensed psychologist must be supervised at all stages of the evaluation by a qualified licensed professional as per K.S.A. § 102-1-5a. Many temporary licensed psychologists performed several evaluations without complete supervision of a qualified licensed professional. Their evaluations therefore should not be admissible. Plaintiffs and Class members must therefore be released immediately; (29) allow a larger budget for defending respondents at an SVP hearing; (30) provide independent counsel, by the Court, from a pool

of defense attorneys, specially trained for civil commitment defense; (31) provide unbiased judges, by the Court, who will preside over all commitment hearings, including the Yearly Review Hearings to determine whether a Plaintiff or Class member should be released on community-based treatment, or Final Release; (32) allow the suspected SVP to bond out of jail while awaiting trial; (33) provide SPTP with the same degree of expert psychological care and real therapy that other mental patients get. Psychiatrists, psychologists, and treatment therapists should be fully licensed and of the highest qualifications. SPTP must not be used as a training ground for interns, trainees, and post-docs, who are poorly trained and lack the professional qualifications to provide adequate treatment; (34) provide immunity from liability, as well as strict employment protection, to any staff, officials, or professionals for advocating, or participating in the release of any Plaintiff or Class member; (35) develop an evaluation team by the Courts, with Board Certified psychiatrists, and clinical psychologist Ph.D.s, *not* employed by or affiliated with the Attorney General's Office, KDADS or LSH, to evaluate Plaintiff's and Class member's confinement. Unless the team finds the Plaintiff or Class member to be mentally ill and dangerous, the Plaintiff or Class member should be released. The term "mental abnormality is too imprecise a category to offer a solid basis for concluding that civil detention is justified."; (36) provide for more meaningful involvement of the Plaintiff's and Class member's family members in the Plaintiff's and Class member's treatment: a) allow the Plaintiff's and Class member's family members to attend Sunday church services with the Plaintiffs and Class members, b) provide family counseling to be voluntarily attended by the Plaintiffs and Class members and their family members, c) provide a free luncheon once per month, to be attended by the Plaintiffs and Class members and their family members, d) make conjugal visits happen, as per K.S.A. § 59-2978, e) allow family members to be physically present at the Plaintiff's and Class member's CITP (treatment planning meeting), f) provide unrestricted right to visitation, with 5:00 pm to 10:00 pm visiting hours Monday through Friday, and 8:00 am to 4:00 pm visiting hours Saturday, Sunday, and Holidays. Allow visitors to prepare food or bring food from any restaurant. Hand holding and hugging to be allowed any time during visitation. Allow visitors to drop off gifts and/or groceries during their visits with Plaintiffs and Class members. Visits must not be limited to pre-approved visitation. Once a visitor is on a permanently approved visitor's list, that visitor can come for a visit any time within regular visiting hours he/she chooses, without pre-approval, during regular visiting hours; (37) appoint an independent Oversight Committee, by the Court, not employed by the Attorney General's Office, KDADS, or LSH, to oversee the operation of SPTP and keep the administration "honest"; (38) provide sufficient office space, on each unit, to house the necessary qualified mental health professionals: Unit Directors, psychiatrists,

psychologists, social workers, registered nurses and mental health associates. Such persons shall be readily accessible to the Plaintiffs and Class members and, in turn, the Plaintiffs and Class members shall be accessible to them, as per *Davis v. Watkins*, 384 F. Supp. 1196; (39) transfer medically frail Plaintiffs and Class members to community group residences, as per K.S.A. § 59-29a08(a); (40) release those whose age or health make it unlikely they will or could re-offend, as per K.S.A. § 59-29a08(a); (41) upgrade the SPTP facility to parity ordinary mental health facilities. Implement the least restrictive alternative confinement. (Not all Plaintiffs or Class members have the same level of security needs); (42) separate non-participating Plaintiffs and Class members from participating Plaintiffs and Class members, in order to avoid harassment of the participating Plaintiffs and Class members; (43) allow Plaintiffs and Class members to leave the facility, when necessary, with a staff escort, without physical restraints; (44) implement a routine maintenance and repair program comprised of supervised Plaintiffs and/or Class members. SPTP currently uses a "paint crew" to perform tenuous repairs at best; (45) add more incoming telephone lines to SPTP units and allow cell phones. The SPTP telephone system is not adequate. There are only two incoming lines per unit. Each unit has up to 33 Plaintiffs and Class members. This causes a stressful and potentially violent atmosphere, because several Plaintiffs or Class members hog the phones and refuse to give other Plaintiffs or Class members equal opportunity to receive calls from their loved ones. The current pay phone system charges exorbitant rates. Plaintiffs and Class members are often cut off from their loved ones and unable to use 800 numbers to conduct business. The extremely high rates residents are charged serve no therapeutic or security purpose. This creates a prison-like atmosphere where it's hard to remain in contact with loved ones, which is anti-therapeutic. Furthermore, SPTP administrations only argument for disallowing cell phones is to limit access to the internet and keep residents from calling potential victims. However, Nex-Tech Wireless is willing to provide a basic phone no contract plan without internet access, without the ability to send and receive emails, without the ability to send and receive photos, and pre-programming the phone to only allow the Plaintiff or Class member to call pre-approved numbers, approved through SPTP administration, to ensure SPTP Plaintiffs and Class members cannot call any potential victim, or anyone else SPTP administration is not aware of, nor disapproves of. There is therefore, no danger or security risk for the Plaintiffs or Class members to have these cell phones. See *Turay v. Seling*, 108 F. Supp. 2d 1148 [The **Turay Standards**]: "Inclusion of the resident's family in the rehabilitation effort, including visitation, **telephone**, and mail." See also *K.S.A. 59-29a22(16)*: "Reasonable access to a telephone to **make and receive** telephone calls within reasonable limits."; (46) allow Plaintiffs and Class members to have computers again. The

administration took them away because they do not want Plaintiffs and Class members to be able to access the internet. Plaintiffs and Class members are denied and restricted from using or accessing the internet, even though only one individual abused the internet. This is unwarranted restriction. Treatment is supposed to be individualized. Each Plaintiff and Class members should be privileged or restricted on an individual basis, depending on his own actions. Furthermore, a computer tower is not automatically internet accessible. These computers could be on a closed system, not accessible to the internet. Plaintiffs and Class members could utilize their personal computers for class work, phase work, and preparing their autobiographies and relapse prevention plans. Plaintiffs and Class members who do not know how to read and write could use voice recognition software for their class work and to write letters to their loved ones, who are otherwise unable to communicate with their loved ones. This would be therapeutic and important to their treatment. They are otherwise hindered in their progression in the program.; (47) provide an adequate diet for Plaintiffs and Class members. The diet must provide, at a minimum, the recommended daily dietary allowances established by the National Academy of Sciences. In developing such menus, the SPTP must utilize the moderate cost food plan of the United States Department of Agriculture. SPTP cannot spend less per Plaintiff or Class member for raw food, including donated food, than the most recent per person costs of the moderate cost food plan for the Midwestern Region of the United States, as compiled by the United States Department of Agriculture, for appropriate grouping of Plaintiffs and Class members, discounted for any savings which might result from institutional procurement of such food. Fire **A'viands**. The SPTP food contractor A'viands continually provides an inadequate diet, shortening meals or simply not delivering what is on the menu. Food quality and portions were reduced significantly when A'viands took over. Meals are poorly prepared and in some cases handled without due care. Food portions are rationed out at a lesser degree than what the menu states. The food A'viands provides is of extremely poor quality and includes by-product meat. The food A'viands serves and portion sizes do not meet the minimum 2800 calorie recommended daily dietary allowances established by the National Academy of Sciences. A'viands eliminated nearly *all* fresh fruit from the menu and replaced them with canned fruit saturated with high fructose corn syrup, and fattening, sugary deserts. Fresh fruit is only served an average of three (3) times per week, and only at breakfast time. Meals are too low in protein and fiber. Vegetables are over cooked and lose nutritional value. A'viands often fails to deliver what is on the menu and refuse to replace the missing items with any other food to replace the missing calories.; (48) allow Plaintiffs and Class members to purchase from any vendor they choose. Currently residents are forced to buy from Keefe, Walkenhorsts, Walmart.com, or Walgreens.com **only**, even though security staff

310

scan **all** incoming mail, and check **all** incoming mail for contraband, when the Plaintiffs and Class members open the mail or package in the mail room. Limiting purchases to approved vendors only serves no true security purpose.; (49) restrict the unwarranted and unreasonable searches of Plaintiff's and Class member's persons, property, and living quarters. No meaningful process exists to oppose the searches or appeal the resulting arbitrary confiscation of Plaintiff's and Class member's property. Appoint the treatment ombudsperson to provide an outlet for opposing unwarranted and unreasonable searches and appealing the resulting arbitrary confiscation of Plaintiff's and Class member's property.; (50) handle all rule violations that are not specifically defined by law, administratively. Stop wasting valuable resources on unnecessary criminal prosecution; (51) relocate SPTP to an area of the State with a larger labor market that will increase the number of potential job applicants. SPTP should be relocated to population center(s) that could realistically recruit qualified mental health professionals; (52) provide Plaintiffs and Class members proper medical treatment which meets standards of the medical practice of the community; (53) forbid the use of county jails for the purpose of detaining Plaintiffs and Class members, or any person(s) awaiting involuntary civil commitment proceedings;

   j.      That Defendants, together with their agents, officials, employees and all persons acting in concert with them shall seek "as one of SPTP's top priorities" sufficient funding for Plaintiff's and Class member's relief as set forth herein. In the event funding is not secured the Plaintiffs are not without recourse. If funding is not secured, the Plaintiffs have the right to declare any affected provisions "void" and resume litigation with respect to that provision. Plaintiffs are not required to give up any additional rights or forfeit any other terms of the settlement and can simply resume litigation with respect to any affected portion;

   k.      That Plaintiffs and Class members recover actual and/or nominal damages, as provided by law, determined to have been sustained as to each of them, and that judgment be entered against Defendants on behalf of Plaintiffs and Class members;

   l.      That Plaintiffs and Class members receive pre-judgment and post-judgment interest as allowed by law;

   m.      That Plaintiffs and Class members recover their costs of the suit, as allowed by law;

   n.      Award reasonable attorney's fees and expenses to Plaintiffs' counsel pursuant to 42 U.S.C. § 1988;

   o.      Grant such other relief allowed by law and equity as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury as to all matters triable.

Dated: _____, ____, 2014.


By: Randall J. Ritchie _____
       Class member

312

Ronald A. Baker

David E. Benton Sr

Richard L. Cochran

Robert Fox

Michael P. Gallagher

Harvey Hickman

Billy Ingram

Robert H. Kinzer

Alan Kirk

Michael D. Mellon

Justin Miller

Roy Nalley

Dale Patterson

Eric Patterson

Ramon Cruz Perez

James E. Roberts Jr.

James R. Rowray

Billy J. Stanley

Danny Stanley

David Thayer

Michael Unruh

William Eugene Wald

Vance Walters

Travis Williams

Larry Wright