IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

RONALD BAKER, *et al.*,

        Plaintiffs,

v.                                                Case No. 6:14-cv-01356-JTM-KGG

TIM KECK, *Interim Secretary of Kansas Department for Aging and Disability Services,* and
MIKE DIXON, *Clinical Program Director of the Kansas Sexual Predator Treatment Program*,

        Defendants.

**MEMORANDUM AND ORDER**

The plaintiffs are more than twenty individuals who have been involuntarily committed to the custody of the State of Kansas pursuant to the Kansas Sexually Violent Predator Act (KSVPA), K.S.A. § 59-29a01, *et seq*. Their First Amended Complaint alleges that the defendants are violating their right to due process under the Fourteenth Amendment by failing to provide minimally adequate treatment, by denying less restrictive confinement alternatives, and by subjecting them to conditions that amount to punishment. Dkt. 62. Plaintiffs seek to bring the claims on behalf of a class of similarly situated individuals. The matter is now before the court on defendants' motion to dismiss the action. Dkt. 76. For the reasons stated herein, the court finds the motion to dismiss should be granted.[1]

---

[1] The First Amended Complaint (Dkt. 62) superseded the 314-page initial complaint (Dkt. 1) with respect to all except one plaintiff, David Thayer. Thayer requested and was granted leave to proceed separately on the initial complaint. Dkt. 69. Despite being served with defendant's motion to dismiss (Dkt. 76 at 2; Dkt. 77 at 15), Thayer filed no response to the motion. Accordingly, the motion to dismiss is granted with

**I. Summary of complaint.**

The KSVPA created a civil commitment scheme for the long-term control, care, and treatment of sexual predators. When an individual meets the criteria of a sexually violent predator, the Attorney General may file a petition for commitment, followed by an evaluation of the individual at a state hospital. A civil trial may then be held to determine if the individual suffers from a mental abnormality or personality disorder that, if not treated, will make the person likely to engage in repeated acts of sexual violence. If the judge or jury finds beyond a reasonable doubt that the person presents such a risk, the individual is committed to the Sexual Predators Treatment Program (SPTP). Dkt. 62 at 6-7.

The SPTP is a seven-phase program. The first five phases are provided at Larned State Hospital (LSH). The last two phases, known as reintegration, are provided at other state hospitals. Residents who complete all seven phases are conditionally released from the program and into the community, where they are monitored by district courts for at least five years. After that, an individual is eligible for final discharge by a court.

Plaintiffs allege that as of December 2014, there were 243 individuals in the SPTP, but only three individuals have successfully completed the program, while 30 individuals have died during confinement. Plaintiffs claim there are a number of "systemic obstacles and impediments" to completion of the program. These include detainees receiving significantly less treatment than the 31.5 hours per week previously

---

respect to his claims as well. *See* D. Kan. R. 7.4(b) (where party fails to file brief, the court will consider and decide the motion as uncontested and will ordinarily grant it without further notice).

claimed by the State, with some plaintiffs reporting they only receive three hours of group therapy per week and one hour of individual therapy per quarter. Plaintiffs claim group therapy at LSH is overcrowded and has insufficient opportunities for improvement. They claim treatment-plan reviews take place every 90 days rather the 30 days promised in the program's Resident Handbook. They allege reviews are perfunctory and fail to provide accurate feedback, goals, and prognoses.

Plaintiffs contend that as a result of high turnover in staff, they have to continually start over with new therapists, causing delays in progress. They claim individuals who are eligible to transition to phases six and seven are prevented from doing so by a lack of available beds in reintegration facilities. They claim individuals who advance to the reintegration phases "are destined to fail because they have received inadequate treatment and instruction." They allege that individuals "are regularly demoted from one phase of the program to the preceding phase, arbitrarily." Additionally, they claim the SPTP fails to keep adequate records about treatment and progression and is therefore unable to effectively manage the program. Plaintiffs allege that during a required annual review to determine the risk of reoffending, the SPTP uses a test that was not designed to assess that risk.

Plaintiffs allege that defendants run LSH like a prison. Detainees who violate rules are allegedly locked in their rooms, injected with tranquilizers, placed in restraints, or placed in solitary confinement. Policies restrict possession of computers, furniture, bedding, religious items, recording devices, and craft items. Detainees are prohibited from moving freely around LHS, are subject to random searches of their

3

cells, have their phone calls monitored, and are not allowed to have cell phones or use the internet "even though such use would be highly regulated and not subject to abuse." Plaintiffs allege that about 40% of detainees in the SPTP have given up and stopped participating because "they will never receive adequate treatment and … have no realistic possibility of progressing through" the program.

Count I alleges that, contrary to due process, defendants' "failure to provide adequate treatment … has resulted in [plaintiffs'] indefinite confinement and substantially contributes to conditions of confinement so restrictive and indefinite as to be punitive." It alleges defendant have "failed to offer any minimally adequate treatment" and have "failed to exercise professional judgment" in setting and administering policies and treatment. It asserts that the treatment program "is so arbitrary and egregious as to shock the conscience."

Count II alleges that, contrary to due process, defendants ignore less restrictive facility and treatment options, impose unjustified and unreasonable means of confinement, and subject plaintiffs to conditions of confinement bearing no rational relationship to the legitimate objectives of the SPTP. It alleges that the restrictions on plaintiffs' liberty interests have a punitive effect and constitute inhumane treatment that shocks the conscience.

Count III similarly claims that defendants are violating plaintiffs' due process rights by adopting policies and operating LSH as a prison. Plaintiffs allege that detainees are effectively serving life sentences with "no legitimate therapeutic purpose"

to their confinement. Count IV makes clear that plaintiffs are asserting an "as applied" challenge to administration of the SPTP.

**II. Motion to Dismiss (Dkt. 76).**

Defendants argue plaintiffs fail to allege facts showing they receive treatment so inadequate that it constitutes a substantial departure from accepted professional judgment or shocks the conscience. Defendants argue the allegations show plaintiffs are in fact receiving treatment, although not at a level they would like, and that their allegations fail to overcome a presumption of validity attaching to the professional judgment of treatment providers. Dkt. 77 at 8-9 (citing *Burch v. Jordan*, No. 07-3236, 2010 WL 5391569 (D. Kan. Dec. 22, 2010), *aff'd*, 444 F. App'x 236 (10th Cir. 2011)). Defendants point out that a recent Eight Circuit case, *Karsjens v. Piper*, 845 F.3d 394 (8th Cir. 2017), rejected a similar challenge to Minnesota's treatment program, despite the fact Minnesota had no annual review of detainees and none of the 714 individuals committed since 1994 had successfully completed that program. Defendants contend there are no allegations of egregious, malicious, or sadistic conduct to satisfy the "shock the conscience" standard for a due procession violation.

Defendants also argue the complaint fails to show a violation of the right to "reasonably nonrestrictive confinement conditions" recognized in *Youngberg v. Romeo*, 457 U.S. 307 (1982). Defendants point out the State does not have to provide the best or least restrictive means available, and that a state has wide latitude in developing treatment programs for sexually violent predators. Dkt. 77 at 11 (citing *Kansas v. Hendricks*, 521 U.S. 346 (1997)). Defendants again argue there are no facts showing a

departure from accepted professional judgment in operation of the institution. Finally, defendants argue plaintiffs have failed to show that the KSVPA is being applied to them in a punitive manner.

### III. Standard.

Rule 12(b)(6) allows dismissal of a complaint where the facts alleged fail to state a claim to relief "that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. Complaints containing no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" may not survive a motion to dismiss. *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). All well-pleaded factual allegations in the complaint are accepted as true and viewed in the light most favorable to the plaintiff for purposes of determining whether the complaint states a plausible claim for relief. *Smith v. United States,* 561 F.3d 1090, 1098 (10th Cir. 2009). *See Cunningham v. Wichita State Univ.*, No. 6:14-CV-01050-JTM, 2014 WL 4542411, at *2 (D. Kan. Sept. 12, 2014), *aff'd*, 613 F. App'x 758 (10th Cir. 2015).

### IV. Discussion.

A. <u>Due process standards</u>. In *Kansas v. Hendricks*, 521 U.S. 346 (1997), the U.S. Supreme Court upheld the KSVPA against a due process challenge, noting the court had consistently upheld involuntary commitment statutes provided the confinement takes place pursuant to proper procedures and evidentiary standards. *Id*. at 358. The

6

Kansas Act requires evidence of past sexually violent behavior and a present mental condition that creates a likelihood of such conduct in the future absent incapacitation, which the Supreme Court found sufficient for due process purposes. *Id*. at 360. The court also rejected a claim that such a commitment was punitive, noting among other things that restricting the freedom of the dangerously mentally ill is a legitimate government objective, and the duration of confinement under the KSVPA was linked to the stated purposes of confinement – that is, "to hold the person until his mental abnormality no longer causes him to be a threat to others." *Id*. at 363.

In *Youngberg v. Romeo*, 457 U.S. 307 (1982), the Supreme Court addressed the substantive due process rights of an individual with a mental disability who was involuntarily committed to a state institution. The court recognized that despite the commitment, the person retained "constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests." *Id*. at 324.

These liberty interests "are not absolute; indeed to some extent they are in conflict." *Id*. at 320. An institution cannot protect its residents from violence if it allows them complete freedom of movement. *Id*. In determining whether a due process right has been violated, "it is necessary to balance 'the liberty of the individual' and 'the demands of an organized society.'" *Id*. (citation omitted). This means involuntarily committed persons "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Id*. at 321-22. But it does not amount to a "compelling" or "substantial" necessity test,

7

which would place an undue administrative burden on the state and unnecessarily restrict the exercise of professional judgment as to the needs of residents. *Id*. at 322. Rather, due process requires "minimally adequate training," which is training that is reasonable in light of the person's liberty interests. *Id*. In determining what is reasonable, courts "must show deference to the judgment exercised by a qualified professional." *Id*. at 322. There is no reason to think judges or juries are better qualified than professionals to make such judgments, so decisions of professionals are presumptively valid. *Id*. at 323. Liability may be imposed "only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id*.

Courts have adapted the *Youngberg* standards to persons committed on account of sexually violent behavior. *See e.g., Burch v. Jordan*, No. 07-3236, 2010 WL 5391569 (D. Kan. Dec. 22, 2010). The rights of such persons "cannot be coextensive with civil committees like the plaintiff in *Youngberg*" because "[t]here are institutional and societal interests at stake in the protection of society" from violent sexual predators. A restrictive condition may be imposed upon such persons without being considered punishment if "it bear[s] some reasonable relation to the purpose for which persons are committed." *Id*. (citation omitted). *See also Jackson v. Indiana*, 406 U.S. 715, 738 (1972) ("due process requires that the nature … of commitment bears some reasonable relation to the purpose for which the individual is committed."). And in light of the purposes behind commitment under the KSVPA, conditions of confinement "cannot give rise to a

8

due process violation unless those conditions constitute 'atypical and significant hardship on [a resident] in relation to the ordinary incidents of [confined] life." *Burch*, 2010 WL 5391569, at \*14. Additionally, in evaluating treatment and other conditions of confinement, the court employs the professional judgment standard of *Youngberg*. The court balances the individual's interests and the State's interests "to insure that there is minimal interference with the internal operations of the State's institution, by considering any decision by a professional of that institution to be 'presumptively valid,' rendering violative only those decisions that are 'a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.'" *Id*.

B. <u>Inadequate treatment allegations</u>. Plaintiffs contend the treatment they receive is constitutionally inadequate. Dkt. 83 at 10. They argue "the utter dearth of individualization in treatment plans for detainees not only fails the recommended, standard professional judgment, it also belies a lack of exercise of any judgment whatsoever." *Id*. Defendants allegedly apply a "one size fits all" approach regardless of a detainee's mental or physical characteristics. Defendants also allegedly generate evaluations with "canned language," use treatment plans that are "perfunctory," and offer "inadequate" group and individual therapy. *Id*. at 11.

Under *Youngberg* and its progeny, treatment violates plaintiffs' due process rights only if it represents a substantial departure from "accepted professional judgment, practice or standards" to a degree that demonstrates the person responsible "actually did not base the decision on [professional] judgment." The amended

9

complaint parrots that standard and claims various aspects of plaintiffs' treatment fall below it. But under *Twombly* and *Iqbal*, simply labeling the treatment "inadequate" or a "departure from standards" is not enough to withstand a motion to dismiss. Plaintiffs' allegations in Count I largely consist of such labels. They fail to identify the accepted standards or practices from which defendants have allegedly deviated. They allege that "defendants' failure or refusal to provide adequate treatment" results in indefinite confinement (Dkt. 62, ¶ 71), that defendants "have failed to offer minimally adequate treatment" and "have failed to exercise professional judgment" in setting policies (¶ 72), and that defendants offer a treatment program that is "arbitrary and egregious" (¶ 72). These are mere conclusions unsupported by underlying factual allegations showing a substantial departure from accepted standards. *See e.g., Sciarrillo ex rel. St. Amand v. Christie*, 2013 WL 6586569, *7 (D.N.J. Dec. 13, 2013) ("sweeping legal conclusions derived from *Youngberg*" are insufficient to state a valid claim).

The mere allegation that defendants require all sexually violent predators to complete the same treatment program does not, without more, establish a departure from professional standards. Even assuming more individualized treatment is common or is generally preferred by treatment professionals, that fact alone would be insufficient to show a violation of due process.[2] *Allison v. Snyder*, 332 F.3d 1076, 1081

---

[2] In their response, plaintiffs cite a 2015 audit report by a legislative committee. Dkt. 83-1. The report mirrors several allegations in the amended complaint, including criticism of the SVTP for providing insufficiently individualized treatment. Dkt. 83-1 at 17. The court does not consider materials outside the pleadings in a motion to dismiss under Fed. R. Civ. P. 12(b)(6), so the report does not cure the deficiencies in the complaint. Moreover, the court notes the audit report appears to be based on a survey of only three other states, as well as what the audit committee considered "best practices" under its own review of sex offender treatment studies and guidelines. Even if the court were to consider this report as part of

(7th Cir. 2003) ("As for plaintiffs' contention that treatment must be tailored to each individual rather than administered to groups: one court of appeals has said this (without explanation) … but what *Youngberg* held two years later is that (a) committed persons are entitled to some treatment, and (b) what that treatment entails must be decided by mental-health professionals."). *Cf. Hendricks*, 521 U.S. at 368, n.4 ("States enjoy wide latitude in developing treatment regimens.").

Plaintiffs also complain that under policies created by defendants, detainees "have no realistic chance of progressing through the SPTP and instead remain in state custody for life." Dkt. 62 at ¶ 71. But plaintiffs have no constitutional right to "a realistic chance" of being discharged from the State's program. *Cf. Hendricks*, 521 U.S. at 366 (noting that even if treatment is not possible, "we have never held that the Constitution prevents a State from civilly detaining those for whom no treatment is available, but who nevertheless pose a danger to others."). *See also Burch*, 2010 WL 5391569, at *16 ("Plaintiff's primary complaint … is that his treatment is inadequate to ensure his eventual release. Such treatment is not guaranteed under the Constitution."). Moreover, the complaint elsewhere alleges that three individuals have in fact successfully completed the program. The complaint also shows that the State provides some group and individual therapy as part of the program, it provides a treatment plan review every 90 days and does a risk assessment on an annual basis, and some of the plaintiffs have advanced to the latter stages of reintegration. Plaintiffs fail to explain why or how

---

plaintiffs' allegations, it does not allege or purport to show that the Kansas program was such a departure from accepted standards that it reflects an absence of professional judgment. Additionally, the report indicates that "the agency has made several program and process changes since [the] audit work was conducted…." Dkt. 83-1 at 58.

11

such treatment is a substantial departure showing a complete lack of professional judgment. *Allison*, 332 F.3d at 1081 ("The Constitution does not command state officials to follow the majority view of a given professional association. Plaintiffs have not supplied any reason for us to conclude that the choices made by Illinois are so far outside the bounds of professional norms that they must be equated with no professional choice at all."). The amended complaint shows nothing beyond disagreement or dissatisfaction with the current treatment program. *See Burch*, 2010 WL 5391569, at * 17 ("the Complaint simply fails to provide sufficient detail to overcome the presumptive validity of the obviously professional nature of judgments regarding the nature, type and scope of plaintiff's treatment plan…."). Plaintiffs must allege both an accepted standard of treatment and conduct that substantially deviates from it. That is not to say plaintiffs must cite or produce their evidence at this stage, but merely labeling the treatment program as inadequate or a deviation from unspecified standards is insufficient to state a plausible claim.

C. <u>Denial of less restrictive alternative confinement</u>. Count II of the amended complaint alleges defendants are violating plaintiffs' due process rights by ignoring "less restrictive facility and program options" and imposing "unjustified and unreasonable means of confinement" that bear "no rational relationship to the legitimate objectives of the SPTP." Dkt. 62 at 14.

The allegation that defendants have failed to adopt less restrictive alternative conditions does not state a claim for violation of due process. Plaintiffs "may be correct that the institution could address its security interests with a more tailored policy, but

that is not the test." *Beaulieu v. Ludeman*, 690 F.3d 1017, 1033 (8th Cir. 2012) (quoting *Thielman v. Leean*, 140 F.Supp.2d 982, 992 (W.D. Wis. 2001), *aff'd*, 282 F.3d 478 (7th Cir. 2002)). "[N]othing in *Youngberg* suggests that the choice made by the institution must have been the least restrictive alternative available." *Id*.

Due process does require that the conditions and duration of confinement bear some reasonable relation to the purpose for which persons are committed. *Allison*, 332 F.3d at 1079 (citing *Seling v. Young*, 531 U.S. 250, 265 (2001)). Count II claims defendants have imposed conditions bearing no such relation, but it fails to specify the conditions. Dkt. 62 at 14. Elsewhere the complaint alleges that defendant have policies restricting ownership of computers and other personal items; prohibiting detainees from moving freely about LSH; placing detainees in restraints when they leave LSH; monitoring detainees' phone calls and communications; not allowing detainees to have cell phones and internet access; and providing limited vocational opportunities. Dkt. 62, ¶ 60.

Persons who are involuntarily committed in civil proceedings are entitled to more considerate treatment and conditions of confinement than prisoners whose conditions are designed to punish. *Youngberg*, 457 U.S. at 321-22. But "sexually violent predators like other civil detainees and prisoners are unquestionably subject to security measures typically employed by corrections officials." *Merryfield v. Schearrer*, 2008 WL 4427656, *3 (D. Kan. Sept. 25, 2008) (citing *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)). "Thus detainees may be subjected to conditions that advance goals such as preventing escape and assuring the safety of others, even though they may not be punished." *Allison*, 332 F.3d at 1079. To establish that a particular condition or restriction of confinement is

13

impermissible punishment, a detainee must show either that the condition was (1) imposed with an expressed intent to punish, or (2) it was not reasonably related to a legitimate governmental objective, in which case an intent to punish may be inferred. *Matherly v. Andrews*, 859 F.3d 264 (4th Cir. 2017).

Each of the conditions alleged by plaintiffs to be punitive and unreasonable has been upheld in one form or another as a restriction on liberty reasonably related to legitimate institutional concerns or the safety and treatment of civil detainees. *See Matherly*, 859 F.3d at 264 ("random mass shakedowns, which involve a search of detainees' living quarters for contraband," having less vocational courses than prisoners, and monitoring detainee communications were policies reasonably related to legitimate interests of maintaining institutional safety, rehabilitating civil detainees, and protecting the public); *Wean v. Budz*, 589 F. App'x 488, 490 (11th Cir. 2014) ("the use of the small black box over handcuffs on sexually violent predators during trips outside of [the institution] does not impose an additional restriction so significant that it amounts to a deprivation of a protected liberty interest"); *Beaulieu v. Ludeman*, 690 F.3d 1017, 1031-33 (8th Cir. 2012) (upholding policy of placing civil detainees in full restraints whenever being transported); *Aruanno v. Corzine*, ___ F. App'x ___, 2017 WL 1479286 (3rd Cir. 2017) (program imposing sanctions for misconduct was reasonably related to institutional goals of security and treatment); *Robinson v. Scaturo*, 2017 WL 2628005, *4-5 (D.S.C. June 5, 2017) (taking away computer access, frequent lockdowns, and imposing sanctions for rules violations were reasonably related to legitimate interests); *Herrick v. Quigley*, 2016 WL 7324288, *8 (W.D. Wash. Nov. 2, 2016) (restricting computer use was

reasonably related to treatment goals of sexually violent predator); *Allen v. King*, 2016 WL 4386186 (E.D. Cal. Aug. 16, 2016) (regulation prohibiting computers, cell phones and other devices was reasonably related to legitimate interests); *Gilmore v. Kansas*, 2004 WL 2203458, *5 (D. Kan. Sept. 27, 2004) (restriction on movement in facility reasonably related to legitimate governmental interest).

The above case and others show the restrictions plaintiffs object to – *e.g.*, being restrained while transported, being subjected to random searches, and being prohibited from having cell phones and using the internet – often bear an obvious relationship to legitimate objectives of treatment for violent sex offenders and to institutional security. Plaintiffs have added a few modifiers to bolster their claims, such as alleging that defendants' searches are "unreasonable and excessive," and defendants unreasonably deny cell phone and internet use "even though such use would be highly regulated and not subject to abuse." Dkt. 62, ¶ 60. These allegations are conclusory, however, and the court is not bound to accept them as true. *Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). If the allegations in a complaint "are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). Absent specific factual allegations showing defendants' conditions are excessive or unwarranted under their treatment program and the particular circumstances of confinement at LSH, plaintiffs' amended complaint fails to state a claim upon which relief can be granted.

15

D. <u>Conditions amounting to punishment</u>. Count III alleges that LSH "is effectively a prison" and that plaintiffs are "effectively prisoners serving life sentences" under restrictions for which "[t]here is no legitimate therapeutic purpose." As stated previously, due process forbids the imposition of conditions amounting to punishment on persons who are civilly committed. But for the same reasons previously expressed, the court finds the allegations in Count III of the amended complaint are insufficient to state a valid claim for violation of this right. *See Allison*, 332 F.3d at 1079 ("Does placement in a prison, subject to the institution's usual rules of conduct, signify punishment? The answer, given by [*Bell v. Wolfish*] is no. *Wolfish* held that pretrial detainees, who like civil committees may be held for security reasons but not punished, may be assigned to prisons and covered by the usual institutional rules, which are designed to assure safety and security."). Merely labeling the conditions as punitive or unwarranted, without accompanying allegations showing a plausible factual basis for such a finding, is insufficient to withstand a motion to dismiss.

**IT IS THEREFORE ORDERED** this 17th day of July, 2017, that defendants' motion to dismiss (Dkt. 76) is GRANTED. The action is hereby dismissed for failure to state a claim upon which relief can be granted.

Plaintiffs' Motion to Certify Class (Dkt. 73) is DENIED as moot.

                                                  ___s/ J. Thomas Marten_____
                                                  J. THOMAS MARTEN, JUDGE